M54TMELC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        20 CR 314 (GHW)

5   ETHAN MELZER,

6              Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        May 4, 2022
9                                       10:00 a.m.

10

    Before:
11
                   HON. GREGORY H. WOODS,
12
                                        District Judge
13

14                    APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    MATTHEW HELLMAN
17  SAMUEL ADELSBERG
         Assistant United States Attorneys
18
    FEDERAL DEFENDERS OF NEW YORK
19       Attorneys for Defendant
    JONATHAN MARVINNY
20  HANNAH McCREA

21

22

23

24

25
```

M54TMELC

```
 1          (Case called)

 2          LAW CLERK:  Counsel, please make your appearances for

 3   the record.

 4          MR. HELLMAN:  Good morning, Matthew Hellman and Sam

 5   Adelsberg for the United States.

 6          THE COURT:  Thank you.

 7          MR. MARVINNY:  Good morning, your Honor, Federal

 8   Defenders of New York by Jonathan Marvinny and Hannah McCrea

 9   for Mr. Melzer.

10          THE COURT:  Thank you very much.  Good morning.

11          First, thank you all for being here.  We're here for a

12   final pretrial conference with respect to this matter.  There

13   are a number of things that I have on the agenda for this

14   morning's conference.  I would like to lay out my agenda and

15   then to turn to the parties to ask if there's anything that you

16   would like me to add to that agenda and then to begin our work.

17          So what I would like to begin with is a discussion of

18   trial logistics, then I want to talk about the jury selection

19   process.  I hope to discuss something about the charging

20   process and the jury instructions briefly.  I hope to provide

21   some notes about trial practice generally, witnesses and

22   exhibits, and then I hope to turn to a discussion of the

23   parties' motions in limine.  That's my agenda for the

24   conference today.

25          Counsel, is there anything else that any of you would
```

1    like to raise apart from those issues, first, counsel for the

2    United States?

3              MR. HELLMAN:  No, thank you, your Honor.

4              THE COURT:  Counsel for defendant?

5              MR. MARVINNY:  Your Honor, only that I think it might

6    make sense for the Court to set a schedule for disclosures

7    going forward as to things like the government's trial

8    exhibits, 3500 material, things like that.  I'm not asking the

9    Court, as we had not raised this in advance, to set that

10   schedule today, and perhaps the parties could confer, but I

11   would like to place on the record that I do believe some

12   schedule for remaining disclosure should be set in the near

13   future.

14             THE COURT:  Thank you.  I'm happy to take that up.

15             Very good.  So let's start with some brief discussion

16   of trial logistics.  As you know, counsel, in my March 4, 2022

17   order I scheduled trial to begin on July 5, 2022, at 9:00 a.m.

18             Now the parties know how the Court is going about the

19   process of selecting trial dates as a result of the Covid-19

20   pandemic.  We have not yet submitted our request for what are

21   quarter three trial slots, but I will do so.  My hope is that

22   we will get trial date on July 5.  I will let you know as soon

23   as I know that the final trial date has been confirmed.

24             You also know most likely that criminal trials have

25   been conducted in courtrooms other than ones like this but

M54TMELC

1    rather in the large courtrooms upstairs.  So I will let you

2    know not only when the courtroom has been determined but also

3    the specific date and time, to the extent it's different from

4    the July 5 date that I noted in my order.

5                As a matter of trial practice, my trial days will

6    begin each day at 9:00 a.m., including the first day.  I don't

7    know when the jury panel will arrive on any given day, maybe as

8    late as 10:00, it may be later than that.  You should still

9    arrive at 9:00 a.m. on the first day.  We'll use that time

10   early in the day to discuss any outstanding issues before the

11   venire arrives.

12               Each day will begin at 9:00 a.m.  You should be here

13   before that so we can begin on time.  I will plan to take the

14   bench each day at 9:00 a.m.

15               I expect that we'll be beginning testimony around

16   9:15 a.m. and we'll use the window from 9:00 a.m. to 9:15 a.m.

17   to discuss any outstanding issues that you anticipate for the

18   day ahead.  You should expect again that I'll be telling the

19   jury that they can expect that testimony will begin at 9:15.  I

20   will be asking them to arrive at 9:00, and I'll tell them if

21   we're ready, we can get started as soon as they are all

22   convened.

23               We'll take a short lunch break around 11:30.  I'll try

24   to keep that lunch break as short as possible.  If I can, I'm

25   going to try to keep it to half an hour.  We'll try to

1   recommence testimony appropriately at noon.  The principal

2   variable here is whether and to what extent the jurors need to

3   commute from the courtroom where we'll be conducting the trial

4   to a place where they can eat safely given our Covid restraints

5   that may be in place.

6            The trial day will continue until no later than

7   4:00 p.m. on each day after the first day.  I expect we will

8   work until at least 5:00 p.m. on the first day, however long it

9   takes, and the jurors are willing to give us, in order to

10  complete jury selection.

11           I expect to tell the jury that I am going to try to

12  excuse them by 3:30 on days after the first day.  I will tell

13  them in any event they will be excused no later than 4:00 p.m.

14  We'll take short breaks during the course of the day, including

15  the afternoon, as needed.

16           This schedule may need to change as a result of Covid.

17  During Covid, as a result of our protocols, at times the Court

18  has assigned approved blocks of trial time.  My hope is that

19  will not recur, but if health conditions require, I may need to

20  change this default schedule.

21           In any event, counsel, each of you should be prepared

22  to be in the courtroom from 9:00 to 5:00, at least, each trial

23  day, but you can expect that we'll finish the trial day before

24  5:00.  I tend to schedule other matters in the window following

25  4:00 p.m. on trial days.

M54TMELC

1          Now during the window from 9:00 a.m. through 9:15 when

2     testimony begins, we'll have the opportunity to discuss any

3     legal or evidentiary or other issues that you anticipate will

4     arise during the course of the trial day.  I ask that you

5     confer about the exhibits that you anticipate you'll be

6     introducing into evidence on any trial day and anticipate any

7     objections.

8          My hope is that you will be able to raise or preview

9     such objections with me before the jury is brought in for the

10    day.  My hope and expectation is that we will, to the extent

11    possible, discuss evidentiary issues that can be anticipated

12    before the trial day begins outside of the hearing of the jury

13    so we can move along as efficiently as possible and use the

14    jurors' time wisely.

15         Counsel, as you know, counsel must obtain permission

16    to bring certain electronic devices into the courthouse during

17    trial.  The application for permission is found on the Court

18    website.  Counsel, to the extent that you need such an order,

19    you should make an application within the week prior to trial.

20         As you all know, the courtrooms are equipped with

21    audiovisual equipment.  I'm sure that you're all familiar with

22    it.  I recommend nonetheless that you or your paralegals make

23    arrangements with my courtroom deputy, Ms. Joseph, to come in

24    and test any equipment that you may plan to use before the

25    trial begins so that the jury does not see you struggling with

M54TMELC

| 1 | the technology.  Again, my hope is to use their time as

| 2 | efficiently as possible.

| 3 | Counsel, just as a point of information, do either of

| 4 | you anticipate that any of the witnesses will require the

| 5 | services of an interpreter here?

| 6 | Counsel first for the United States?

| 7 | MR. HELLMAN:  No, we don't so anticipate.

| 8 | THE COURT:  Thank you.

| 9 | Counsel for defendant?

| 10 | MR. MARVINNY:  No, your Honor.

| 11 | THE COURT:  Thank you.

| 12 | So let me just say a few words about the jury

| 13 | selection process.  My process is the same as that of most of

| 14 | my colleagues here, we'll be using the struck panel method.

| 15 | Basically here's how that works, we will select 32 people, my

| 16 | hope is that we'll be able to choose jurors who should not be

| 17 | excused for cause so that you have the full pool of 32

| 18 | individuals against whom you will be able to exercise your

| 19 | peremptory challenges.

| 20 | When the venire arrives, and I want to just caveat

| 21 | this with a comment that we'll talk about in a moment about how

| 22 | jury selection will take place, but when the venire arrives or

| 23 | when I present them with the information regarding the case, I

| 24 | will provide them with a short introduction to the jury

| 25 | selection process.  I expect that that overview will include a

M54TMELC

description of the case.  I have reviewed the proposed case

description that the parties have provided to me in your

February 1 letter.  That's acceptable to me, and I expect to

use it.

What I would like to talk about now is about the voir

dire process generally.  I have reviewed the parties' proposed

voir dire questions.  I have assembled a series of voir dire

questions based on your proposals.  What I wanted to discuss,

however, before circulating my proposals with respect to the

voir dire questions is the following:  The question that I have

is whether or not this is a case in which a questionnaire

approach would be appropriate, in other words, whether we

should submit a questionnaire with the baseline voir dire

questions to prospective jurors rather than inquiring of them

in the first instance live.

I won't overview the voir dire process, although I am

happy do so if you would like me to do so.  If so, do so,

otherwise I will assume that you have some familiarity with the

process.  Again, if that is an incorrect assumption or you

think you benefit from further comment by the Court on how that

process would work, please don't hesitate to let me know.

My question basically is whether or not this is a

case, given the nature of the issues presented, the anticipated

duration of the trial, and any other factors that you would

like to bring to my attention where a questionnaire would be an

M54TMELC

1    appropriate approach to assist us in the jury selection

2    process.

3         Let me hear first from the government, what do you

4    think?

5         MR. HELLMAN:  Thank you, your Honor.  The government

6    isn't making that request, but the case does, of course,

7    involve a number of sensitive issues.  I don't anticipate that

8    the length of the trial will be a persuasive factor in

9    determining whether a questionnaire is needed.  I don't think

10   the parties anticipate a very lengthy trial, but given the

11   nature of the materials, we would not oppose questionnaires

12   being used in the process.

13        THE COURT:  Thank you.  Do you think it would be

14   helpful?  What's your view?  I appreciate you don't oppose it,

15   what's your feedback, will it be helpful or not helpful?

16        MR. HELLMAN:  I think that it could be helpful.

17        THE COURT:  Thank you.

18        Counsel for defendant, what's your view?

19        MR. MARVINNY:  Your Honor, I think our view is largely

20   the same.  We hadn't made the request, but upon considering it

21   now, I do think it could be helpful.

22        THE COURT:  Thank you.

23        So let me propose this then, I will send you

24   essentially what I was planning to send you in any event, which

25   is a series of voir dire questions formulated in a way that I

M54TMELC

1    typically would if I were to administer the questions live.

2             As is my practice, and is often the custom here, the

3    questions are formulated to request, I'll call it yes/no

4    answers to certain of the questions in the ordinary course were

5    we to not use a questionnaire.  I would ask Juror No. 1 all the

6    questions out loud with all the jurors having the full set of

7    questions in front of them, I would then ask each subsequent

8    juror, Juror No. 2, et cetera, whether or not they had any yes

9    answers to any of the questions, and drill down based on the

10   nature of their responses.

11            So I will send those to you, and we have some time, so

12   what I ask you to do is to look at those and to let me know two

13   things, one, whether you think that we should proceed using a

14   questionnaire, and if so, I expect that I will ask that you

15   help the Court to reformulate the questions as presented so

16   that they can be presented to the panel in the form of a

17   questionnaire.

18            As you know, a questionnaire requires, I'll call it a

19   substantial amount of coordination between us, and that is you

20   and me and the jury department, so there are some procedural

21   complications involved in using a questionnaire.  They don't

22   necessarily outweigh the potential benefits of it, but I just

23   want to raise them for you.

24            Where I used a questionnaire in the past, it requires

25   prospective jurors to come in advance of trial to fill out the

M54TMELC

1    questionnaire, then you, counsel, have to review the

2    questionnaires.  After you've reviewed the questionnaires, you

3    will let me know whether and to what extent there are any

4    jurors that fit into any of the three categories that I'm about

5    to describe, broadly speaking: (1), those for who there is no

6    justification, the parties agree there is no justification for

7    a for cause excuse; (2) those who the parties agree should be

8    excused for cause based on the nature of their responses; and

9    (3) the group of prospective jurors as to whom there is some

10   difference of opinion regarding whether or not the responses

11   merit a for cause excuse.

12            In the past what I have then done is held a conference

13   with the parties to discuss the last of those three categories,

14   namely whether or not the responses justify a for cause excuse

15   on the face of those responses.  To the extent that I conclude

16   that on the face of the responses the for cause excuse is

17   appropriate, then we would make a determination based on the

18   voir dire responses.  To the extent I'm unable to resolve that

19   issue based on the responses and the questionnaires by

20   themselves, we then may need to bring in those people,

21   depending on the parties' views about the appropriate process,

22   to conduct further in-person examination of the people.

23            In order to make a determination counsel would need to

24   identify which prospective jurors fit into each of those three

25   categories in a relatively short period of time.  We would need

M54TMELC

1    to hold our conference and identify those prospective jurors

2    who we would then bring in for examination, prior to Covid it

3    would be the following Monday.  Here I expect it will be the

4    July 5 date, which I'm hoping would be our trial date.  So the

5    questionnaire would be submitted to the prospective jurors the

6    week before the prospective trial date.

7          So I want you to have at least an overview of what I

8    understand the process to be -- likely to be.  This is the

9    process in essence that we used prior to Covid.  I'm frankly

10   not familiar with whether and to what extent that's been

11   modified as a result of Covid-related protocols.

12         So I will send you the voir dire questions framed in

13   the way that I typically would, and I will ask you to let me

14   know whether, understanding the nature of the questionnaire

15   process, you think that it's appropriate for us to do this

16   using a questionnaire.  And then also, to the extent that you

17   believe that's the case, I expect that I will charge the

18   parties with reformulating the questions that I'm going to be

19   sending to you in the frame of a questionnaire that could be

20   provided to prospective jurors for the benefit of the

21   government and the defense.  I think the most recent case that

22   I did involving questionnaires was *United States v. Richardson*,

23   before that I think I used it in the *United States v. Reichberg*

24   case, just as touchstones.  I'm happy to learn about others'

25   processes and hear about other ways to structure the

M54TMELC

1    administration of a questionnaire if you would like to proceed

2    in that way.

3              So one thing I want to make clear, and we'll talk

4    about this when I come to the motions in limine, my expectation

5    will be, for the reasons that I'm going to articulate I expect

6    when I respond to the motions in limine, that I will ask

7    follow-up questions for voir dire.  My expectation is that each

8    of the parties will have the opportunity to do so as well, so

9    you have the opportunity to suggest additional questions for me

10   to ask prospective jurors.

11             If I don't specifically ask you during the voir dire

12   process if you have additional questions, please just let me

13   know that you have follow-up questions.  I'm happy to consider

14   additional follow-up questions, and to ask those that we all

15   think are appropriate.  So please just let me know if you have

16   follow-up questions with respect to any questions for any

17   prospective juror.  I ask that you do so in a way that doesn't

18   highlight to the prospective juror that you had the question,

19   instead you can raise it with me at sidebar or otherwise so

20   that I can consider the potential question.

21             After jury selection has been completed -- let me say

22   one other word about my jury selection process so that you're

23   not surprised by it.  My experience has been that I end up

24   conducting a substantial portion of the voir dire at sidebar.

25   That's not a rule, but oftentimes the questions require

M54TMELC

1    responses that I think jurors would be most candid in answering

2    or providing at sidebar.  So that you're aware of it, I think

3    there's a decent likelihood that a substantial portion of the

4    voir dire process may take place at sidebar, which allows us to

5    have more detailed engaged conversation with each of the

6    prospective jurors out of the hearing of their fellows.

7           Counsel, after jury selection has been completed by

8    whatever process we ultimately land upon, and I will set a

9    schedule for that in a moment, I expect to provide the jurors

10   before we begin with opening statements with basic instructions

11   about the trial process, the roles of the Court, the parties

12   and the jury, as well as a brief description of the burden of

13   proof.

14          As part of those introductory remarks, I would like to

15   read prospective jurors an overview of the law really to give

16   them a sense of the kind of issues they're going to be asked to

17   decide at the close of evidence.  I tell them when I provide

18   them with such an overview of the law that applies to the

19   charges that the overview is subject to the final charges which

20   govern their deliberations.  I understand from the social

21   science it can be helpful for jurors to have some schema

22   through which to look at the evidence prior to the

23   instructions.  I don't universally do this, but it can be

24   helpful, particularly if the parties can provide an agreed-upon

25   proposed summary description of the law which I requested of

M54TMELC

1      the parties.

2            Can I hear, counsel, if you think that you would be

3      able to present to the Court a summary overview of the law to

4      provide to the selected jurors before opening statements?

5      Again, this is not intended to be a complete charge, but

6      something to help them understand what it is that they're going

7      to be asked to ultimately decide.

8            Counsel for the government?

9            MR. HELLMAN:  Thank you, your Honor.  I believe the

10     parties did or attempted to do so and to submit that proposal

11     jointly.  I believe the government submitted it along with its

12     first round of motions in limine briefing.  There was a fair

13     amount of briefing in the case and attachments submitted by

14     both parties, so what I propose is that we'll check on our end

15     and resubmit them today if for some reason we failed to

16     sufficiently convey it to the Court in the past.

17           THE COURT:  Thank you.  If I missed it, that's fine, I

18     would find that out shortly.  So let's move along.

19           Let me hear from each of you a little bit about the

20     charge itself.  Let me tell you what my process is.  Any

21     expectation is we'll, of course, have a charging conference at

22     some point during the trial.  My hope is to provide you with my

23     draft charge as soon as I have the draft ready for you to

24     review.  My hope is that I'll be able to get you a proposed

25     draft of the charge before trial begins or very early during

1    the trial.  My hope in sending you my proposed charge early is

2    that we'll be able to take advantage of any afternoon after the

3    beginning of the trial to conduct the charging conference.

4          I understand that at that point there will be certain

5    issues that will not be resolved, so I expect, for example,

6    that my charge would provide you with alternative charges, one

7    for if the defendant testifies, one for if he chooses not to

8    testify.  And I may also include other, I'll call it optional

9    versions of charges, and I will ask for your views regarding

10   the language of those charges in the event that we ultimately

11   use them.

12         So in any event, my hope is that we'll be able to do

13   much of the substantive work of the charge prior to the end of

14   trial.  My hope is that we can do that so that the process will

15   be less difficult as we get toward the end of the trial itself

16   so that the charge can be clearly established well before

17   closing arguments.

18         Just so that you know, I read the charge to the jury,

19   but I also provide the jury with a written copy of the charge

20   for them to review as I am instructing them for them to take

21   with them to the jury room.  I instruct them that they can read

22   along if they like or just to listen to me.

23         So counsel, I have looked at the proposed jury

24   charges.  I don't want to engage in a substantial conversation

25   about them now.  I understand that the government may be

M54TMELC

1   planning to dismiss certain of the counts in the indictment, so

2   I would like to talk about that now.

3          Counsel for the United States, anything that you can

4   tell me?

5          MR. HELLMAN:  Yes, thank you, your Honor.  The

6   government has determined and notified Court and counsel that

7   it does not intend to proceed on one count in the superseding

8   indictment, that is the count charging violations of Title 18,

9   Section 956, and my recollection is that is what is currently

10  Count Six in the superseding indictment.

11         I have spoken to counsel about paths forward, so I

12  think the parties will confer, there may be agreement on a

13  trial indictment that would eliminate that count and renumber

14  the two counts which are currently Seven and Eight which

15  follow, to make them Six and Seven with no other amendments to

16  the document.

17         And so my proposal would be that we continue to confer

18  on that and either present that document to the Court, I think

19  that could be accomplished within not more than two weeks.  If

20  there is not agreement, then I think the most likely path

21  forward is that the government would obtain a superseding

22  indictment that did not include that charge.

23         THE COURT:  Thank you.

24         Counsel for defendant, what's your view?

25         MR. MARVINNY:  As I told the government before the

1   conference today, my instinct is that we would be able to agree

2   to some amended or -- I guess it's not redacted, it's an edited

3   version of the indictment that simply advances Counts Seven and

4   Eight forward.  If there are no other changes to the

5   indictment, I don't think that would be objectionable from our

6   standpoint.  I would like a little bit longer and think about

7   it for a final answer, but that's my instinct.

8           THE COURT:  Thank you.  That's helpful.

9           MR. HELLMAN:  Your Honor, if I could make one more

10   comment, I want to make something clear.  By eliminating Count

11   Six, we have also indicated that we will also remove Title 18,

12   United States Code, Section 956, as a predicate crime for what

13   is Count Five, providing material support to terrorism.

14           So that would be another change that would be

15   reflected in the amended document, and just so that it's clear.

16           THE COURT:  Thank you very much, I appreciate that.

17           Yes, I would ask the parties to meet and confer about

18   whether or not you can agree on a trial indictment, which would

19   be one that would set forth those charges as to which the

20   government expects to move forward.  I understand that the

21   government would move to dismiss Count Six.

22           Very good.  Thank you very much.  I'm somewhat

23   disappointed that I won't have the opportunity to take up the

24   interesting issue raised with respect to Count Six.

25           So let me talk a little bit about trial practice

M54TMELC

1    during Covid.  I don't know, again, where it is that we're

2    going to be conducting the trial.  My expectation is that we'll

3    be doing it in one of the large courtrooms upstairs.  I assume

4    that, counsel, you have been in those courtrooms and perhaps

5    you have had the opportunity to try cases there during the

6    pandemic.  You know that they're set up with plexiglass boxes

7    for witnesses and for counsel.

8           While our Covid-related constraints have been

9    significantly reduced recently, my expectation will be that

10   during trial, assuming that we're in one of those rooms, that

11   everyone will wear a mask except in one of those plexiglass

12   encased spaces.  The existing Covid protocol require that all

13   individuals, including jurors in public spaces, wear N-95,

14   KN-95 or KF-94 masks at all times except for me when I'm

15   speaking from the bench, witnesses while testifying, and

16   attorneys while speaking from a podium in a courtroom.  So you

17   should expect that we'll be following those rules during the

18   course of trial, and witnesses who will be testifying will be

19   wearing a mask until they sit down in the witness box.  And

20   counsel, you should wear a mask until you take the podium.

21          You should not make what I call a talking objection or

22   a speaking objection during the course of trial.  I don't think

23   those are appropriate.  You should state the objection and the

24   basis for it briefly, for example, objection, hearsay,

25   objection, foundation; so the objection and a single word or

1    phrase statement for the basis for the objection.

2           I don't accept lengthy objections that are

3    communicating your view regarding the evidence to the witness

4    or to the jury.  If I need more information about the nature of

5    the objection, I will ask for it and we'll talk about it at

6    sidebar or I'll excuse the jury.  I don't like to engage in

7    that kind of colloquy in front of the jury.  I think that it's

8    a bad use of their time and I think it's improper for counsel

9    to make objections that are designed to influence the jurors or

10   to instruct the witness through lengthy colloquies associated

11   with objections.

12          If you think that I don't understand the basis for an

13   objection, you should feel free to let me know that you would

14   like to have a sidebar, so if you want to engage in a lengthier

15   colloquy about the basis for the objection, please feel free to

16   ask for a sidebar.  I'm happy to hear from you in more depth

17   about the basis for an objection as a general matter, but

18   please ask for a sidebar and we can discuss the issue at

19   sidebar during a break in the testimony.  So please abide by

20   that instruction.

21          Now during the course of the trial, it's my

22   practice -- and it was my practice before Covid -- to ask

23   counsel to ask my leave to approach witnesses to show any given

24   witness an exhibit or a document.  Your request and my response

25   should just become a matter of the routine.  I think this is

M54TMELC

particularly true during Covid.  My expectation as a general

matter is that you should not expect to be prowling around the

courtroom.

        Similarly, my expectation is that all of the parties

will have electronic copies of the exhibits ready to be shown

to the jury, the witness and the Court, and that the principal

means of showing exhibits to them and me will be

electronically.  That's not preclusive, so if you have physical

evidence, of course you're welcome to show it to the jury, but

if you have a document, please have it available on computer so

that you can show it to the witness, the Court and the jurors

using our technology

        To the extent that there are paper documents that you

want to show to a witness either during a direct or

cross-examination, I ask that you prepare a binder in advance

for that witness that contains all of the exhibits that that

person may need to examine.  You can then instruct the witness

to turn to a particular document in that binder.  And again, in

part that's in order to reduce the amount of commuting time

that the parties need to do masking and unmasking given our

Covid protocols.

        So for both sides, if you anticipate putting a

document in front of a witness during an examination or

cross-examination, please do two things:  One, try to have a

copy of that available in electronic form so that it can be

M54TMELC

1   displayed to her in an efficient manner using our technology,

2   and also, please have a binder that can serve as a reference

3   point to the extent that there's a large document or the

4   technology doesn't work, so please prepare separate binders for

5   witnesses in advance.  I think that that is all that I need to

6   tell you about that.

7          Just briefly again, I apologize, because I don't

8   expect that I need to tell any of you this, but I remind you to

9   please prepare all of your foundational questions for the

10  introduction of each exhibit in advance for each exhibit.  I

11  say this because I had trials where the parties haven't done

12  that and it's turned into a trial in advocacy class.  Please

13  have the necessary questions prepared in advance so that the

14  process is as efficient as possible for the jury's sake and for

15  ours.  I apologize for raising it, but some people, not you,

16  actually struggle with this.

17         My practice is to ask the opposing party if she has

18  any objections to the introduction of any exhibit before ruling

19  on it.  If you don't have an objection when a party offers an

20  exhibit into evidence, you should feel free to volunteer that

21  you have no objection; otherwise, you should expect that I will

22  turn to you and ask for your view regarding your view whether

23  there's an objection to the document

24         With that, let me turn to openings and closings.

25  Counsel, do you have a sense at this point how long each of

M54TMELC

