M6GHMelC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        20 Cr. 314 (GHW)

5   ETHAN PHELAN MELZER,

6              Defendant.                Conference

7   ------------------------------x

8                                        New York, N.Y.
                                         June 16, 2022
9                                        9:05 a.m.

10
    Before:
11
                    HON. GREGORY H. WOODS,
12
                                         District Judge
13
                         APPEARANCES
14
    DAMIAN WILLIAMS,
15       United States Attorney for the
         Southern District of New York
16  BY:  KIMBERLY J. RAVENER
         SAMUEL S. ADELSBERG
17       MATTHEW HELLMAN
         Assistant United States Attorney
18
    DAVID E. PATTON
19       Federal Defenders of New York, Inc.
         Attorney for the Defendant
20  JONATHAN MARVINNY
    ARIEL CHARLOTTE WERNER
21

22

23

24

25
```

M6GHMelC

```
1         (Case called)
2              MS. RAVENER:  Good morning, your Honor.  Kimberly
3    Ravener and Sam Adelsberg, for the government.
4              THE COURT:  Thank you.  Good morning.
5              MR. MARVINNY:  Good morning, your Honor.  Federal
6    Defenders of New York by Jonathan Marvinny and Ariel Werner for
7    Ethan Melzer.
8              THE COURT:  Very good.  Thank you very much.  Good
9    morning.
10             So I have lengthy agenda for this morning's
11   conference.  Let me tell you what I hope to cover.
12             First, I want to talk briefly about the motions
13   pertaining to defendant's purported expert.  Then I want to
14   talk some about the jury selection process, including the
15   questionnaire.  I'd like to provide some feedback with respect
16   to the issue of defendant's provision of its witness and
17   exhibit list.  I have some feedback also on the parties'
18   proposed limiting instructions.  I want to talk about the trial
19   indictment, provide you some scheduling issues, and also I will
20   seek an update regarding the CIPA issues.  Then I hope to turn
21   to a resolution of the issues related to the admissibility of
22   the testimony of Dr. Simi.
23             So is there anything that any of you would like to add
24   to my agenda before I begin with that?
25             Counsel, first, for the government?
```

M6GHMelC

1          MS. RAVENER:  I don't believe so, your Honor.

2          THE COURT:  Thank you.

3          Counsel?

4          MR. MARVINNY:  No, thank you.

5          THE COURT:  Good.  Thank you.

6          So with respect to the first issue, namely,

7  defendant's purported expert, I've reviewed the government's

8  memorandum.  I haven't seen the defendant's memorandum or any

9  reply yet, so I don't know what my view will be regarding the

10  arguments presented by the government.  I won't have a sense of

11  that until I've read the complete briefing.

12          I know, however, from looking at the government's

13  motion that, among other things, they challenge the

14  admissibility of the witness' testimony under *Daubert* and its

15  progeny.  As a result, I want to make sure, from a scheduling

16  perspective, given the amount of time between now and trial,

17  that we have something on the calendar for a *Daubert* hearing to

18  provide defendant the opportunity to establish the bona fides

19  of the purported expert.  Looking at my calendar, the only date

20  that works between now and trial that will also provide me with

21  ample time to resolve the issue before trial is next Wednesday.

22          So, counsel, I'm going to schedule a hearing for next

23  Wednesday, at which I expect defense will be able to present

24  evidence and testimony from the expert to establish his -- the

25  admissibility of his testimony.  It may be that I'll be able to

M6GHMelC

1    reach a resolution that would not require such testimony, but

2    at this point I don't know that.  So I'm going to just schedule

3    a placeholder now and direct the parties to prepare for a

4    hearing on that date.

5            With respect to the jury selection process, I've been

6    thinking about the number of alternates that we should have.  I

7    think that when we talked about it before our -- my, at least,

8    going in assumption was that we would seat only two alternates

9    as is customary practice here.  In light of COVID, I've been

10   thinking about whether or not it might not be prudent to seat

11   more than two alternates, in particular whether we should seat

12   something like four alternates for our expected two-week trial,

13   and I wanted to get the views of the parties regarding that

14   prospect.

15           Counsel for the government, what do you think?

16           MS. RAVENER:  Your Honor, we do believe that would be

17   prudent.

18           THE COURT:  Thank you.

19           Counsel for defendant?

20           MR. MARVINNY:  Your Honor, our position is that two

21   alternates is sufficient.  That is the standard in this

22   district even for cases of the anticipated length that

23   Mr. Melzer's trial will be, but we defer to the Court.

24           THE COURT:  Good.  Thank you.

25           I think that we should seat additional alternates.

M6GHMelC

1    The parties are aware of the fact that we've been living

2    through a pandemic over the course of the last couple of years.

3    Most recently there's been a surge which seems to be abating

4    somewhat, but, unfortunately, we face the real prospect of

5    potentially losing one, two, or -- one or two jurors during the

6    course of trial.  If we lose three, we would have to consider

7    deeply whether we wish to proceed with less than 12 jurors.

8    That's not my preference.

9           In order to guard against is that prospect, in light

10   of the fact that we are operating in the middle of a global

11   pandemic, I think it is prudent for us to select four

12   alternates.  That will change somewhat the jury selection

13   process that we discussed previously.  You can do the math

14   yourselves.  The rule tells you how many peremptory strikes you

15   have with four alternates.  I expect to proceed in that way.

16   That will mean that I think we will have to qualify 36 jurors

17   in order to arrive at a group with four alternates.

18          If for some reason we have difficulty qualifying that

19   number of prospective jurors, we'll deal with it, but at this

20   point my hope is that we'll be able to qualify 36 so that the

21   parties can exercise the appropriate number of peremptory

22   strikes to arrive at a jury of 12 with four alternate jurors.

23          As with the process that I articulated at the final

24   pretrial conference, you will know the pool of jurors against

25   whom you'll be exercising your strikes as to the alternates.

M6GHMelC

1    So you will know who those people are that will be the last

2    grouping of jurors.  So we'll have 12 that will be the selected

3    jurors, which will be the lowest numbers remaining on the

4    board, and you'll be exercising your strikes as to the

5    alternates with respect to the remaining pool.

6             So let's turn now about -- to a discussion about the

7    questionnaire and the voir dire process.  We're working with --

8    I am working with the jury department to prepare the

9    questionnaire.  Thank you very much for working, counsel, to

10   provide a version of it to me based on the questions that we

11   had worked to develop together.  I thought that your

12   questionnaire was very helpful and very well done.  I very much

13   appreciate it.  There are two issues that the parties have

14   asked me to resolve with respect to it.  I'll turn to that in

15   just a moment.

16            Now, as a reminder, the questionnaire is going to be

17   administered on the 22nd of June.  By no later than June 24,

18   2022, I will ask the parties to have reviewed all of the

19   questionnaires to determine whether there's a basis to excuse a

20   juror for cause and to discuss each of the prospective jurors

21   with that determination in mind.

22            No later than 5 p.m. on Friday, the 25th, you should

23   email the Court a list of all of the jurors divided into three

24   categories:  First are the jurors who both parties agree should

25   be excused for cause; second are jurors about whom the parties

M6GHMelC

1    disagree as to whether they should be excused for cause; and

2    the third are jurors that the parties agree there is no basis

3    to excuse for cause.  I'll look at that list and the responses

4    to the questionnaires over the weekend, and we'll schedule a

5    conference for Monday, the 27th, at 10 a.m. to resolve any

6    disputes.  And then the parties will prepare and send to the

7    Court a final list of all of the jurors to be called back for

8    voir dire.  That list will need to be presented to me, that is,

9    the Court, no later than 9 p.m. on the 27th.  That way the jury

10   department can inform the selected jurors that they need to

11   appear on the 5th.

12         Now, at our last conference, counsel, I asked the

13   parties to consider a hypothetical, which is the following:  If

14   we have a sufficient number of agreed-upon jurors to

15   participate in individualized questioning, that is, enough

16   people in category three, if we had 36 people in category

17   three, would you be willing to -- or more, would you be willing

18   to proceed to individualized voir dire with just that pool, or

19   should we instead resolve all disputes regarding what I'll

20   describe as category two and then engage in some process to

21   determine which of the jurors in categories two and three

22   should be potentially selected to be members of the jury?

23         Counsel, have you had an opportunity to think about

24   that question, and if so, what are your respective views?

25         First, counsel for the government.

M6GHMe1C

1          MS. RAVENER:  Your Honor, we have discussed it

2     hypothetically.  I think we do believe that bringing in an

3     increased group, even if we have approximately 36 people in,

4     say, the agreed-upon category, would make sense.  It leaves

5     open the risk that, upon individualized questioning, some

6     additional information might appear that would require further

7     inquiry and additional for cause excuse -- excusing of the

8     jurors.

9          THE COURT:  That's fine.

10         Let me change the hypothetical.  What if we have 60

11    people in category three?

12         MS. RAVENER:  I think that may be adequate, your

13    Honor.

14         THE COURT:  Thank you.

15         Counsel for defendant, what's your view?

16         MR. MARVINNY:  Your Honor, our view is that the Court

17    should rule on disagreements between the parties, that is, that

18    the group two should be adjudicated by the Court.  Our position

19    is that a contrary system, that is, one that just leaves the

20    jurors in the third category somewhat incentivizes parties to,

21    how should I put it, overstrike for cause, and we'd seek to

22    avoid that.

23         We think the more sensible system and the fairer

24    system is to have the parties represent their good faith

25    positions as to each juror and the Court to decide the

M6GHMelC

1    discrepancies.

2              THE COURT:  Thank you.  That's fine.  I'm happy to

3    approach it in the way that the defense proposes.

4              Good.  So we'll proceed in that way.  I will expect

5    that we will be bringing in, then, the people in categories two

6    and three, and that we'll begin our voir dire process with the

7    jurors who are in category two.  I'll make determinations

8    regarding whether or not those jurors, prospective jurors, in

9    category two should be stricken for cause.  And then we will

10   select our jurors from amongst the group two and three

11   categories.

12             I think that in order to use a randomized system, my

13   expectation going in is that we'll use -- in order to order

14   them, we'll use the randomly assigned juror numbers downstairs.

15   So to use a hypothetical, if there are 15 jurors in category

16   two and 40 in category three, we won't select from two and then

17   three for our jury.  We'll instead place those people using

18   their random numbers, that is, those that have been permitted

19   to proceed, that is, who have not been stricken for cause.

20             Good.  So in the June 9, 2022, accompanying the

21   questionnaire submitted by the parties, defendants raised two

22   issues about the questionnaire.  I'm going to resolve each of

23   those issues now.

24             First, the defendant asked the Court to revise the

25   wording of questions 55 to 66 to ask the jurors whether they

M6GHMelC

 1   would be able "to follow" as opposed to whether they would be

 2   "unable" to answer those questions.  I am denying that request.

 3   The current language is consistent with the phrasing that I and

 4   my colleagues typically use in voir dire.  I understand that

 5   usually those questions are structured so that the polarity of

 6   the responses drive a "yes" answer if there's a problem.  But

 7   the questions themselves, I think, are clearly worded, and

 8   prospective jurors will be encouraged to read the questionnaire

 9   carefully, minimizing the risk of misunderstandings.  Also,

10   each of the relevant words, I think, is bolded in the text.  So

11   I think the likelihood that they will misinterpret the question

12   based on its phrasing is very low.  I think it's really none.

13           Second, the defendant has requested that the Court add

14   a question noting that some of the evidence in this case will

15   relate to 9/11 and asking if anything about such evidence would

16   make it difficult for a juror to render a fair and impartial

17   verdict in this case.  I am going to deny that request for a

18   number of reasons.

19           First, I don't think that the question is necessary.

20   Question 44 notes already that some of the "evidence in this

21   case will relate to certain individuals' association with and

22   praise for . . . Osama bin Laden, ISIS, and al Qaeda" and asks

23   if anything about such evidence would make it difficult for the

24   juror to render a fair and impartial verdict in this case.  I

25   think that question sufficiently screens for issues related to

M6GHMelC

9/11 that a potential juror may bring to the Court's attention.

Further, the evidence related to 9/11 is very limited.
The governments notes that it consists of a photo on a slide in
a U.S. Army briefing deck, a Telegram chat that briefly
mentions 9/11, and an image that reflects approval for the 9/11
attacks.  The evidence is limited, and I am concerned that the
addition of the defendant's proposed question would have the
potential to confuse the issues in this trial by suggesting
that 9/11 plays a larger role in the case than it does.