```
 1    your opening statements will last?

 2                First, counsel for the United States?

 3                MR. HELLMAN:  At this time we think our opening

 4    statement will be not more than 15 minutes.

 5                THE COURT:  Thank you.

 6                Counsel for defendant?

 7                MR. MARVINNY:  I certainly don't have a firm answer,

 8    your Honor.  I would think under no circumstances longer than

 9    20 minutes or a half hour.

10                THE COURT:  Thank you.  Good.

11                So counsel, just a few are brief notes about your

12    openings and closings.  Let me just direct you to please keep

13    your statements in line.  Opening statements aren't argument

14    but an overview of the expected evidence, as you know.

15                If you stray into argument, I may need to interrupt

16    you, which I don't want to do.  As a general matter, my

17    guidance to you is just to remind yourselves what the general

18    parameters for both openings and closing statements and to

19    police yourselves.

20                If you stray from that which is generally permitted,

21    you can expect that I may interrupt you or sustain objections

22    with respect to the openings or closings.  My hope is that I

23    won't have to do that, so I'm asking you to please review the

24    governing rules and to police yourselves understanding that

25    there's a good chance that, if you stray, I'll need to
```

M54TMELC

1     intervene.

2          One brief note about closings.  If either party wants

3     to use demonstrative exhibits at closing, whether that's in the

4     form of a PowerPoint or otherwise, I ask that you please send

5     me a copy of the proposed demonstratives the day before the

6     closings.  When I say "the day before," enough before the

7     closings so that I can actually look at it.  That doesn't need

8     to be a lot of time.

9          Let me tell you what I'm going to be looking for and

10     what I'm not going to be doing.

11          I would like to look at demonstratives just to see if

12     there's something that is egregiously long.  I had a trial once

13     where somebody put into a demonstrative PowerPoint slide a

14     picture of a gun that was not the gun at issue in the case.  I

15     will be looking for things like that, obviously problematic

16     issues.

17          I will not be preapproving any demonstratives that are

18     presented to me.  So do not take from the fact that I hope to

19     be reviewing the demonstratives that I preapproved them or that

20     you should in any way be restrained in your ability to object

21     to them.  You should feel free to object to them because I'm

22     not preapproving them, I'm just looking for things that are

23     very obviously problematic of the type that I just described,

24     the inclusion of images that are not in the case.  That just

25     happened in one of my most recent trials where somebody

M54TMELC

1    included a cartoon in their proposed demonstratives that was

2    not part of the case.  Nice editorial, but not appropriate for

3    closing arguments.  The general rule is that you can put into a

4    slide what you can say, but there are constraints on the proper

5    presentation of demonstratives at closing.  And the way I would

6    like to police it is by directing you to present to me your

7    proposed demonstratives in advance of trial.

8            Obviously, you're completely free to use any exhibits,

9    direct evidence that have been introduced at trial in your

10   closing, so I'm really focused on reviewing demonstratives.

11           So counsel, with respect to witnesses, each party must

12   have your next witness available immediately at the conclusion

13   of the previous witness's testimony.  My view is that our

14   jury's time is very important.  You are responsible for

15   ensuring your witness's appearance at trial.  If you need to

16   subpoena any witness to appear, you should do so in a manner

17   that ensures their appearance at the time when their testimony

18   is required.

19           I have heard that legendarily some of my colleagues

20   say that they will understand the party to have rested if their

21   next witness is not available immediately.  I will not say that

22   I will do that necessarily, but it is very problematic if you

23   don't have your next witness available.  And as a result, I'm

24   directing you to ensure that your next witness is available at

25   the time that their testimony is required.  I do not want there

M54TMELC

1    to be gaps in our jurors' day.  That would be a misuse of their

2    time.

3           Counsel, is there a request to sequester any witnesses

4    here?  Counsel first for the United States?

5           MR. HELLMAN:  No, your Honor.

6           THE COURT:  Thank you.

7           Counsel for defendant?

8           MR. MARVINNY:  No, your Honor.

9           THE COURT:  Thank you.  So I'm not ordering

10   sequestration of witnesses.

11          I understand that there is expected to be expert

12   testimony in the case.  Let me just say a couple of things

13   about experts.  You should not ask me to designate an expert as

14   an expert in front of the jury, so please don't move for me to

15   designate someone as an expert.

16          You should ask your foundational questions to

17   establish that the person has the qualifications necessary to

18   provide expert testimony, then you can proceed to questioning

19   him or her as an expert.  Unless there's an objection, you can

20   proceed to treat the witness as an expert.  I understand that

21   there will be an expert, and we'll talk about that expert

22   momentarily, but the overall comment that I want to leave you

23   with is that you should not ask me to dub a person an expert in

24   front of the jury.

25          Now during this trial, for the sake of clarity, please

M54TMELC

1    use colored exhibit stickers to mark each of the exhibits as

2    they're introduced.  Any exhibits will be sent to the jury room

3    at the outset of deliberations.  You should confer with my

4    deputy, Ms. Joseph, regarding the exhibits that have been

5    accepted into evidence before they're sent back.  As a practice

6    note, it's good practice to check to make sure that the list of

7    exhibits that you think are in evidence are indeed in evidence

8    before you close.  Ms. Joseph will be keeping a list of the

9    exhibits that she thinks are in.  She will have access to my

10   list as well.

11            During the peak of the pandemic we were not sending

12   paper exhibits to the jury, instead we were preloading them

13   onto a computer so that the jurors could look at them on

14   computers in the jury room.  I understand that that requirement

15   has been relieved and so that we'll be able to present paper

16   exhibits to the jury again.

17            So I think that we will expect to proceed in regular

18   order with respect to the presentation of exhibits to jurors,

19   but that was the practice during an earlier phase of the

20   pandemic, so I just wanted to let you know that it's a

21   possibility that we would ask you to load exhibits on to a USB

22   drive so that they can be presented to the jury in electronic

23   format.

24            Now here, as I understand it, the government seeks to

25   introduce media, including video.  My expectation is that those

M54TMELC

1    will be provided to the Court in the form of either a preloaded

2    and clean laptop or in a USB that we can upload to a computer

3    that the jurors can access.  Which of those two approaches

4    we'll be taking will turn in large part on what courtroom we'll

5    be trying the case in and whether or not the jury deliberation

6    room is equipped with a computer on which you can preload

7    media.

8            The takeaway, however, that you should come away with

9    with respect to this issue is that my expectation is that we

10   will provide the jurors copy of media so that they can review

11   them at their leisure rather than requiring them to come back

12   to the courtroom to watch any videos or listen to other media.

13           Counsel, if there are any stipulated facts in the case

14   that are to be submitted to the jury, please write them out in

15   the way that is customary in criminal cases in this district

16   and have them signed by counsel.  I expect that the stipulation

17   itself will be introduced into evidence in the form of a marked

18   exhibit.  I expect that a lawyer will read the stipulation to

19   the jury when it's introduced and then would move the

20   stipulation and any documents that may be associated with the

21   stipulation into evidence.

22           So those are the principal things that I wanted to

23   take up before we turn to the motions in limine.  Let me turn

24   to the issue that was raised by counsel for defendant before we

25   turn to the motions in limine.  That was a request for the

M54TMELC

1    Court to discuss with the parties the timeline for disclosure

2    of 3500 materials and mutual exchange of discovery.

3            Counsel for the government, can you respond?

4            MR. HELLMAN:  Thank you.  Well, first, in line with

5    Mr. Marvinny's observation, the parties can confer and either

6    make a joint proposal to the Court about deadlines or indicate

7    a disagreement, and I think we can do that very quickly.

8            I will note that the government has already produced

9    nearly all of what it considers to be 3500 material in this

10   case, and has also endeavored to just turn over at least draft

11   exhibits that it has prepared so far as well.  So the

12   government is prepared to continue that process and to abide by

13   I think a disclosure schedule which would give the defense

14   plenty of time.  We think maybe 30 days ahead of trial we could

15   complete those processes, except, of course, for any 3500 which

16   is created thereafter in the case of trial preparation or

17   exhibits which are not yet marked.

18           But sort of with that in mind, I think I would take

19   Mr. Marvinny's proposal to speak after today's conference and

20   to make a proposal about scheduling to the Court which we could

21   submit I'm sure by the end of the week.

22           THE COURT:  Very good.  Thank you very much.

23           Counsel for the defendant, you heard the offer by the

24   United States and their suggestion regarding appropriate

25   approach going forward, how do you respond?

M54TMELC

1          MR. MARVINNY:  I don't disagree with most of it.  I

2     think, say, where the deadline for government exhibits and

3     whatever 3500 material they have, in addition to what they

4     provided, 30 days before trial would be sufficient.

5          I raise the concern namely because, as the Court knows

6     from review of the parties' motions in limine, I think it's

7     likely there will be some briefing regarding the exhibits the

8     government ultimately proposes, particularly under the rule of

9     completeness when the government informs us which portions of

10    Mr. Melzer's post-arrest statements we seek to introduce and

11    which specific chats among the thousands and thousands of chats

12    that have been produced to us that they plan to introduce.  So

13    I just want to allow for a sufficient time for us to brief

14    those issues to the Court.

15         THE COURT:  Thank you.  That is a topic that I want to

16    talk about and will do that as we turn to the motions in

17    limine.

18         Let me come back to the voir dire issue and the

19    questionnaire issue.  My expectation is that my office will be

20    able to send you probably tomorrow the voir dire questions as

21    we formulated them.

22         What I would like to do is to ask that the parties

23    look at them, that you think, and that you meet and confer

24    about the issue regarding whether or not a questionnaire would

25    be appropriate here.  What I would invite is that you write me

1   jointly by the 13th to let me know your respective positions

2   regarding whether or not each side believes that a

3   questionnaire would be an appropriate process here.  With that

4   feedback, we'll take the next steps.

5          To the extent that the parties have reservations about

6   proceeding with the questionnaire or otherwise, don't think

7   that it is necessary or an efficient means of conducting our

8   voir dire here.  With that, I should say I'm perfectly happy to

9   hear from the parties and will consider it.  I have not made a

10  determination about how best to proceed here, I want to hear

11  the parties' considered views before making a decision, which

12  is why I'm proposing this approach.

13         If the parties believe that a questionnaire is

14  appropriate, what I would also invite is that the parties let

15  me know if you have any questions or objections regarding the

16  nature of the questions posed.  I would ask that you let me

17  know those in your responsive letter on the 13th so that we can

18  resolve any issues related to, I will call it the phrasing of

19  the questions and the scope of the proposed questions.  That

20  way we can then craft either a questionnaire or final set of

21  voir dire questions with the benefit of your feedback.  We may

22  need to reconvene in order to complete that discussion.

23         You should know that the document that I'm going to

24  send you is going to reflect my considered evaluation of the

25  parties' proposals regarding the voir dire questions, so you

M54TMELC

1    should take that into account as you're providing any feedback

2    regarding the questions that I will be sending you.  In other

3    words, keep in mind that I have considered your proposals, and

4    the document that I will be sending reflects my considered view

5    of what questions are appropriate here.  That said, I'm happy

6    to hear any concerns or objections to what I give you.

7            So what I would like to do now is to turn to the

8    motions in limine.  Counsel for the United States, what I

9    understand that I have with respect to the brief description of

10   the law is what I referred to earlier in the February letter,

11   which was a description of the case and a list of the charges

12   contained in the indictment.  If there was a more substantive

13   description of the law, meaning description of what it is that

14   the government has to prove with respect to each of the

15   charges, in addition to the, I will call it beyond a reasonable

16   doubt standard, I would welcome it if you could point me to it.

17   I didn't see it when preparing and then my staff's brief

18   inquiry now, since I raised this earlier today, we also haven't

19   been able to find it, as I understand it.  So if you can point

20   me to it subsequently, that would be helpful.

21           MR. HELLMAN:  Thank you, I will.

22           THE COURT:  Good.  Thank you.

23           Very good.  So counsel, first, just a note for the

24   record, your colleague has left the room, counsel for the

25   United States.  I want to note that.  I understand that he has

M54TMELC

1  a jury out in another case, is that right?

2           MR. HELLMAN:  That's correct, your Honor, and I

3  believe there's a note from the jury now before the trial in

4  front of Judge Gardephe.

5           THE COURT:  That's fine.  I wanted to note his absence

6  for the record.

7           Very good.  Let's turn to the motions in limine.

8           First off, I have reviewed the parties' motions in

9  limine.  I looked at the exhibits that the parties have

10 presented to the Court that are the subject of the motions in

11 limine.  I believe as a result that I have a view regarding the

12 parties' proposals and your respective positions regarding the

13 motions in limine.  And I believe that on the basis of your

14 written submissions I am able to provide some feedback with

15 respect to the issues that are presented to the Court.

16          That said, if either of you, counsel, would like to

17 add anything to supplement the written submissions to the

18 Court, I'm happy to hear from you.

19          Counsel for the United States, is there anything that

20 you would like to add to the written submissions to the Court?

21          MR. HELLMAN:  No, thank you, your Honor.

22          THE COURT:  Thank you.

23          Counsel for the defendant, is there anything that you

24 would like to add to your written submissions to the Court?

25          MR. MARVINNY:  Very briefly, your Honor, two points I

M54TMELC

1    want to add.  The first point relates to the government's

2    motion to admit certain videos and images that they termed

3    "Jihadist" and "O9A Materials" which the Court was just

4    referring to.  I want to say at this point simply that the

5    defense is still trying to track down solid answers to the

6    question of whether the evidence shows that Mr. Melzer actually

7    consumed certain of the videos and certain of the images.

8         I know the government has I believe taken the position

9    that they're going to be able to prove at trial that Mr. Melzer

10    actually viewed some of the videos -- and I'm mainly talking

11    about videos, I should say -- that Mr. Melzer viewed them as

12    opposed to simply possessing them or having received them on

13    his phone in some sense.

14         I think the question of whether Mr. Melzer has viewed

15    the videos is important to their relevance at trial.  The

16    government may dispute that.  But I wanted to place on the

17    record that we still think that the government would have the

18    burden at trial of showing that Mr. Melzer consumed the videos

19    for them to have the relevance that the government would seem

20    to impute to them.

21         So that's an outstanding issue.  It's frankly a more

22    complicated question than I would have anticipated.  We are

23    still trying to track that down.  But to the extent the Court's

24    decision turns on whether Mr. Melzer actually watched the

25    videos, it's still a somewhat open question, from our

M54TMELC

1    perspective.  That's point one I wanted to flag for the Court.

2              The second issue is just as it relates to Dr. Simi's

3    proposed testimony, I simply wanted to bring the Court's

4    attention to a Second Circuit case that was issued after the

5    close of briefing in this matter, which is *U.S. v. Zhong*, 26

6    F.4th 536, (2d Cir. 2022).  That is a case that concerned the

7    propriety of expert testimony that the government had

8    introduced in a forced labor case.  Again, it came down after

9    the close of briefing.  *Zhong*, your Honor, stands for many

10   propositions.  It certainly reaffirms many of the points that

11   we made in our submissions regarding the propriety of expert

12   testimony, and particularly as to the question of when expert

13   testimony infringes or usurps the jury's role to decide

14   ultimate issues.  I won't go into the facts of Zhong, the Court

15   is likely already familiar with it, but since we hadn't cited

16   it in our briefs, I wanted to mention it today.  Those were the

17   two addendums that I had.

18             THE COURT:  Thank you very much.  Let me just invite

19   response from the United States principally about the first

20   argument just raised by counsel for defendant.  Does it matter

21   if the defendant watched the videos or is it sufficient that

22   they were downloaded by him to the phone?  What's the view of

23   the government?

24             MR. HELLMAN:  It's sufficient in either event, and any

25   arguments in that vein I think are properly the province of the

1    jury after considering the exhibits themselves.  And I imagine,

2    based on Mr. Marvinny's comment, that there will be discussion

3    at the trial of how those videos and images, which have been

4    proposed as government exhibits and briefed to the Court, came

5    to be on Mr. Melzer's phone, but they are no less relevant for

6    the reasons that the government outlined if they were merely

7    received by the defendant based on his active participation in

8    Telegram channels which are delivering those videos and images,

9    for example, or if he can be shown through the evidence to have

10   actively consumed them, which I understand to mean used his

11   phone or another electronic device to play the videos.

12          THE COURT:  Could I ask a factual question about this,

13   just as a point of information.  Were these videos -- I'm

14   referring to the jihadist videos now, were they downloaded to

15   his phone or were they -- that is, downloaded to the phone, or

16   were they embedded in the Telegram messages that he accessed?

17          MR. HELLMAN:  The government believes that the

18   evidence shows that the videos were downloaded to the phone,

19   and many of them, I would have to look back specifically at

20   each exhibit, but the lion's share, if not all of the videos,

21   in particular were received on messaging platforms, principally

22   Telegram, but there may also have been videos from other

23   messaging applications such as Discord, and then saved locally

24   in folders on the defendant's phone.

25          THE COURT:  So this is not, as the government is

M54TMELC

1    proffering it, a situation in which there's a LinkedIn message

2    or an attachment to a message but rather, as I understand the

3    government's proffer, the defendant downloaded whatever the

4    material was and saved it locally to his phone, is that right?

5         MR. HELLMAN:  Every exhibit that the government has

6    indicated it will offer in the form of a video, as we're

7    discussing now, was recovered from a folder in the defendant's

8    phone.  None of the exhibits were, for example, taken by

9    activating a link which was embedded in a chat, finding a

10    resultant image or video somewhere on the internet, and then