So I am denying each of those requests for the reasons
that I've just described.  I think that the questions, as
formulated, are adequate to ascertain whether each of the
jurors is able to serve as a fair and impartial juror in the
case.

Again, I remind you parties that something that I said
during our final pretrial conference, namely, that if you have
additional questions for any particular prospective juror that
you'd like for me to ask, please feel free to remind me of
that.  I'm happy to do so.

I'd like to turn next to the government's request that
the defendant produce his trial exhibits, as well as a list of
those exhibits and any prior statement of witnesses that he
will call to testify by June 21, 2022.

Counsel, I've reviewed the parties' submissions with
respect to this issue.  Is there any other argument that either

M6GHMelC

1  party would like to raise with respect to this topic before I

2  take it up?

3           First, counsel for the government?

4           MS. RAVENER:  Nothing further from the government.

5           THE COURT:  Thank you.

6           Counsel for defendant?

7           MR. MARVINNY:  Just one moment, please.

8           THE COURT:  Please.

9           (Counsel confer)

10           MR. MARVINNY:  Your Honor, we just want to add one

11  brief point, which is that now that it looks like we will be

12  potentially proceeding with a *Daubert* hearing on Wednesday, the

13  22nd, it makes the obligation to provide defense exhibits by

14  the 21st even more onerous.  It was already onerous to begin

15  with for the reasons we'd stated, but this is an additional

16  consideration we ask the Court to consider.

17           THE COURT:  Thank you.  Understood.

18           Very good.  Let me just take up this issue.  As the

19  parties know, Federal Rule of Criminal Procedure 16(b)

20  provides:

21           "If the defendant requests disclosure under

22  Rule 16(a)(1)(E) and the government complies, then the

23  defendant must permit the government, upon request, to inspect

24  and to copy or photograph books, papers, documents, data,

25  photographs, tangible objects, buildings or places, or copies

M6GHMelC

1    or portions of any of these items if (i) the content is within

2    the defendant's possession, custody, or control; and (ii) the

3    defendant intends to use the item in the defendant's

4    case-in-chief at trial."

5            Pardon me.  I misread Romanette (i).

6            "If the item is within the defendant's possession,

7    custody, or control; and (ii) the defendant intends to use the

8    item in the defendant's case-in-chief at trial."

9            Federal Rule of Civil Procedure 16(b).  Information

10   subject to such disclosures includes documents and objects, as

11   well as reports of any physical or mental examination that the

12   defendant intends to use in his case-in-chief at trial.  *Id*.

13   The term "case-in-chief" has been interpreted to encompass "all

14   nonimpeachment exhibits they intend to use in their defense at

15   trial, whether the exhibits will be introduced through a

16   government witness or a witness called by a defendant." *United*

17   *States v. Napout*, 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12,

18   2017).  In addition, Rule 26.2 requires that the defendant

19   provide prior statements by witnesses upon the government's

20   request after any witness other than the defendant testifies.

21           Notably, there's no deadline for the required

22   disclosures under Rule 16 and Rule 16's text, and Rule 26.2

23   provides the timeline that I've just outlined.  However, as the

24   government points out in its request, numerous courts in this

25   district have ordered the early disclosure of the defendant's

M6GHMelC

1    exhibit list and witness list.  *See, e.g., United States v.*

2    *Brennerman*, 17 Cr. 337, Dkt. No. 24 (ordering disclosure 18

3    days prior to the start of trial); *United State v. Percoco*,

4    16 Cr. 776, Dkt. No. 396 (ordering disclosure more than a month

5    prior to the start of trial).

6           The Court agrees that ordering pretrial disclosure of

7    the requested material prior to trial will aid in the efficient

8    and orderly presentation of the government's and the

9    defendant's respective cases at trial.  It will allow the

10   parties to raise any evidentiary issues with the Court in

11   advance and, therefore, reduce the need for delay and

12   disruption at trial and for the parties to brief and the Court

13   to resolve any disputed issues.

14          This is also fair in the context of this case.  As the

15   government articulates in its letter, the government has

16   produced the -- provided the defense with its exhibits and the

17   vast bulk, as I understand it, of the 3500 materials.  It did

18   so a very long time ago.  This is a complex case, and the

19   defense has had substantial time to review those materials and

20   to prepare for trial.  Given the age of this case and the

21   quantum of disclosures by the government about the case, I

22   believe that the defendant should be in a position to disclose

23   its exhibit list and its witness list before trial.

24          While I recognize that the defendant may need to

25   change what it wants to do at trial, there's no reason at this

M6GHMelC

point for it not to be able to identify the universe of
documents and witnesses that it may introduce at trial, other
than to retain the tactical advantage associated with such a
late disclosure.

Given the many benefits of early disclosure for the
efficient presentation of the evidence and the opportunities
for the parties to fully develop anticipated objections to
evidence, I conclude that it's appropriate to order the
reciprocal disclosure of an exhibit and witness list here.

That said, I will not order disclosure on either of
the timelines suggested by the parties.  First, as the
defendant points out, the government has yet to produce 3500
material from trial preparation meetings, nor has it disclosed
which of defendant's postarrest interviews it will seek to
introduce.  I also understand that the defense must prepare, as
it, frankly, should have been expecting to do regardless given
the nature of the expert testimony that it anticipates, for a
*Daubert* hearing on the schedule that I've just established.  As
a result, I am not going to require that the disclosures be
provided by the 21st as recommended by the United States.

As a result of those things, I think it's reasonable
for the defendant to take more time to determine which exhibits
it will introduce at trial and to assemble its exhibit list and
witness list.  At the same time, there has been considerable
discovery in this matter, which weighs in favor of as early a

M6GHMelC

1    disclosure as possible to ensure that the parties' cases are

2    presented in as efficient a manner as possible to the Court.

3    Plus, as the government has pointed out, defendant has had

4    ample time to review the government's proposed exhibit list,

5    which should aid in the defendant's ability to compile its own,

6    and of course, defendant will remain free, within bounds, to

7    amend or supplement the exhibit and witness list as the trial

8    grows closer.  More on that point in a moment.

9           Accordingly, defendant is ordered to produce a list of

10   exhibits that he reasonably expects to introduce at trial no

11   later than June 24, 2022.  Defendant is also ordered to produce

12   a witness list and any witness statements by that date.  The

13   witness and exhibit lists are subject to good-faith revision as

14   the defense continues to prepare for its case.  But please

15   don't view that caveat as an invitation for sandbagging.  If an

16   exhibit or witness is not disclosed in accordance with the

17   Court's order, I will expect that I will ask for a

18   justification for the failure to disclose the information

19   timely, and an unsatisfactory justification may lead to the

20   exclusion of the proposed exhibit or testimony.

21          So, again, June 24 is the deadline for provision of

22   those materials by the defense for the reasons that I've

23   articulated.

24          In addition, I'm providing the parties with copies of

25   the limiting instructions that I expect to both include in the

M6GHMelC

1    jury charges and also to administer to the jury during the

2    course of trial.

3              I want to say a couple of things about these

4    instructions so that you understand what my thought process was

5    here.  I'm happy to hear further objections to them before I

6    administer them, but I want to give you both my current

7    proposals for your feedback and also provide you with some

8    reasoning behind the decisions that I have made that are

9    embedded in those instructions.  I also want to make a request

10   for you to aid me in the efficient and proper administration of

11   the trial.

12             First, as you'll see, I have not included reference to

13   the First Amendment in these instructions.  I don't believe

14   that reference to the First Amendment is necessary to instruct

15   the jury that Mr. Melzer is "not on trial for holding or

16   expressing any particular extremist or religious or political

17   beliefs" or for the "mere possession of such materials."

18   Further, the inclusion of the reference to the First Amendment

19   could needlessly confuse the jury.  This is a topic I expect

20   that we may take up in more depth as we discuss the charges

21   given the nature of the proposals by the defense on this point

22   which I read to suggest that there's a free-floating First

23   Amendment exception to criminal liability.  I want to talk

24   about that when we get to the charges.

25             Further, I've clarified the purposes for which the

M6GHMelC

evidence discussed in these instructions can be used, namely,
to show the defendant's state of mind, as did the courts in
*United States v. Hossain*, which is 19 Cr. 606, and *United*
*States v. Abu Jihaad*, 600 F.Supp.2d 362 (D.Conn. 2009).  It is
my intention that the instruction will ensure that the jury
does not do more than is proper.

        In addition, I've clarified that jurors are not
allowed to use evidence that Mr. Melzer held or expressed
certain beliefs to substitute for proof beyond a reasonable
doubt of the charged offenses.  I'm going to ask for your views
on these limiting instructions at or before -- probably at the
outset of trial.  So if you have comments on these, please do
let me know.

        I'm also going to look to you for your views regarding
the timing for administration of these instructions.  You, the
parties, know much more about the case, the evidence, and the
witnesses.  I don't know the order of the evidence that you'll
be presenting.  So I'm going to ask you to let me know when you
think it would be appropriate for me to administer any given
limiting instruction during the course of or prior to the
testimony of any given witness.

        This is part of the reason why I'm providing these to
you now, so that you can contemplate them, and let me know when
you believe that an instruction should be administered.  I've
asked that you try to alert me to that outside of the hearing

M6GHMelC

1    of the jury, if you would, so that I can take it up in a way

2    that will seem organic to the jury.

3            Good.  So, again, I'll look to you for comments with

4    respect to those issues before trial.

5            I'd like to talk briefly about two issues related to

6    the charge.  First is I'd like to just hear briefly from the

7    defense about the First Amendment issue that I just alluded to.

8    I've been engaging with that as I've been drafting the charges.

9    But before I turn to that, I'd like to turn to a brief

10   discussion of the trial indictment.

11           The government is dismissing Count Six of the

12   indictment.  The parties, I understand, expect to use a trial

13   indictment that omits that count.  The government's proposed

14   charges run from Count One through Count Seven, while

15   defendant's run from Count One through Five, then Seven through

16   Eight.  I assumed, coming is into this, that the trial

17   indictment would run from Count One through Count Seven and

18   that conforming modifications would be made to it such that the

19   charges would refer only to seven counts; in other words, it

20   would not be transparent to the jury that a count had been

21   omitted.

22           Let me just confirm that's the parties' expectation as

23   well, and also your expectations regarding the timing for the

24   completion of the trial indictment, if you know.

25           MS. RAVENER:  One moment, your Honor.

M6GHMelC

1          THE COURT:  Thank you.  Please take your time.

2          (Counsel confer)

3          MS. RAVENER:  Your Honor, we agree that it would be

4   sensible to renumber the proposed trial indictment.

5          I would just briefly ask the Court if we could have

6   our colleague, AUSA Matthew Hellman, join us at counsel table.

7   He was delayed this morning in order to continue discussions

8   relating to the Classified Information Procedures Act issue,

9   and he is now present.

10         THE COURT:  Yes.  Thank you.  Mr. Hellman, please come

11  forward.  Thank you.

12         MS. RAVENER:  Thank you, your Honor.

13         THE COURT:  Good.  Counsel for defendant, is that your

14  expectation as well?

15         MR. MARVINNY:  Yes, your Honor.  At the time we

16  submitted our request to charge, my recollection is that the

17  sixth count hadn't even been officially dismissed yet.  So we

18  weren't asking the Court to infer anything else from that, so

19  yeah.

20         THE COURT:  Very good.  Thank you.

21         MR. MARVINNY:  Sequential numbering makes sense.

22         THE COURT:  Good.  Thank you.

23         Counsel, by when do you plan to complete the trial

24  indictment?  My hope is that work can be done well in advance

25  of trial.  I was going to propose to ask the parties to submit

M6GHMelC

1    it to me under cover of a joint letter by the 29th.

2            What's your thought regarding an appropriate schedule

3    here, counsel for the government?

4            MS. RAVENER:  We can do that by June 29, your Honor,

5    and that allows us time to prepare it and also show it to the

6    defense.

7            THE COURT:  Good.  Thank you.

8            Counsel.

9            MR. MARVINNY:  That works, your Honor.

10           THE COURT:  Thank you.

11           Please submit the proposed trial indictment to me

12   under cover of a joint letter by June 29, 2022.