11    downloading it by a government agent.  These were all saved

12    locally on the defendant's phone.

13         I think counsel's point, Mr. Marvinny's point, is

14    that:  Does that necessarily indicate as much affirmative

15    action by Mr. Melzer as the Court has suggested in its

16    question?  Is it possible that there is some electronic process

17    through which these were saved locally to his phone by

18    automatic operations not triggered by Mr. Melzer?

19         I don't think it matters.  The point is, from the

20    government's perspective, each of these images was saved

21    locally on the phone and recovered by the government, thusly,

22    arguments about that that means I think are going to be fleshed

23    out between the parties at trial.  The government should

24    nevertheless be entitled to seek admission of these exhibits.

25         THE COURT:  Thank you.

M54TMELC

1      Counsel for defendant, anything else from you on this

2  topic?

3      MR. MARVINNY:  Just to put a gloss on what Mr. Hellman

4  was saying, I believe the evidence will show that -- backing up

5  for a minute.  As Mr. Hellman said, the vast majority of the

6  videos, if not all of them, essentially came through the

7  Telegram application.

8      I think the evidence will show that the default

9  setting on Telegram is to, quote, "download" the videos.  So

10  simply by a phone that has the Telegram application on it

11  receiving a video, in some sense it is automatically

12  downloaded.  So the fact that the video may have been, quote,

13  unquote, "downloaded," doesn't necessarily speak to whether

14  Mr. Melzer did that.  In fact, I think the evidence will show

15  Mr. Melzer did not.

16      THE COURT:  Thank you.  I have no information about

17  the facts here, I'm looking forward to learning about it, but

18  my understanding was that Telegram chats are encrypted from end

19  to end.  So counsel, is that not the case?  And if that's the

20  case, why are you saying that the default rule is that anything

21  on Telegram is automatically downloaded to a person's phone?

22  That seems inconsistent with the idea of end-to-end encryption.

23      MR. MARVINNY:  I think that is the default setting on

24  Telegram.  Essentially if the video is sent Telegram settings,

25  unless the user goes into Telegram and manually alters those

M54TMELC

1   settings, the video or the image that is communicated through

2   the message is sent to a folder on the phone.  I think that is

3   the default setting.

4          I understand these are complicated questions.  The

5   government has not provided expert notice about the specifics

6   of what they might offer.  I think the government may take the

7   position that expert notice is not required, but my point today

8   is that these are perhaps more complicated questions than the

9   government would allow, and we are certainly not conceding that

10  Mr. Melzer downloaded or consumed any of those videos.

11          THE COURT:  Thank you.

12          Anything else from the United States?

13          MR. HELLMAN:  No, thank you.

14          THE COURT:  What I propose to do, since we have been

15  here for a short time, is take a very short, say five-minute

16  break, and then to come back.  My expectation is when we do, I

17  will deliver my decisions on the parties' motions in limine to

18  the extent that I'm able to do so based on the information that

19  is before me, but my proposal is that we take a short recess

20  before I take up that effort.

21          So counsel, I expect to see you back here in about

22  five minutes.  Thank you all.

23          (Recess taken)

24          THE COURT:  Counsel, thank you very much for your

25  arguments.  I do have some questions that are going to be posed

M54TMELC

1    to the parties as I review the parties' motions in limine and

2    provide some feedback with respect to the issues raised in

3    them.  I will come to those questions when I come to them,

4    otherwise, please indulge me as I try to resolve as many of

5    these issues as I can here today.

6           I'm going to eschew my mask to make it as easy as

7    possible for to you hear me.

8           1.  Introduction

9           I will now deliver my decisions on the parties'

10   motions in limine.  I will do so orally.

11          By way of background, the United States filed its

12   motions in limine on February 1, 2022.  Those motions asked the

13   Court to (1) admit certain videos and photos recovered from

14   defendant's phone, as well as items found in his barracks; (2)

15   admit statements made to defendant by purported co-conspirators

16   on online messaging apps; (3) admit certain other statements

17   made by non-co-conspirators; (4) admit certain out-of-court

18   statements made by defendant; (5) prevent the parties and the

19   Court from disclosing the name of the military base to which

20   the defendant was deployed; and (6) adopt certain

21   confidentiality measures for jury members.  Dkt. No. 90 ("Gov.

22   Mot.").  Defendant's opposition to that motion was filed on

23   February 8, 2022.  Dkt. No. 93 ("Def. Opp.").  The United

24   States filed its reply on February 18, 2022.  Dkt. No. 99

25   ("Gov't Reply").

1          Defendant filed his motions in limine in motion for a

2     bill of particulars on February 1, 2022. ("Def. Mot.") Dkt.

3     No. 92. In addition to his motion for a bill of particulars,

4     Defendant sought to exclude the testimony of Dr. Peter Simi and

5     to permit attorney-conducted voir dire. The United States

6     filed its opposition to his motion on February 8, 2022 ("Gov't

7     Opp."). Dkt. No. 93. Defendant filed his reply on February

8     18, 2022 ("Def. Reply"). Dkt. No. 98.

9          The parties are familiar with the underlying facts,

10    therefore, I will not recite those in detail. To the extent

11    that any facts in this case are particularly pertinent to my

12    decision, those facts are embedded in my analysis.

13          2.  Legal Standard

14          I begin with an overview of some guiding legal

15    principles that inform my evaluation of the parties' motions in

16    limine. "The purpose of an in limine motion is to aid the

17    trial process by enabling the Court to rule in advance of trial

18    on the relevance of certain forecasted evidence, as to issues

19    that are definitely set for trial, without lengthy argument at,

20    or interruption of, the trial." *Hart v. RCI Hosp. Holdings,*

21    *Inc.*, 90 F. Supp. 3d 250, 257 (S.D.N.Y. 2015) (quoting *Highland*

22    *Cap.Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176

23    (S.D.N.Y. 2008)). "Evidence should not be excluded on a motion

24    in limine unless such evidence is 'clearly inadmissible on all

25    potential grounds.'" *Id*. (quoting *Nat'l Union Fire Ins. Co. of*

M54TMELC

1    *Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287

2    (S.D.N.Y. 1996)).  Courts considering a motion in limine may

3    reserve judgment until trial, so that the motion is placed in

4    the "appropriate factual context."  *See Natl Union Fire Ins.*

5    *Co.,* 937 F. Supp. at 287.  Further, "[a] ruling [on a motion in

6    limine] is subject to change when the case unfolds,

7    particularly if the actual testimony differs from what was

8    contained in the [party's] proffer."  *Luce v. United States*,

9    469 U.S. 38, 41 (1984)

10          The Federal Rules of Evidence govern the admissibility

11    of evidence at trial.  Under Rule 402, evidence must be

12    relevant to be admissible.  Fed. R. Evid. 402.  The "standard

13    of relevance established by the Federal Rules of Evidence is

14    not high."  *United States v. Southland Corp.*, 760 F.2d 1366,

15    1375 (2d Cir. 1985) (quoting *Carter v. Hewitt*, 617 F.2d 961,

16    966 (3d Cir. 1980)).  If the evidence has "any tendency to make

17    a fact more or less probable than it would be without the

18    evidence" and "the fact is of consequence in determining the

19    action," it is relevant.  Fed. R. Evid. 401.  Nonetheless,

20    under Rule 403, relevant evidence may be excluded if "its

21    probative value is substantially outweighed by danger of one or

22    more of the following:  Unfair prejudice, confusing the issues,

23    misleading the jury, undue delay, wasting time, or needlessly

24    presenting cumulative evidence."  Fed R. Evid. 403.

25          The Second Circuit has instructed that "district

M54TMELC

courts have broad discretion to balance probative value against

possible prejudice" under Rule 403. *United States v. Bermudez*,

529 F.3d 158, 161 (2d Cir. 2008).  Because "virtually all

evidence is prejudicial to one party or another," "to justify

exclusion under Rule 403, the prejudice must be unfair."

Weinstein's Federal Evidence Section 403.04[1][a] (2019)

(citing cases).  "The unfairness contemplated involves some

adverse effect beyond tending to prove a fact or issue that

justifies admission." *Costantino v. David M. Herzog, M.D.,*

*P.C.*, 203 F.3d 164, 174-75 (2d Cir. 2000).  Further, as the

advisory committee notes to Federal Rule of Evidence 403

explain, "'unfair prejudice' within its context means an undue

tendency to suggest decision on an improper basis, commonly,

though not necessarily, an emotion alone." Fed. R. Evid. 403

advisory committee notes.

Federal Rule of Evidence 404(b) provide, "evidence of

a crime, wrong or other act is not admissible to prove a

person's character in order to show that on a particular

occasion the person acted in accordance with the character."

Fed. R. Evid. 404(b)(1).  However, the "evidence may be

admissible for another purpose, such as proving motive,

opportunity, intent, preparation, plan, knowledge, identity,

absence of mistake, or lack of accident." *Id*. at 404(b)(2).

"The Second Circuit's 'inclusionary' rule allows the admission

of such evidence 'for any purpose other than to show a

M54TMELC

defendant's criminal propensity, as long as the evidence is

relevant and satisfies the probative-prejudice balancing test

of Rule 403 of the Federal Rules of Evidence.'" *United States*

*v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (quoting *United*

*States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994)). "The

district court has wide discretion in making this

determination. . ." *United States v. Carboni*, 204 F.3d 39, 44

(2d Cir. 2000).

In order to assess the admissibility of "other acts"

evidence under Rule 404(b) a district court follows a multistep

process:

"First, the district court must determine if the

evidence is offered for a proper purpose, one other than to

prove the defendant's bad character or criminal propensity.  If

the evidence is offered for proper purpose, the district court

must next determine if the evidence is relevant to an issue in

the case, and, if relevant, whether its probative value is

substantially outweighed by the danger of unfair prejudice.

Finally, upon request, the district court must give an

appropriate limiting instruction to the jury."

*United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir.

1992); accord *United States v. Schlussel*, No. 08-cr-694 (JFK),

2008 WL 5329969, at *2 (S.D.N.Y. Dec. 15, 2008).

"However, evidence of uncharged criminal activity is

not considered 'other crimes' evidence if it arose out of the

M54TMELC

same transaction or series of transactions as the charged

offense, if it is inextricably intertwined with the evidence

regarding the charged offense, or if it is necessary to

complete the story of the crime on trial." *United States v.*

*Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (citations and

internal quotation marks omitted); accord *Carboni*, 204 F.3d at

44 ("Evidence of uncharged criminal activity is not considered

other crimes evidence under Fed. R. Evid. 404(b) if it arose

out of the same transaction or series of transactions as the

charged offense, if it is inextricably intertwined with the

evidence regarding the charged offense or if necessary to

complete story of the crime on trial)" (citation omitted).

Such evidence is instead considered "direct" evidence of the

charged crime. *United States v. Herron*, 2014 WL 1894313, at *4

(E.D.N.Y. May 12, 2014) (citing *United States v. Nektalov*, 325

F. Supp. 2d 367, 370 (S.D.N.Y. 2004)).

        "If evidence is determined to be admissible as

intrinsic or direct proof of the charged crimes as

distinguished from 'other acts' under Rule 404(b) . . . the

Court is not required to instruct the jury against making an

improper inference of criminal propensity." *United States v.*

*Townsend*, No. 06-cr-34 (JFK), 2007 WL 1288597, at *1 (S.D.N.Y.

May 1, 2007). "However, 'where it is not manifestly clear that

the evidence in question is intrinsic proof of the charged

crime, the proper course is to proceed under Rule 404(b).'"

M54TMELC

*Id*. (quoting *Nektalov*, 325 F. Supp. 2d at 372).

The Court must decide preliminary or predicate questions of fact regarding the admissibility of evidence. Under Rule 104(a) of the Federal Rules of Evidence, the Court "must decide any preliminary question about whether a witness is qualified.  That privilege exists where the evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).  When preliminary facts related to the admissibility of evidence are disputed, the party offering the evidence must prove its admissibility by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  Rule 104(b) provides that "when the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.  The court may admit the proposed evidence on the condition that the proof be introduced later." Fed. R. Evid. 104(b).  This rule permits the introduction of evidence at trial "subject to connection" when other evidence is proffered to be offered later in the trial. Under certain circumstances, a court must conduct a hearing regarding a preliminary question outside of the hearing of the jury, particularly if the defendant in a criminal case is a witness and requests such a hearing, or if "justice so requires." Fed. R. Evid. 104(c).

3.  The government's motions in limine.

M54TMELC

1          a.  The "Jihadist Materials"

2          I'll first address government's motions in limine

3    beginning with the government's motion to admit what it has

4    termed "the Jihadist Materials."  The government proffers that

5    it would establish that those materials were accessed from

6    Telegram and saved by defendant on his iPhone.  Gov. Mot at 25.

7    Those materials consist of GX 801, GX 803, GX 805, GX 810, and

8    GX 537.  The parties have provided apt descriptions of those

9    materials in their motions, which I refer you to in lieu of

10   describing those materials here.

11         i.  Relevance

12         As an initial matter, despite defendant's argument to

13   the contrary, *see* Def. Opp. at 3, I conclude that those

14   materials are relevant.  Among other things, the government has

15   charged defendant with providing military information to

16   jihadists in order to facilitate an attack on a U.S. military

17   base.  That defendant possessed on his iPhone materials

18   featuring attacks on military bases and military service people

19   similar to that he is charged with helping to plan is relevant

20   to those charges.  Furthermore, the materials would be relevant

21   to rebut statements purportedly made by defendant, to the

22   extend admitted, in post-arrest interviews in which he

23   expressed that he had not been serious about planning an

24   attack.

25         Let me respond briefly to the arguments that were

M54TMELC

1    reiterated here regarding the question with respect to whether

2    or not the defendant viewed those videos or whether he took

3    specific steps to download them to the phone.  I think that,

4    regardless, the fact that these videos are on his phone is

5    probative of the issues for which they're offered by the United

6    States.  The fact that these materials were downloaded to the

7    defendant's phone makes them relevant and makes them probative.

8          To the extent that there's an argument that that

9    happened automatically or that the defendant did not place them

10   there, that is perfectly good grist to present to the jury for

11   them to evaluate the weight of this evidence, but at this

12   point, I do not believe that it undermines the Court's

13   conclusion that these materials are relevant and that their

14   presence on the defendant's phone, locally saved to the

15   defendant's phone, is highly probative of the charged offenses.

16         Defendant argues that these videos are irrelevant

17   because defendant is not accused of committing any actual act

18   of violence, and because defendant is not accused of belonging

19   to or providing support to ISIS, al Qaeda or any other

20   identifiable "jihadist" group.  But defendant is charged with

21   taking steps to plan a violent attack that would be aided by

22   jihadist groups, and the government has proffered that it has

23   evidence that defendant was motivated to plan that attack

24   partially because of his pro-jihadist beliefs.  "The standard

25   of relevance established by the Federal Rules of Evidence is

M54TMELC

not high." *United States v. Southland Corp.*, 760 F.2d 1366,

1375 (2d Cir. 1985).  Here, the videos and other materials

saved to the defendant's phone locally featuring attacks on

service members and military bases is relevant to the

government's accusation that defendant was planning and

intended to facilitate such an attack.

To the extent pertinent, this is, as the other

evidence is, direct evidence of the charged offenses.

ii.  Rule 403

I turn now to whether the materials should not be

admitted pursuant to Rule 403.  I have some initial questions

on this topic for the parties.

First, for the government counsel, in your motion you

note that there's a substantial volume of other evidence on

Mr. Melzer's phone that the government chose, through its

efforts to curate the evidence to be presented to the jury, not

to offer here, including, as I understand it, inflammatory

videos including things like beheadings.

Counsel, does the government plan to introduce

evidence that there was other such materials on the defendant's

phone and that it isn't presenting them?  In other words, will

the jury be hearing about the fact that this was a curated

subset of Mr. Melzer's downloaded videos?  Counsel?

MR. HELLMAN:  Thank you.  I don't think we have a

final answer on that right now.  I don't expect that the

M54TMELC

1    government would adduce testimony that described in graphic

2    detail what other materials on the phone contain in line with

3    its efforts as described in its motions in limine not to run

4    afoul of Rule 403, but I don't have an answer for the Court at

5    this time as to whether the government will introduce testimony

6    about what other types of materials were located on the phone.

7    And I'm guided in particular by some of the argument the

8    government is hearing for the first time today about whether

9    and how images were saved on the device and where there may be

10   more testimony about that and what it means for the

11   government's case than the government previously apprehended.

12        THE COURT:  Thank you, understood.  Just as a brief

13   query sparked by the colloquy that we had earlier, counsel for

14   defendant said that they hadn't received expert notice

15   regarding testimony from someone who might testify about the

16   means by which these materials were downloaded to the phone, I

17   wanted to give you the opportunity to respond to that remark.

18   Counsel for the government?

19        MR. HELLMAN:  We don't anticipate introducing expert

20   opinion testimony on that subject, but I will have to confer

21   with co-counsel.

22        THE COURT:  Without an expert, how are you going to

23   show Mr. Melzer -- how it was that the videos got on to

24   Mr. Melzer's phone locally?

25        MR. HELLMAN:  So the government intends to call FBI

M54TMELC

1    personnel who conducted extractions of the defendant's phone.

2    Such testimony has been commonly admitted in this district and

3    in others as non-expert or non-opinion testimony.  The

4    extractions of the phone and what specifically was located on

5    the phone would be the subjects of that testimony.

6           To the extent now that there are complex technical

7    issues which may be raised, I will have to consult with the

8    government's analyst to determine whether those features are

9    self-evident from the face of the device and the face of the

10   extraction and the types of testimony which are commonly

11   offered in cases involving cellphone extractions.

12          THE COURT:  Thank you.  I do encourage you, counsel,

13   to think carefully about whether or not testimony about the

14   issues that you described, including cellphone extractions and

15   the processes used to do so, are properly designated as expert

16   in nature requiring timely disclosure under the rules.  I'm not

17   going to take a position on that, but you have heard that's an

18   issue and I encourage careful thought about whether such

19   disclosures are required here.

20          So counsel for the United States, you note in your

21   submissions that the government will "briefly summarize certain

22   of the violence that has been omitted from the excerpts played

23   at trial through the testimony of law enforcement witness or

24   witnesses."  What are you referring to there?

25          MR. HELLMAN:  That is, to the extent that the proposed

M54TMELC

exhibits have been edited to remove particularly graphic

imagery or particularly graphic sounds, that the government

expects witnesses to describe anything that has been omitted

to, for example, provide context for what the totality of the

videos contained or to indicate how certain items have been

removed, for example, why the sound will suddenly cut out of a

video, but the government doesn't intend to substitute graphic

testimony for graphic imagery.