13           I don't want to spend a lot of time here talking about

14   the charges.  I've been looking at the parties' proposed

15   charges.  I think I have a bead on what each of you is looking

16   for.  My hope, as I've told you before, is to send you my

17   proposed charge as early as possible, and I'm working with that

18   goal in mind.  My hope is that I'll be able to send you a

19   version of the charge either before or very early in the trial,

20   with the hope that we'll be able to take the opportunity to

21   discuss them at a reasonable time during the course of trial.

22   So my goal is to try to complete that work early.

23           The one issue that I did want to hear briefly from the

24   defense about is your First Amendment instruction, counsel.

25   Can I hear a little bit from you about that proposal, and I'll

M6GHMelC

1      just give you the floor, and then I have a particular question

2      that I'd like to raise.

3            MR. MARVINNY:  So, your Honor, of course happy to

4      address it.  I confess, that particular charge was not top of

5      mine as I wasn't sure I would be addressing it today.  So with

6      that context, we understand, to the extent the Court was

7      raising the concern that any instruction suggest that the First

8      Amendment provides a blanket excuse as to criminal liability,

9      that obviously is not the case, and we don't seek a charge that

10     says otherwise.

11            Nevertheless, given the nature of some of the

12     communications at issue here, the tender of some of the

13     communications attributed to Mr. Melzer and others, we're very

14     concerned that the jury either implicitly or explicitly

15     convicts Mr. Melzer simply because of the abhorrent nature of

16     some of those communications.  We do think it's important that

17     the jury know that holding troublesome problematic views unto

18     themselves is not unlawful in this country and that Mr. Melzer

19     can't be convicted for that reason, and that the location of

20     that right is found in the First Amendment.

21            I don't have much to say beyond the specific contours

22     at this point, your Honor, but that's the message we think

23     should be communicated to the jury, while understanding, of

24     course, they shouldn't be instructed that the First Amendment

25     provides Mr. Melzer some blanket protection.

M6GHMe1C

1          THE COURT:  Understood.  I'll give you the -- I'll

2     point you to the specific sentence that I was focused on.  In

3     the proposed charge on First Amendment rights, the defense

4     includes a sentence that says, "The law may not be applied in a

5     way that abridges the exercise of these rights," which

6     suggested to me a position that if the jury found that in some

7     way the criminal law abridged the exercise of First Amendment

8     rights, that they could not enforce it.

9          I understand from your comments that's not your

10    position.  Is there anything else that you'd like to say

11    regarding this issue or why it is that that particular, I'll

12    call it, line of direction to the jury would be appropriate

13    here?

14         MR. MARVINNY:  Not at this time, your Honor, no.  Of

15    course, we're happy to discuss it again once we see the Court's

16    proposed instruction.

17         THE COURT:  Good.  Thank you very much.

18         Very good.  So just a brief comment about scheduling

19    that I'd like to hear whatever the parties can tell me about

20    your -- what you can tell me here about your discussions

21    regarding the CIPA issues.

22         This is a scheduling matter.  On the 7th of July,

23    unfortunately, I need to end the trial day a little bit early.

24    I have to end at 3:00.  That is, unfortunately, because I

25    previously scheduled a confirmation -- I should say a fairness

M6GHMelC

1     hearing with respect to a class action for that date and time.

2     I can't change it because the notices went out to the class a

3     long time ago.  So, unfortunately, I need to adjourn the trial

4     so that I can take up that fairness hearing at 3 p.m. on the

5     7th.  So I apologize for that.  It was scheduled before we

6     adjourned the trial to the 5th, and, again, I can't change it

7     because there are a lot of potential class members.

8              Good.  So the only other thing before we turn to

9     Dr. Simi is my question about if there's anything else that we

10    can talk about here in this forum regarding the parties'

11    ongoing work with respect to the CIPA issues.  If there's

12    nothing that I can hear now, I'm happy to table it.  If so,

13    please feel free to tell me that.

14             MS. RAVENER:  Your Honor, I would ask for permission

15    for AUSA Hellman to address the Court about that matter.

16             THE COURT:  Thank you.

17             Counsel.

18             MR. HELLMAN:  Thank you, and good morning.

19             I think I can offer a little more context here which

20    may be helpful for the Court.  There are essentially two

21    buckets of materials which were at issue in the Section 5

22    notice from defense counsel.  We have essentially resolved one

23    of those two buckets, which the government understands to be in

24    the declassification process, but to have already been at least

25    orally confirmed.  Until it is actually formally declassified,

M6GHMelC

1    no final word or guarantees, but we do believe that that set of

2    materials has been resolved and will be set ahead of trial.

3         With respect to the remaining bucket, the parties have

4    been at work together on a proposed substitution with respect

5    to those materials.  There are several categories of

6    information that are implicated there, and those categories are

7    now pending final review with the original classification

8    authority.  That is a person who is located outside of the

9    United States who is a high-ranking U.S. Army member of staff

10   who has, currently, responsibility for an array of pending

11   global issues, I'll say.

12        So I have spoken at length again this morning with a

13   representatives from the Department of Defense and, in

14   particular, the Army, who are closest to the original

15   classification authority, and they have told me again that the

16   timeline that was proposed in the government's letter of

17   June 10, 2022, is reachable, that is, a final determination one

18   way or the other to put the government in a position to

19   respond, if necessary, by June 24, 2022, and to address in a

20   hearing on June 29.  I should say, the parties proposed that

21   time based on a prior conversation with chambers about the

22   Court's availability, but certainly after the 24th, when we

23   would be able to provide a final answer, we could come before

24   the Court at any point in time, subject to the availability of

25   the Court and the CISO.

M6GHMelC

| | |
|---|---|
| 1 | THE COURT:  Good.  Thank you.  I'll certainly try to |
| 2 | make myself available as promptly as possible for that, so |
| 3 | please let me know. |
| 4 | Thank you very much, counsel for both sides, for |
| 5 | working to resolve those issues.  I appreciate it. |
| 6 | Anything from the defense in addition to what I've |
| 7 | heard from the government on those topics? |
| 8 | MR. MARVINNY:  Not on this topic, your Honor. |
| 9 | THE COURT:  Thank you very much. |
| 10 | So, counsel, I think that that completes my agenda |
| 11 | with the exception of discussion related to Dr. Simi and his |
| 12 | testimony.  Anything else that either party would like to raise |
| 13 | with me before I turn to that topic? |
| 14 | Counsel, first, for the government? |
| 15 | MS. RAVENER:  No, your Honor. |
| 16 | THE COURT:  Thank you. |
| 17 | Counsel for defendant? |
| 18 | MR. MARVINNY:  Thank you, your Honor.  We have two |
| 19 | items, please. |
| 20 | THE COURT:  Go ahead. |
| 21 | MR. MARVINNY:  First, the Court has ordered the |
| 22 | defense to make certain disclosures, including our witness |
| 23 | list, by June 24.  We, of course, will comply with that order. |
| 24 | I would respectfully request that the Court order the |
| 25 | government to provide its witness list to us in advance of that |

M6GHMelC

1    date.  While it is true that the government has provided a
2    broad range of 3500 material, they have not specified which of
3    the individuals they provided that material for they're
4    actually going to call as witnesses at trial.  I'd respectfully
5    suggest that the Court order the government to provide their
6    witness list by the 21st.  The provision of that witness list
7    will impact our decisions as to who we might call at trial as
8    well.  Thank you.

9           THE COURT:  Go ahead.

10          MR. MARVINNY:  Two, your Honor, understand that the
11   Court has set a provisional *Daubert* hearing for the 22nd.  We,
12   obviously, have not had the chance to speak to Dr. Greenfield,
13   our proposed expert, about his availability.  We will do so
14   immediately, of course.

15          I just wanted to raise now whether -- the question of
16   whether the Court would permit Dr. Greenfield to testify at any
17   *Daubert* hearing by video.  Again, without knowing the specifics
18   of his schedule, as I sit here today, based on conversations
19   we've had with him, that might be more feasible than his
20   appearance in New York City on Wednesday.  He's not located in
21   New York City, as the Court may be aware.

22          THE COURT:  Thank you.

23          Good.  My strong preference would be for him to appear
24   in person.  Let me just say one thing.

25          First, I understand the witnesses is in Connecticut.

M6GHMelC

1   That's not very far from here.

2           Two, all of us have grown familiar with testimony by

3   videoconference.  We have the technical capacity here to host

4   such testimony, and I'd be happy to consider an application by

5   the parties to proceed in that way.  My default would be that

6   he should appear -- must appear here.  If the parties want to

7   work together to develop a request for the Court consistent

8   with the rules, I'm happy to consider it.  If you want to make

9   such a request, I'd ask that you confer about it and provide me

10  a letter both with the nature of the request and the legal

11  authority for me to conduct the conference by remote means.

12          As you know, in the criminal space, the CARES Act

13  provides me with some authority to conduct proceedings by

14  remote means, but I have not conducted a hearing of the type

15  that we're discussing now in a criminal case, although I'll be

16  frank that I've conducted at least one *Daubert* hearing by

17  remote means in a civil case.

18          So the question of the Court's legal authority to

19  conduct the hearing by remote means in a criminal case is a

20  question that I haven't had the opportunity to examine in the

21  past.  So I'd ask you to tell me what you believe the legal

22  authority of the Court is to do so and what findings, if any,

23  I'd need to make in order to determine that it is appropriate.

24  The civil rules I know off the top of my head impose a number

25  of required findings by the Court in order to permit remote

M6GHMelC

1    testimony.  I don't know that there are parallel rules in the

2    criminal context, but I'll look to the parties in the first

3    instance (a) to determine whether or not the expert can travel

4    here from Connecticut, and (b) if for any reason the answer to

5    that first question is no, to let me know what, if any,

6    authority I have to accept testimony by remote means in this

7    criminal proceeding.

8            So I'm open to it is what I'm saying, but I need to

9    know that I have the legal authority to do so.  And the default

10   rule is that the witness should expect to be here.  The

11   unfortunate fact is that because we're going to trial in early

12   July and this issue was just recently raised to my attention,

13   there's very little time before trial for us to conduct a

14   *Daubert* hearing.  Given the questions raised about the

15   sufficiency of the basis for his testimony raised in the

16   government's motion, I don't believe that I should permanent

17   him to testify without undertaking, at a minimum, a careful

18   examination.  Fulfilling my role as a gatekeeper under *Daubert*,

19   I don't think I can do that through live testimony in front of

20   the jury.  So we need to wedge in time before trial to do that

21   work.

22           MR. MARVINNY:  Your Honor, understood.  Sorry to

23   interrupt.

24           THE COURT:  That's fine.

25           MR. MARVINNY:  If the Court set a time for the *Daubert*

M6GHMelC

1    hearing, I missed it.

2            THE COURT:  That's fine.  Let's plan to start -- I

3    have it on my calendar at 10:00.  I can move it forward to

4    9:00.  I could move it back some as well.  Given the amount of

5    time that it took for us to go through Dr. Simi's testimony, I

6    wouldn't move it back, frankly, much after 10:00 or 11:00 so we

7    can make sure we have as much time as possible.  I'm basically

8    prepared to leave that full day free for us to complete the

9    hearing on this issue.  That will give me time to review the

10   testimony and to make a determination regarding the

11   admissibility of his testimony prior to trial.

12           Good.  Anything else, counsel for defendant?

13           MR. MARVINNY:  No.

14           THE COURT:  Thank you.

15           In terms of timing for making a proposal with respect

16   to potential remote testimony by the expert suggested by

17   counsel for defendant, I think that the latest that I can hear

18   from you, unfortunately, is going to be over the weekend.  So

19   I'll ask that any writing be submitted to me by Sunday.  That

20   will put me in a position to review it, make a decision by

21   Monday.  And then to the extent I grant the request, that will

22   give us the opportunity to put in place any necessary

23   technology in the courtroom and also for the Court to prescribe

24   parameters for the testimony through written orders.  So any

25   application for him to appear remotely must be made by Sunday,

M6GHMelC

1    and it must contain an outline of the Court's legal authority

2    to do so.

3         Again, the default rule is that he must appear here,

4    and the default will be that the hearing starts at 10 a.m. on

5    that date in this courtroom.

6         With respect to the defense's first request, counsel

7    for the United States, what's your view?  Can you provide the

8    defense with your witness list by the 21st?