THE COURT:  Thank you.  How does that work?  So I

understand that we have a video, your proposal is that FBI

witness might testify, for example, that she watched the video

and heard something, or something else, and that we have taken

it out because it's so disturbing, what are you thinking would

happen here?

The alternative would be to not comment on it or for

the Court or someone else to comment on the fact that there are

redactions and they, the jury, are not to consider the reasons

for the redactions, but in order to understand what the options

are, I would like to have a clear picture of what the

government is contemplating.

MR. HELLMAN:  Your Honor, I think we would have to

consider that on a per exhibit basis.  I'm sorry that I don't

have a specific proffer to the Court at this moment of

precisely what that type of testimony would entail.  I think

the idea is that, to the extent redactions have been made, the

M54TMELC

1    government believes that they're appropriate for the reasons

2    explained in the brief.  I think any context that would be

3    offered, it would be at a very high level to explain what an

4    analyst understands a particular video to be.

5         So the idea, in other words, for example, with respect

6    to I believe it's Government Exhibit 810, the government

7    doesn't intend to substitute testimony that, for example, audio

8    which has been eliminated contained screams.  That's not the

9    proposal.

10        Again, I apologize, I don't have a particular position

11   on a per exhibit basis.  I think that the comment was merely

12   meant to indicate that to the extent any context was important

13   to the video itself, the government would offer that type of

14   testimony.

15        THE COURT:  Thank you.  Let me turn to counsel for

16   defendant for your response.  As you can hear both of these

17   questions are basically focusing on what I understand to be the

18   possibility that the government may call some witness to

19   characterize or describe videos or other materials that are not

20   coming into evidence, either because they have been

21   intentionally redacted or curated out of the case, could I get

22   a sense of what the defense's view is regarding that prospect?

23        MR. MARVINNY:  Your Honor, we would have serious

24   concerns and would object to any government witness's testimony

25   implying to the jury that the evidence they're seeing has been

M54TMELC

1    culled down from a more graphic subset or from a more graphic

2    set of materials but this is somehow curated.  It seems to me

3    it defeats the Court's careful reviewing of this evidence to

4    let a government witness get up and essentially describe for

5    the jury the items they have been spared or suggest that

6    there's so much more graphic material out there.  That seems

7    exceptionally prejudicial to Mr. Melzer and certainly difficult

8    to assess under 403, so we would object to that.

9            As for redactions to any exhibits, our position would

10   be that if the redactions aren't obvious, then no comment need

11   be made.  In my experience, an instruction to the jury

12   vis-a-vis redacted exhibits usually accompanies exhibits that

13   are obviously redacted, there's some portion blacked out or

14   something like that.

15           I don't think -- whatever the Court ultimately rules

16   on the admissibility of these videos and once they're edited

17   and finalized, I don't think any commentary from the the Court,

18   the government or any government witness is helpful.  Not only

19   is it not helpful, I think it could be very, very prejudicial

20   in what it might suggest to the jury.

21           THE COURT:  Good.  Thank you very much.

22           So counsel, I'm not going to take a specific position

23   on this issue now.  I just note, I will call it reasonable

24   concerns articulated by the defense about potential

25   characterization of other, I'll call it graphic, potentially

1    graphic components of exhibits that have been intentionally

2    redacted in order to avoid potential prejudice associated with

3    the presentation of those graphic aspects of the exhibit to the

4    jury.

5            Similarly, I want to encourage consideration of what,

6    if anything, a witness might be able to say as a fact witness

7    about the content of documents that aren't being shown to the

8    jury. I'm not taking a position on this, it hasn't been

9    briefed, but I thought it was something that was important to

10   highlight the concerns that the defense has noted are ones that

11   we would have to address. There may be other issues such as

12   best evidence or other issues with respect to fact witnesses --

13   emphasis on fact witness -- fact witnesses' proposed summary of

14   what they saw in documents that aren't being presented to the

15   jury. So again, I don't believe that this issue is

16   specifically raised for the Court's decision here, but these

17   aspects of the briefing raised a concern that I thought was

18   something that should be considered carefully before trial.

19           So counsel for the United States, a couple of the

20   videos here, 804 and 810, lead me to inquire about how those

21   videos will be used. I have watched both of them and I'm

22   curious how you anticipate that they will be used. For

23   example, are you planning to show them a lot of times? Are you

24   planning to freeze frame them on particular images embedded in

25   the videos, or will you just be playing them by pressing play

M54TMELC

1    and running through them?  I ask because it may be that the

2    impression left by these exhibits will be different if you just

3    play them as opposed to if you play them and then choose to

4    freeze frame on particularly disturbing or graphic aspects of

5    the videos.

6              So counsel, how are you planning to use these videos?

7              MR. HELLMAN:  At this time, we intend to play them for

8    the jury when they're admitted into evidence, and I think it is

9    likely that we will reference them during closing arguments.  I

10   don't currently anticipate a plan to freeze frame on any

11   particular moments from either 804 or 810.  The government

12   agrees and concedes they are graphic in nature, and I don't

13   believe at this moment that there's any particular frame from

14   either video that the government intends to rely on in

15   particular.  And I will also note that the government would

16   make efforts not to pause unnecessarily on an image of a

17   deceased U.S. service member, for example.  So that's our

18   position at this time.

19             THE COURT:  Thank you.  Let me turn to counsel for the

20   defendant.  Just briefly, counsel, my understanding from

21   reading your submissions is that you don't dispute whether GX

22   537 is admissible, is that right?

23             MR. MARVINNY:  That is correct, your Honor.

24             THE COURT:  Thank you.  With respect to GX 301,

25   counsel, I understand that the defense agrees with the fact of

M54TMELC

1    the defendant's possession of the book is relevant, but that

2    the contents should not be admitted.

3         The government, as I understand it, has proffered that

4    it will not introduce the contents of the book but they will

5    only introduce the cover and/or the covers and the pages that

6    are purportedly smeared with defendant's blood.

7         Counsel for the defendant, what's your response to the

8    government's proposal regarding I will call it the portions of

9    GX 301 that it has offered to introduce?

10        MR. MARVINNY:  Those portions seem admissible to us.

11   We're not objecting to those specific portions.

12        THE COURT:  Good.  Understood.  So let me take up

13   these issues.  Thank you very much, counsel for your arguments.

14        At this point, I don't see a basis, that is, do not

15   see a basis to preclude GX 801, 803, 804, 805 or 810 under Rule

16   403 because I believe that their probative value is not

17   substantially outweighed by the risk of unfair prejudice,

18   confusing the issues, misleading the jury, undue delay, wasting

19   time, or needlessly presenting cumulative evidence.

20        First, with regard to cumulativeness, I note that I

21   will not exclude any these materials on the basis that they're

22   cumulative at the pretrial stage.  As one court in the Eastern

23   District commented, "the court cannot predict when [the

24   government's] evidence will become cumulative because the court

25   does not know what evidence [the government] will present.

M54TMELC

1    Should [the government] cross the line at trial, [defendant]

2    should renew his challenge then." *Ali v. Connick*, 2016 WL

3    3002403, at *4 (E.D.N.Y. May 23, 2016).

4          However, the Court notes that in and of themselves,

5    the five videos and one graphic that comprise the Jihadist

6    Materials are not needlessly cumulative.  While all the videos

7    feature jihadist activities, the specific activities in each

8    video is unique -- e.g., GX 803 features the use of an I.E.D.

9    on a military personnel carrier while GX 801 features militants

10    storming and setting firearm to a military compound.  And

11    though GX 801, 804, and 810 each show an attack on a military

12    base, none of the videos show the same attack:  The videos are

13    idiosyncratic in who they depict (for example, GX 810 is shot

14    by a U.S. military service member where the other videos seem

15    to have been filmed by jihadists or militants), the location

16    and the type of methods used in the attack.  Moreover, each of

17    the videos is under three minutes long -- the videos are not so

18    lengthy as to be repetitive.  In sum, the Jihadist Materials,

19    in and of themselves, are not cumulative.  Of course, if the

20    government should seek to admit additional evidence that is

21    similar to the Jihadist Materials at trial, the Court would

22    entertain a cumulativeness objection at that point.

23          Broadly speaking with regard to prejudice, the Court

24    notes the government has "significantly trimmed the volume of

25    these videos down from a larger -- and decidedly more

M54TMELC

graphic -- set of Jihadist Materials located on Melzer's's

iPhones, including jihadist videos of civilian decapitations

and point-blank shooting executions of civilians and soldiers."

Gov. Reply at 12.  Thus, the Court is mindful that the

defendant allegedly had far more prejudicial materials in his

possession.  That the Government has taken steps to prove its

case using a subset of evidence available to it suggests that

it recognizes that risk of prejudice, and has taken steps to

mitigate that risk.  That said, I evaluate each of the pieces

of evidence individually.

GX 801:  Moving on to discuss specific pieces of

evidence, the probative value of GX 801 is not substantially

outweighed by a risk of unfair prejudice.  The video, which

features militants attacking a military base, is highly

probative of defendant's planning and intent to commit a

similar jihadist attack on the military base.  It's also

probative of the knowledge, that is, the knowledge of

defendant, of jihadist militants' ability to carry out such an

attack.

Defendant argues that the video is "violent and

upsetting."  Def's. Opp. at 5.  While a video of militants

shooting bullets and burning down a military compound certainly

is upsetting, it showcases some degree of violence, it does

not, however, show militants harming or killing any

individuals.  Indeed, the compound appears to be abandoned.

M54TMELC

Without explanation, the video is not immediately recognizable
as jihadist militants attacking a military base rather than
individuals shooting rounds into an abandoned compound.
Frankly, just as a note, watching the video I couldn't tell
that this was jihadists attacking a military compound
necessarily.  I understand there will be additional evidence
that brings that aspect of the video to light.  Further, the
fact that the video is underscored by someone speaking Arabic
not sufficient to cause the defendant such unfair prejudice as
to outweigh the probative effect of the video -- defendant is
charged with providing material information to pro-jihadist
individuals, and his possession of jihadist propaganda is
probative of his intent to do so.  The risk of prejudice is not
so significant as to render GX 801 inadmissible under Rule 403.

        GX 803:  The same is true as to GX 803 -- it is highly
probative.  The video, which features a military personnel
carrier being hit by an IED, is probative of defendant's
knowledge that jihadists can ambush American military vehicles,
which, in turn, is probative of his alleged efforts to plan an
attack on a U.S. military base.  That is particularly true
given that Melzer allegedly communicated information about a
military convoy, including the road on which it would travel,
in his Telegram chats.  See Gov. Mot. at 17.  That he possessed
a video showing an attack is also probative of his motive, as
it's consistent with O9A's alleged violent and anarchist

M54TMELC

ideology that advocated for the demise of Western civilization.

While the image of a U.S. personnel carrier being hit in an ambush is certainly disturbing and violent, it is not so unfairly prejudicial as to substantially outweigh its probative effect. Though one could surmise any individuals in the personnel carrier may have suffered or could have suffered harm or death, indeed that is what makes it so disturbing, the video is filmed from a distance and does not show directly any harm to any individual. Further, this Circuit has, in multiple cases, found it proper to admit evidence that carries some risk of prejudice when that evidence is "no more sensational or disturbing than the crimes with which [the defendant] was charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir.1990); *see also, United States v. Curley*, 639 F.3d 50, 59 (2d Cir. 2011)(same). Indeed, the probative value of a video showcasing such an attack is not outweighed by risk of unfair prejudice "in light of [its] similarity" to the attack defendant is charged with planning. *See United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998)(affirming lower court decision to admit certain videos showing attacks "in light of their similarity" to the attack committed by the defendant). The same is true here.

GX 805: As to GX 805, its probative value is not outweighed by the risk of unfair prejudice. The video, which shows a jihadist militant firing mortars into the distance, is

M54TMELC

1    probative of Mr. Melzer's alleged knowledge of jihadists'

2    ability to use mortars to carry out an attack, and his planning

3    to assist jihadist in doing so in attacking the Military Base.

4    This is particularly true given his alleged Telegram message

5    stating that, "some mortar team could absolutely wreak havoc"

6    during an attack on the Military Base.  Gov. Mot. 28.

7        By contrast, admitting GX 805 would carry little risk

8    of unfair prejudice.  It is not apparent form the video what

9    the target of the mortar fire is.  The viewer does not see any

10   disturbing effects of mortar fire -- their explosions or

11   destruction.  Accordingly, the probative value of GX 805 is not

12   outweighed by an unfair risk of prejudice to defendant.

13       GX 804 and 810:  Based on the government's

14   representation of how the materials will be shown, I

15   conclude -- at this phase of the case -- that GX 804 and 810

16   should not be excluded pursuant to Rule 403.  Both videos have

17   high probative value.  That defendant had accessed and

18   possessed videos of violent attacks on military compounds is

19   probative of intention to plan and facilitate a similarly

20   violent attack on the Military Base to which he was deployed.

21   As I said earlier, the fact that they were possessed on his

22   phone by itself is highly probative of whether or not that was

23   the case, regardless of whether or not he watched each of them.

24   Whether or not he did so is an issue that the jury can consider

25   in evaluating the weight of this evidence.

M54TMELC

1          The videos are also probative of his alleged knowledge

2     of jihadists' ability to carry out such attacks.  The violent

3     aspect of the attacks in the video are particularly probative

4     given that defendant allegedly described the planned attack as

5     a "mascal" or "mass casualty" event.  Gov. Mot. 16.  In

6     addition, that defendant possessed GX 804 and 810 is probative

7     to rebutting defendant's anticipated claims made in post-arrest

8     interviews that his conduct do be attributed to satire or dark

9     humor.

10         The videos are certainly violent and disturbing, which

11    carries some risk of prejudicing the jury, but the government

12    proffered the videos will not be shown in a manner that

13    emphasizes the violence.  It stated that it will just play the

14    video.  It hasn't offered that it will play the videos multiple

15    times, hasn't said they're going to stop the videos and pause

16    them on images of dead or mangled bodies, nor that it will

17    probe the more violent aspects of the video through

18    questioning.  So while disturbing, the video passes relatively

19    quickly.

20         The government also represents that it will play GX

21    810 without sound, further limiting any prejudicial effect.

22    Moreover, the footage in GX 810 is chaotic and jolting, making

23    it difficult to discern precisely what is occurring at any

24    given time -- at least without any indication otherwise.  That

25    quality makes it less likely that the jury will unfairly focus

M54TMELC

on the more gratuitous acts of violence in that video.

Similarly, with regard to the GX 804, the particularly violent

aspects of the video -- namely, when a militant shoots twice

into the body of dead soldier -- is certainly disturbing, but

comprises only a few seconds of the more than two-minute long

video.

More generally, defendant is charged with planning and

providing assistance to individuals to carry out a violent

attack on a U.S. military base that would result in the murder

of many of his fellow service members.  GX 804 and GX 810,

though they show disturbing, graphic, and violent content,

including the apparent murder of military service members, are

"no more inflammatory than the charges alleged in the

indictment."  *United States v. Abu-Jihaad*, 630 F.3d 102, 133

(2d Cir. 2010).

Overall, at this point, I do not find a basis to

exclude GX 804 and 810 under Rule 403, after conducting

detailed examination of those exhibits and all of the relevant

context and balancing all of the relevant factors.

The "O9A Materials"

Next, I will address what the government has termed

the "O9A Materials."  These materials consist of 16 images, 12

documents, and one video that relate to defendant's purported

membership in the Order of the Nine Angles ("OA9").  Rather

than describing each of these materials in detail, I again

M54TMELC

refer the parties to the apt descriptions in the parties'
briefing.

Defendant does not dispute that "some of these
materials are admissible to help establish Melzer's state of
mind, including his knowledge of O9A and its ideology." Def.
Opp. at 7. Instead, Defendant argues that certain materials
should not be admitted as "irrelevant, cumulative, or unfairly
prejudicial." *Id*.

However, as discussed with respect to the jihadist
materials, the Court declines to entertain a cumulativeness
objection at the pretrial phase before it knows what evidence
the government will present to the jury.

As to defendant's objections that the materials'
probative value is substantially outweighed by risk of unfair
prejudice, I note that, as with the Jihadist Materials, the
government culled the O9A Materials from a larger set of
materials seized from defendant's devices and his barracks.
The Court approaches its analysis with the knowledge that
government has attempted to select only certain pieces of
evidence from a larger set of materials. Again, that said, I
evaluate each piece of evidence individually.

GX504, 507 and 510: At this point, I conclude that
the probative value of GX 504, GX 507 and 510 is not
substantially outweighed by the risk of prejudice or the
various other concerns articulated in Rule 403.

M54TMELC

1          Defendant first argues that these photos, which

2     allegedly show defendant performing O9A rituals, are irrelevant

3     unless the government can establish that they actually depict

4     defendant, noting that during post-arrest interviews, defendant

5     denied having performed any O9A rituals.  *See* Def. Opp at 7.

6          However, the fact that defendant possessed these

7     images, regardless of whether they showcase the defendant

8     himself, proves relevant to the case.  At minimum, the images

9     show that defendant had an interest in O9A rituals.  That

10    interest, in turn, is probative of his motive to plan an ambush

11    on a U.S. military convoy in order to further O9A's mission of

12    accelerating the demise of western civilization.

13         Separately, as an aside, while the person in these

14    images is wearing a mask, his entire face is not obscured in

15    all of them.  It's not at all unclear to me that a jury could

16    not determine that it is Mr. Melzer shown in those images just

17    from looking at him and from looking at the images.

18         Regardless, the government proffers that evidence will

19    establish that the photo was found on defendant's iPhone.  It

20    also states that it will introduce similarly photos of a hooded

21    man holding up a book with blood smeared on one page in

22    addition to the physical book taken from defendant's barracks

23    that features blood smeared on the page.  That is certainly

24    evidence that the person depicted is Mr. Melzer, namely his

25    physical possession of the relevant book depicted.  The

M54TMELC