9         MS. RAVENER:  Yes, we consent to that.

10        THE COURT:  Good.  Thank you.  I direct the government

11   to do so.  Very good.  So thank you all very much.

12        What I'm going to do now is I'm going to turn to the

13   *Daubert* issue with respect to Dr. Simi.  I'm going to rule on

14   this application orally.  Let me give you fair ruling -- fair

15   warning, I should say.  I have some questions for the parties

16   at the outset of this proceeding regarding some of the issues,

17   and I'm going to point you to them in a moment.  I'm going to

18   use your feedback with respect to these questions to inform my

19   decisions with respect to some of aspects of the decision.

20        Once I am able to incorporate the feedback from my

21   questions into my view of the case, I expect to turn to the

22   decision itself, which is lengthy.  And I will say I'm happy to

23   provide you with what Judge Rakoff would call a bottom line

24   regarding my determination, and I'm happy to excuse all but one

25   member of each side's legal team as I review the reasoning for

1   my decision which spans some 14 single-spaced pages.  So just a

2   note.

3          So, counsel, the parties are familiar with the

4   underlying facts and procedural history here.  Therefore, I'm

5   not going to recite them in detail.  To the extent that any of

6   the facts in this case are pertinent to my decision, those

7   facts are embedded in my analysis.  For the reasons that

8   follow, I am expecting to deny defendant's motion to exclude

9   Dr. Simi's testimony.

10         In his motion in limine, submitted on February 1,

11  2022, Defendant seeks to exclude the testimony of Dr. Simi at

12  Dkt. No. 792, which I'll describe as "Mot."  Primarily,

13  defendant argues that Dr. Simi "lacks expertise about O9A

14  specifically" and that "Dr. Simi's testimony about O9A appears

15  to be based primarily on publicly available documents to which

16  he will not have applied any particular expertise."  Id. at

17  10-11.  On May 24, 2022, the Court held a Daubert hearing to

18  evaluate the admissibility of Dr. Simi's proposed testimony.

19  See May 24, 2022, Hearing Transcript ("Tr.").  Based on the

20  parties' submissions and the testimony from Dr. Simi during

21  that hearing, I am denying defendant's motion to exclude

22  Dr. Simi's testimony.

23         Before we begin, I do have a few questions, however.

24         First, I note that the government's supplemental

25  notice does not mention that Dr. Simi will be testifying

M6GHMelC

1   regarding O9A's views on human self-sacrifice.  However, during

2   the *Daubert* hearing, Dr. Simi testified at length regarding

3   human sacrifice and its importance to the O9A worldview.

4        Counsel for the government, can I just hear from you?

5   Is it your intention that Dr. Simi testify regarding the

6   significance of human self-sacrifice to the O9A worldview, and

7   if so, the next question would be why isn't it in the notice?

8        MS. RAVENER:  Your Honor, if you could give me one

9   moment?

10        THE COURT:  That's fine.

11        (Counsel confer)

12        MS. RAVENER:  Your Honor, thank you for giving me a

13   moment to confer.

14        THE COURT:  That's fine.

15        MS. RAVENER:  I apologize.  I do not currently have

16   the notice and the supplemental notice in front of me.

17   However, our recollection is that the notice did include the

18   fact that Dr. Simi would be testifying regarding the practice

19   of culling, which is the concept of human sacrifice embraced by

20   O9A, and it's one of the terms used by the group for that

21   practice.

22        In any event, to the extent that there was any gap in

23   that notice or confusion, we believe that that should have been

24   clarified by the *Daubert* hearing testimony which has now

25   provided everyone with ample notice of the nature of that

M6GHMelC

1    testimony and its importance to the organization.

2            THE COURT:  Good.  Thank you.

3            Good.  Understood.  So I understand that the

4    government's position is that culling is included in the notice

5    and that that provides ample notice together with the nature of

6    the testimony provided by Dr. Simi in the hearing.

7            Counsel for defendant, any comments on this question?

8            MR. MARVINNY:  Your Honor, I don't have additional

9    comment.  My recollection, in fact, is that the government

10   might have mentioned something about that in their response

11   motion.  It wasn't in their supplemental notice.  So I don't

12   have anything to add.

13           THE COURT:  Thank you.

14           Good.  So I'm not sure that it is in the notice, but I

15   do believe that it was referenced in the briefing as well as

16   taken up at length during the hearing itself.

17           Just a note on this.  Defendant has objected to the

18   inclusion of testimony regarding human self-sacrifice, arguing

19   that there is already fact evidence that demonstrates that

20   Mr. Melzer was serious about the attack.  However, Dr. Simi

21   testified that "culling" and "human self-sacrifice" can be

22   shown as a means of "demonstrating commitment" to O9A.  Tr. at

23   155:19-23.  Jurors are unlikely to be familiar with those

24   practices.  Further, I believe they're relevant to the facts of

25   this case, especially given defendant's comment to other

M6GHMelC

1    apparent O9A followers that he was willing to die in the attack

2    on the U.S. military base because he "would have died

3    successfully" if the attack led to "another ten-year war in the

4    Middle East," it would "leave a mark."

5        Here, I think that the testimony regarding O9A's

6    emphasis on human self-sacrifice would be helpful to understand

7    why defendant would profess such a willingness to die in order

8    to further O9A's goals.  The Court doesn't see a basis to

9    exclude that testimony.  I think that the notice, together with

10   the briefing and the disclosures provided through the course of

11   the testimony by Dr. Simi at our hearing, provide ample notice

12   to prepare for such testimony.

13       Counsel for the United States, I have a similar

14   question regarding one aspect of Dr. Simi' testimony, which I

15   also don't recall having seen in the notice, and I don't know

16   whether this is a topic that you expect to have him testify

17   about at trial or if it's just something that came up in the

18   course of asking him questions in particular about his recent

19   testimony; namely, Dr. Simi's testimony about his research into

20   the correlation between white supremacists and individuals who

21   have served in the military.

22       Counsel, is that a topic that you expect Dr. Simi to

23   take up at trial?

24       MS. RAVENER:  One moment, your Honor.

25       (Counsel confer)

1          MS. RAVENER:  Yes, your Honor, we expect that we
2     would.  We believe that it's relevant for establishing
3     Dr. Simi's experience in this area, including the field of
4     white supremacy and the particular issues that arise in
5     connection with the idea of white supremacist groups being
6     taught to intentionally infiltrate organizations such as the
7     military.
8          THE COURT:  Thank you.
9          Let me just pause you.  There's a particular I'm going
10     to mischarach- -- I'm not going to mischaracterize, I'm going
11     to recharacterize Dr. Simi's testimony, as I recall it.
12          A part of a thread of his testimony with respect to
13     this issue was that, as I recall it, was that some people who
14     have had military service as a result of, I'll call it, their
15     experience there tend to become members of white supremacist
16     organizations.  That, in other words, there is some correlation
17     between military service and the experience of some people, who
18     I will describe as people who are not particularly successful
19     in the military, proceeding to be interested in white
20     supremacist groups.
21          That's the thread of the testimony that I'm
22     particularly interested in and want to make sure the defense
23     has an opportunity to comment on because it may suggest some
24     view that someone who has had military service is more likely
25     to be a white nationalist or supremacist.  So that was the

M6GHMelC

1    aspect of the testimony in particular that I was focused on.

2    It wasn't what you were describing, so I just wanted to direct

3    you.

4            MS. RAVENER:  Thank you, your Honor.  Give me one

5    moment to confer.

6            THE COURT:  Thank you.

7            (Counsel confer)

8            MS. RAVENER:  Your Honor, that clarification is very

9    helpful to the government.  I think that aspect that the

10   Court's referring to relates to some of Dr. Simi's findings

11   after evaluation of many individuals who had, in fact, engaged

12   in federal crimes of terrorism and related matters in the name

13   of white supremacy and then looking backwards at their life

14   histories to understand what, if any, experiences they might

15   have had in common.

16           I think the Court's particular concern that that might

17   give rise to some kind of predisposition for certain

18   individuals who've had a certain life experience to commit such

19   acts is something that we can certainly seek to cabin.  We

20   don't plan to elicit any testimony of that particular

21   conclusion, and we can work on that with respect to presenting

22   our evidence.  I believe that that is not our intention.

23           THE COURT:  Thank you.  Thank you for that

24   clarification.  I think that's helpful.  I'll hear from the

25   defense.

M6GHMelC

1      So can I ask you to continue with your description of

2  the nature of the testimony that you would expect to elicit

3  from Mr. Simi on this topic.

4      MS. RAVENER:  Your Honor, I believe that we would

5  expect to elicit Dr. Simi's general research experience, the

6  fact that he conducted research regarding, I believe it was,

7  dozens, if not over 100 individuals who had been involved in

8  white supremacist-motivated actions.  As part of his training

9  and experience that qualifies him to testify to the jury here

10  today, I believe we would elicit that he has testified before

11  Congress, including the Committee on Veterans' Affairs.  And I

12  believe we would elicit the fact that one of the reasons his

13  testimony has been sought and was relevant or the topic of his

14  testimony was of -- was given there all related to the same

15  broader thread that white supremacist organizations, other than

16  O9A but including O9A, have a practice of attempting to both

17  recruit members of the military, historical practice of doing

18  so, and that certain white supremacist organizations actively

19  encourage military service as a means of infiltrating the

20  military, gaining training in violence and other matters that

21  they view as relevant to their mission.

22      THE COURT:  Thank you.

23      Good.  So counsel for defendant, you've heard my

24  concern on this topic, which I don't believe was raised by you

25  previously, but it came to my attention during the course of

M6GHMelC

1    his testimony.  You've heard how the government has proposed to

2    cabin Dr. Simi's testimony on this point.  Any comments?

3         MR. MARVINNY:  Yes, your Honor.  We object as

4    vociferously as possible to any of this testimony coming in.

5    It was not noticed by the government in its original notice, in

6    its supplemental notice, in any of its briefing.  The first we

7    heard of this topic was during Dr. Simi's direct exam at the

8    *Daubert* hearing.  Frankly, it caught us very much off guard

9    given the lack of notice.

10        It's irrelevant to the case as well because, as I

11   understand it, based on the colloquy the Court just engaged in,

12   the testimony essentially is that white supremacist's groups

13   recruit people from the military or someone's military service

14   makes it more likely that they will progress into a white

15   supremacist group or join a white supremacist group.

16        Of course, the government's account of this case is

17   precisely the opposite chronology.  The allegation is the

18   Mr. Melzer was a white supremacist, dyed in the wool, from

19   years before he joined the military or O9A, and that it was

20   fact his affiliation with O9A and informed by his white

21   supremacist worldview that led to his enrollment in the

22   military in the first instance.  We think the evidence is going

23   to show that to be absolutely incorrect, and the Court will

24   receive some briefing from us on that today in response to the

25   government's 404(b) motion.  But that renders Dr. Simi's

M6GHMelC

1    testimony, to the extent I understand it correctly, irrelevant.

2          Finally, your Honor, whatever relevance it may have,

3    it is so unduly prejudicial that it simply cannot be admitted

4    under any faithful Rule 403 balancing.  To have an expert

5    testify to the jury about the link between white supremacists

6    and violence and members who share a characteristic that

7    Mr. Melzer obviously shares, that is, being in the military, is

8    so obviously prejudicial it would completely deprive Mr. Melzer

9    of a fair trial.

10          There's going to be no dispute at trial that

11    Mr. Melzer is in the military.  The government has ample

12    evidence that he affiliated with O9A.  None of that is really,

13    frankly, going to be in dispute.  So testimony from Dr. Simi

14    with the imprimatur of an expert is particularly prejudicial

15    and unnecessary.

16          THE COURT:  Thank you.

17          Understood.  Counsel, can I ask you to respond to the

18    first prong that the government referred to in supporting the

19    admissibility of Dr. Simi's testimony on this point, namely,

20    their desire to refer to his testimony before Congress as part

21    of their -- which happened to be about this topic as part of

22    their effort to credentialize him in front of the jury.  What's

23    your view about that aspect of the proposed testimony, namely,

24    to summarize, Dr. Simi testified before Congress about X topic

25    without more?