government also proffers that the evidence will show that the skull mask in GX 507 is associated with white supremacist groups, and that a skull mask was found in defendant's barracks. Based on that proffer, there's a basis to conclude that the government will be able to establish that the photos feature the defendant.

Defendant next argues that the images should not be admitted because their admission would be unduly prejudicial under Rule 403. However, the images purport to establish defendant's purported membership in O9A, which is probative of his motive for joining the military in an "insight role," and ultimately helping to plan an attack that aligned with O9A's ideology. The images also are probative to the extent that they would help rebut any assertion that defendant's interest in O9A was insincere.

That probative effect is not substantially outweighed by risk of prejudice to defendant. While the image of an individual holding a knife or gun suggests that the individual could be violent, the images do not show the individual committing any acts of violence, nor is the individual in the photo wielding the knife in a threatening manner. Indeed, the knife is being held by the handle with the point of the knife facing down. That appears to be more ceremonial than threatening. Similarly, the manner in which the individual is holding the rifle is not particularly threatening, but for his

M54TMELC

1   apparel.  The nozzle of the rifle is pointing up and not toward

2   the camera.  To the extent pertinent, all of these O9A

3   materials are direct evidence of the charged offenses.

4          In sum, Mr. Melzer is charged with participating in an

5   effort to murder his fellow soldiers based on his adherence to

6   the worldview of the O9A.  This evidence is highly probative of

7   the engagement with that worldview and its manifestations, a

8   worldview and manifestations that are disturbing in nature.

9   And I do not think that we can wholly sanitize Mr. Melzer's

10  alleged conduct by excluding all disturbing images of his

11  activities and content of his phone.  The probative value of GX

12  504, GX 507, and GX 510 is not substantially outweighed by

13  prejudice or the other adverse impacts under Rule 403.

14         GX 513, 536, and 802:  Similarly, the probative value

15  of GX 513, GX 536, and GX 802 is not substantially outweighed

16  by risk of unfair prejudice to the defendant or the other

17  considerations set forth in Rule 403.  Contrary to defendant's

18  arguments, these materials are relevant to show defendant's

19  membership in O9A, as they showcase defendant's apparent

20  interest in O9A symbology and ideology, and particularly O9A's

21  focus on Nazism and rape.  GX 513's focus on the "mobilization"

22  of "rapists" is probative of defendant's intention to carry out

23  an attack.  And the use of the term "rape" is particularly

24  probative because he communicated over Telegram channels that

25  used rape in their titles, such as the "Rapewaffen" Telegram

M54TMELC

channel.  *See e.g.*, Gov. Mot. at 2.  Defendant also used the

term "rape" in his online communications allegedly with other

O9A members and proponents.  *See* Gov. Reply at 18-19.

       The high probative value of these materials is not

substantially outweighed by risk of unfair prejudice.  While

Nazi symbols and the term "rape" certainly have the potential

to inflame, these images do not showcase any violence being

committed.  GX 513 is simply a graphic that uses the term

"rape," but that alone is not sufficiently prejudicial to

substantially outweigh the probative impact of the exhibit.  GX

536, which shows an individual in military fatigues arranging

TNT in the shape of a swastika, showcases problematic

symbology, but the mere appearance of that symbol is not so

prejudicial as to substantially outweigh the probative impact

of the image, especially given that the government seeks to

prove that the defendant embraced an ideology that viewed

Naziism positively.  GX 802 is similar -- the image of a man in

military fatigues performing the Sieg Heil showcases Nazi

symbology, but is not violent, graphic, or so disturbing as to

outweigh its probative value.

       Again, these images are disturbing, but they are

highly probative of the charged offenses.  They are not

unnecessary invocations of disturbing concepts that prejudice

the jury -- Mr. Melzer's charged conduct is disturbing, and

these exhibits are highly probative of it.  Thus, I do not

M54TMELC

think that the probative value of GX 513, 536 and GX 802 is
substantially outweighed by the risk of unfair prejudice or the
other concerns articulated in Rule 403.

GX 908, 911 and 912:  In addition, the probative value
of GX 908, 911 and 912 -- documents that contain antisemitic
and pro-O9A propaganda -- is not substantially outweighed by
risk of unfair prejudice to defendant.  These materials are
also highly probative of defendant's alleged membership in O9A,
as well as his motive for allegedly planning an attack on a
U.S. military base.  GX 908 and 912, which showcase violent and
antisemitic statements, are probative of defendant's alleged
antisemitic beliefs and his alleged adherence to O9A's
antisemitic belief systems.  This is particularly true given
that defendant and his co-conspirators allegedly invoked
antisemitic language as motivation for the attack; for
instance, CC-3 told defendant that his goal was to "kill jews
and embrace tradition."  Gov. Reply at 19-20.  That defendant
possessed GX 911, which appears to be a primer on O9A's
ideology and belief system, is particularly probative of his
alleged adherence to O9A ideology.

Certainly, that the materials espouse repulsive
antisemitic beliefs carries a risk of prejudice.  But the
government asserts that defendant adhered to those beliefs --
evidence that spells out the tenets of those beliefs is "no
more inflammatory than the charges alleged in the indictment."

M54TMELC

*See Abu-Jihaad*, 630 F.3d 102, 132-33 (2d Cir. 2010) (evidence
of the defendant espousing jihadist beliefs was properly
admitted where defendant was alleged to have cooperated with
jihadist organizations).  Though these materials may be
prejudicial, given defendant's alleged beliefs, they are not
"unfairly prejudicial" such that any prejudice would
substantially outweigh their probative value.

          With respect to GX 301 and 302, first, the defendant
does not object to admitting the book pursuant to the
government's proposal, so I understand that there's no
continuing objection with respect to the introduction of that
exhibit, at least not prior to trial.

          Regarding GX 302, contrary to defendant's arguments,
it meets the low standard for relevance and then some.  The
book purports to provide instructions for creating homemade
explosive devices, among other things.  Here, the government
represents that the defendant adhered to O9A's belief system
that espoused violence and anarchy, and that defendant planned
to carry out a violent ambush on his fellow service members,
that he possessed a physical book in his military barracks
providing instructions on building explosive devices is
probative of his belief in anarchic violence.  And having
custody of this well-known treatise in physical form on a
military base is highly probative of the degree of his
commitment to this anarchic worldview -- it shows that this was

M54TMELC

not an interest limited to an online rabbit hole.  In sum, his

possession of the physical evidence in his barracks is

probative of his commitment to an anarchic and violent ideology

which drove his alleged participation in the charged offenses.

        In addition, at this point, the Court concludes that

the probative value of GX 302 is not substantially outweighed

by its prejudicial effect.  The book's covers do not contain

violent or graphic imagery.  And while there may be some risk

that the jury will be confused into believing defendant himself

attempted to build explosive devices, we can take up that, to

the extent there's an issue.  Thus, while there is some risk of

prejudice should the book be admitted, the risk of unfair

prejudice does not substantially outweigh that probative value,

nor do any of the other concerns articulated under Rule 403

outweigh that probative value substantially.

        Let me talk about the prospect for a limiting

instruction.

        Moreover, for both the jihadist and O9A materials, I

believe that any potential prejudicial effect could be

mitigated by appropriate limiting instructions to clarify how

those materials may be used by the jury.  "District courts

analyzing evidence under Rule 403 should consider whether a

limiting instruction will reduce the unduly prejudicial effect

of the evidence so that it may be admitted."  *Benzinger v.

Lukoil Pan Americas, LLC*, 2021 WL 431169, at *3 (S.D.N.Y.

M54TMELC

1    Feb. 8, 2021) (quoting *United States v. Ferguson*, 246 F.R.D.

2    107, 117 (D. Conn. 2007)); *see also United States v. Downing*,

3    297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the

4    contrary, we must presume that juries understand and abide by a

5    district court's limiting instructions."). "As the Supreme

6    Court has recognized, limiting instructions are often

7    sufficient to cure any risk of prejudice." *United States v.*

8    *Walker*, 142 F.3d 103, 110 (2d Cir. 1998) (citing *Zafiro v.*

9    *United States*, 506 U.S. 534, 539 (1993)). The Court invites

10   defendant and the government to work together to propose

11   appropriate limiting instructions. I will ask that any

12   proposed limiting instructions, whether joint or separate, be

13   presented to the Court no later than June 3, 2022.

14          To that end, I remind the parties that the defendant

15   agrees that GX 901 to 907 and 909 to 910 are admissible, but

16   request that the Court issue a limiting instruction stating

17   that they're not being admitted for the truth of their contents

18   but only for defendant's state of mind. The parties are

19   invited to meet and confer and propose appropriate limiting

20   instructions for these materials, as well as the Jihadist

21   Materials and O9A Materials, by joint letter no later than

22   June 3, 2022. If sooner, all the better.

23          While I will not take a position on the limiting

24   instructions prior to both parties weighing in on the specific

25   text of the instructions, I note that the Court would likely

M54TMELC

have no issues with adopting an instruction that the defendant

is not on trial for holding certain religious or political

views.  I will consider any such instructions and will analyze

it under applicable law.  However, to the extent that defendant

would propose an instruction that says that defendant is "not

on trial for sympathizing" with jihadist organizations, I might

hesitate to permit such an instruction that would suggest that

defendant's association with O9A is irrelevant to the charged

crimes.  I look forward to seeing the parties' proposals and

will make a decision with the benefit of your concrete

proposals to the Court.

      b.  Statements by CC-1 and CC-3

      The government is seeking to introduce a number of

statements made by out-of-court declarants CC-1 and CC-3 in

Telegram chats.  Gov. Mot. at 48.  The government offers two

bases for the statements to be admitted: as co-conspirator

statements under Rule 801(d), and as statements against

interest under Rule 804(b)(3).  I will address each of those

bases in turn.

      i.  Hearsay Generally

      "Hearsay evidence is any statement made by an

out-of-court declarant and introduced to prove the truth of the

matter asserted." *United States v. Cardascia*, 951 F.2d 474,

486 (2d Cir. 1991)(citing Fed. R. Evid. 802).  "Of course,

every out-of-court statement is not hearsay, and all hearsay is

M54TMELC

1    not automatically inadmissible at trial.  Instead, the purpose

2    for which the statement is being introduced must be examined

3    and the trial judge must determine whether -- if that purpose

4    is to prove the truth of its assertion -- the proffered

5    statement fits within any of the categories excepted from the

6    rule's prohibition."  *Id.*

7              ii.  Co-Conspirator Statements

8              "Under Rule 801(d), an out-of-court statement offered

9    for the truth of its contents is not hearsay if 'the statement

10   is offered against an opposing party' and it 'was made by the

11   party's coconspirator during and in furtherance of the

12   conspiracy.'"  *United States v. Brown*, 2017 WL 2493140, at *1

13   (S.D.N.Y. June 9, 2017) (quoting Fed. R. Evid. 801(d)(2)(E)).

14   "In order to admit a statement under this Rule, the court must

15   find:  '(a) that there was a conspiracy, (b) that its members

16   included the declarant and the party against whom the statement

17   is offered, and (c) that the statement was made during the

18   course of and in furtherance of the conspiracy.'"  *Id.* (quoting

19   *Gupta*, 747 F.3d at 123).  "Evidence may be admitted under Rule

20   801(d)(2)(E) only if a court finds, by a preponderance of the

21   evidence, that the defendant and the declarant joined a

22   conspiracy, and the challenged out-of-court statements may

23   themselves be considered in making this determination."  *United*

24   *States v. Lumiere*, 2017 WL 1391126, at *5 (S.D.N.Y. Apr. 18,

25   2017) (citing *Bourjaily*, 483 U.S. at 175-76, 178-79).  There is

M54TMELC

no requirement that the person to whom the statement is made

must also be a member of the conspiracy. *Gupta*, 747 F.3d at

125 (citation omitted). "In determining the existence and

membership of the alleged conspiracy, the court must consider

the circumstances surrounding the statement, as well as the

contents of the alleged coconspirator's statement itself." *Id*.

at 123.

"The existence of a conspiracy" and the declarant's

involvement in that conspiracy are "preliminary questions of

fact that, under Rule 104, must be resolved by the court" and

should be "established by a preponderance of proof."

*Bourjaily*, 483 U.S. at 175.

As an initial matter, I cannot conclude that any

particular statements are admissible at this point. The

government has not provided me with a list of the statements

that it seeks to introduce, and I will not pore through the

government's proof and guess at which statements the government

seeks to admit. And I obviously cannot provide blanket

guidance about all statements by the alleged co-conspirators.

Thus, my analysis is limited to the narrow question of whether

I believe that, based on the parties' proffers, the government

is likely to be able to prove the first element under Rule

801(d)(2)(E) -- the existence of a conspiracy.

1.  The Existence of a Conspiracy

At this point, I believe that the government will be

M54TMELC

likely to sustain its burden to establish the existence of a

conspiracy by a preponderance of the evidence.  "An essential

element of the crime of conspiracy is an agreement."  *United*

*States v. Bicaksiz*, 194 F.3d 390, 398 (2d Cir. 1999).  "A

fact-finder may properly find the existence of a criminal

conspiracy where the evidence is sufficient to establish, by a

preponderance of the evidence, that 'the. . . alleged

coconspirators entered into a joint enterprise with

consciousness of its general nature and extent.'"  *In re*

*Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93,

137-38 (2d Cir. 2008) (quoting *United States v. Beech-Nut*

*Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir.1989).  "The

government 'need not present evidence of a formal or express

agreement,' and may instead rely on proof the parties had a

'tacit understanding to engage in the offense.'"  *United States*

*v. Scott*, 979 F.3d 986, 990 (2d Cir. 2020) (quoting *United*

*States v. Amato*, 15 F.3d 230, 235 (2d Cir. 1994)).

            A.  CC-1

            First, with regard to CC-1, the government has

identified evidence that defendant and CC-1 agreed on the

general nature and extent of the proposed attack on a U.S.

military base.  CC-1 and defendant exchanged a number of

messages regarding a planned attack on that base, including one

in which CC-1 expressly asked defendant "are we literally

organizing a jihadist attack[?]"  When defendant responded

M54TMELC

"yes, probably," CC-1 approved, stating "that's kinda baste [a phrase used to express praise or approval]." Gov. Mem. at 16. CC-1 also expressly asked defendant for information about his convoy, including "how many people will be in the convoy," "is it gonna be air to ground or is it gonna be on the ground," "what will be carried," and "what's the plans." *Id.* at 17. Further, CC-1 facilitated defendant's exchange of information related to the military base with other individuals online by forming an invite-only group within the larger RapeWaffen chat in which the participants discussed the attack. *See id.* 18-20. CC-1 also made suggestions for the attack, suggesting that the attackers should mount the assault from high ground and fire weapons from multiple locations at the Military Base. *Id.* 19. That CC-1 not only agreed with defendant to assist in planning the attack, but was also facilitating information-sharing about the attack between other individuals further supports a determination that CC-1 agreed to the general nature and extent of the planned attack on the Military Base with defendant.

Defendant counters there could be no agreement because while CC-1 claimed to be a former Canadian paratrooper who had served in Iraq, he was in fact a 15-year-old boy residing in Canada who had recently been detained in a mental health facility. Def. Opp at 10. But the fact that CC-1 was not who he claimed to be does not negate that CC-1 communicated that he was willing to assist defendant in planning an attack on a U.S.

M54TMELC

1    military base.  And to the extent that defendant claims that

2    CC-1 could not have entered into a conspiracy because he was a

3    minor, defendant has not identified any case law supporting

4    such an argument.

5         Moreover, to the extent that defendant suggests that

6    CC-1 did not in fact intend to assist in the planning of an

7    attack on the Military Base but was instead engaging in a

8    childish fantasy, that argument by itself does not lead me to

9    believe that the government will not be able to demonstrate the

10   existence of a conspiracy by preponderance of the evidence.

11        First, defendant's sole support for that argument

12   appears to be *United States v. Rosenblatt*, which cited a law

13   review article for the proposition that "unless at least two

14   people commit (the act of agreeing), no one does.  When one of

15   two persons merely pretends to agree, the other party, whatever

16   he may believe, is in fact not conspiring with anyone."  554

17   F.2d 36, 38 (2d Cir. 1977) (quoting Developments in the Law

18   Criminal Conspiracy, 72 Harv. L. Rev. 920, 926 (1959)).  But

19   *Rosenblatt* is easily distinguished: in that case, the purported

20   co-conspirator "had no knowledge" of the conspiracy, nor did

21   the co-conspirator "intend or agree to commit" any offenses in

22   furtherance of the conspiracy.  *Id*. at 39.  Here, the

23   Government has proffered that there is ample evidence to show

24   that CC-1 knew of, and agreed to assist in the facilitation of,

25   the attack on the Military Base, including the evidence I just

M54TMELC

1    outlined.

2          Second, the government has identified statements by

3    CC-1 that expressly suggest that CC-1 believed that he was in

4    fact planning an attack.  In one message discussing the attack,

5    CC-1 expressly told defendant, "we're not into larping [live

6    action role-playing]."  Gov. Mot. at 17.  In another, he

7    expressly asked defendant if the two were "literally organizing

8    a jihadi attack," and responded "that's kinda baste" [a term

9    that expresses approval].  *Id*. at 16.  Indeed, defendant has

10   not identified any evidence that suggests that CC-1 believed

11   that he was, in fact, only engaging in fantasy.  At this point,

12   defendant's contention is just a speculative argument without

13   evidentiary support.  Thus, CC-1's own statements appear to be

14   sufficient to establish by a preponderance of the evidence that

15   CC-1 agreed to the general nature and extent of the conspiracy.

16         Third, to the extent that defendant argues otherwise,

17   defendant need not have known CC-1's identity in order to enter

18   into a conspiracy with him.  "Parties may agree -- i.e., may

19   conspire with each other -- without being aware of one

20   another's identity" so long as "the evidence . . . supports an

21   inference that, at a minimum, the accused conspirators knew

22   there were other participants in the conspiracy."  *United*

23   *States v. Bicaksiz*, 194 F.3d 390, 399 (2d Cir. 1999).  Here,

24   the government has proffered that there are numerous messages,

25   including those described above, that establish that defendant

M54TMELC

and CC-1 knew that the other was aiding them to jointly plan an
attack on the Military Base.

          And finally, as an aside, if CC-1 did not, in fact,
agree to the nature and extent of the conspiracy, that is not
sufficient to demonstrate that a conspiracy did not exist.  As
I will discuss in a moment, the government has identified
evidence that demonstrates that defendant agreed not only with
CC-1, but also with CC-3.  Thus, a conspiracy could still exist
between defendant and CC-3 -- though CC-1's statements may not
be admissible if CC-1 did not, in fact, agree to the
conspiracy, there could still exist a conspiracy between
Defendant and CC-3.

          Accordingly, at this point, I believe that the
government will be likely able to prove the existence of a
conspiracy between CC-1 and defendant by preponderance of the
evidence.

          B.   CC-3

          Similarly, I believe that the government will be able
to prove the existence of a conspiracy with regard to CC-3 by a
preponderance of the evidence.  For example, CC-3 told CC-1 and
defendant that attackers should "come from the mountain" and
also noted that if the attack were "done very quickly. . . then