M6GHMelC

1          Counsel for defendant?  Let me hear from defendant.

2          MR. MARVINNY:  It's preferable to the alternative, but

3     we would object to that as well, your Honor, again.  Invoking

4     this kind of -- the importance of Dr. Simi's work or the

5     importance of his testifying before Congress, it's suggesting

6     to the jury that that makes it more credible.  We think that's

7     improper as well.

8          THE COURT:  Thank you.

9          Good.  I'm going to take this issue under advisement.

10    I understand that the defense has argued that this testimony

11    should not be admitted, that is, testimony regarding the

12    correlation between service in the military and white

13    supremacists should be excluded under Rule 403.  They've argued

14    that it's got limited probative value in the context of this

15    case and that it is -- that is because of the chronology that

16    defense counsel has recounted and because of the prejudicial

17    effect of the testimony.

18          Counsel for the United States, before I move on to the

19    next topic, any response to the defense's arguments that this

20    should be excluded under 403?

21          MS. RAVENER:  Yes, your Honor.  If I could just

22    address at least two points with respect to that.  One is that

23    I think the defense may have misapprehended part of the

24    description that I gave of my recollection, at least, of

25    Dr. Simi's testimony on this topic.  I don't believe it was

M6GHMelC

1  limited to the recruitment of members of the military once they

2  were already serving.  I believe that he also discussed the

3  fact that his research has revealed that white supremacist

4  groups, including but not limited to O9A, have historically

5  taught the concept and encouraged the concept of infiltration.

6  O9A's specific terminology for that is the encouragement of

7  engagement in an "insight role," which we submit is the

8  practice that Mr. Melzer was engaged in here and is relevant

9  for that reason.

10         As the Court knows, one of the defense's objections to

11  Dr. Simi's testimony, which we expect they will continue to

12  press on cross-examination, is an attack on his credentials as

13  they apply to O9A specifically.  We believe that Dr. Simi's

14  experience observing and studying this phenomenon in the white

15  supremacist movement, which is not unique to O9A, is relevant

16  for the jury's understanding of the facts here and his ability

17  to speak to what an insight role is and how that is utilized as

18  a practice among members of white supremacist groups or the

19  white supremacist movement.

20         So I would just note that I don't believe the

21  chronology of Mr. Melzer's service is a basis to limit that

22  testimony.

23         The second point I would just note for the Court is

24  that defense counsel cross-examined Dr. Simi on his purported

25  bias because he had spoken about Mr. Melzer's prosecution on a

M6GHMelC

1    prior occasion.  We expect they will cross-examine him about

2    that at trial.  We need to be able to elicit that fact to the

3    extent that it is a possible area of cross-examination, and

4    that occasion was this testimony before the Veterans' Affairs

5    committee.  So I want to make sure that that fact is clear to

6    the Court in making its assessment.

7            If you could give me one moment, your Honor.

8            THE COURT:  That's fine.  Please take your time.

9            (Counsel confer)

10           MS. RAVENER:  I would just note as well that the

11   concept of insight roles and their centrality to Dr. Simi's

12   testimony was included in our notice, including his testimony

13   about infiltrating the military.  We're happy to address, of

14   course, any other factual questions that the Court may have or

15   about the nature of our presentation of evidence.

16           THE COURT:  Thank you.

17           Understood.  So let me just say a couple things:

18   First, I'll comment further on Dr. Simi's testimony regarding,

19   I'll call it, insight roles generally.  I expect to find that

20   that is helpful to the jury and relevant and that it shouldn't

21   be excluded under 403.

22           The particular issue that I'm taking under advisement

23   and will rule on in advance of trial is the extent to which

24   Dr. Simi can testify regarding his research into what I'll

25   describe categorically as the correlation between white

M6GHMelC

1   supremacists or white nationalists and individuals who have

2   served in the military.  One subset of that is the fact of his

3   testimony before the Veterans' Affairs committee, which

4   happened to involve that topic.  The larger subset of that

5   category is the actual substance of the research and his

6   conclusions regarding those correlations.

7          I'm going to take up that issue mindful of the

8   defense's objections regarding to its prejudicial -- that is,

9   the prejudicial effect of such testimony regarding an asserted

10  correlation between military service and white nationalism

11  here, and I will rule on it in advance of trial.  I won't take

12  it up now.

13         So, counsel, if any one of you wanted to leave, this

14  would be the right time.  Again, I won't at all be offended if

15  you decide to limit the number of people who sit here as I

16  review my decision and the reasoning.  It is not a problem at

17  all.  The transcript of today's proceeding will be available to

18  you.  So I'll take a brief pause if you want to confer with

19  your colleagues to see if any of you would like to be excused.

20  Again, it's not a problem if you'd like to do so.

21         MS. RAVENER:  Thank you, your Honor.

22         THE COURT:  That's fine.  So Mr. Hellman is departing.

23  That's fine.  Again, not a problem.  You don't even need to

24  excuse yourself.  That's absolutely fine.

25         MR. HELLMAN:  Thank you, your Honor.  Have a good day.

M6GHMelC

1          THE COURT:  Good.  Thank you.

2          Counsel for defendant.

3          MR. MARVINNY:  We'll both remain.  Thank you, your

4    Honor.

5          THE COURT:  That's fine.  Thank you.

6          So I'm going to review my decision with respect to

7    Dr. Simi's testimony.  As I said, I'm excluding here the

8    particular topic which, like the defense, came to my attention

9    at the first time during the *Daubert* hearing.  I'm going to

10   reserve decision regarding the admissibility of that topic and

11   will rule on it after -- before the commencement of trial.  So

12   as I review the remainder of my decision, understand that I am

13   reserving with respect to that topic.

14          1.  Discussion.

15          A.  Notice.

16          The government's notice in this case was sufficient.

17   Federal Rule of Civil Procedure 16(a)(1)(G) requires that "at

18   the defendant's request, the government must give to the

19   defendant a written summary of any [expert] testimony that the

20   government intends to use . . . during its case-in-chief at

21   trial." Federal Rule of Civil Procedure 16(1)(G).  Other

22   Circuits have determined that a notice is insufficient where it

23   merely relates "general subject matters to be covered, but does

24   not identify what opinion the expert would offer on those

25   subjects."  *United States v. Duvall*, 272 F.3d 825, 828 (7th

M6GHMelC

1    Cir. 2001); *United States v. White*, 492 F.3d 380, 407 (6th Cir.

2    2007)(same).

3           As an initial matter, I note that the government

4    supplemented its initial notice on January 25, 2022. *See*

5    Dkt. No. 94-4 (the "Notice"). The Court will treat the notice

6    as the operative notice in this case, particularly because that

7    notice has omitted topics from the scope of the testimony that

8    the government plans to elicit, including testimony regarding

9    violent acts committed by O9A in the past.

10          Here, the government's notice is sufficiently detailed

11   to satisfy the requirements under Rule 16(a)(1)(G). The

12   government has provided a list of the topics on which Dr. Simi

13   will testify, accompanied by detailed descriptions of what that

14   testimony will entail. The government also provided background

15   information about Dr. Simi and his résumé which outlines his

16   extensive experience in researching and commenting on white

17   supremacy. In other words, the government did not merely

18   provide a "list of topics." It provided a detailed summary of

19   the testimony that Dr. Simi would deliver.

20          To the extent defendant objects on the basis that

21   Dr. Simi's testimony will not provide an "opinion" but will

22   instead provide only background information about O9A, courts

23   in the circuit routinely allow expert testimony to provide

24   relevant background information about organizations. *See,*

25   *e.g., United States v. Farhane,* 634 F.3d 127, 159 (2d Cir.

M6GHMelC

2011) (affirming introduction of expert testimony regarding the

background of al Qaeda, and commenting that the Second

Circuit has "approved the use of expert testimony to provide

juries with background on criminal organizations, notably

organized crime families"); *United States v. Kadir*

718 F.3d 115, 121 (2d Cir. 2013) (concluding that there was no

abuse of discretion in permitting expert testimony to

"describe al Qaeda and Hezbollah and their activities in

South America and to define various terms related to

terrorism").  As in those cases, background information about

white supremacy and O9A is the proper subject of expert

testimony in this case.  As I'll discuss, the testimony is

competent and will be helpful to the jury.

Accordingly, the government's notice in this case was

sufficient, and Dr. Simi's testimony will not be precluded on

those grounds.

B.  FRE 702 Generally.

The Federal Rule of Evidence 702, which governs the

admissibility of expert testimony provides:

"A witness who is qualified as an expert by knowledge,

skill, experience, training, or education may testify in the

form of an opinion or otherwise if: (a) the expert's

scientific, technical, or other specialized knowledge will help

the trier of fact to understand the evidence or to determine a

fact in issue; (b) the testimony is based on sufficient facts

or data; (c) the testimony is product of reliable principles

and methods, and (d) the expert as reliably applied the

principles and methods to the fact of the case."  Federal Rule

of Evidence 702.

In *Daubert V. Merrill Dow Pharmaceuticals*, *Inc.*, 509

U.S. 579 (1993), the Supreme Court explained that Rule 702

requires district courts to act as gatekeepers by ensuring that

expert testimony "both rests on a reliable foundation and is

relevant to the task at hand."  *Id.* at 597.  As such, the Court

must make "a preliminary assessment of whether the reasoning or

methodology underlying the testimony is scientifically valid

and whether that reasoning or methodology properly can be

applied to the facts at issue."  *Id.* at 592-93.  In short, the

Court must "make certain that an expert, whether basing

testimony upon professional studies or personal experience,

employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant

field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152

(1999).

C.  Qualification as Expert.

"Rule 702 requires a trial court to make an initial

determination as to whether the proposed witness qualifies as

an expert."  *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d

346, 352-53 (S.D.N.Y. 2003).  "Courts within the Second Circuit

'have liberally construed expert qualification requirements'

M6GHMelC

when determining if a witness can be considered an expert."

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 2003 WL

1878246, at *1 (S.D.N.Y. Apr. 11, 2003) (quoting *TC Sys. Inc.*

*v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174 (N.D.N.Y.

2002)); accord *Plew v. Ltd. Brands, Inc.,* 2012 WL 379933, at *4

(S.D.N.Y. Feb. 6, 2012). "To determine whether a witness

qualifies as an expert, the court must first ascertain whether

the proffered expert has the educational background or training

in a relevant field." *Crown Cork & Seal Co., Inc. Master*

*Retirement Trust v. Credit Suisse First Boston Corp.,* 2013 WL

978980, at *2 (S.D.N.Y. Mar. 12, 2013) (citation and internal

quotation marks omitted). "Any one of the qualities listed in

Rule 702 -- knowledge, skill, experience, training, or

education-may be sufficient to qualify a witness as an expert."

Id. (citing Tiffany (N.J.) Inc. v. eBay, Inc., 576 F. Supp. 2d

457, 458 (S.D.N.Y. 2007)).

     Even if a proposed expert lacks formal training in a

given area, he may still have "practical experience" or

"specialized knowledge qualifying him to give opinion testimony

under Rule 702. *See McCullock v. H.B. Fuller Co.*, 61 F.3d

1038, 1043 (2d Cir. 1995) (quoting Fed. R. Evid. 702) (internal

quotation marks omitted). But "if the witness is relying

solely or primarily on experience, then [he] must explain how

that experience leads to the conclusion reached, why that

experience is a sufficient basis for the opinion, and how that

M6GHMelC

experience is reliably applied to the facts." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 Advisory Committee Note).  Where a witness's "expertise is too general or too deficient," the Court "may properly conclude that [he is] insufficiently qualified." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

A court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citing *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994)).  "The expert's testimony must be related to those issues or subjects within his or her area of expertise. *Crown Cork*, 2013 WL 978980, at *2 (citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007)).  "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the Court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl*, 117 F.3d at 80).  "Thus, an expert 'should not be required to satisfy an overly narrow test of his own qualifications,' and the court's focus should be on 'whether the expert's knowledge of the

M6GHMelC

subject is such that his opinion will likely assist the trier

of fact in arriving at the truth.'"  *Crown Cork*, 2013 WL 978980

at *2 (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA*

*Vision Corp.*, 2006 WL 288785 at *5.  (S.D.N.Y. July 28, 2006).

"Assertions that the witness lacks particular educational or

other experiential background, 'go to the weight, not the

admissibility, of [the] testimony.'"  *Zyprexa Prods.*, 489 F.