no worries about air support."  Gov.Mot. at 19-20.  He
responded directly to information about the base provided by
Defendant, noting that "since you already know the

M54TMELC

approximately [sic] number of soldiers in the base, you already

won the battle." *Id.* Such statements provide a sufficient

basis to determine that CC-3 entered into a joint enterprise to

plan an attack on a U.S. military base with consciousness of

its general nature and extent.

Much of the analysis that applies to CC-1 also applies

here. To the extent that defendant argues that CC-3 did not

agree to the conspiracy because his identity is apparently

unknown, the identity of a co-conspirator need not be known for

a conspiracy to exist. And none of CC-3's identified

statements suggest that CC-3 believed the conversations to be

merely fantasy -- defendant offers no evidence to support that

narrative at this stage. Finally, even if CC-3 did not agree

to the conspiracy, a conspiracy could exist between CC-1 and

defendant. Of course, if the government could not prove by a

preponderance that defendant conspired with any individuals, no

conspiracy would exist. But at this point, defendant has not

identified any evidence suggesting that to be the case.

The Court's determination could, of course, be altered

at trial based on the evidence presented there if defendant

were to present evidence that suggested that CC-3, whose

identity appears to be unknown, did not in fact agree to the

conspiracy. *See Rosenblatt*, 554 F.2d at 40 (overturing

conviction where two individuals did not agree to commit the

same offense). But without any evidence suggesting that to be

the case at this point, I believe that the government will be

able to establish the existence of a conspiracy, based on the

communications that I articulated, as would be necessary to

admit CC-3's statements that satisfy the other elements of Rule

801(d).

iii.  Alternative Basis to Admit CC-1 and CC-3's

statements: Rule 804(b)(3).

Though the Court has determined it is likely that the

government will be able to demonstrate the existence of a

conspiracy with regard to CC-1 and CC-3, and that statements

made in furtherance of that conspiracy would be admissible as

non-hearsay, it will nonetheless consider whether there is also

a basis to admit those statements under 804(b)(3).  Under

Federal Rule of Evidence 804(b)(3), one type of statement that

is "not excluded by the rule against hearsay if the declarant

is unavailable as a witness" is a statement that:

"(A) a reasonable person in the declarant's position

would have made only if the person believed it to be true

because, when made, it was so contrary to the declarant's

proprietary or pecuniary interest or had so great a tendency to

invalidate the declarant's claim against someone else or to

expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that

clearly indicate its trustworthiness, if it is offered in a

criminal case as one that tends to expose the declarant to

criminal liability."

Federal Rule of Evidence 804(b)(3).

To satisfy Rule 804(b)(3), the proponent must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (quoting *United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983)).  In assessing whether a statement is against penal interest within the meaning of Rule 804(b)(3), the district court must first ask whether "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest," a question that can be answered only "in light of all the surrounding circumstances." *United States v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014).

The parties do not dispute that CC-1's and CC-3's statements were against their penal interest.  I'm not taking a position on that question because, among other things, I do not have a precise list of the relevant statements, but I will address the parties' dispute regarding whether CC-1 and CC-3 are sufficiently "unavailable" under Rule 804(b)(3).  At this

M54TMELC

point, the government falls short of establishing that the

declarants are unavailable under the rule.

A declarant is "unavailable" for purposes of the rule

if he or she "is absent from the hearing and the proponent of a

statement has been unable to procure the declarant's

attendance. . . by process or other reasonable means."  Fed. R.

Evid. 804(a)(5).  "While there is no hard-and-fast rule as to

what constitutes the reasonable means that a proponent of the

evidence must undertake, some affirmative steps must be taken."

*United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 176 (S.D.N.Y.

2006).  Under Rule 804, Courts in this Circuit have found

parties unavailable where, for instance, (1) for an individual

living abroad, the "government submitted an affidavit and

memorandum detailing its efforts to obtain [his] attendance,"

*United States v. Losada*, 674 F.2d 167, 172 (2d Cir. 1982); (2)

for an individual who lived in Turkey and could not be

identified, the government "conducted interviews regarding the

witness's whereabouts," and with FBI assistance, reached out to

Turkish law enforcement authorities in an attempt to find him,

*Ozsusamlar*, 428 F. Supp. at 177; and (3) for an individual who

had been deported, the government "obtained a visa for him,

purchased his airplane tickets, and made several attempts to

contact him by telephone," *United States v. Mejia*, 376 F. Supp.

2d 460, 466 (S.D.N.Y. 2005).

Here, the government has not shown that it used

M54TMELC

reasonable efforts to obtain testimony from CC-1 and CC-3.

First, with respect to CC-1, the government appears to know

that CC-1 is located in Canada and is thus not subject to

compulsory process. But despite knowing CC-1's identity and

whereabouts in Canada, the government has not proffered that it

has requested CC-1's testimony, nor has it explained any other

efforts that it has taken to obtain that testimony. With

respect to CC-3, whose identity appears to be unknown (though

it appears that the individual lives overseas), the government

has not described any efforts it has undertaken to identify

CC-3 or obtain their testimony. Without any affirmative steps

to obtain the testimony, the government has not shown that the

witnesses are sufficiently unavailable.

            Moreover, the government has not identified any cases

in which such limited, really non-existent efforts to obtain

the testimony of a witness have been shown to suffice to

demonstrate unavailability. But rather than identifying the

affirmative steps that it has taken to procure the witness's

testimony, the government instead argues that the fact that

CC-1 and CC-3 are likely to invoke their Fifth Amendment

privilege against testifying, such that they are unavailable

under the rule. Gov. Reply at 32. The government appears to

base that conclusion solely on their own assumption as to what

the individuals will do. It does not proffer, for instance,

that it has spoken with CC-1 and CC-3 and confirmed that they

M54TMELC

1    would, in fact, invoke their Fifth Amendment privileges.

2    *United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y.

3    2004) (finding a declarant to be unavailable given "the

4    government's representation that the pleading defendant's

5    lawyer has been contacted and that such attorney stated that

6    his client would assert the Fifth Amendment privilege is

7    sufficient").

8            Indeed, under the government's approach, all that

9    would be required to prove unavailability would be a hypothesis

10   that a certain witness would plead the Fifth.  That broad

11   interpretation of Rule 804(a)(5) is unsupported and lacks a

12   basis in sound reason.  Not everyone sought to testify in a

13   criminal case would necessarily plead the Fifth.  For example,

14   the 15-year-old CC-1 might not see himself as being in legal

15   jeopardy.  I decline to create a rule that allows the

16   government to take no steps to obtain a witness's testimony in

17   a criminal case and instead designate that witness as

18   unavailable based on mere speculation that the witness would

19   invoke the Fifth Amendment if called to testify.  Accordingly,

20   without any showing that the government has made reasonable

21   efforts to procure the declarant's testimony, indeed without

22   any showing that the government has made any efforts to procure

23   the declarant's testimony, there is currently no basis to admit

24   statements by CC-1 and CC-3 under Rule 804(b)(3).

25           Now if the government believes that it can establish

M54TMELC

1    that it has made, or will make, reasonable efforts to procure

2    the declarants' testimony, it should inform the Court of those

3    efforts promptly, no later than June 3, 2022.

4            So I have a number of issues that I need to address.

5    I propose, to give everybody a break, that we take a short,

6    ten-minute break now before we reconvene for me to resolve the

7    remainder of the issues presented here.

8            Let's take a 15-minute break.  Counsel, I will see you

9    back here shortly.  Thank you.

10           (Recess taken)

11           THE COURT:  We're back on the record after a lengthy

12   recess.  Thank you, counsel.

13           Let's begin where we left off, which is with the

14   Court's decisions regarding the defendant's statements to

15   Individual-1.

16           The government next moves to admit statements of the

17   confidential source and Individual-1.  I'm going to refer to

18   the confidential source as "CS."  Defendant does not dispute

19   that "many of the CS's and Individual 1's statements are. . .

20   likely admissible," Def. Opp. at 14, but instead argues that

21   Melzer's statements to Individual-1 concerning the military and

22   his lack of patriotism should be excluded under Rule 403.

23           Counsel for defendant, am I correct that you're

24   referring to the following statement, the one that begins,

25   "Good luck, it's great for training," is there something else

1    in addition to that one?

2            MR. MARVINNY:  No, I think everything that follows the

3    colon on page 14 of our motion is what we're referring to.

4            THE COURT:  Thank you.  So I have considered that

5    statement, which begins, "Good luck, it's great for training. .

6    . Just don't become a f***in patriot. . . Train and get the ***

7    out. . . I'm not patriotic for sh**. . . All of these places

8    the vast majority deserve to be burned."

9            I find that the probative value of that statement is

10   not substantially outweighed by a risk of unfair prejudice or

11   the other considerations identified in Rule 403.  It has

12   significant probative value -- specifically, that statement,

13   which exhibits alleged defendant's lack of patriotism and the

14   apparent belief that American bases should be "burned," is

15   directly probative of defendant's intent and motive for

16   allegedly planning an attack on an American military base.

17           While there is some danger of prejudice from the

18   introduction of anti-patriotic statements allegedly made by the

19   defendant, the defendant, a U.S. service member, is charged

20   with attempting to murder his follow service members in

21   furtherance of O9A's goal to destroy, as I understand it,

22   western civilization.  That charge, by its very nature, accuses

23   the defendant of engaging in anti-patriotic conduct.  Thus,

24   defendant's statement is "no more sensational or disturbing

25   than the crimes with which [the defendant] was charged."

M54TMELC

*United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

Having considered all of the relevant factors, the Court concludes that the probative value of this statement is not substantially outweighed by the risk of prejudice or the other considerations identified in Rule 403. Fundamentally, the statement, to the extent it's prejudicial, the prejudice is not unfair, it's direct proof of the charged offense and the defendant's alleged interest in committing it.

In addition, the Court invites the parties to confer regarding an appropriate limiting instruction in order to mitigate any possible prejudice stemming from this statement. Any proposal must be made no later than June 3.

C.  The Defendant's Prior Statements

The government next moves to preclude defendant from offering his own prior statements, "including statements made in Telegram chats or during his post-arrest interviews unless and the until the defendant first establishes that the statement is admissible pursuant to a hearsay exception or provision of law." Gov. Mot. at 55-56. Under Federal Rule of Evidence 801, a declarant witness's prior statement is hearsay (and thus is not admissible unless it fits within any of the categories excepted from the prohibition on the admission of hearsay) unless, among other things, "the declarant testifies." Fed. R. Evid. 801(d)(1). By contrast, defendant's prior

1    statements are not hearsay if offered by the government.  *See*

2    *id*.  Defendant counters that "the Court should apply the rule

3    of completeness in determining whether to admit Melzer's own

4    prior statements."  Def. Opp. at 15.

5            The rule of completeness finds its home in Federal

6    Rule of Evidence 106, which states that "if a party introduces

7    all or part of a writing or recorded statement, an adversary

8    may require the introduction, at that time, of any other

9    part -- or any other writing or recorded statement -- that in

10   fairness ought to be considered at the same time."  The rule of

11   completeness provides that "even though a statement may be

12   hearsay, an omitted portion of the statement must be placed in

13   evidence if necessary to explain the admitted portion, to place

14   the admitted portion in context, to avoid misleading the jury,

15   or to ensure fair and impartial understanding of the admitted

16   portion."  *United States v. Kopp*, 562 F.3d 141, 144 (2d Cir.

17   2009) (quotation marks omitted).  "The completeness doctrine

18   does not, however, require the admission of portions of a

19   statement that are neither explanatory of nor relevant to the

20   admitted passages."  *United States v. Johnson*, 507 F.3d 793,

21   796 (2d Cir. 2007) (internal quotation marks omitted), cert.

22   denied, 552 U.S. 1301 (2008).

23           Here, the parties appear to agree that the Court

24   cannot decide the government's motion at this time because the

25   government has not yet identified which of defendant's

M54TMELC

1   statements it plans to introduce prior to trial to allow the

2   defendant to raise any objections or concerns under Rule 106.

3   The Court agrees and will defer ruling on this motion until it

4   is presented with concrete objections.

5       We have just talked about having the government

6   identify the statements that the government may seek to

7   introduce no later than 30 days prior to trial, at least that

8   is the preliminary view of the government.  The parties are

9   going to meet and confer about that topic.  I comment on the

10  defendant's suggestion that that will allow the defense to

11  identify any portions of these documents that they may seek to

12  introduce as a result of the rule of completeness with specific

13  reference to the relevant components of the statements

14  themselves.  I agree with defendant that it will be very

15  helpful for the parties to identify any applications to provide

16  additional portions of these documents to the jury under the

17  rule of completeness and for the parties to identify any

18  disputes regarding that issue well prior to trial.

19      Assuming for these purposes that the parties agree to

20  the proposal that the government circled, namely that exhibits

21  and 3500 materials be provided no less than 30 days prior to

22  trial, I would ask the parties to provide to the Court no later

23  than two weeks prior to trial any disputes regarding sections

24  of statements that the defendant wishes to introduce pursuant

25  to the rule of completeness.

M54TMELC

1          To the extent that the parties are able to agree that

2     portions of statements should be admitted under the rule of

3     completeness, you need not raise it with the Court, but no

4     later than two weeks prior to the trial I would ask that the

5     parties identify specifically what the statements are that the

6     government seeks to introduce, and those statements or portions

7     of statements that the defendant argues must be introduced

8     pursuant to the rule on completeness.  That will give me ample

9     time to take a position on the issues prior to trial.  The

10    defendant's suggestion is proper, and I expect that I would

11    require the parties to do just that, assuming, again, that you

12    circle the 30 days that the government originally proposed.

13          If, for any reason, the parties come up with a

14    proposal that is less than 30 days, please let me know,

15    otherwise, my expectation is that any disputes regarding

16    portions of the submissions, or I should say the defendant's

17    statements that the defendant seeks to introduce under the rule

18    of completeness will be identified by joint submission from the

19    parties no later than two weeks prior to trial.

20          D.  Evidence of the Military Base's True Name

21          The government next moves to prohibit the use of the

22    true name of the military base at trial and instead to

23    substitute "the Military Base" as a pseudonym.  Gov. Mot. at

24    56.  Defendant counters that doing so could "adversely impact

25    Melzer's defense 'by inaccurately  suggesting to the jury that

M54TMELC

the base's true name is closely held'" as would be required to

find defendant guilty under Counts Seven and Eight of the

indictment.  Def. Mem. at 19-20.

    The Court agrees that the military base should be

referred to as "the Military Base," as opposed to its true name

at trial.  The government has proffered that it will introduce

evidence that defendant shared information including the

"number of soldiers who would be guarding the installation,

their weaponry (including what weapons they lacked), and which

modes of attack would be most successful given the topography

surrounding the military base."  Gov. Mot. at 56-57.  The

government proffers that the use of the facility's name at

trial would be damaging to national security.  The Court

understands that the information may be available via public

sources, but ascribes significant weight to the government's

assertion of the strong national security interest in using a

pseudonym for the military base at trial.

    Indeed, numerous cases in this Circuit have recognized

that special measures may be necessary to keep information

confidential when national security concerns are implicated.

In *United States v. Schulte*, the court ordered certain

materials to remain under seal because their disclosure could

"empower the United States' adversaries."  2019 WL 3764662, at

*4 (S.D.N.Y. July 22, 2019).  And in *United States v. Doe* -- an

unpublished decision -- the Second Circuit commented that the

1    district court had "properly determined that sealing was

2    required in order to serve the Government's compelling interest

3    in promoting safety and ongoing national security

4    investigations," especially because unsealing could "jeopardize

5    the safety of numerous individuals," in an investigation that

6    "involved national security issues."  629 F. App'x 69, 73 (2d

7    Cir. 2015).  Further, in *United States v. Alimehmeti*, a court

8    in this district found it appropriate to partially close

9    testimony of certain undercover officers because of the risk

10   that, should their identities be made public, the officers

11   "lives would be endangered and they would be unable to continue

12   their lines of vital work."  284 F. Supp.3d 477, 486 (S.D.N.Y.

13   2018).

14            At the same time, the Court appreciates that the use

15   of the term "Military Base," if introduced in a manner that

16   would draw attention to the fact that it is being used as a

17   pseudonym, could adversely impact defendant by suggesting that

18   the base and its location are "closely held" military secrets.

19   Thus, the Court agrees that measures are necessary to minimize

20   any adverse impact to the defendant.  *See United States v.*

21   *Urena*, 8 F. Supp. 3d 568, 573 (S.D.N.Y. 2014) (determining that

22   a witness should testify under an alias, rather than under a

23   "transparent code name like UC-188" because doing so would

24   "protect [the witness's identity] in a way that avoids drawing

25   the jury's attention to the prophylactic measures taken by the

1    Court").

2            Accordingly, I will instruct the parties to refer to

3    the military base as "the Military Base" throughout the trial.

4    I instruct them not to draw attention to the fact that the

5    Military Base is being used as a synonym.  In addition, I will

6    not prohibit the admission of evidence demonstrating that the

7    Military Base's name was publicly searchable.  Defendant is

8    free to elicit testimony that information about the Military

9    Base, for example, can be found on Wikipedia or otherwise.  Nor

10   will I prohibit the admission of evidence that defendant knew

11   that information about the Military Base was publicly

12   available.  But given the national security interests

13   implicated by its use at trial, as proffered by the government,

14   the parties may not refer to the actual name of the base.  My

15   hope is that this will strike an appropriate balance between

16   the national security interests asserted by the United States

17   and the defendant's rightful desire to demonstrate that the

18   information about the base was not so closely held as a secret,

19   but they can do so, I believe, without specifically stating the

20   name of the base during the course of the trial.

21           e.  Anonymized Jury

22           The government next requests that the Court anonymize

23   the jurors' names, addresses and other identifying information