Supp. 2d at 282 (quoting *McCullock*, 61 F.3d at 1044).

      D.  Expert Testimony Must Assist the Trier of Fact

      A district court must conclude that the proposed

testimony will assist the trier of fact.  *In re Rezulin*

*Products Liab. Litig.,* 309 F. Supp. 2d 531, 540 (S.D.N.Y.

2004).  "Testimony's properly characterized as 'expert' only if

it concerns matters that the average juror is not capable of

understanding on his or her own."  *United States v. Mejia*, 545

F.3d 179, 194 (2d Cir. 2008); see also *United States v. Amuso*,

21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit

manifest error by admitting expert testimony where the evidence

impermissibly mirrors the testimony offered by fact witnesses,

or the subject matter of the expert's testimony is not beyond

the ken of the average juror.")

      "Weighing whether the expert testimony assists the

finder of fact goes primarily to relevance."  *Faulkner v.*

*Arista Records LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014)

(citing *Daubert*, 509 U.S. at 591).  Relevance can be expressed

M6GHMelC

as a question of "fit" -- "whether expert testimony proffered

in the case is sufficiently tied to the facts of the case that

it will aid the jury in resolving a factual dispute." *Daubert*,

509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d

1224, 1242 (3d Cir. 1985)).  The testimony is not helpful if it

"usurps either the role of the trial judge in instructing the

jury as to the applicable law or the role of the jury in

applying that law to the facts before it." *United States v.*

*Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (quoting *United*

*States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

Expert testimony that is "directed solely to lay matters which

a jury is capable of understanding and deciding without the

expert's help" should not be admitted.  *United States v.*

*Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United*

*States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)).

E.  Expert Testimony Must be Reliable

In assessing reliability, courts should consider "the

indicia of reliability identified in Rule 702, namely, (1) that

the testimony is grounded on sufficient facts or data, (2) that

the testimony is the product of reliable principles and

methods, and (3) that the witness has applied the principles

and methods reliably to the facts of the case." *Amorgianos v.*

*Nat' l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)

(citing Fed. R. Evid. 702).  "Under *Daubert* factors relevant to

determining liability include 'the theory's testability, the

M6GHMelC

extent to which it 'has been subjected to peer review and

publication,' the extent to which a technique is subject to

'standards controlling the technique's operation,' the 'known

or potential rate of error,' and the 'degree of acceptance'

within the 'relevant scientific community.'" *Restivo v.

Hessemann*, 846 F.3d 547, 575-76 (2d Cir. 2017) (quoting *United

States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015)).

    *Daubert* sets forth a non-exhaustive list of factors

that district courts may consider in gauging in the reliability

of scientific testimony, which include: (1) whether the theory

has been tested, (2) whether the theory has been suggested to

peer review and publication, (3) the known or potential rate of

error and whether standards and controls exist and have been

maintained with respect to the technique, and (4) the general

acceptance of the methodology in the scientific community.

*Daubert*, 509 U.S. at 593-95.  "Whether some or all of these

factors apply in a particular case depends on the facts, the

expert's particular expertise, and the subject of his

testimony."  *In re Fosamax Products Liab. Litig.*, 645 F. Supp.

2d 164, 173 (S.D.N.Y. 2009) (citing *Kumho Tire*, 526 U.S. at

138).

    When evaluating the reliability of an expert's

testimony, the Court must undertake a rigorous examination of

the facts on which the expert relies, the method by which the

expert draws an opinion from those facts, and how the expert

M6GHMelC

applies the facts and methods to the case at hand."

*Amorgianos*, 303 F.3d at 267.  "In undertaking this flexible

inquiry, the district court must focus on the principles and

methodology employed by the expert, without regard to the

conclusions the expert has reached or the district court's

belief as to the correctness of those conclusions."  *Id.* at

266.  But as the Supreme Court has explained, "conclusions and

methodology are not entirely distinct from one another," and a

district court is not required to "admit opinion evidence that

is connected to existing data only by the *ipse dixit* of the

expert.  A court may conclude that there is simply too great an

analytical gap between the data and the opinion proffered."

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation

omitted).  "Thus, when an expert opinion is based on data, a

methodology, or studies that are simply inadequate to support

the conclusions reached, *Daubert* and Rule 702 mandate the

exclusion of that unreliable opinion testimony."  *Amorgianos*,

303 F.3d at 266.  On the other hand, "where an expert's

methodology overcomes the hurdle of being based on a reliable

process, remaining controversies as to the expert's methods and

conclusions generally bear on the weight and credibility . . .

but not admissibility . . . of the testimony."  *Royal & Sun

Alliance Ins. PLC v. UPS Supply Chain Solutions, Inc.*, 2011 WL

3874878, at *2 (S.D.N.Y. Aug. 31, 2011) (citation omitted).

        If an expert's testimony falls within "the range where

M6GHMelC

experts might reasonably differ," the duty of determining the

weight and sufficiency of the evidence on which the expert

relied lies with the jury rather than the trial court. *Kumho*

*Tire*, 526 U.S. at 153.  "Vigorous cross-examination,

presentation of contrary evidence, and careful instruction on

the burden of proof are the traditional and appropriate means

of attacking shaky but admissible evidence. *Daubert*, 509 U.S.

at 596 (citation omitted).  "The proponent of expert testimony

has the burden of establishing by a preponderance of the

evidence that the admissibility requirements under Rule 702 are

satisfied." *United States v. Williams,* 503 F.3d 151, 160 (2d

Cir. 2007) (citing *Daubert* 509 U.S. at 593, n. 10).

Still, testimony that is admissible under Rule 702 may

be excluded under Federal Rule of Evidence 403 if the Court

finds that "the probative value of the evidence is

substantially outweighed by a danger of . . . unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting

time, or needlessly presenting cumulative evidence." Fed. R.

Evid. 403.  Expert testimony is particularly susceptible to

these dangers "given the unique weight such evidence may have

in a jury's deliberations." *Nimely v. City of New York*, 414

F.3d 381, 397 (2d Cir. 2005).  "Expert evidence can be both

powerful and quite misleading because of the difficulty in

evaluating it.  Because of this risk, the judge, in weighing

possible prejudice against probative force under Rule 403 . . .

exercises more control over experts than lay witnesses.

*Daubert*, 509 U.S. at 595 (quotations omitted).

      II.  Discussion.

      A.  Dr. Simi's qualifications.

      Dr. Simi is sufficiently qualified to serve as an expert in this case.  First, Dr. Simi's education and scholarship is significant.  He obtained his Ph.D. in sociology from the University of Las Vegas, Nevada, and served as a professor of sociology at the University of Nebraska before he assumed his current position as an associate professor at Chapman University.  *See* Dkt. No. 92-4 ("Résumé") at 1.  His scholarship focuses on "the issue of violence and extremist movements, terrorism, hate groups, and hate crimes," and specifically focuses on "far right extremism with [a] focus on white supremacist extremism.  *Id*.  He's published more than 50 academic journal articles and book chapters regarding white supremacy, dozens of which have been peer reviewed.  Tr. 39:2-11.  In addition, he authored the book *American Swastika: Inside the White Power Movement's Hidden Spaces of Hate,* which was selected as an "Outstanding Academic Title of the Year" in 2010.  *Id.* at 1.  He's been interviewed by numerous news outlets and has appeared on CNN's "United Shades of America," MSNBC's "Hardball," and PBS "Newshour."  *Id.* 24.  Further, he's served as an expert consultant in a number of litigations and has testified as an expert witness is two cases.  *Id.* at 10-11.

M6GHMelC

1          Dr. Simi also has ample experience with sociological

2    methodologies.  He's taught a number of courses on qualitative

3    sociological methodologies, including at Chapman, where he

4    teaches classes on qualitative and field methods.  *Id.* at 19;

5    *see also*, e.g., Tr. 7:12–17.  He also co-chairs the

6    University's institutional review board, which oversees all

7    research conducted at Chapman.  Tr. 12:19–13:13.  Further, on a

8    regular basis, he serves as a reviewer for academic journals,

9    including the *American Sociological Review*, and also serves as

10   a reviewer for grant agencies such as the National Science

11   Foundation Service, National Institute for Justice, and the

12   National Science Foundation.  *Id.* at 15:15–16:9.

13          In short, Dr. Simi is an experienced and

14   well–respected scholar and researcher in both the study of

15   extremism and sociological methodology.  He's qualified to

16   testify as an expert in this case.

17          B.  Reliability of Dr. Simi's Testimony

18          Dr. Simi's proposed testimony is sufficiently

19   reliable.  First, Dr. Simi's testimony relies on established

20   and well–recognized sociological methodologies.  In addition to

21   his review of academic literature and primary source materials,

22   Dr. Simi testified at length regarding various types of

23   fieldwork and analysis that he employs in his work.  For

24   instance, Dr. Simi testified that he has performed ethnographic

25   fieldwork, a sociological method that has been used for "more

than a hundred years." Transcript 52:23 to 54:3. He also has
utilized "participant observation" -- viewing individuals
either as a member of a group you are studying or as a "total
observer." *See Id.* at 54:2-21. Dr. Simi testified that he has
been using participant observation and interviews with white
supremacist groups since 1996 in which he's observed and
interviewed hundreds of members of white supremacist groups in
their "natural environment." *Id.* at 25:12-26:9. For instance,
Dr. Simi performed "thousands of hours" of fieldwork in
preparation to write his book *American Swastika,* including time
where he "lived with families" that had white supremacist
members. *Id.* at 29:11-30:4.

        Dr. Simi also testified regarding his use of "open
source data analysis," a sociological methodology that "relies
on secondary sources," such as websites or publicly available
court documents. *Id.* at 32:2-34:4. As one example, Dr. Simi
testified that he used that methodology to conduct long-term
research into the backgrounds of individuals indicted on
federal terrorism charges using federal court documents. *Id.*
at 32:2-34:4. In addition, Dr. Simi has conducted hundreds of
interviews of members with white supremacist groups, including
in order to study disengagement and deradicalization from white
supremacist movements. *Id.* at 38:2-38:25.

        Dr. Simi also utilizes "virtual ethnography" -- a
methodology that is "very much" accepted in the sociological

M6GHMelC

field.  Tr. 69:8-10.  That methodology involves strategy such
as participant observation, interviewing observation, and
observation coupled with participation and observation in
virtual online spaces.  *Id.* at 57:16-58:17.  Dr. Simi explained
that he's conducted virtual ethnography using web forums like
"Stormfront," which is "one of the . . . older kind of white
supremacist web forums," as well as "Telegram, Discord, and
Gab*."  Id.* at 65:14 to 66:3.  He explained that he spend
"thousands of hours" studying such fora and has analyzed
"hundreds, if not thousands," of virtual spaces in the course
of his research on the white supremacist movement.  *Id.*
67:11-15.  Dr. Simi also noted that virtual ethnography is
particularly apt for studying white supremacist groups because
there is "such an emphasis within the white supremacist
movement on the virtual realm, that to really understand the
movement, you have to go where they congregate to understand
[its] cultural dimensions . . . ." *Id.* 67:16-24.

      Importantly, Dr. Simi has applied those principles are
and methods reliably to his study of O9A.  Dr. Simi testified
that he has undertaken a review of all of the scholarly
literature that he is aware of that addresses O9A in whole or
in part*.  Id.* 124:8-125:7.  Dr. Simi also reviewed journalistic
materials, estimating that he had reviewed "dozens of
journalistic materials relating to O9A*."  Id.* 126:13-127:4.

      Further, Dr. Simi's research included review of

M6GHMelC

primary sources, including O9A's specific works written by the

supposed founder of O9A, Anton Long, such as *The Sinister*

*Tradition* and *Hostia*.  Tr. at 123:9-23.  Dr. Simi also reviewed

multiple websites that appeared to have been created by O9A

adherents, such as O9A.org.  *Id.* 127:21-128:8.

In addition, Dr. Simi used virtually ethnography to

learn about O9A.  He noted that virtual ethnography was a

particularly apt tool for the study of O9A, since members of

O9A tend to be a "hard-to-reach group," such that O9A -- that

may be inaccessible in terms of participant observation and/or

interviews.  *Id.* at 130:8-20.  He explained that virtual

ethnography allowed him to "access . . . that community culture

. . . in order to try and employ some of the methods of

fieldwork in studying the communication [and] the way people

present themselves . . . ."  *Id.*  He testified that he used the

Telegram platform in his virtual ethnography and had observed

approximately ten Telegram channels that relate to O9A in order

to discern themes and patterns present in the data and

communications sent via those channels.  *Id.* 131:4-133:17.