24   from the public.  As an initial matter, I note that this is not

25   a true "anonymized jury."  A true anonymized jury is one in

which the jurors' personal information is not disclosed to the

parties, particularly the defendant or the public.  Here, as I

understand it, the government seeks only that the jurors'

information not be disclosed to the public.  The information

would be available for the defense for purposes of jury

selection and the like.  Not using the jury names at trial

would not be a significant departure from my typical trial

practices.  I typically refer to the jurors by number

throughout trial, and refer to them only by name once, during

the voir dire process as they are seated.  Thus, while I will

analyze whether this iteration of an "anonymized jury" is

appropriate under the traditional framework for determining

whether an anonymized jury is warranted, I do so with the

specifics of the government's request in mind.

        "Anonymous juries are impaneled in order to protect

jurors from harm, to address concerns of jurors regarding their

safety, and to prevent potential jury tampering." *United

States v. Khan*, 591 F.Supp.2d 166, 169 (E.D.N.Y. 2008) (quoting

*United States v. Gammarano*, 2007 WL 2077735, at *4 (E.D.N.Y.

July 18, 2007)).  Yet impaneling an anonymous jury also

presents "the possibility of unfair prejudice to the defendant

and the danger of encroaching on the presumption of innocence."

*United States v. Tutino*, 883 F.2d 1125, 1132 (2d Cir. 1989).

        Indeed, "the Second Circuit has consistently 'made

clear that when genuinely called for and when properly used,

M54TMELC

anonymous juries do not infringe a defendant's constitutional

rights.'"  *United States v. Tairod Nathan Webster Pugh*, 150 F.

Supp. 3d 218, 221 (E.D.N.Y. 2015) (quoting *United States v.*

*Kadir*, 718 F.3d 115, 120 (2d Cir. 2013)).  "It has also

explained, however, that the 'analysis of the potential

constitutional impact of an anonymous jury on a defendant must

receive close judicial scrutiny and be evaluated in the light

of reason, principle and common sense.'"  *Id*. (quoting *United*

*States v. Taylor*, 17 F. Supp. 3d 162, 179 (E.D.N.Y. 2014),

aff'd, 802 F. App'x 604 (2d Cir. 2020)).

        "As a general rule, a district court may order the

impaneling of an anonymous jury upon '(a) concluding that there

is strong reason to believe the jury needs protection, and (b)

taking reasonable precautions to minimize any prejudicial

effects on the defendant and to ensure that his fundamental

rights are protected.'"  *United States v. Stewart*, 590 F.3d 93,

124 (2d Cir. 2009) (quoting *United States v. Paccione*, 949 F.2d

1183, 1192 (2d Cir. 1991)).  "In determining whether there is a

"strong reason" to believe a jury needs protection, courts

consider whether (1) the charges against the defendants are

serious, (2) there is a substantial potential threat of

corruption to the judicial process, and (3) considerable media

coverage of the trial is anticipated."  *United States v.*

*Tomero*, 486 F. Supp. 2d 320, 322 (S.D.N.Y. 2007); *United States*

*v. Rivera*, 2015 WL 630242, at *2 (E.D.N.Y. Feb. 13, 2015)

M54TMELC

1    (same).

2             To address the third factor, the crimes charged in

3    this case are likely to obtain media attention.  The Court

4    expects numerous news outlets will be interested in the case of

5    a U.S. military serviceman charged with the attempted murder of

6    his fellow servicemen.  That is proven out based on the

7    interest in this case until now.

8             Let me just hear briefly from you, counsel for the

9    United States, I understand that the defendant is charged with

10   planning a violent deadly attack on fellow service members,

11   what's the reputation of these groups?  What's the basis that

12   the government proffers that the Court should consider in order

13   to determine that prospective jurors would have fear as a

14   result of the nature of the crimes or the nature of the

15   evidence that would be presented to them?  Counsel?

16            MR. HELLMAN:  Thank you.  So I think there are two

17   sets of groups that the government has in mind, speaking

18   broadly, the first are particular far right and/or white

19   nationalist groups, including groups which are active in the

20   United States.  Most notably, I think the Order of Nine Angles,

21   to which the government says the defendant was a member, groups

22   outside of those form category two, which is the Jihadist

23   groups which are known to be international organizations to

24   which the defendant was allegedly attempting to pass sensitive

25   information about the military base.

M54TMELC

1          Many of those groups are likely to be more familiar to

2     the jurors, which forms the basis of the government's request

3     to allow Dr. Simi's testimony, but the government imagines, and

4     I understand we haven't reached the question of Dr. Simi's

5     testimony yet, but either through that expert testimony or

6     through other evidence offered at the trial, the jury is going

7     to learn about far right groups which espouse violent idealogy

8     and discuss violent sexual attacks and also murder as means of

9     accelerating a predicted race war.

10          Because these groups themselves embrace violence at

11     their core, and in particular violence against any members of

12     the public who can do not ascribe to their idealogy, the

13     government posits that jurors may have fear of these groups,

14     which are not only known to be active in the United States but

15     to also have taken steps such that individual members hide

16     their membership or identities or participation in these groups

17     and have been alleged to or admitted to having infiltrated

18     various aspects of society, including government and law

19     enforcement, military functions.

20          THE COURT:  Thank you.

21          Counsel for the defendant, do you have any response to

22     the government's proffer regarding whether prospective jurors

23     may have some fear of reprisal given the nature of the charges

24     and the anticipated evidence?

25          MR. MARVINNY:  Your Honor, I would point the Court to

M54TMELC

1    the arguments we make on page 22 of our response motion, but I

2    will touch on them here.  I don't dispute in some broad sense

3    that a group like ISIS is dangerous, no one would, but I point

4    out of course Mr. Melzer is not charged with being a member of

5    ISIS, he's not charged with providing material support to ISIS,

6    nor is he charged with committing any act of violence himself.

7         His case in that sense is analogous to the case we

8    cite on page 22, which is *United States v. El Gammal*, where

9    Judge Ramos declined to anonymize the jury in a case charging

10   material support for terrorism because the defendant was, "not

11   personally accused of committing violent acts, much less

12   attacks on innocent New Yorkers."  That's true of Mr. Melzer.

13        So while the government may be able to point to some

14   parade of horribles about some of these groups, there is simply

15   nothing specific to Mr. Melzer, the way he has comported

16   himself from the moment of his arrest, the way he comported

17   himself during his period of incarceration, certainly the way

18   he comported himself in court.  And again, there's no

19   allegation that committed an act of violence, that he provided

20   direct support to any designated group.  And so for those

21   reasons, the specific circumstances as to Mr. Melzer don't

22   suggest that the jury needs to be worried about protection.

23        THE COURT:  Thank you.  Let me hear from you, counsel,

24   about the nature of the government's request here.  This isn't,

25   as I noted at the outset, a true request, as I understand it,

M54TMELC

1    for an anonymized jury.  Mr. Melzer will have, if I adopt the

2    government's proposal, full access to the identities of the

3    prospective jurors.  What is the defendant's interest in making

4    sure or asking the Court to ensure that the names of

5    prospective jurors are available to third parties, namely the

6    public and the press?

7           MR. MARVINNY:  We're not particularly interested in

8    that, your Honor.  Our main concern is that the jury, either

9    the jury that is ultimately impaneled or the prospective

10   jurors, have it communicated to them in any way that Mr. Melzer

11   is dangerous and that they need to fear for their personal

12   safety.  That would obviously prejudice Mr. Melzer.

13          So the Court's earlier comments that the proposed

14   mechanism here wouldn't deviate that far from the Court's

15   normal practice is heartening.  It's the type of thing we're

16   interested in.  But if there's any suggestion to the jury,

17   implicitly or otherwise, that Mr. Melzer can't hear their names

18   or their names can't be uttered in a way that would be flagged

19   for them or would raise alarm bells for them, that's our

20   concern.

21          THE COURT:  Thank you, that makes good sense.

22          So let me say I'm going to grant the government's

23   request.  I should say that I'm granting this in a bit of a

24   vacuum in that for two reasons.  One, I'm happy to adopt a

25   process that I think will address the defendant's concern,

M54TMELC

namely one in which we will not highlight to the jury that

there's any potential concern.  As I said, usually during my

trials I refer to each juror by their number and don't provide

any explanation about why it is that I do that, I just refer to

Juror No. 1 as Juror No. 1 and don't use people's names.

The second thing that I want to say is the reason why

I say that I'm caveating this is because the people who may

have the most interest in the information that the government

is seeking for me to protect here aren't speaking here, namely

the public and the press.  I think that there's serious

concerns regarding, I will call it the safety of prospective

jurors and their perception of you.  That's principally what

I'm responding to here in the government's application.

I'm emphasizing this point because it may be that

we'll hear from other voices who are focused principally on

what I will call the presumption of public access to the

judicial information, namely the identity of these jurors, who

will provide additional argument that may lead the Court to

conclude that the names of the jurors should be disclosed.

So I'm making these decisions based on the arguments

that I have in front of me now, and I believe that these

arguments, given the risk that the government has described,

are sufficient both to grant their motion and also to outweigh

the presumption of public access to judicial documents, namely

the identity of the individual jurors, given the risk

M54TMELC

associated with these, I'll call it hate groups and terrorist

groups and the risk of potential reprisal that the government

has proffered.

But I just highlight that the proffer by the

government has largely been focused on how the jurors will

receive that potential risk, and it may be that additional

information would be beneficial to the Court at a future stage

in the event this issue is put to the Court in a different

context.

So just looking at this, using the traditional

framework, understanding that this is not a traditional request

for an anonymized jury, as to the first factor, the charges

against the defendant are serious.  The Court agrees that they

are serious.  The defendant is charged with planning a violent

deadly attack on his fellow service members.  This is a very

serious charge.  He's accused of attempting to murder U.S.

service people.

As to the second factor, whether there's a threat of

corruption to the judicial process, "courts traditionally look

at two types of evidence."  *Pugh*, 150 F. Supp. 3d at 225.

"First, courts examine evidence of prior attempts by 'the

defendant to engage in intimidation or bribery of, or violence

toward, either witnesses or jurors.'"  *Id.* (citing *United*

*States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir. 1995) and

*United States v. Paccione*, 949 F.2d 1184, 1192-93 (2d Cir.

M54TMELC

1991)).  "Second, courts consider whether, given the context of
the case, there is reason to believe that jurors 'would fear
reprisal.'"  *Id.* (quoting *United States v. Al Fawwaz*, 57 F.
Supp. 3d 307, 309 (S.D.N.Y. 2014)).

        Here, there's no evidence of any attempts to engage in
intimidation, bribery or violence towards witnesses or jurors.
Indeed, this factor is not particularly important here where
the government is not requesting that the jurors' names be kept
from the parties, as might be appropriate in a case where the
government is concerned that the defendant would use that
information to intimidate or bribe those jurors.  At this
point, the government has not suggested that these alleged hate
groups are likely to take action against prospective jurors
either.

        As to whether there's reason to believe the jurors
would fear reprisal, the government argues that the jury needs
protection because of the severity of the charged crimes and
because "the charges center around a white supremacist and
jihadist plot to murder U.S. soldiers."  *See* Gov. Reply at
43-44.  Courts in this Circuit have repeatedly determined that
the "mere invocation" to a defendant's membership in a
potentially threatening organization, without "something more,"
is an insufficient basis to anonymize a jury.  *See, e.g.*,
*United States v. Pugh*, 150 F. Supp. 3d 218, 223 (E.D.N.Y. 2015)
("The mere invocation of the words 'terrorism' or 'al Qaeda'

M54TMELC

are insufficient alone to justify an anonymous jury' --
something more is required.") (quoting *United States v. Al
Fawwaz*, 57 F. Supp. 3d 307, 309 (S.D.N.Y. 2014)); *United States
v. Vario*, 943 F.2d 236, 241 (2d Cir. 1991) ("The invocation of
the words 'organized crime,' 'mob,' or 'Mafia,' unless there is
something more, does not warrant an anonymous jury."). "This
'something more' can be a demonstrable history or likelihood of
obstruction of justice on the part of the defendant or others
acting on his behalf or a showing that trial evidence will
depict a pattern of violence by the defendants and his
associates such as would cause a juror to reasonably fear for
his own safety." *United States v. Vario*, 943 F.2d 236, 241 (2d
Cir. 1991).

          Here, I conclude that a reasonable juror would fear
reprisal.  White supremacist groups, jihadist groups, and
perhaps, to the extent known, O9A, have reputations as violent
militant organizations.  That reputation for violence is such
that a reasonable juror could fear reprisal.  *See United States
v. Al Fawwaz*, 57 F. Supp. 3d 307, 309 (S.D.N.Y. 2014) ("The
specific charges in this case raise a 'reasonable likelihood
that the pervasive issue of terrorism would raise in the
jurors' minds a fear for their individual safety.'") (quoting
*Stewart*, 590 F.3d at 125).  So too, here.  Based on the
evidence proffered, I understand that the evidence presented
will raise just such a concern in the minds of our jurors.

M54TMELC

1    Thus, all three factors weigh in favor of determining that

2    there's strong reason to believe the jury needs some level of

3    protection.

4         Moreover, the Court will take reasonable precautions

5    to minimize any prejudicial effects on defendant and to ensure

6    that his fundamental rights are protected.  Defendant argues

7    that the impanelment of an anonymous jury could raise "raise

8    the spectre that defendant is a dangerous person from whom the

9    jurors must be protected."  Def. Opp. at 21.  The government

10   has proposed that the jurors should not be "informed about the

11   basis for the protective measures" or that they be "told that

12   the number system is being used for privacy reasons."  Gov.

13   Reply at 46.  The Court agrees that the latter proposal –– that

14   the jurors be told that they are being anonymized for privacy

15   reasons –– adequately mitigates any prejudicial effects.

16   Alternatively, I may simply say nothing to them and just use

17   their numbers throughout trial without need for further

18   comment.  That will be my default approach, that is, that I

19   won't say anything about why it is that I'm referring to them

20   by number, I would just do it.  If the parties have an

21   alternative view regarding that approach or a different

22   suggestion, I'm happy to adopt it.

23        Accordingly, at this point, my conclusion is that I

24   need not disclose the jurors' names to the public and that I

25   will refer to the jurors only by number throughout the course

M54TMELC

1    of the trial.

2            So in conclusion, with respect to the government's

3    motion, it's denied in part and granted in part.  The Court

4    concludes at this point that the probative value of the

5    Jihadist Material, the O9A Materials, are not substantially

6    outweighed by the risk of unfair prejudice and the other

7    concerns articulated in Rule 403.

8            I reached that conclusion with respect to each of the

9    exhibits after having examined each of them in context and

10   considered all of the relevant facts that have been presented

11   to me up to this point, including an examination of each of the

12   relevant exhibits.  I have engaged in a balancing with respect

13   to all of the factors articulated in Rule 403 and reached the

14   conclusion that I have just articulated.  As I described, I

15   believe that all of this evidence is direct evidence of the

16   charged offenses.

17           I also believe that it is likely that the government

18   will be able to prove by a preponderance of the evidence that a

19   conspiracy existed between defendant CC-1 and CC-3 under Rule

20   801(d).  The government has not provided a sufficient basis to

21   admit such statements as statements against interest under Rule

22   804(b)(3) because they have done nothing, and, therefore, I

23   cannot conclude that the witnesses are unavailable.

24           In addition, the Court will not at this point preclude

25   the admission of the previously described statements by

M54TMELC

1    Mr. Melzer to Individual-1 under Rule 403.  I reach that

2    conclusion, too, after examining all the relevant facts and

3    balancing the probative value of that evidence against the

4    prejudicial effect of the evidence and all of the other factors

5    articulated in Rule 403.  I conclude, having done a considered

6    examination of those factors, that the prejudicial effect and

7    other adverse potential consequences do not substantially

8    outweigh the probative value of that evidence.

9            Finally, I will preclude the evidence of the true name

10   of the Military Base at trial, in part out of deference for the

11   proffer by the United States, that doing so would have an

12   adverse impact on national security, and my conclusion that the

13   alternative that we will adopt will not unduly hinder the

14   defendant's ability to present his proposed defense.

15           And I will also prevent the disclosure of the jurors'

16   names to the public.  Again, that does not in any way, as I

17   understand it, adversely impact the interests of the defendant,

18   who will have full access to the jurors' identities.  That

19   issue is something that I take up, I will call it

20   provisionally.  It may be that I will reexamine that conclusion

21   in the event that additional information is put to me with

22   respect to the issue.

23           Let me turn now to the defendant's motions in limine.

24           Defendant seeks (1) a bill of particulars identifying

25   defendant's co-conspirators; (2) to exclude testimony by the

M54TMELC

1    government's proposed expert, Dr. Peter Simi; and (3) to

2    conduct attorney-led voir dire.

3            I will begin with the discussion of defendant's motion

4    for a bill of particulars.  First, counsel for the United

5    States, as defendant points out, the government's position on

6    when the conspiracy began has changed somewhat through the

7    course of the case.  And now, as I understand it, you proffer

8    that all of the communications with the alleged co-conspirators

9    "occurred within the time period of just over a month, namely

10   between late April 2020 and May 29, 2020."

11           Can the government confirm that it does not intend to

12   identify any co-conspirators based on communications made

13   outside of that time period?

14           MR. HELLMAN:  Yes.

15           THE COURT:  Thank you.  So counsel, the defendant also

16   points out that the government's position has been inconsistent

17   throughout its filings with regard to the identities of the

18   co-conspirators.  Does the government anticipate identifying

19   additional co-conspirators in addition to CC-1, CC-2, and CC-3

20   at trial?

21           MR. HELLMAN:  No.

22           THE COURT:  Thank you.

23           Counsel for the defendant, in your opposition to the

24   government's motions in limine, you note that you requested

25   unredacted information relating to his co-conspirators.  Is

M54TMELC

1    there anything additional that you would like to bring to my

2    attention regarding that request?

3         MR. MARVINNY:  Yes, your Honor, thank you.  The

4    government has produced some additional material related to the

5    co-conspirators since the filing of our motions.  I have spoken

6    with the government.  We expect to receive more information

7    soon.  The government has indicated that it expects to get

8    additional evidence to us as soon as the end of this week.  I

9    certainly, to the best of my ability, encourage the government

10   to do that.  It might engender further litigation.

11        I will say the materials we have been provided are not

12   entirely unredacted.  To the contrary, they're still heavily

13   redacted.  So the short answer is yes, we have gotten some

14   materials, although arguably not the most critical materials,