Finally, Dr. Simi testified that he had encountered

O9A-related content in his fieldwork related to more general

white supremacy.  For instance, he testified that more than 20

of his interviews with white supremacists related to

neopaganism*.  Id.* 127:5-20.  He also testified that he had

reviewed academic scholarship on white supremacy that included

M6GHMelC

in discussion of O9A.  Tr. 125:17-25.

         Second, Dr. Simi's testimony is grounded in facts and
data.  As explained above, Dr. Simi collected the facts and
data that contribute to his expertise in white supremacy
through extensive academic research and "thousands of hours" of
fieldwork -- including by embedding himself in white
supremacist communities, gatherings, and online spaces.  *See,*
*e.g.,* Tr. 29:16-30:4.  Dr. Simi supplemented that work with
extensive facts and data collection specific to O9A.  He
monitored O9A-specific Telegram channels and reviewed numerous
O9A-related publications -- both primary and secondary sources.
Given that Dr. Simi relied on a variety of reliable O9A-related
data sources, I find his testimony to be sufficiently grounded
in facts and data.

         Defendant objects to Dr. Simi's testimony on the basis
that O9A is "anything but a 'traditional' white supremacist
group."  Mot. at  13.  However, Dr. Simi credibly explained
that O9A fits solidly within the orbit of the greater white
supremacist movement, such that Dr. Simi's expertise in white
supremacy provides an apt foundation for his testimony
regarding O9A.  Specifically, Dr. Simi testified that the white
supremacist movement is composed of multiple subgroups,
including O9A, the Ku Klux Klan, neo-Nazis, National
Socialists, Christian Identity, and skinhead.  According to
Dr. Simi, there are "porous boundaries between those

subgroups." *Id.* 17:11-24.  Those subgroups are united by "key

beliefs and emotions" that are also shared by O9A.  Those

include a racist ideology (one that includes anti-Black racism,

antisemitism, and anti-immigrant sentiments) and a common goal

of developing a "white ethnostate" or some "restructuring of

society that is consistent with . . . [those] core beliefs."

*Id.* 80:7-12.

He further explained that white supremacists hold core

beliefs about social hierarchies rooted in social Darwinism --

white supremacists, including adherents to O9A, have a "sense

some people are intellectually and physically superior to

others," and that other groups are "weakening society." *Id.* at

107:21-108:18.  And to the extent defendant argues that O9A's

focus on the occult and satanism renders Dr. Simi's expertise

less applicable to O9A, Dr. Simi testified that neopaganism,

which he defined to include satanism, "features . . .

prominently among white supremacists." *Id.* 128:9-20.

Moreover, it's simply not the case that Dr. Simi would

testify about O9A based solely on his expertise in general

white supremacy.  As explained above, Dr. Simi has conducted

significant specific research into O9A, applying widely

accepted methodologies, and has been able to situate the

information he's collected about O9A into his broader

experience in white supremacy.  In short, the Court is

convinced that Dr. Simi may reliably testify about O9A.

M6GHMelC

1          Defendant also objects on the basis that in previous

2    cases, including his testimony in *Sines v. Kessler*, utilized

3    somewhat different methodologies than Dr. Simi applied to his

4    research into O9A; namely, defendant notes that Dr. Simi's

5    testimony in the *Sines* case involved a quantitative analysis of

6    Discord posts related to the Unite the Right Rally in

7    Charlottesville, Virginia, but Dr. Simi's analysis in this case

8    involved no such quantitative review.  *Id.* at 215:14-216:17.

9    However, Dr. Simi testified that the core elements of the

10   [virtual ethnography] methodology are still intact" between

11   both cases, including because in both cases he conducted a

12   study of online messages to make an assessment about the data

13   as it relates to white supremacy and, in this case, O9A.  *Id.*

14   at 224:14-225:19.  The Court agrees that the differences

15   between the methodologies Dr. Simi used in this case, as

16   compared to others, do not render his testimony unreliable.

17         In short, the government has established that

18   Dr. Simi, a professor of sociological methodologies, utilized

19   well-accepted sociological methods to derive the testimony he

20   will deliver in this case, and also that his testimony is

21   grounded in facts and data.  Accordingly, the Court concludes

22   that Dr. Simi's testimony is reliable.

23         C.  Helpfulness to the Jury

24         Dr. Simi's testimony will also assist the trier of

25   fact.  The government's supplemental notice provides that

M6GHMelC

1    Dr. Simi will testify regarding seven topics.  I will address

2    each of those topics in turn.

3            O9A's origins within the white supremacist movement:

4    Testimony regarding O9A's origins within the white supremacist

5    movement will assist the trier of fact.  The average juror is

6    unlikely to have any degree of familiarity with O9A or its

7    ideology, including its "militant support for the promotion of

8    extreme violence in order to overthrow western civilization."

9    Notice at 1.  Nor is the average juror likely to be familiar

10   with the fact that O9A's goal is to enact a "major change in

11   society that would move away from . . . multiculturalism and

12   away from [an] idea of Judeo-Christian domination" and toward

13   the "establishment of a Nazi-like state."  Tr. at 146:3-147:5.

14           Further, the testimony's relevant to the facts in this

15   case.  Most prominently, defendant is alleged to have been an

16   active member of O9A.  Thus, testimony about O9A's origins and

17   its connection with the greater white supremacist movement will

18   give the jury necessary background information about a

19   fundamental aspect of this case.  Moreover, testimony regarding

20   O9A's interest in furthering the demise of western civilization

21   would shed light on including defendant's testimony or

22   statements regarding dying in the attack on his military base

23   would mean that he "would have died successfully" because

24   "another ten years war in the Middle East would definitely

25   leave a mark."  *See* Opp'n at 10.  Dr. Simi's testimony could

M6GHMelC

also assist jurors in understanding defendant's alleged

admiration for Nazism and Adolph Hitler.  In short, Dr. Simi's

testimony regarding O9A's origins and its connections to the

larger white supremacist movement will assist the trier of

fact.

O9A Literature and Philosophy:  So too will Dr. Simi's

proposed testimony regarding the importance of certain O9A

texts and their contents be helpful to the jury.  Given that

the jurors are unlikely to be familiar with O9A, they're

similarly unlikely to have any knowledge of key O9A texts, such

as *The Sinister Tradition*, *Hostia*, or *The Seven-Fold Way of the

Order of Nine Angles*.  Nor are jurors likely to have any

background in the principles espoused in those works, including

the performance of "insight roles" as a "type of infiltration."

*Id.* 149:4-23.  Such information is likely beyond the ken of the

average juror.

Dr. Simi's testimony on this topic is relevant to the

facts in this case.  In particular, the government alleges that

the defendant possessed copies of those key O9A works in his

barracks.  An expert's insight into the contents of the works

that defendant possessed is relevant to defendant's adherence

to O9A's ideology and, in turn, his motive for committing the

charged crimes.  Further, Dr. Simi's testimony regarding

insight's roles will provide necessary background information

to understand defendant's express references in his

M6GHMelC

communications to the "insight role" he was performing as a member of the U.S. military, as well as his comments to CC-1 that he had "thought about" joining al Qaeda to perform an insight role. *See* Opp'n at 18.  Accordingly, Dr. Simi's testimony on this topic is relevant to the facts of this case.

        With regard to testimony about insight roles, defendant argues that the "jury will hardly require expert testimony to understand that a person affiliated with O9A might not wish to publicize that fact."  However, according to Dr. Simi, the concept of an insight role is more nuanced than simply keeping private one's participation in an extremist group.  As Dr. Simi explained, the goal of performing an insight role is to "be able to influence society in [a] kind of more surreptitious way by getting into the system and starting to exert influence in that respect."  Tr. 149:4-23.  Further, according to the government, defendant expressly used the term "insight role" in conversations with the alleged coconspirators -- it's not the case that he simply told those individuals that he would keep his membership to O9A to himself.  In short, the concept of an insight role is more nuanced than defendant's argument suggests.  Defendant's argument illustrates the value of expert testimony on this issue to illustrate such nuances.  The Court determines that Dr. Simi's testimony on O9A's literature and philosophy -- including testimony regarding insight roles -- will assist the

1    trier of fact.

2            O9A Structure:  Dr. Simi's proposed testimony

3    regarding O9A's structure will also be helpful to the jury.

4    First, the jurors are unlikely to be familiar with O9A's

5    structure as a "largely clandestine" organization that

6    "purposely conceals its members."  Tr. at 166:14-21.

7    Similarly, jurors are not likely to be familiar with the fact

8    that the group typically operates under the name "Temple ov

9    Blood" in the United States, nor are jurors likely to be

10   familiar with the O9A's "seven-fold" self-initiation process

11   which involves "various rituals" and "various practices,"

12   including performing insight roles.  Tr. at 147:6-148:4.

13           Further, Dr. Simi's proposed testimony is relevant to

14   the facts of this case.  Here, the government alleges that

15   defendant participated in the O9A self-initiation process

16   during which he outlined his extremist views in his responses

17   to a series of vetting questions.  Opp'n at 19.  Defendant also

18   referred to the Temple ov Blood in his online communications,

19   and information on that term is thus relevant to understanding

20   those communications.  *Id*.  The government also proffers that

21   it will establish that defendant performed various initial

22   rituals to prove his commitment to O9A, as evidenced by photos

23   of defendant cutting his hand in a form of ritual sacrifice.

24   Dr. Simi's testimony will assist the jurors by providing

25   context to explain how such evidence relates to defendant's

M6GHMelC

purported dedication to O9A's ideology and goals, which is relevant to his motive to plan an attack on his fellow service members.  Accordingly, Dr. Simi's testimony on O9A's structure will assist the trier of fact.

The Convergence of O9A and Jihadists:  Dr. Simi's testimony regarding the convergence of O9A and Jihadists will also be helpful to the jury.  As jurors are unlikely to have any knowledge or awareness of O9A, they're similarly unlikely to be aware of the connections between an O9A and Jihadists.  Thus, the average jurors is not likely understand O9A's admiration of the "idea of jihadi extremism" without expert testimony.  Tr. at 161:12-162:25.

Similarly, that testimony is relevant to the facts of this case.  The government asserts that it will establish that defendant and his O9A coconspirators conspired to plan a jihadist attack on a U.S. military base using a Telegram channel alternatively named "Jihad" and then named "Jihadist Caliphate."  Opp'n at 21.  Dr. Simi's testimony will allow the jury to understand the connections between defendant's adherence to O9A's ideology and his attempt, alleged attempt, to plan a jihadist attack on a U.S. military base. Accordingly, Dr. Simi's testimony on the convergence of O9A and jihadists will assist the trier of fact.

O9A's Emphasis on Dissention and Violence:  In large part, Dr. Simi's testimony regarding O9A's emphasis on

M6GHMelC

deception and violence will be helpful to the jury.  Beginning

with O9A's emphasis on violence, it is unlikely that jurors are

aware of the ways that white supremacist groups and O9A, in

particular, view violence.  While some jurors may be aware that

certain white supremacist groups have enjoyed -- employed,

pardon me, violent tactics in the past, Dr. Simi testified that

O9A "valorizes" violence and speaks of it in "heroic terms in

many respects."  Tr. at 155:24-56:14.  The degree of respect

for violent tactics is unlikely to be within the ken of the

average juror.  Similarly, jurors are unlikely to be aware that

O9A adherents valorize and celebrate sexual violence.  *Id*.  In

particular, O9A adherents see rape as a means of forcibly

producing a new generation of offspring that would "allow for

the survival of the white race." *Id.* 158:17-23.  Thus,

Dr. Simi's testimony regarding O9A's emphasis on violence is

likely to provide the jurors with information that they would

not otherwise know without expert testimony.

          In addition, such testimony is relevant to the facts

of this case where the government alleges that defendant and

his coconspirators aimed to plan a violent attack on a U.S.

military base.  It's also relevant to explaining references to

"rape" by defendant and his alleged coconspirators, as well as

the fact that the Telegram channel on which the individuals

communicated was named the "Rapewaffen Division."  Dr. Simi's

testimony would provide useful context for understanding

M6GHMelC

defendant's alleged adherence to O9A's ideology and, as a

result, his motive to plan a jihadist attack on his military

base.  Accordingly, Dr. Simi's testimony regarding O9A's focus

on violence will assist the trier of fact.