15   and we're expecting the rest very soon.

16        THE COURT:  Good, thank you.

17        Counsel for the United States, let me hear from you

18   about the status.  Let me begin with a question and then I will

19   ask for your response to the defendant's remarks.

20        So the defendant has requested that the government

21   produce any material in its possession that is relevant to the

22   co-conspirators' states of mind and identities under Rule

23   16(a)(1)(E).  They assert that doing so is required, consistent

24   with the government's obligations under *Brady* and its progeny.

25        First, do you disagree that the information that

M54TMELC

1    they're requesting is required to be provided to them under

2    *Brady*?

3        MR. HELLMAN:  The government agrees that if there

4    existed evidence in the government's possession that would tend

5    to negate any element of the crime or that would otherwise

6    consist of material information under the *Brady* standard, it

7    would be required to disclose that.  If the government in this

8    particular context is in possession of information that

9    suggests that any of the CCs it has identified did not have the

10   requisite mens rea or state of mind, then the government does

11   agree that it would be required to disclose that information to

12   the defense.  The government has endeavored to collect all of

13   that information available to it and has continued working with

14   its law enforcement partners to identify any information

15   responsive to the defendant's request.

16        Responding to what Mr. Marvinny said, that's an

17   accurate capsule of our conversations on this subject.  The

18   government is continuing to work to identify those materials

19   and in particular work through any potentially related

20   classification issues that pertain to them and will keep

21   counsel closely apprised of the status of its efforts produce

22   that additional material.

23        THE COURT:  That you, that's helpful.

24        MR. MARVINNY:  Your Honor, may I be heard?

25        THE COURT:  Yes, please.

M54TMELC

1          MR. MARVINNY:  We're not trying to hide the ball here.

2     The most specific request we have is for records related to

3     CC-1's arrest in early 2020 and his concurrent psychiatric

4     hospitalization pursuant to that arrest.

5          The government disclosed these facts, the fact that he

6     had been arrested and hospitalized, in what was a *Brady*

7     disclosure to us a very long time ago.  We have been operating

8     under the assumption that those records are in the government's

9     possession because they at least know enough material to have

10    provided some initial *Brady* disclosure.  It seems to me there's

11    no dispute that that kind of evidence is *Brady*.

12         So that's our most specific request, but we appreciate

13    the government's willingness to think about it more broadly as

14    well, because we don't know the universe of documents that's

15    out there.

16         THE COURT:  Good.  Thank you.

17         Counsel for the United States, can you respond

18    regarding the specific category of documents that the defense

19    is focused on right now, namely records of CC-1's arrest and

20    hospitalization?

21         MR. HELLMAN:  Yes.  The government notes, first of

22    all, that in its disclosure to defense counsel, and as the

23    Court is aware, the person the government has identified as

24    CC-1 is a foreign national.  To the extent that the government

25    is attempting to locate records in its possession responsive to

M54TMELC

1    counsel's specific request, I'll say again that the government

2    is working through any potential classification issues.

3          THE COURT:  Let me pause you on that.  Why would

4    information about the arrest of a Canadian and his

5    hospitalization be classified?

6          MR. HELLMAN:  I could address that in greater detail

7    before the Court in a Section II proceeding.

8          THE COURT:  Thank you, fine.

9          MR. HELLMAN:  So with that in mind, the government

10   hopes to update counsel as to the status of its attempts to

11   answer that request on the timeline that counsel mentioned.

12         THE COURT:  Thank you.  Good.  Thank you, counsel for

13   the United States.  I appreciate that the government recognizes

14   its obligations under *Brady*, which are sweeping and important.

15   Obviously the government must comply with its obligations, and.

16         I agree with what I believe to be the parties' mutual

17   understanding that information regarding the mens rea of

18   alleged co-conspirators would fit within the scope of that

19   disclosure to the extent that it is *Brady* material.  I expect

20   it would be.  I'm not ruling on that, but I appreciate that

21   both parties seem to agree at least in that regard.

22         Let me just take up the defendant's application for a

23   bill of particulars and the other issues raised here.

24         I'm not going to grant the defendant's motion for a

25   bill of particulars.  I'm going to describe the reasons why in

M54TMELC

sum.  It's in part because the nature and scope of the

conspiracy now in terms of time and number of individuals based

on the government's proffer is quite limited.

I will explain more now.

Federal Rule of Criminal Procedure 7(f) "permits a

defendant to seek a bill of particulars in order to identify

with sufficient particularity the nature of the charge pending

against him, thereby enabling defendant to prepare for trial,

to prevent surprise, and to interpose a plea of double jeopardy

should he be prosecuted a second time for the same offense."

*United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

The decision to grant or deny a request for a bill of

particulars "rests within the sound discretion of the district

court."  *Id.*

"A bill of particulars is required 'only where the

charges of the indictment are so general that they do not

advise the defendant of the specific acts of which he is

accused.'"  *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir.

1999) (internal citations omitted).  "Furthermore, a bill of

particulars is not necessary where the government has made

sufficient disclosures concerning its evidence and witnesses by

other means."  *Id.*  "Generally, if the information sought by

defendant is provided in the indictment or in some acceptable

alternate form, no bill of particulars is required."

*Bortnovsky*, 820 F.2d at 574.  "In considering whether a bill of

M54TMELC

particulars is required, the Court considers not only the

information provided in the indictment, but also discovery

materials and other information provided to the defendant."

*United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 302

(S.D.N.Y. 2018).

a. Bill of Particulars

A bill of particulars is not "a general investigative

tool, a discovery device or a means to compel the government to

disclose evidence or witnesses to be offered prior to trial."

*United States v. Tuzman*, 2017 WL 4785459, at *13 (S.D.N.Y. Oct.

19, 2017) (quoting *United States v. Gibson*, 175 F.Supp.2d 532,

537 (S.D.N.Y. 2001)).  "Instead, its purpose is to supplement

the facts contained in the indictment when necessary to enable

defendants to identify with sufficient particularity the nature

of the charges against them."  *Id*. (quoting *United States v.

Gotti*, 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004)).  In the

same vein, "acquisition of evidentiary detail is not the

function of the bill of particulars."  *United States v. Torres*,

901 F.2d 205, 234 (2d Cir. 1990), abrogated on other grounds by

*United States v. Marcus*, 628 F.3d 36, 41 (2d Cir.2010)); *see

also United States v. Trippe*, 171 F. Supp. 2d 230, 240

(S.D.N.Y. 2001).  It is well-established that a defendant is

entitled to a bill of particulars only where it is "'necessary

to the preparation of his defense, and to avoid prejudicial

surprise at the trial.'"  *Torres*, 901 F.2d at 234 (2d Cir.

M54TMELC

1990) (quoting 1 C. Wright, Federal Practice and Procedure,

Section 129, at 434-35 (2d ed. 1982).

    Although "the line between mere evidentiary detail and

information needed to prepare a defense and prevent unfair

surprise can be thin indeed," *Rajaratnam*, 2010 WL 2788168, at

*1, requests for evidentiary detail such as "whens," "wheres,"

and "with whoms" are frequently denied. *United States v.*

*Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001).

    "The government's presentation of evidence at trial is

limited to the particulars contained in the bill [of

particulars], so care must be taken not to overly restrict the

government's proof while still protecting the defendant from

unfair surprise." *United States v. Mahabub*, 2014 WL 4243657,

at *2 (S.D.N.Y. Aug. 26, 2014) (citing *United States v. Payden*,

613 F. Supp. 800, 816 (S.D.N.Y. 1985)); *see also United States*

*v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) (collecting

cases) ("It is beyond cavil that a bill of particulars confines

the Government's proof to the particulars supplied.").

    "In considering a request for particulars as to the

names of unindicted co-conspirators," courts in this Circuit

"have considered the following factors: (1) the number of

co-conspirators, (2) the duration and breadth of the alleged

conspiracy, (3) whether the government otherwise has provided

adequate notice of the particulars, (4) the volume of pretrial

disclosure, (5) the potential danger to co-conspirators and the

M54TMELC

1    nature of the alleged criminal conduct, and (6) the potential

2    harm to the Government's investigation." *United States v.*

3    *Oruche*, 2008 WL 612694, at *3 (S.D.N.Y. Mar. 5, 2008), aff'd

4    sub nom. *United States v. Oluigbo*, 375 F. App'x 61 (2d Cir.

5    2010); *see also United States v. Nachamie*, 91 F. Supp. 2d 565,

6    572-73 (S.D.N.Y. 2000) (same).

7            At this point, those factors weigh against ordering

8    the government to particularize defendant's co-conspirators.

9    As to the number of co-conspirators, the government has

10   proffered that it does not intend to identify any

11   co-conspirators other than CC-1, CC-2 and CC-3 at trial, nor

12   does it intend to call those co-conspirators as witnesses.

13   Gov. Opp. at 5.

14           Accordingly, the government has also proffered that it

15   does not expect to identify co-conspirators from any time

16   period other than from late April 2020 and May 29, 2020,

17   meaning that the duration and breadth of the conspiracy is

18   relatively limited.  Moreover, the government has attached to

19   its briefing "an index delineating the online monikers for the

20   co-conspirators referenced in the Complaint, the Indictment,

21   the Superseding Indictment, and the government's briefing."

22   *Id*.  That -- that is, the combination of all these factors and

23   disclosures -- is sufficient, at this point, to provide

24   adequate notice of the particulars of the co-conspirators.

25           As to the other factors, defendant does not argue that

M54TMELC

1    the discovery in this case has been voluminous, nor does it

2    argue that the co-conspirators would face harm.  Further,

3    there's been no suggestion that the government's investigation

4    could be harmed by providing particulars of defendant's

5    co-conspirators.

6         The "ultimate test" for granting a bill of particulars

7    is "whether the information sought is necessary, not whether it

8    is helpful." *United States v. Mitlof*, 165 F.Supp.2d 558, 569

9    (S.D.N.Y. 2001) (emphasis added).  Here, given the government's

10   express identification of the limited number of

11   co-conspirators, the relatively limited length of the

12   conspiracy, and the disclosures that have already been made by

13   the government, a bill of particulars is not required for the

14   adequate preparation of defendant's defense.  *See United States*

15   *v. Middendorf*, 2018 WL 3956494, at *2 (S.D.N.Y. Aug. 17,

16   2018)("The scope of the alleged conspiracy is limited to

17   employees of two entities -- KPMG and PCAOB.  And the

18   government has produced extensive discovery, documenting the

19   conduct and interactions of the named co-conspirators.").

20        Despite defendant's arguments to the contrary, this

21   case is readily distinguishable from *United States v. Valle*,

22   where the court ordered the government to identify

23   co-conspirators.  *United States v. Gilberto Valle*, Dkt. No. 40

24   at 7-8 (S.D.N.Y. Jan.9, 2013).  There, the court noted that the

25   number of potential co-conspirators was "potentially more than

M54TMELC

1    twenty" in a conspiracy that was alleged to have spanned years,

2    and where the government had produced "massive" discovery of

3    more than one million pages.  *Id*.  Moreover, in that case, the

4    defendant sought a bill of particulars only two weeks prior to

5    trial -- at that point, faced with no information and a

6    mountain of discovery, the defendant required a bill of

7    particulars in order to prepare the defense.  *See id*.  Here, by

8    contrast, the government has represented that it intends to

9    identify only three co-conspirators in a conspiracy that

10   spanned a short period of time.  Moreover, the government

11   disclosed that information approximately five months before

12   trial, providing defendant with ample time to prepare a

13   defense.

14          Defendant argues that a bill of particulars would

15   prevent the government from changing its account of Melzer's

16   co-conspirators prior to trial, noting that its account "has

17   changed with each successive filing."  Def. Reply at 1.  The

18   government's changing positions are noteworthy, but given that

19   the government has represented that it does not plan on

20   changing the time span or identity of the three co-conspirators

21   already identified, I cannot conclude that a bill of

22   particulars is "necessary to the preparation of his defense."

23   *Torres*, 901 F.2d at 234 (2d Cir. 1990).  Of course, if the

24   government should again change its position in a manner that is

25   concerning to defendant, defendant is welcome to raise those

M54TMELC

1    concerns to the Court.

2          b.  Motion to Preclude Dr. Peter Simi's Expert

3    Testimony

4          Defendant next moves to exclude the testimony of

5    Dr. Peter Simi.  Defendant offers four arguments as to why

6    Dr. Simi's testimony should be precluded: "(1) the government's

7    notices contain only a list of topics and do not identify what

8    opinions, if any, Dr. Simi will offer; (2) certain proposed

9    topics are plainly irrelevant and prejudicial; (3) Dr. Simi

10   lacks expertise about O9A specifically; and (4) Dr. Simi's

11   testimony about O9A appears to be based primarily on publicly

12   available documents to which he will not have applied any

13   particular expertise."  Def. Mot. at 10-11.

14         The Court cannot determine whether Dr. Simi is

15   qualified to testify as an expert without a *Daubert* hearing.  I

16   suggested this in my prior order but I conclude this now.

17   Federal Rule of Evidence 702 permits "[a] witness who is

18   qualified as an expert by knowledge, skill, experience,

19   training, or education" to "testify in the form of an opinion

20   or otherwise if: (a) the expert's scientific, technical, or

21   other specialized knowledge will help the trier of fact to

22   understand the evidence or to determine a fact in issue; (b)

23   the testimony is based on sufficient facts or data; (c) the

24   testimony is the product of reliable principles and methods;

25   and (d) the expert has reliably applied the principles and

M54TMELC

methods to the facts of the case."  Fed. R. Evid. 702; *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016).

Following the Supreme Court's ruling in *Daubert*, trial courts are to serve as gatekeepers for expert testimony.  "The proponent of the expert testimony bears the burden of establishing these admissibility requirements, and the district court acts as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Vivendi, S.A.*, 838 F.3d at 253 (quoting *Daubert*, 509 U.S. at 597).  "The district court has broad discretion to carry out this gatekeeping function," and "its inquiry is necessarily a 'flexible one.'"  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *Daubert*, 509 U.S. at 594).

As previewed in the Court's April 20, 2022 order, the Court will hold a *Daubert* hearing to address defendant's motion in limine to preclude the expert testimony of Dr. Simi on May 24, 2022 at 10:00 a.m.  The government must make arrangements for Dr. Simi to attend the hearing in person.  If the parties wish to hold the hearing remotely, you can send the Court a request that I will consider that needs to be consistent with the CARES Act.

Just as a brief aside, counsel, there are a number of issues that the defendant's motion raises.  We'll need to address all of the predicates for Dr. Simi's testimony, but I

M54TMELC

1    want to highlight, among other things, the concern raised by

2    counsel for defendant regarding the basis for Dr. Simi's

3    knowledge about the O9A and the related question of whether or

4    not the methodology that he used to obtain his knowledge was

5    reliable.

6        Counsel for defendant also identified a number of

7    areas in which they believe that his testimony crosses over the

8    line from helpful to the jury to intruding on the jury's

9    ultimate role by providing ultimate conclusions regarding facts

10   that are findings that are reserved for the jury.

11       I expect at the *Daubert* hearing we will address all of

12   the issues that the Court must evaluate in order to determine

13   that Dr. Simi's testimony is appropriate, but I highlight those

14   issues.  Counsel for defendant's reply includes a number of

15   specific items of testimony that they are concerned about, in

16   addition to the broader concerns.  So I look forward to

17   discussing those at or after the hearing.

18       c.  Motion for Attorney-Conducted Voir Dire

19       Defendant also requests that the Court permit

20   attorney-conducted voir dire in this case.  I'm going to deny

21   that request.

22       Federal Rule of Criminal Procedure 24(a)(1) provides

23   that "the court may examine prospective jurors or may permit

24   the attorneys for the parties to do so."  Fed. R. Cr. P.

25   24(a)(1).  The Court has "ample discretion in determining how

M54TMELC

1    best to conduct the voir dire" because ultimately it falls to

2    the trial judge in the first instance to "impanel an impartial

3    jury. . . and he must rely largely on his immediate

4    perceptions." *Rosales-Lopez v. United States*, 451 U.S. 182,

5    189 (1981).  The general view, at least among judges, is that

6    "examination by the court is the preferable practice and. . .

7    it results in great savings of time and improves the character

8    of the examination." *Wright & Miller*, Federal Prac. & P.

9    Section 380.

10        The Second Circuit observed that deciding whether

11    attorneys should be allowed to conduct voir dire in any given

12    case "depends not on any interpretation of law, but rather

13    requires a judgment as to the proper accommodation between the

14    need to protect jurors, the goal of promoting efficiency in the

15    conduct of criminal trials without doing damage to the right of

16    a criminal defendant to an unbiased and impartial jury, and the

17    desire of the defendant to know as much as possible about those

18    who sit in judgment on him." *United States v. Barnes*, 604 F.2d

19    121, 143 n.10 (2d Cir. 1979).

20        Here, the defendant primarily argues that attorney-

21    conducted voir dire is necessary to this case because this case

22    involves "sensitive issues -- touching on racism, misogyny,

23    Satanism, and anti-Semitism, among others" about which "jurors

24    are likely to have strong feelings. . . that can only be

25    explored through precise questioning to uncover biases and

M54TMELC

1    prejudices." Def. Mot. at 15.  Defendant argues that such

2    questioning will be better conducted by the parties.  *Id.*

3    However, I have reviewed the proposed voir dire questions the

4    parties submitted and I will include those in some form where

5    they were proper and not repetitive in the proposed jury

6    questionnaire or questions.

7            Moreover, the parties will have the opportunity to ask

8    the Court to make follow-up questions.  That will provide an

9    opportunity for precise questioning of prospective jurors where

10   warranted but with the benefit of moderation by the Court.  As

11   one Court in the Southern District commented, "this Court is

12   persuaded beyond peradventure of doubt that [Court-conducted

13   voir dire], without exception, has resulted in the impaneling

14   of fair and impartial juries." *United States v. Wilson*, 571 F.

15   Supp. 1422, 1428 (S.D.N.Y. 1983).  I have no doubt that voir

16   dire conducted by the Court with input by the parties regarding

17   questions will properly allow us to select an impartial jury in

18   this case.  As a result, I deny defendant's motion to allow

19   attorney-conducted voir dire.

20           So counsel, I will issue an order on the record here

21   that points to the transcript of today's proceedings for the

22   outcome with respect to these motions.  I look forward to our

23   hearing on the 24th with Dr. Simi.

24           Anything else that we need to talk about now before we

25   adjourn?

M54TMELC

1              First, counsel for the government?

2              MR. HELLMAN:  I don't believe so.  Thank you.

3              THE COURT:  Thank you.

4              Counsel for defendant?

5              MR. MARVINNY:  Nothing comes to mind, your Honor.

6              THE COURT:  Very good.  Thank you very much.  This

7    proceeding is adjourned.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25