As to O9A's focus on deception, to the extent that

Dr. Simi's testimony will contextualize O9A's observation as an

idiosyncratically clandestine organization, such information is

unlikely to be known by the average juror.  That information is

also relevant to the nature of defendant's membership in and

interactions with O9A.  Thus, to the extent that Dr. Simi will

testify that O9A is generally a clandestine organization that

does not publicize its members, that testimony will be

permitted.

However, the government also asserts that Dr. Simi's

testimony would be "relevant to contextualize . . . why

[defendant] was not fully truthful in his postarrest statements

with law enforcement" and also relevant to rebut any argument

that defendant was not, in fact, a member of O9A because "O9A

adherents are instructed to lie about their affiliation with

O9A and that the jury should evaluate the defendant's

statements regarding his association with the group in that

context."  Opp'n at 22.

While Dr. Simi may testify to the fact that O9A is

generally secretive, he may not opine that defendant actually

possessed the requisite mental state to be convicted of the

1    charged offense, despite defendant's statements to the

2    contrary.  Rule 704(b) prohibits the expert from expressing an

3    "opinion or inference as to whether the defendant did or did

4    not have the mental state or condition constituting an element

5    of the crime charged or the defense thereto."  Fed. R. Evid.

6    704(b).  This disables even an expert from "expressly finding

7    or stating the final conclusion or inference as to a

8    defendant's actual mental state" at the time of the crime.

9    *United States v. Richard*, 969 F.2d 849, 854 (10th Cir.), cert.

10    denied, 506 U.S. 887, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992),

11    and petition for cert. filed, No. 92-6588 (Nov. 16, 1992);

12    accord *United States v. McBride*, 786 F.2d 45, 50 (2d Cir. 1986)

13    ("A district court may exclude psychiatric testimony which

14    merely offers an opinion about the defendant's capacity to form

15    the mental state required to commit the offense charged,

16    without suggesting the presence of a mental disease or defect .

17    . . ").  To the extent that Dr. Simi is asked to opine that the

18    jury should write off defendant's denial of any membership in

19    O9A as the product of O9A's clandestine nature and that

20    defendant, in turn, possessed the requisite mental state to

21    commit the offenses for which he was charged, that testimony

22    evidently will not be permitted.  We can talk about that some

23    more at the end of this decision.

24          The Use of Certain Terms Images, Symbols, and Memes in

25    the White Supremacist Community:  Dr. Simi's testimony

M6GHMelC

regarding the use of certain terms, images, symbols, and memes in the white supremacist community will also be helpful to the jury.  First, the idiosyncratic use of certain terms, including terms like "rape, baste, and kek" in O9A and white supremacist parlance is unlikely to be understood by the average juror.  Similarly, and as mentioned above, jurors are unlikely to be familiar with the manner by which O9A adherents and white supremacists view sexual violence, including rape.  Testimony regarding these terms is also relevant to the facts in this case given defendant's and his coconspirators' use of those terms in their online communications.

            As to Dr. Simi's testimony regarding "double speak," "just joking," and "front-stage/back-stage strategies," the Court agrees that jurors are unlikely to be familiar with those concepts.  For instance, the average juror is probably not aware that members of white supremacist groups employ front-stage/back-stage as a recruitment strategy, Tr. at 88:4-89:2, and that they use humor and "just joking" strategies to help "sow confusion" and "avoid culpability."  Tr. at 98:24-99:22.

            To an extent, such information is relevant to the facts of this case.  Broadly speaking, information about these strategies is relevant to the language and strategies used in O9A-related primary sources, and Dr. Simi will be permitted to testify as to the use of "double speak," "just joking," and

M6GHMelC

"front-stage/back-stage strategies" as they appear in those
primary sources.

However, Dr. Simi will not be permitted to testify as
to the manner by which these strategies were or were not
employed by defendant and his alleged coconspirators in this
case.  As explained above, experts in criminal cases are not
permitted to express an "opinion or inference as to whether the
defendant did or did not have the mental state or condition
constituting an element of the crime charged or of a defense
thereto."  Fed. R. Evid. 704(b).  And to permit testimony
regarding defendant's use of these strategies -- particularly
with regard to defendant's statements during postarrest
interviews -- would impermissibly suggest that defendant
possessed the requisite mental state to commit the charged
offenses despite his denials of that fact.  Thus, Dr. Simi's
proposed testimony is limited to the use of these strategies in
the abstract, i.e., as it appears in O9A primary source
materials, as opposed to the use of these strategies by
defendant and his coconspirators.

I also point out that defendant's counsel asserted at
the *Daubert* hearing that the government's notice states that
O9A "regularly" employs strategies like doublespeak, "just
joking," and "front-stage/back-stage strategies."  Tr. at
214:24-215:13.  I note that the government's notice does not
contain the word "regularly," though the government's

M6GHMelC

opposition suggests that the notice does.  *See* Opp'n at 23.
During cross-examination, Dr. Simi conceded that he had
reviewed only a limited set of O9A communications.  Thus, the
Court is dubious of testimony that would suggest that O9A
"regularly" utilizes these strategies -- a more apt description
would be that O9A "uses" these strategies.  The Court trusts
that Dr. Simi's testimony will be more precise than what is
suggested.

        O9A's Use of Encrypted Messaging Applications:
Testimony regarding O9A's use of encrypted messaging
applications will also be helpful to the jury.  The average
juror is unlikely to have significant familiarity with the
extent to which white supremacist groups use encrypted
messaging services like Telegram and Discord.  *See* Tr. at
65:14-66:3 (explaining that white supremacists have "developed
a pretty substantial presence" on those platforms).  That
testimony is also relevant to this case, as the government
asserts that defendant and his coconspirators communicated
extensively via Telegram.  That defendant used Telegram as a
platform is less relevant to his purported membership in O9A
and, consequently, his motive to commit the charged offenses.
Accordingly, Dr. Simi's of use of encrypted messaging
applications would be helpful to the jury.

        Here too, however, I note that the government's notice
states that Dr. Simi will testify that O9A "primarily"

M6GHMelC

1    communicates via encrypted messaging applications like

2    Telegram.  During cross-examination, Dr. Simi conceded that

3    instead of the word "primarily," he would likely use a

4    different term.  Tr. at 221:9-13.  Again, the Court anticipates

5    that Dr. Simi's testimony will be more precise than the notice

6    in this respect.

7            D.  Hearsay

8            Despite defendant's arguments to the contrary,

9    Dr. Simi's testimony will not be precluded on the basis that it

10   impermissibly relies on hearsay.  "Under Rule 703, experts can

11   testify to opinions based on inadmissible evidence, including

12   hearsay, if 'experts in the field reasonably rely on such

13   evidence in forming their opinions.'"  *United States v. Mejia*,

14   545 F.3d 179, 197 (2d Cir. 2008) (quoting *United*

15   *States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993).  Here, and

16   as discussed, Dr. Simi utilized well-accepted sociological

17   methodologies to come to the conclusions in his testimony,

18   including the review of academic literature and primary

19   sources, ethnographic fieldwork, and virtual ethnography.  Nor

20   is it the case that Dr. Simi will "repeat information that is

21   essentially already in evidence."  Tr. at 236:10-237:4.

22   Rather, Dr. Simi, a preeminent expert in white supremacy, will

23   provide expert foundational background on O9A that simply

24   cannot be discerned by review of the evidence, certainly not

25   during the amount of time that we have for trial.  Indeed, were

M6GHMelC

1    jurors asked to merely read the defendant's online

2    communications -- which are replete with terms like "insight

3    role," "kek," and references to jihad -- it is unlikely that

4    they would have the depth of understanding to properly evaluate

5    the issues and charges in this case.

6          Moreover, the cases upon which defendant relies for

7    this argument can be readily distinguished.  In *Mejia*, for

8    example, the Second Circuit determined that a police officer's

9    testimony was improper because it merely -- it was "merely

10   repeating information he had read or heard" and because he "did

11   not analyze his source materials so much as repeat their

12   contents."  545 F.3d 179, 197 (2d Cir. 2008).  Here, by

13   contrast, Dr. Simi is a trained sociological expert who adeptly

14   described the well-accepted methodologies he used to derive his

15   testimony.  Moreover, his testimony is based on a synthesis of

16   that expertise in white supremacy and his specific research

17   into O9A.  Dr. Simi did not, as defendant implicitly

18   suggests -- merely "repeat the contents" of evidence to be

19   admitted in this case.

20         Accordingly, Dr. Simi's testimony should not be

21   categorically excluded because it constitutes inadmissible

22   hearsay, and it will not be categorically excluded on those

23   grounds.

24         E.  Rule 403.

25         Nor will Dr. Simi's testimony be precluded under

M6GHMelC

Rule 403.  Under Rule 403, relevant evidence may be excluded if

"its probative value is substantially outweighed by a danger of

one or more of the following: unfair prejudice, confusing the

issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence."  Fed R. Evid. 403

403.

          The Second Circuit has instructed that will "district

courts have broad discretion to balance probative value against

possible prejudice" under Rule 403.  *United States v. Bermudez*,

529 F.3d 158, 161 (2d Cir. 2008)(citation omitted).  Because

virtually all evidence is prejudicial to one party or another,

to justify exclusion under Rule 403, the prejudice must be

unfair.  *See* Fed. R. Evid. 403.  Weinstein's Federal Evidence

Section 403.04[1][a] (2019) (citing cases).  "The unfairness

contemplated involved some adverse effect beyond tending to

prove a fact or issue that justifies admission."

*Constantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164,

174-75 (2d Cir. 2000).  Further, as the advisory committee

notes to Federal Rule of Evidence 403 explain, "'Unfair

prejudice' within its context means an undue tendency to

suggest decision on an improper basis commonly, though not

necessarily, an emotional one."  Fed. R. Evid. 403 advisory

committee notes.

          Here, defendant's primary objection to Dr. Simi's

testimony under Rule 403 appears to be related to testimony

M6GHMelC

1    about "key events in O9A's history, including historical acts

2    of violence perpetrated by O9A members and associates." *See*

3    Mot. at 11.  However, the defendant has removed this topic in

4    its supplemental notice, such that defendant's objection is

5    moot.  I understand that such testimony will not be offered.

6            To the extent defendant objects under Rule 403 to the

7    other aspects of Dr. Simi's testimony as I've outlined it, such

8    objections do not have merit.  I have considered all of the

9    relevant factors under Rule 403 and engaged in a careful

10   balancing of the probative value of this evidence against the

11   adverse consequences outlined in the rule.

12           As explained above, the testimony offered by Dr. Simi

13   is highly probative, including because testimony regarding

14   O9A's core tenets provides necessary context to understand

15   defendant's alleged membership in O9A, and consequently, his

16   motive to facilitate an attack on the U.S. military base, as

17   well as his planning of said attack.

18           I'm going to reserve decision, as I said earlier, with

19   respect to the, I'll call it, correlation between white

20   supremacy and the military.  I have substantial concerns about

21   that proposed testimony.  I just want to consider it further

22   before taking a position.  I will do so before trial.

23           For the forgoing reasons, defendant's motion *in limine*

24   to excluded the testimony of Dr. Simi is denied.

25           So thank you very much, counsel, for your patience as

1    I reviewed the reasoning behind my decision with respect to the

2    testimony of Dr. Simi.  As you can see, the Court has examined

3    carefully all of the evidence presented with respect to

4    Dr. Simi and his anticipated testimony after -- with the

5    benefit of a hearing.  Having balanced all the relevant factors

6    in light of the governing law, I believe that his testimony is

7    admissible with the limitations that I outlined during the

8    course of my decision here.

9            Good.  So I think that's all that I had on my agenda.

10   I look forward to seeing the submissions by the defendant in

11   response to the government's motion regarding its proposed

12   expert.  I'm going, again, to expect to see you here next

13   Wednesday for our hearing with respect to the admissibility of

14   that expert's testimony, an issue as to which the defense bears

15   the burden of proof.

16           Anything else that we should take up here before we

17   adjourn?  First, counsel for the United States?

18           MS. RAVENER:  No, your Honor.

19           THE COURT:  Thank you.

20           Counsel for defendant?

21           MR. MARVINNY:  No, thank you.

22           THE COURT:  Good.  Thank you all very much.  Again,

23   thank you for your indulgence.  I look forward to seeing you

24   back here on Wednesday.  This proceeding is adjourned.

25           (Adjourned)