M6M5mel1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               20 Cr. 314 (GHW)

ETHAN PHELAN MELZER,

                Defendant.

------------------------------x

                                             June 22, 2022
                                             10:10 a.m.

Before:

                    HON. GREGORY H. WOODS,

                                             U.S. District Judge


                         APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:     KIMBERLY RAVENER
        MATTHEW HELLMAN
        SAMUEL S. ADELSBERG
        Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK
        Attorneys for Defendant
BY:     ARIEL C. WERNER
        JONATHAN A. MARVINNY

M6M5mel1

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3     appearance for the record.

4          MS. RAVENER:  Good morning, your Honor.  Kimberly

5     Ravener, Matthew Hellman and Samuel Adelsberg for the

6     government.

7          THE COURT:  Thank you.  Good morning.

8          MR. HELLMAN:  Good morning.

9          MR. ADELSBERG:  Good morning.

10          MS. WERNER:  Good morning, your Honor.  Federal

11     Defenders of New York by Ariel Werner and Jonathan Marvinny for

12     Ethan Melzer, joined at counsel table by our paralegal Maria

13     Barkhurst.

14          THE COURT:  Very good.

15          Thank you, counsel, for being here.  We are here to

16     conduct a Daubert hearing with respect to the proposed

17     testimony of Dr. Greenfield.  Is there anything that either

18     party would like to raise with the Court before we begin with

19     that work, first counsel for the government?

20          MS. RAVENER:  Nothing further, your Honor.

21          THE COURT:  Thank you.

22          Counsel for defendant?

23          MS. WERNER:  No, your Honor.  Thank you.

24          THE COURT:  Good.  Thank you very much.

25          So, let's begin.  Counsel for defendant, would you

M6M5mel1                    Greenfield - Direct

1    please call your witness?

2              MS. WERNER:  Your Honor, the defense calls Dr. David

3    Greenfield.

4              THE COURT:  Thank you.

5              MS. WERNER:  Your Honor, may I approach the podium?

6              THE COURT:  Yes, you may.

7              MS. WERNER:  And your Honor, may I remove my mask when

8    questioning the witness?

9              THE COURT:  Thank you.  Yes, you may.

10   DAVID GREENFIELD,

11        called as a witness by the Defendant,

12        having been duly sworn, testified as follows:

13             THE DEPUTY CLERK:  Please state your full name and

14   spell your last name slowly for the record.

15             THE WITNESS:  My name is Dr. David Greenfield.

16             THE COURT:  Thank you very much.

17             Counsel, you can inquire.

18   DIRECT EXAMINATION

19   BY MS. WERNER:

20   Q.  Good morning, Dr. Greenfield.

21   A.  Good morning.

22   Q.  What kind of doctor are you?

23   A.  I'm a clinical psychologist.

24   Q.  What is clinical psychology?

25   A.  Well, it is the study and practice of treating and

M6M5mel1                          Greenfield - Direct

1    understanding human behavior but it's largely a clinical

2    discipline as well as an academic study of human behavior,

3    thinking, and emotion.

4    Q.  Does that study of human behavior include a study of how

5    people relate to one another?

6    A.  Very much so.  That's really the basis of it.  Social

7    interaction is the largest part of human interaction and human

8    behavior.

9    Q.  How long have you been a psychologist?

10   A.  I have been practicing as a licensed psychologist since

11   1986.

12   Q.  And where are you licensed to practice?

13   A.  I'm licensed to practice in New York -- New York,

14   Massachusetts, Connecticut, and I have a telemedicine license

15   in Florida.

16   Q.  Do you currently practice?

17   A.  Yes, I do.

18   Q.  In what setting?

19   A.  Well, I practice actually all over the place because of

20   COVID but largely in Connecticut, but I practice from a variety

21   of offices because some of what I do is through telemedicine

22   now.

23   Q.  So you maintain a private practice?

24   A.  Yes, it is a private office.

25   Q.  We will discuss this in greater depth in a few minutes but

M6M5mel1                        Greenfield – Direct

1    during your career as a psychologist, have you developed a

2    professional speciality or focus?

3    A.   Yes, I have.

4    Q.   And what is that?

5    A.   In the understanding of Internet behavior, as well as

6    treating Internet-related problems.

7    Q.   Where did you earn your psychology Ph.D, Dr. Greenfield?

8    A.   Texas Tech University.

9    Q.   What year was that?

10   A.   1986.  '85, '86.

11   Q.   Did you write a dissertation or thesis?

12   A.   Yes, I did.

13   Q.   What is the topic?

14   A.   The topic was predicting marital satisfaction.

15   Q.   Did you conduct any sort of work or do work during graduate

16   school?

17   A.   Well, yeah.  About half of the time you are in school you

18   are treating patients in a clinic or in a hospital, which is

19   what I did, in addition to internship and residency.

20              (Continued on next page)

21

22

23

24

25

M6mWmel2                         Greenfield – Direct

1    BY MS. WERNER:

2    Q.  What kind of schooling did you have prior to your Ph.D.?

3    A.  I have a master's degree from -- I have a bachelor's degree

4    from Ramapo College of New Jersey.  I have a master's degree

5    from New York University, and I have additional postdoctoral

6    master's degree in pharmacology from Fairleigh Dickinson

7    University.

8    Q.  What was the subject of your psychology bachelor's degree?

9    A.  It was in general psychology.

10   Q.  And your master's degree?

11   A.  In psychology, particularly clinical counseling psychology.

12   Q.  What is counseling?

13   A.  It's the -- it's the technique of providing a variety of

14   methods to alleviate human suffering, basically, through

15   techniques of psychotherapy: listening, cognitive behavioral

16   strategies, sometimes pharmacology as well.

17   Q.  And when did you receive that additional training in

18   psychopharmacology?

19   A.  I completed it in 2017.  Yeah, 2017.

20   Q.  What is psychopharmacology?

21   A.  It's the study and use of psychoactive substances in the

22   field of psychiatry.

23   Q.  Did your academic training include training on research

24   methodology?

25   A.  Yes, it did.

M6mWmel2                    Greenfield – Direct

1    Q.   What kind of training?

2    A.   There were four or five courses in statistical analysis,

3    research methods, research design, and that's both at the

4    master's and doctoral level as well as the undergraduate level.

5    Q.   Did that training include the performance of research using

6    surveys?

7    A.   Absolutely.

8    Q.   And did that training include the evaluation of surveys

9    that were based on self-reporting?

10   A.   The research courses really included the ability to design

11   and critique studies of all sorts in behavioral science and,

12   actually, in all medical science, because you needed to

13   understand how drug studies worked as well.

14   Q.   Did your training include training in how to draw

15   conclusions and synthesize ideas based on clinical practice and

16   work with patients?

17   A.   Yes, very much so.

18   Q.   And did it include training in the use of case studies?

19   A.   Yes, it did.

20   Q.   What are case studies?

21   A.   Case studies are research reports that are based on

22   individual or groups of treatment experiences that are reported

23   in the literature as case studies.

24   Q.   Did your training include the review of academic literature

25   conducted by others in order to inform your own understanding

M6mWmel2                         Greenfield - Direct

1  and practice?

2  A.  Yeah, that's -- you have to understand the ability -- you

3  have to be able to critique and understand other people's

4  research both in order to conduct your own as well as to

5  implement the results of other people's research.

6  Q.  After you graduated from your Ph.D. program, did you have

7  an internship?

8  A.  I did.  I had an internship at --

9  Q.  Where --

10     Go ahead.

11  A.  At McGuire V.A. Medical Center in Richmond, Virginia.

12  Q.  What was that internship in?

13  A.  It was in general psychiatry, addiction medicine, and

14  neurology.

15  Q.  What sort of work did you do during your internship?

16  A.  Treatment of patients.  I worked on a substance abuse

17  addictions unit.  I also worked in the acute psychiatry unit as

18  well as in the neurology outpatient clinic and performing

19  neurological and neuropsychological examinations.

20  Q.  You're talking about psychiatry.  Could you describe

21  briefly the relationship between psychology and psychiatry?

22  A.  Well, they're obviously highly interrelated disciplines.  I

23  mean my degree is in psychology, but most of my clinical work

24  has been in psychiatric or general medical settings.  That's

25  not unusual, because the professions are interrelated.

1    Q.  How would you --

2    A.  And we do very similar things.

3    Q.  How would you define psychiatry?

4    A.  The study and practice of addressing and treating human

5    behavior disorders.

6    Q.  And so does your training as a psychologist prepare you to

7    work in a psychiatric setting as well?

8    A.  Yes, it does.

9    Q.  After your internship, did you have a residency?

10   A.  I did.

11   Q.  What was your residency in, and where was that?

12   A.  Part of it was completed at Virginia Commonwealth

13   University in a counseling service, and then I transferred to

14   Fairfield Hills psychiatric hospital in Newtown, Connecticut,

15   and worked there -- completed my residency and then stayed on

16   as a staff psychologist.

17   Q.  What kind of work did you do during your residencies?

18   A.  I worked in the general psychiatry unit and acute

19   psychiatry unit and some work in the addictions unit, and I

20   performed neuropsychiatric evaluations.

21   Q.  You started to say that you continued on at Fairfield

22   Hills.  What kind of work did you do after your residency?

23   A.  What I just said.  I worked -- I continued in the general

24   psychiatry unit doing neuropsychiatric evaluations and also

25   covered some of the acute psychiatry unit.  We would evaluate

M6mWmel2                         Greenfield - Direct

1    new patients coming in and then do routine evaluations, and

2    then we also did psychotherapy with the patients that were

3    suitable.

4    Q.  And where did you go from there?

5    A.  I left there and worked at a private psychiatric hospital

6    for one year with adolescents.  Elmcrest Psychiatric Institute,

7    for one year.

8    Q.  What age range is adolescence?

9    A.  I would say the ages at this facility were about 12 and 13

10   on the low end and all the way up to about 18.

11   Q.  What did you do after you left Elmcrest?

12   A.  Well, I went into full-time private practice.  Prior to

13   that I was already in part-time practice.

14   Q.  You had started your private practice --

15   A.  Yes.

16   Q.  -- while you were still a staff psychologist?

17   A.  Yes, which is very common.  People will work in hospitals,

18   and then they will work part time in their private offices as

19   well.

20   Q.  When you launched your private practice, did it have a

21   specific topic focus, or was that a general private practice?

22   A.  Well, initially, it was a general psychiatric practice

23   working with a variety of problems and disorders that people

24   come in with, like depression and anxiety and a variety of

25   marital issues, relationship issues.  But shortly after I

1    opened it, into the early '90s, I started to develop a

2    specialty in the addiction field, which, with a more specific

3    specialty in internet-related addiction issues.

4    Q.  Have you held any academic appointments in the years since

5    your residency?

6    A.  I have.  I mean I have had numerous academic appointments,

7    but the longest one I had was as assistant clinical professor

8    of psychiatry at the University of Connecticut School of

9    Medicine.

10   Q.  What were you teaching at the University of Connecticut

11   School of Medicine?

12   A.  Different things throughout the years.  Initially, medical

13   status examination to the med students and some of the

14   residents.  The latter part I taught behavioral addiction

15   medicine, internet addiction, sexual medicine courses, and I

16   supervised the psychiatry residents in their clinical care of

17   their patients.

18   Q.  What did that entail, the supervision?

19   A.  Meeting with them once a week in my office.  They would

20   rotate through my office, and we would discuss their cases.

21   Q.  Would you advise them on best practices in working with

22   patients and conducting research?

23   A.  Yes, I would.

24   Q.  How many years were you at the University of Connecticut

25   School of Medicine?

M6mWmel2                         Greenfield – Direct

1   A.   20 years.

2   Q.   And what did you teach in some of your other academic

3   appointments prior to the University of Connecticut?

4   A.   More general courses.  I would say the internet addiction

5   courses were more at the University of Connecticut.  The other

6   universities that I taught at, they were just general courses.

7   Q.   During your time in academia, were you also seeing patients

8   in your private practice?

9   A.   Yes, I was.

10  Q.   Do you hold any board certification, Dr. Greenfield?

11  A.   I do.  I have a board certification in clinical psychology

12  from the American Board of Professional Psychology.  I have a

13  board certification as a master addiction counselor from

14  NAADAC, and I have additional training and certification in

15  psychopharmacology.

16  Q.   Are you a member of any professional associations?

17  A.   Yes, I am.  I'm a member of a lot.  American Psychological,

18  Connecticut Psychological and Sexual Medicine Society, the

19  American Society of Addiction Medicine.  There's a bunch of

20  others.  I don't remember all of them.  National Register of

21  Health Service Providers, and a few others.

22  Q.   Are your board certifications and professional association

23  memberships outlined on your CV?

24  A.   Yes, they are.

25  Q.   Have you served on any boards or committees?

1    A.  Yes, I've served on a number of boards.  The most recent

2    board I'm serving on is the CATSO board, which stands for

3    Connecticut Association for Treatment of Sex Offenders.  So

4    that is an organization that deals with people who get into

5    trouble with regard to sexual behavior, much of which involves

6    the internet.

7    Q.  What other sorts of boards or committees have you served

8    on?

9    A.  I've served as the president of the Connecticut

10   Psychological Association.  I've served as a representative for

11   the Joint Commission of accreditation of healthcare

12   organizations and hospitals, and I've served as a liaison to

13   various committees through the Connecticut State board.

14   Q.  Thank you.

15       Have you served during your career as a reviewer or on the

16   editorial board of any journal or publication in your field?

17   A.  Yeah, I'm on about ten editorial boards, which basically

18   means that you review articles when they send them to you and

19   comment on articles if they ask your opinion.

20   Q.  Have you yourself been published in such journals,

21   peer-reviewed journals?

22   A.  Yes, I have.

23   Q.  And you may have been starting to describe this, but what

24   is the peer review process?

25   A.  Well, just what it sounds like.  You know, they will send

1    an article to one, two, or three doctors, who will review the

2    article for its research methodology and thoroughness and

3    writing style, and then they will critique that article and

4    then give it a thumbs up or thumbs down for publication, or a

5    publication with revision.  So sometimes you'll make

6    recommendations: if you correct this, then we would consider

7    publishing it.

8    Q.  Will peer-reviewed academic journals publish any submission

9    they receive?

10   A.  No.  That's the nature of -- peer-reviewed journals tend to

11   be harder to publish in because they are critical and they have

12   higher standards.

13   Q.  Approximately how many peer-reviewed journal articles have

14   you written?

15   A.  About ten.

16   Q.  Are any of these on the topic of internet use and behavior?

17   A.  Yeah, most of them are.

18   Q.  Have you also contributed to chapters to academic books?

19   A.  Yes, I have.

20   Q.  In these instances, did you volunteer to contribute

21   chapters, or were you solicited to do so?

22   A.  No.  In all -- in most of my writing, even the journal

23   articles, I was requested or asked to publish the chapter or

24   the article.

25   Q.  Why was that, if you know?

1    A.  Because I'm recognized as a leading expert in the field.

2    Q.  Did your book chapters that you contributed include

3    chapters on internet use and behavior?

4    A.  Yes, they have.

5    Q.  Have you yourself published books?

6    A.  Yes, I have.

7    Q.  How many?

8    A.  Two, to date.

9    Q.  And what was the subject matter of those books?

10   A.  Internet use, internet behavior, and internet addiction.

11   Q.  And what was the first book title that you published?

12   A.  Virtual Addiction.

13   Q.  And when was that published?

14   A.  1999, by New Harbinger.

15   Q.  And the second?

16   A.  Overcoming Internet Addiction, published by Wiley.

17   Q.  Did you approach Wiley to write that book?

18   A.  No.  They approached me.

19   Q.  And these two books, are these academic titles or popular

20   titles?

21   A.  No.  These are books written for the layman.  Although

22   there's technical data in the books, it's really written to

23   help people and as a resource.

24   Q.  Have you been published in other forums besides these

25   peer-reviewed journals, books, and book chapters?

A.  Yeah, I've been published in non-peer-reviewed settings as
well, and I've also done about 150 professional presentations,
some of which -- many of which are invited.  In fact, most of
them are invited.

Q.  Going back to your non-peer-reviewed writing, did that
writing include writing on internet use and behavior?

A.  Yes, it did.

Q.  And your presentations, you mentioned peer-reviewed
presentations.  What does it mean for a --

A.  Well, peer-reviewed presentation means that they've invited
you because of a specific area of expertise.  Like, the
American Society of Child and Adolescent Psychology invited me
to speak at one of their conferences, so that's -- they'll ask
you to speak because of your expertise.

Q.  About how many peer-reviewed presentations have you given
during your career?

A.  You know, 10 or 15.  I don't really remember exactly,
but --

Q.  Did those presentations include the subject matter of
internet use and behavior?

A.  Yes, most of them.

Q.  And have you been invited to deliver other oral
presentations, other than these peer-reviewed academic
presentations?

A.  Yeah, about 150.  I'm still invited pretty regularly to do

1    things.

2    Q.   On the topic of internet use and behavior?

3    A.   Yes, that's correct.  The vast majority of my presentations

4    are on that subject.

5    Q.   Have you appeared or been quoted in the popular media as

6    well?

7    A.   Yes, I've been quoted quite a bit.  I don't really - I mean

8    hundreds of times, but I don't know how many exactly.

9    Q.   On what subject matter?

10   A.   Mainly on the issue of internet behavior, internet overuse,

11   internet addiction, sexual issues on the internet, video

12   gaming, chatrooming.  Anything that has to do with internet

13   behavior.

14   Q.   What kind of outlets?

15   A.   You're talking about -- I'm sorry.

16   Q.   What kind of popular media outlets have you been quoted in

17   or --

18   A.   Pretty much every major newspaper and magazine in the

19   country, most of the major talk shows, The New York Times.  I

20   mean pretty -- there's pretty much nothing that's, that I

21   haven't been quoted in in some way or, you know, form.

22   Q.   Have you testified in court before?

23   A.   I have.

24   Q.   Have you testified in this courthouse before?

25   A.   It -- it sounds like I have.  I know I have, but I don't

1    remember.  I don't remember the courthouse, because it's been

2    so long.

3    Q.  Did you testify in the case of *United States v. D'Amelio* in

4    the Southern District of New York?

5    A.  Yes, I did.

6    Q.  Have you ever been precluded as an expert?

7    A.  No, I have not.

8    Q.  How long have you maintained your private clinical

9    practice?

10   A.  Since about 1986, so it's 35, 36 years.  37 -- it's a long

11   time.

12   Q.  You started to discuss this a few minutes ago, but do you

13   have a general psychological clinical practice, specialized

14   practice or both?

15   A.  Both.

16   Q.  Could you tell us more about that?

17   A.  Well, you know, I actually have two websites.  One

18   website's sort of geared toward the general psychiatric

19   community, and I will deal with a variety of issues, like

20   depression and anxiety and relationships and sometimes sexual

21   issues, often sexual issues.  And then I have a specialty area,

22   which is internet behavior, internet addiction, and about 70

23   percent of my cases and people that come to see me are for

24   internet-related issues.  About 30 percent are general

25   psychiatric issues.

M6mWmel2                        Greenfield - Direct

1   Q.  Where are your private practices located?

2   A.  The main office is in west Hartford, Connecticut, but I do

3   do some telemedicine from other locations as well.

4   Q.  Do you ask your general psychological patients about the

5   internet as well?

6   A.  Yeah.  When you do a workup with a new patient, you ask

7   them about all the things that might be contributing to their

8   issues, and that would include substance use, internet use,

9   gambling, other behavioral addictions, relationship issues;

10  their medical history, of course, as well.

11  Q.  I don't expect you to have an exact number, but about how

12  many patients, if you had to estimate, have you seen since

13  1986?

14  A.  Oh, my God.  It could be as high as 20,000.  Somewhere

15  between 10- and 20,000.

16  Q.  Would that include patients in your residency and

17  internship?

18  A.  Yeah.

19  Q.  Focusing a little bit more specifically on your specialty

20  in internet use and behavior, you have testified about your

21  clinical work before.  Earlier today you testified about your

22  clinical work.  When did that become your primary area of

23  focus?

24  A.  It started to become the primary area of my focus I would

25  say in the mid-'90s as people started to come in to my practice

1    complaining of issues related to the internet.  I didn't start

2    out or set out to become an expert in internet addiction.  It

3    just sort of evolved over time, and that's what partially led

4    to my doing research and writing about it, and then once you

5    sort of become expected to be an expert, you then have to

6    become an expert.

7    Q.  Did the internet exist in a form that was available to your

8    average American when you began practicing as a --

9    A.  No, not really.  No.  I finished most of my medical

10   training without the internet.

11   Q.  When did the internet come into mainstream use in the

12   average American household?

13   A.  Early '90s.

14   Q.  What was the focus of your research prior to that?

15   A.  Well, I did research on marital satisfaction.  I would say

16   that that was the majority of my research early on.  I did some

17   other studies on training, clinical training and methodology

18   for clinical training.

19   Q.  Did you have any focus on addiction prior to --

20   A.  Yeah.  I mean my subspecialty was always addiction

21   medicine, so that has always been a big part of my practice and

22   what I got one of my board certifications in.

23   Q.  When did your patients in your general practice start

24   talking to you about the internet and start bringing up the

25   internet in sessions?

M6mWmel2                        Greenfield - Direct

1  A.  In, I would say early to mid-1990s is when they started to
2  show up and getting themselves into all different issues and
3  circumstances that were -- involving the internet.  This was
4  when the internet was pretty new.
5  Q.  Did those conversations inspire you to found your clinical
6  practice that --
7  A.  Yeah.  At that time I founded the Center for Internet
8  Studies, which was basically a research, training, and
9  treatment center for issues related to the internet.
10 Q.  Around what year did you form the Center for --
11 A.  Mid 1990s, '95, '96.  It's morphed since then.
12 Q.  Were your patients in your general practice reporting any
13 behavioral dynamics that seemed particular to the online forum?
14 A.  Very much so.
15 Q.  So is it fair to say that you've practiced as a
16 psychologist for almost 40 years; more than 20 of them with a
17 the focus on internet use and behavior?
18 A.  Very much, yeah.  Over -- probably close to 25 years.
19 Q.  And over the last 25 years --
20 A.  Let's not push 40 years.  That sounds horrible.
21 Q.  OK.  36.
22 A.  OK.  That's better.
23 Q.  Over the last 25 or so years, since developing your
24 specialty, around what percentage of your writing and public
25 presentations have focused on the topic of internet use and

1    behavior?

2    A.  Oh, I would say 90-plus percent.  I mean that's pretty much

3    at this point all I -- all I am -- all I speak about and write

4    about.

5    Q.  Many of those writings and presentations have an emphasis

6    on internet abuse and addiction.  Are you only an expert on

7    internet overuse?

8    A.  Well, you have to be an expert on internet behavior in

9    order to understand internet abuse just like in addiction

10   medicine and substance-based addictions, you have to understand

11   the substance in order to understand the abuse potential of

12   that substance, which would include the etiology, the behavior,

13   the pharmacology, the neurobiology.  So I would say I'm an

14   expert in internet behavior and then the abuse within that

15   behavior, potential abuse, because not everybody abuses it.

16   Q.  People just use it?

17   A.  Many people use it.  Most people overuse it.

18   Q.  Are there commonalities of experience between your typical

19   internet user and those who are overusing it?

20   A.  Yes.  It's a matter of degree.

21   Q.  Focusing in on this idea of addiction, have you specialized

22   in addiction psychology throughout your career?

23   A.  Yes.

24   Q.  And have you ever taught addiction psychology and

25   psychiatry?

M6mWmel2                    Greenfield - Direct

1    A.  Yes.

2    Q.  Are there concepts from general addiction science that are

3    useful to this understanding of internet use and behavior more

4    generally?

5    A.  Yeah, the basic principles and etiology and neurobiology of

6    addiction are relevant to all substances and behaviors that

7    have abuse potential.  In fact, the American Society of

8    Addiction Medicine, which I'm a member of, talks about

9    addictive substances and behaviors, and they all have the same

10   underlying neurobiology.

11   Q.  What is addiction?

12   A.  It's the overuse of a substance or a behavior to a point

13   where there is deleterious impact and a change in emotion,

14   cognition, judgment, motivation, and can in some cases lead to

15   physical and psychological damage.

16   Q.  How do you determine when a person is addicted to a

17   substance or behavior?

18   A.  Well, that's a -- that's an interesting question.  I mean,

19   ultimately, it's by the end-state impact on their lives.  There

20   are -- people have a misconception that addiction has to do

21   with physiological tolerance and withdrawal, but that's not

22   actually accurate, because that's only one aspect of addiction.

23   Addiction is a far more complex phenomena that involves

24   behavior, memory, learning, patterns of motivation, and that's

25   really what creates the negative impact in people's lives.

M6mWmel2                    Greenfield - Direct

1  Q.  Is there any kind of clear biological marker or indicator

2  for --

3  A.  There's really no -- there's no lab test or biological

4  marker for addiction.  Most of the time you note addiction

5  based on lifestyle impact.

6  Q.  So can you bring someone into a lab and get a clear

7  yes-or-no test whether they're a cocaine addict?

8  A.  No.  The only -- you can do a lab test, you know, a drug

9  detox, a drug-tox test that tells you whether there's cocaine

10 in their system, but you cannot tell whether they're a cocaine

11 addict.

12 Q.  Is the same true of a gambling addict or a sex addict?

13 A.  Correct.  Behavioral addictions and substance addictions

14 are essentially the same thing from a neurobiological level.

15 Q.  What part of the brain is implicated by addiction?

16 A.  Well, it involves the whole brain, but the largest section

17 of the brain that's involved is the limbic system, particularly

18 structures like the striatum, the hippocampus, the amygdala,

19 some aspects of the prefrontal cortex, the nucleus accumbens.

20 These are the main structures that you see involved in reward

21 circuitry.  And reward circuitry has everything to do with

22 motivation and the likelihood of repeating behaviors

23 irrespective of negative impact.

24 Q.  Can you flesh that out a little bit more and perhaps

25 describe the evolutionary basis for this is understanding --

1   A.   Yeah, it's pretty interesting that, you know, the main

2   neurochemical involved in reward and addiction is dopamine, and

3   we evolved dopamine for really two basic reasons.  It's to

4   enhance the likelihood that we would experience pleasure from

5   food and from procreation, which is one of the ways that

6   we're -- we, and when I say we, I'm including animals, because

7   animals have the same system that we do -- that you're likely

8   to survive.  So in a sense, the basic neurobiological system

9   that's involved in addiction's really been hijacked by the

10  substance or behavior that we now overuse to a point where it

11  hurts us.  So it piggybacks on those original survival neuro

12  pathways that are dopaminergic or dopamine-based.

13  Q.   And at a basic level --

14  A.   Well, dopamine's a pleasure neurotransmitter.  I'm sorry.

15  It -- we wouldn't get out of bed without it.

16  Q.   Well, what does it do to our brains?

17  A.   Makes us feel good.  I mean in small ways and in large

18  ways, and it has everything to do with reward and everything to

19  do with the anticipation of reward.

20  Q.   This description you just gave us about evolutionary

21  biology, is this generally accepted in the scientific

22  community, or did you just make that up?

23  A.   No.  This is generally accepted in -- I wish I had made it

24  up, but --

25  Q.   And has the effect of dopamine on human behavior been

1  studied or proven in a scientifically reliable manner?

2  A.  Yes, very much so.

3  Q.  How so?

4  A.  And we can look -- we can measure dopamine, not directly

5  with an assay, but we can measure it through imaging studies.

6  We can see areas of brain that are lit up which are affected by

7  dopamine.  So in internet studies and gambling studies and

8  substance-based studies, you can see areas of the brain that

9  light up dopaminergically in scan studies.

10 Q.  Have those studies been done with the brain, dopamine, and

11 internet use?

12 A.  Very much so, yes.

13 Q.  Can you tell us how those studies work?

14 A.  Yeah.  I mean, basically, there have been numerous studies,

15 dozens.  There have been meta-analytic studies, which a

16 meta-analytic study is just basically a study that looks at a

17 bunch of studies all together and then sees if there's a

18 pattern between those studies and evaluates the methodology of

19 those studies.  And essentially those, the most well-known

20 meta-analytic study found that internet behavior from a

21 neurobiological level, the scan studies look just like other

22 addictions.  In fact, you can't tell the difference.

23 Q.  What does it look like?

24 A.  It just lights up those circuits that are involved,

25 particularly the nucleus accumbens, which is just a tiny little

1    thing in the limbic system, essentially in the midbrain.

2    Q.  In layman's terms, the use of the internet is lighting up

3    the nucleus accumbens --

4    A.  Yeah.  When I say lighting up, there's no lightbulb in your

5    brain, but it's activating those neurons in that area.

6    Q.  And this imaging can show the effect --

7    A.  Correct.

8    Q.  So this imaging shows the effect of dopamine on the nucleus

9    accumbens and on the limbic system generally?

10   A.  Yes, it does.

11   Q.  Are these understandings of dopamine in the limbic system

12   generally accepted in the field of psychology and psychiatry?

13   A.  Yes.

14            THE COURT:  I'm sorry.  Can you ask that question not

15   in the aggregate.  You asked psychology and psychiatry.

16   Dr. Greenfield is a clinical psychologist.  Can you focus your

17   question, please.

18            MS. WERNER:  Yes, your Honor.

19   Q.  This understanding of how dopamine affects the brain and

20   specifically the nucleus accumbens, is this generally accepted

21   in the field of clinical psychology?

22   A.  Yes.

23   Q.  Is it also accepted in the field of psychiatry, where you

24   have practiced and taught for many years?

25   A.  Yes.

M6mWmel2                          Greenfield - Direct

1           THE COURT:  I'm sorry.

2           Dr. Greenfield, you said you practiced in psychiatry.

3           THE WITNESS:  Well, most of my work has been in

4    psychiatric facilities.

5           THE COURT:  As a psychiatrist?

6           THE WITNESS:  No.

7           THE COURT:  Thank you.

8           Go on.

9    BY MS. WERNER:

10   Q.  Do only internet addicts experience the sensation of

11   pleasure or reward when dopamine hits their brain?

12   A.  No.  Everybody does.

13   Q.  So if a person who has never tried cocaine uses cocaine,

14   will it affect their brain, the dopamine-recepting parts of

15   their brain?

16   A.  Very much so.

17   Q.  Is the same true for a person who uses a slot machine at a

18   casino?

19   A.  Yes.

20   Q.  And is the same true for a person who uses the internet?

21   A.  Yes.

22   Q.  Is there a specific test or threshold for determining when

23   an internet user is addicted or using in a compulsive manner?

24   A.  Yeah, there are.  There are a number of tests, some of

25   which I developed and a number of other psychologists and

1    psychiatrists have developed them as well.  There are some that

2    are well standardized and considered the gold standard for

3    evaluating whether somebody meets the criteria for internet

4    addiction.  But often, that's not the sole way you would

5    evaluate whether a person has an addiction or not.  There has

6    to be a clinical evaluation of the patient to determine whether

7    there are behavioral correlates in their life that meet those

8    criteria.

9    Q.  What sort of behavioral correlates do you look for?

10   A.  Well, mainly changes in their major spheres of living,

11   which would include social relationships, work, academic

12   performance, physical health, motivation, self-care, academic

13   pursuits.  I think I said relationships, but if I didn't that

14   would be very much included.

15   Q.  Are there people who use the internet but are not

16   necessarily -- withdrawn.

17        Are people who use the internet but don't overuse it

18   immune to the effects of dopamine in the nucleus accumbens and

19   the brain more generally?

20   A.  Could you repeat that question, please?

21   Q.  Yes.  Let me rephrase it.

22        When someone uses the internet and they're not

23   necessarily an internet addict, are they experiencing this

24   dopaminergic effect in their brain that you have described?

25   A.  I would believe so, yes.

M6mWmel2                        Greenfield - Direct

1    Q.  Does the dopaminergic --

2               THE COURT:  Sorry.

3               What's the basis for that belief?

4               THE WITNESS:  Because it's a pleasure experience, and

5    we know that dopamine's elevated from pleasure experiences, and

6    that the scan studies show that people elevate when they're

7    using the internet.

8               THE COURT:  Thank you.

9    BY MS. WERNER:

10   Q.  Does the internet's dopaminergic effect, based on your

11   research and practice, seem to influence individual behavior on

12   the internet?

13   A.  Could you repeat that?  I'm --

14   Q.  Does the internet's dopaminergic effect, the way that the

15   internet triggers dopamine --

16   A.  Yeah.

17   Q.  -- and sends dopamine to the human brain, seem to impact

18   human behavior?

19   A.  Yes.

20   Q.  Is this true for internet addicts only or users more

21   generally?

22   A.  No.  I think it's true for anyone that uses the internet.

23   It's, again, a matter of degree, just like any intoxicating

24   behavior or intoxicating substance would be a matter of degree.

25   About 90 percent of people that engage in intoxicating

M6mWmel2                    Greenfield - Direct

1    behaviors or substances don't develop an addiction, but some

2    do.

3    Q.   And those people who don't develop an addiction, are there

4    changes that occur in their brains regardless?

5    A.   Very much so, but they don't seem to catalyze to the next

6    level, you know, where they don't have control over it.

7              THE COURT:  I'm sorry.  I didn't hear your percentage.

8    What percentage of people?

9              THE WITNESS:  About 90 percent.

10             THE COURT:  Thank you.

11             90 percent experience that without becoming addicts?

12             THE WITNESS:  Correct.

13             THE COURT:  Thank you.

14             Go on.

15   BY MS. WERNER:

16   Q.   Is internet addiction in the DSM?

17   A.   The -- an aspect of internet addiction is in the DSM as a

18   provisional diagnosis.  The DSM-5 came out quite a while ago.

19   It's not been revised.  The diagnostic manual that's really

20   used now in medical diagnosis is the International

21   Classification of Diseases, or the ICD, and the new ICD-11 has

22   internet addiction diagnoses specified in their nomenclature

23   that have just dropped now into the medical diagnostic systems.

24   But the original DSM-5, it's still listed as a provisional.

25   Q.   Can you describe --

M6mWmel2                           Greenfield - Direct

1    A.  Particularly video game addiction.

2    Q.  What is the DSM?

3    A.  Diagnostic and Statistical Manual that has to do with

4    all -- there's about 450 diagnoses of a psychiatric nature, of

5    things that can go wrong with you.

6    Q.  Do you know when the latest version of the DSM was

7    finalized?

8    A.  You know, it's got to be close to 15 years old now.

9    Q.  Why is there not an inclusion of internet addiction

10   specifically as opposed to internet gaming or something else in

11   the DSM?

12   A.  Well, I think that there is some lack of clarity about what

13   the labeling is going to be.  There are different terms that

14   people use for defining internet addiction, and sometimes it

15   has to do with the type of content that people overuse or

16   abuse.  And so the latest thinking in the field is that

17   there'll probably be a diagnosis of internet addictions with

18   subcategories of specific content areas that people have issues

19   with.  And that seems to be where the field is heading right

20   now.

21   Q.  What type of content?

22   A.  Well, that would include video gaming, chatting, social

23   media, pornography, gambling.

24   Q.  Is there debate in the field about the fact that internet

25   addiction and overuse are a phenomenon that people are seeing

M6mWmel2                    Greenfield - Direct

1    in this field of psychology --

2    A.  I don't think anymore.  I mean I think at this point it's

3    pretty well accepted that internet addiction is a thing.  So

4    no, I don't think there's --

5    Q.  Is there controversy about the fact that heavy internet

6    users demonstrate some common behaviors?

7    A.  Could you repeat that, please?

8    Q.  Is there debate about the fact that internet overusers or

9    internet addicts have some common behavioral impacts?

10   A.  I think that's accepted.

11   Q.  I'd like to turn to your specific research methodology and

12   practice.  You described how in your early years of clinical

13   practice you saw an emerging pattern of behavior regarding the

14   internet?

15   A.  Yes.

16   Q.  In those early days of the internet's popular use, did you

17   develop any hypotheses about how the internet as a platform was

18   affecting individual behavior?

19   A.  Yes.  I had early hunches, but I didn't have the data or

20   the research during what I call the Wild West days.  This is

21   when the internet was hot and new, and nobody knew what was

22   going on or why people were getting into trouble or doing

23   things online.  So I had theories but no -- and there wasn't a

24   lot published back then either.  In fact, my first book was the

25   second book on the subject in the world at that time, and that

1    was just in 1999.

2    Q.   What were your theories and hypotheses based on?

3    A.   Well, initially, they were based on my clinical hunches

4    from the patients that were coming in, and then it was later

5    based on some of the data I collected for my own research.

6    Q.   Did you develop a hypothesis about perceived anonymity?

7    A.   Yes.

8    Q.   What do you mean by perceived anonymity?

9    A.   Well, basically that people perceive the internet as an

10   anonymous form of communication, even though it really is the

11   least anonymous form of communication.  They act as if there's

12   no one watching, and it feels anonymous to them.  So I call it

13   perceived anonymity because of that distortion of perception.

14   Q.   Did you develop a hypothesis about disinhibition?

15   A.   Yes.

16   Q.   What is disinhibition?

17   A.   The loss of inhibition when they're communicating online.

18   They say and do things that they ordinarily would not do in

19   real life or in a real time.

20   Q.   Did you have a hypothesis about how being more disinhibited

21   might impact one's willingness to lie or play roles on the

22   internet?

23   A.   Yes.

24   Q.   Did you have a hypothesis about accelerated intimacy?

25   A.   Yes.  That was one of the early phenomenons that I'd

noticed in my practice, even before the research.  People were

engaging in intimacy, either platonic or sexual, at a much more

rapid rate than they ordinarily would because of the

communication through the internet modality.

Q.  Did you have a hypothesis about the loss of boundaries on

the internet?

A.  Yes.

Q.  What do you mean by loss of boundaries?

A.  Well, there's no beginning, middle or end on the internet.

You know, every form of communication prior to the internet had

a built-in boundary to it.  You know, every book, TV show,

movie, magazine, doesn't matter, there's a beginning, middle

and end.  The internet has no beginning, middle and end.  It's

endless, and part of the appeal of that endlessness is the

brain's capacity to try to want to -- to try to finish it or to

try to complete it.  And that facilitates this sort of endless

boundariless experience that people engage in and one of the

reasons people stay online a long time.

Q.  Relatedly, did you have a hypothesis about time distortion?

A.  Yes, so that's related.  One of the things we found early

on, both clinically and in the research, is that the vast

majority of us lose track of time and space when we're on a

screen, particularly on a screen that's connected to the

internet.  We just can't seem to track time as well.

Q.  What happens when they lose track of time?

1   A.  We spend more time on it than we are aware of, and we think

2   it's related partially to elevations of dopamine.  For

3   instance, if you go to a movie, you experience disassociation

4   to some extent.  So it's by and large a kind of pleasurable

5   experience, but it means that you're not conscious of the

6   passage of that time.

7   Q.  Did you have a hypothesis about the frequency with which

8   people lie on the internet?

9   A.  Yes.

10  Q.  And the hypothesis about how often people role play or that

11  they do role play?

12  A.  Yes.

13  Q.  What do you mean by role playing?

14  A.  Taking on an alter ego or an identity that is different

15  than the reality of your life.  That could include personal

16  characteristics, occupational characteristics, personal

17  proclivities or powers, some of which can be completely

18  fantasy-based.

19  Q.  In those early years, did you speak to patients in your

20  clinical practice about role play?

21  A.  Yes.

22  Q.  After developing these hypotheses, did you undertake any

23  research to investigate them?

24  A.  Yes.

25  Q.  Can you tell us about that?

M6mWmel2                    Greenfield - Direct

A.   Yeah.  Early on, I -- I saw a small study that came out

from a colleague that compared heavy internet users to gambling

addicts, and that prompted me to -- at that point there had not

been any large-scale studies looking at internet behavior.  So

I approached ABC News to see if they would allow us to do a

survey on their platform to be able to gather data, and I spent

about six months with a statistician from the medical school

that I was connected to, designing a study that would evaluate

a variety of different behaviors and characteristics about

internet use.  And once that was designed and set up -- and we

had spent a fair amount of time trying to get it right -- we

put it up on their servers.  And in two weeks, we got probably

about 18,500 or so answers.  We threw out about 1,500 because

of potential statistical issues, and we ended up with about

17,000-plus data points.

Q.   What was the function of your partnership with ABC News?

A.   Just to be able to access their ability to reach people.

In exchange for that, they were -- once the results were

tabulated, they had first crack at announcing them, before I

published the study.

Q.   What did the study ask participants to do?

A.   Basically to complete a survey.  I mean there was about 35

questions, and then within those 35 questions there were

sub-questions.

Q.   Were those questions specific to internet addiction, or

1   were they generally about internet use?

2   A.   They're about internet behavior, internet use.

3   Q.   Is this survey methodology, self-reporting of this kind --

4   A.   Yeah.

5   Q.   -- is that generally accepted as a research method in the

6   field of --

7   A.   It's one research method, yes.

8   Q.   Is self-reporting in surveys commonly deployed as a

9   research method --

10  A.   Yes, it is.

11  Q.   -- in psychology?

12       Just wait until I finish the question if you don't mind --

13  A.   Oh, I'm sorry.

14  Q.   -- for the benefit of the court reporter.

15  A.   Yes, I apologize.

16  Q.   Is 17,000 a large sample size in psychological research or

17  behavioral science generally?

18  A.   Yes, it is.

19  Q.   What are the benefits of having such a large pool of

20  respondents?

21  A.   Well, it enhances the heterogeneity of the sample, which

22  then enhances the ability to generalize to a larger population.

23  It also increases the statistical power that you would garner

24  from the -- from the results.

25  Q.   When you say heterogeneity, what do you mean by that?

M6mWmel2                    Greenfield - Direct

```
 1   A.  Variability; in other words, that there's a wide range of
 2   people, circumstances, education, demographics, income, age,
 3   race, etc.
 4   Q.  Thank you.
 5           Did the survey ask participants about perceived
 6   anonymity?
 7           THE COURT:  I'm sorry.  Mind if I just interrupt
 8   briefly.  I'm sorry.
 9           Dr. Greenfield, did you collect demographic data
10   regarding the participants to know whether or not the pool was
11   actually --
12           THE WITNESS:  I'm sorry.  Could you repeat that?
13           THE COURT:  Yes.
14           Did you collect information about the survey
15   respondents so that you could know whether or not the
16   respondents were indeed demographically disparate?
17           THE WITNESS:  Yeah, that's -- part of the data
18   included the demographics, yes.
19           THE COURT:  Thank you.
20           Please go on.
21           THE WITNESS:  Yeah.  Thank you.
22           And that's -- I -- and that's talked about in the
23   article.
24           THE COURT:  Thank you.
25   BY MS. WERNER:
```

1    Q.  When you say the article, did you publish the findings of

2    your 1999 study in a peer-reviewed article as well as on ABC

3    News?

4    A.  Yes.

5    Q.  Where was that article published?

6    A.  The Journal of Cyber Psychology and Behavior.

7    Q.  And again, that's a peer-reviewed journal?

8    A.  Yes, it is.  The name of it has changed since, but it's

9    still in publication.

10   Q.  Did your survey ask users about perceived anonymity?

11   A.  Yes.

12   Q.  What did it reveal?

13   A.  That people experience the internet as, in an anonymous

14   way, you know, that they -- they perceive it anonymously.

15   Q.  Was this true of all of the survey respondents?

16   A.  No, no.  A percentage.  Probably in the 40-ish percentile.

17   And I could be wrong; I don't remember all the percentages.

18              THE COURT:  I'm sorry.

19              40 percent perceived it as anonymous?

20              THE WITNESS:  Yes.

21              THE COURT:  Thank you.

22              THE WITNESS:  Approximately.

23   BY MS. WERNER:

24   Q.  Would it refresh your recollection about the percentage

25   that experienced perceived anonymity to look at the 1999 Cyber

1    Psychology and Behavior article?

2    A.  It would probably help, since I published it so long ago.

3            MS. WERNER:  One moment, please.

4            I'm sorry.  I'll move on from that.

5            THE WITNESS:  OK.

6    BY MS. WERNER:

7    Q.  Did the survey ask about the concept of accelerated

8    intimacy?

9    A.  Yes.

10   Q.  And what did it reveal about accelerated intimacy?

11   A.  Again, that it's a -- it's a behavior that people endorse.

12   Again, not all the people endorse it, but a sizable percentage

13   endorsed it.

14   Q.  Was that true of all survey respondents?

15   A.  Well, no, because not everybody endorsed it.  So a

16   percentage did.

17   Q.  And was that more pronounced for internet addicts?

18   A.  Yeah.  So, one of the interesting things is that as people

19   move closer to being diagnosed or meeting the criteria of what

20   we called internet addiction -- now, again, that diagnosis was

21   not official back then.  We were kind of extrapolating a

22   diagnosis based on an adaptation of the pathological gambling

23   criteria.  So we modified it slightly in order to come up with

24   an accurate way of assessing what happens when you hit so many

25   things in your internet behavior that you might then qualify as

M6mWmel2                          Greenfield - Direct

1    an addict.

2    Q.  And do you recall what percentage of respondents reported

3    experiencing accelerated intimacy?

4    A.  I don't remember the exact percentage, no.

5    Q.  Would it refresh your recollection to see a copy of your

6    1999 study?

7    A.  It probably would.

8             MS. WERNER:  Brief indulgence, your Honor.  May I step

9    aside, please?

10            THE COURT:  That's fine.  Please take your time,

11   counsel.

12            MS. WERNER:  May I approach the witness, your Honor?

13            THE COURT:  You may.

14            MS. RAVENER:  Your Honor, we would ask to see the

15   document.

16            THE COURT:  Thank you.

17            Yes, if you have an extra copy for counsel for the

18   United States, I would ask that you provide it to them.

19            MS. WERNER:  I apologize.

20            MS. RAVENER:  Thank you.

21            OK.

22   BY MS. WERNER:

23   Q.  Dr. Greenfield, do you recognize this document?

24   A.  I do.

25   Q.  Is this a copy of your 1999 study?

1   A.  It appears to be.

2   Q.  I'd like to direct your attention to page 410 of this

3   study, which is marked 26.2 DG-4.

4   A.  Yes, I see that.  Oh, no.  Four oh --

5   Q.  410.

6   A.  410.  Hang on.

7           OK.

8   Q.  I'd like to direct your attention to the right-hand column

9   on page 410.

10  A.  Yes.  You mean the right-hand paragraph?

11  Q.  The right-hand paragraph.

12  A.  Yes, I see it.

13  Q.  Do you see there the section that says intense intimacy?

14  A.  Yes.

15  Q.  Would you mind reading that to yourself?

16  A.  "Intense" --

17  Q.  Just read quietly.

18  A.  Oh, read it to myself.  OK.

19  Q.  Yes, please.

20  A.  OK.

21  Q.  Does that refresh your recollection about how many

22  respondents reported experiencing accelerated intimacy?

23  A.  Yes.

24  Q.  About what percentage was that?

25  A.  41 percent.

M6mWmel2                        Greenfield - Direct

1    Q.  And did that number go up for internet addicts?

2    A.  Yes.

3    Q.  What percentage of internet addicts experienced accelerated

4    intimacy?

5    A.  It rose to 75 percent.

6    Q.  Thank you.  You can put that down for a moment.

7    A.  OK.

8    Q.  You may still need it.

9    A.  I know.

10   Q.  So don't put it too far.

11   A.  OK.

12   Q.  Dr. Greenfield, did your survey ask respondents about the

13   concept of disinhibition?

14   A.  Yes.

15   Q.  And what did it reveal about disinhibition broadly?

16   A.  That people experience a sense of disinhibition when

17   communicating online.

18   Q.  Was that all respondents?

19   A.  No.

20   Q.  Was it a notable percentage?

21   A.  A notable percentage.

22   Q.  Do you recall the percentage?

23   A.  No.

24   Q.  Would it refresh your recollection to look at the article?

25   A.  Most definitely.

1    Q.  Go ahead.  I'd like to direct your attention again to page

2    410, the right-hand column.

3    A.  I lost it.

4        OK.  Sorry.

5    Q.  In the middle of that second paragraph on the right-hand

6    side --

7    A.  Yes.

8    Q.  -- if you could look at that to yourself.

9    A.  Yes.

10   Q.  How many or what percentage of survey respondents reported

11   experiencing disinhibition?

12   A.  43 percent.

13   Q.  And did that go up for internet addicts?

14   A.  Yes, it jumped to 80 percent.

15   Q.  Thank you.

16        Did your survey ask users about a loss of boundaries?

17   A.  Yes.

18   Q.  What did it reveal?

19   A.  That about 39 percent of people experience a loss of

20   boundaries when communicating online.

21   Q.  And did your survey ask about time distortion?

22   A.  Yes.

23   Q.  And what did it reveal?

24   A.  The majority admitted to losing track of time.  It didn't

25   go into a percentage but that -- it just noted that it was a

M6mWmel2                        Greenfield - Direct

1    majority.

2    Q.   Did your survey ask respondents about lying and role

3    playing?

4         You can put the document down.

5    A.   Oh.

6    Q.   Thank you.

7    A.   Yeah, I think we did talk about lying and role playing.

8    Q.   And did it reveal that people do lie online?

9    A.   Yes.

10   Q.   Do you know what sorts of things people admitted lying

11   about?

12   A.   Well, typically they -- they admit to lying about personal

13   characteristics, which would include occupation, height,

14   weight, age, accomplishments, life circumstance, personal --

15   things that reflect them and who they are.

16   Q.   Lies that go to a person's identity?

17   A.   Correct, lies that go to a person's identity.  Exactly.

18   Q.   Did you make a conclusion in this study about what

19   percentage of respondents were suffering from an internet

20   compulsion or addiction?

21   A.   Yes.

22   Q.   About what percentage?

23   A.   At the time we found about 5.9 percent, almost 6 percent.

24   Q.   For each of the behavioral dynamics we discussed, were

25   those present for addicted respondents only or internet users

1   who --

2   A.  No.  They -- sorry.  They were present for all people, but

3   to a greater extent among the addicted people.

4   Q.  It's been more than 20 years since this study.  Are its

5   conclusions still relevant?

6   A.  Yes, I believe so.  It's still being cited.

7   Q.  Why is this still relevant?

8   A.  Well, it still stands as one of the largest studies done on

9   internet behavior.  There have been many, many, many studies

10  done since, but it still has validity because of that initial

11  definition of what internet addiction is and the percentage of

12  people that experience it as well as the behavioral aspects of

13  what people experience when they're online.

14  Q.  In the years since this '99 study, have you undertaken

15  additional research on the prevalence of internet use and

16  compulsive internet use?

17  A.  Yes.

18  Q.  Did that research touch on these same behavioral dynamics?

19  A.  Yes.

20  Q.  Including disinhibition?

21  A.  Yes.

22  Q.  Including accelerated intimacy?

23  A.  Yes.

24  Q.  Did your subsequent research touch on perceived anonymity?

25  A.  Yes.

1   Q.  Loss of boundaries?

2   A.  Yup.

3   Q.  Time distortion?

4   A.  Very much so.

5   Q.  Did it discuss lying and role playing?

6   A.  Yes.

7   Q.  In the years since '99, have you also reviewed research on

8   similar topics by other scholars?

9   A.  Yeah.  Every time -- the answer is yes, I have.

10  Q.  Have you stayed abreast of other research on --

11  A.  Yeah.  Every time you write a book or a book chapter or an

12  article, you really have to do a literature review to see

13  what's new and what's come out, because you have to cite that

14  literature in your introduction to justify what you're writing.

15  Q.  Are there any other reasons why it's important to stay

16  abreast of research in your field?

17  A.  Well, to make sure that what I'm talking about is valid and

18  credible and that I'm still on target.

19  Q.  In the field of psychology, is it generally accepted to

20  inform one's own knowledge and understanding based on a

21  continued review of other academic literature?

22  A.  Yes, and it's also mandated by the state boards to continue

23  your education as well.

24  Q.  We spoke earlier about the lack of consensus about the

25  label of "internet addiction."  Is there a lack of consensus,

M6mWmel2                              Greenfield - Direct

1    or is there dissent in the literature, I should say, about the

2    experience of disinhibition on the internet?

3    A.  No.  I think people -- there's a pretty good consensus that

4    people experience disinhibition when they're online.

5    Q.  And have other scholars written on that topic?

6              THE COURT:  I'm sorry.  Can I just pause on that.

7              When you say people experience disinhibition, you mean

8    the percentage of people reflected in your study, not all

9    people?

10             THE WITNESS:  Well, I can't speak about all people --

11             THE COURT:  Thank you.

12             THE WITNESS:  -- because I've not evaluated all

13   people, but --

14             THE COURT:  Thank you.

15             What's your testimony then?

16             THE WITNESS:  So my testimony would be the people that

17   I've researched and then the large number of patients that I've

18   seen in the 20 years in my clinical practice.

19             THE COURT:  Thank you.

20             So people that have sought you out for treatment?

21             THE WITNESS:  Correct.

22             THE COURT:  Thank you.

23             Proceed.

24   BY MS. WERNER:

25   Q.  Focusing in on other academic literature, have others

1  written on the fact that a significant number of internet users

2  experience disinhibition?

3  A.  Yes.

4  Q.  Even if not all internet users?

5  A.  I would believe that's correct, yes.

6  Q.  And have other scholars explored the concept of lying and

7  role playing on the internet?

8  A.  Yes.

9  Q.  Have you reviewed research on the extent to which people

10  lie online?

11  A.  Yes.

12  Q.  Does that research include the extent to which people

13  assume others to be lying online?

14  A.  I can't recall if the research specifically discussed the

15  number of people that assume other people are lying, but I

16  think it's well accepted in the literature that people lie

17  online.

18  Q.  Are you familiar with a 2016 study from Indiana University

19  and Purdue University on this subject?

20  A.  Yes.

21  Q.  What was their takeaway?  I don't need a specific number,

22  but what was their --

23  A.  That it's pretty well established that people lie online.

24  Q.  And --

25  A.  Significantly.

1    Q.  Did they have a takeaway or conclusion about how often

2    people assume others online to be lying?

3    A.  I thought the number was around 50 percent, but I could be

4    wrong, so I don't want to misquote it.

5    Q.  Would it refresh your recollection to see a synopsis of

6    that article?

7    A.  Probably, yes.

8            MS. WERNER:  May I approach the government table, your

9    Honor?

10            THE COURT:  Thank you.

11            Yes, you may.

12            MS. WERNER:  May I approach the witness?

13            THE COURT:  You may.

14            Thank you.

15            MS. WERNER:  Brief indulgence?

16            THE COURT:  That's fine.  Please take your time.

17            MS. WERNER:  I apologize, your Honor.  I showed the

18    government the wrong number.  I'm showing the witness what's

19    been marked DG10, defense 26.2 DG-10.

20            THE COURT:  Thank you.

21    BY MS. WERNER:

22    Q.  Dr. Greenfield, do you recognize this document?

23    A.  Yes.

24    Q.  What is this?

25    A.  Well, it's the study that was done by Indiana University,

M6mWmel2                         Greenfield - Direct

1    also Purdue University, in Fort Wayne.

2    Q.  Would it be fair to say that this is an email that you sent

3    me?

4    A.  Yes, it's an email of some recent studies that corroborated

5    some of my original conclusions.

6    Q.  OK.  If you wouldn't mind looking at the synopsis.

7    A.  Yup.

8            Yes.

9    Q.  Does this refresh your recollection about how often

10   internet users expected other internet users to be honest or to

11   lie online?

12   A.  Yes.

13   Q.  How often is that in this study?

14   A.  Well, this study found that only 2 percent of people expect

15   people to be honest online.

16           THE COURT:  Can you say the percentage again,

17   Dr. Greenfield?

18           I'm sorry.

19           THE WITNESS:  2 percent.

20           THE COURT:  Thank you.

21   A.  And 16 to 32 percent reported self-honesty.  In other

22   words, when reflecting their own level of honesty, only 16 to

23   32 percent felt that they were being honest.

24   Q.  Thank you.

25           Did this 2016 study from Indiana University draw any

M6mWmel2                        Greenfield - Direct

1    conclusions about what is a solid predictor of one's lying

2    behavior online?

3    A.   The prediction -- the evaluation and expectation of how

4    other people were -- whether other people were lying or not

5    often predicted whether people viewed themselves as lying.  In

6    other words, the way they saw other people reflected on how

7    they saw themselves in terms of their lying.

8    Q.   Thank you.

9              Are you familiar with a 2011 study published in the

10   Journal of Applied Social Psychology on the topic of lying

11   online?

12   A.   Yes.

13   Q.   And what did that study conclude with regard to whether it

14   is normative to distort reality online?

15   A.   That it -- the study concluded that it is normative to use

16   deception in the communication on computers and the internet.

17   Q.   Are these the only studies you have read about role playing

18   and lying since 1999?

19   A.   No.  I've read dozens, if not hundreds, of studies.

20   Q.   And these other studies, do they reach similar conclusions

21   about the prevalence of lying and role playing online?

22   A.   Yes.

23   Q.   I'd like to turn from your review of other scholars'

24   research to your own clinical practice.

25   A.   OK.

M6mWmel2                          Greenfield - Direct

1    Q.  You testified you've maintained a clinical practice for
2    nearly 40 years and an internet-focused clinic for more than
3    20.  How many patients have you seen in your clinic as opposed
4    to in your residency and internship?
5    A.  I mean it -- probably well over 10,000, conservatively.
6    Q.  In the field of psychology, is it generally accepted to
7    inform one's own understanding of psychological behavior and
8    dynamics using one's own clinical interactions?
9    A.  Yes, it's one method of informing your understanding of
10   human behavior.
11   Q.  Is it generally accepted to develop theories of human
12   behavior based on clinical interactions over time?
13   A.  Yes.
14   Q.  Is that a practice that's been employed by well-known
15   psychologists throughout the existence of --
16   A.  Well, I think the most well-known psychologist was Freud.
17   He based all his original research on case studies.
18   Q.  Are all of your patients internet addicts?
19   A.  No.
20   Q.  Have you discussed role playing with your patients in your
21   own clinical practice?
22   A.  Yes.
23   Q.  Have you discussed lying?
24   A.  Yes.
25   Q.  What do people report lying about, generally?

1    A.   Again, personal characteristics that speak to the person's

2    identity or circumstances.

3    Q.   These lies about identity, how does that relate to the

4    concept of role playing?

5    A.   Well, when you lie about your identity, you're essentially

6    take -- you're essentially role playing.  You're essentially

7    taking on the role of another entity.

8    Q.   What is your sense from your clinical patients of why

9    people do that?

10   A.   That's a great question.  I mean I think people do it

11   because -- I mean without sounding glib, they do it because

12   they can.  On the internet, there's really no check and balance

13   to determine -- there's no threshold to cross.  You're not

14   looking at someone in the, you know, eye to eye, and there's no

15   way to validate whether something is true or not.  You can be

16   anything you want, say anything you want, and nobody really

17   knows the difference, except that there is the potential to

18   verify it later if you actually come in contact with that

19   person.  But many times, these relationships remain only

20   online.

21   Q.   Have you discussed the concept of disinhibition in your

22   clinical practice with patients?

23   A.   Yes.

24   Q.   And have you discussed the concept of loss of boundaries

25   with your patients?

M6mWmel2                         Greenfield - Direct

1    A.  Yes.

2    Q.  Have you discussed the concept of time distortion with your

3    own patients?

4    A.  Very much so, yes.

5    Q.  Have you discussed the concept of perceived anonymity?

6    A.  Yes.

7    Q.  Have you discussed chatrooms with your patients?

8    A.  Yes.

9    Q.  And have you, in fact, had patients who spend time in

10   chatrooms?

11   A.  Oh, yes.

12   Q.  Have you then discussed the reasons why people participate

13   in chatrooms?

14   A.  Yes.

15   Q.  Have you discussed the expression of fantasy in online

16   spaces?

17   A.  Yes.

18   Q.  Is that limited to sexual fantasy or also nonsexual

19   fantasy?

20   A.  No, it's not limited to sexual fantasy.  I would say sexual

21   fantasy's the majority, but it's fantasy involving themes of

22   occupational accomplishment, educational accomplishment, life

23   circumstance accomplishment; status in life, so to speak.

24   Q.  In your clinical practice, have you discussed the idea of

25   broadcast intoxication?

1    A.  Yes.

2    Q.  What is that?

3    A.  Well, that's a term that I coined.  It really refers to the

4    dopaminergic elevation from the act of communicating about

5    oneself through the internet modality.  It's one of the reasons

6    why social media is so powerful and so desirable.  The act of

7    broadcasting makes people feel good, and they experience

8    pleasure from it.

9    Q.  Can you flesh that out a bit more; broadcasting how?

10   A.  Oh, by communicating through the internet.  They are

11   posting, whether it be in a chatroom or social media outlet or

12   in other formats.

13   Q.  Thank you.

14        Have you discussed the idea of how potent content

15   impacts one's feeling of excitement or pleasure online?

16   A.  Yes.

17   Q.  What is -- what do you mean when you talk about potency of

18   content?

19   A.  Well, the way I view it is that the content is the drug,

20   the digital drug, so to speak, and the internet is the

21   hypodermic, the delivery mechanism of that content.  There is

22   an interaction between the delivery mechanism -- the

23   internet -- and the actual intensity of that context --

24   content.  I'm sorry.

25        So that's why pornography, for instance, is so readily

1    consumed on the internet.  One-third of all internet searches

2    are for pornography, which is enormous, and it's because that

3    content has potency, and when combined with the internet

4    delivery mechanism, there is a synergistic amplification of the

5    potency of that content, the power of that content.

6    Q.  So in other words, your hypothesis is that people have a

7    stronger dopamine effect with --

8    A.  Correct.

9    Q.  -- with potent content?

10   A.  Correct.

11   Q.  Have your clinical sessions over the last 20 to 25 years

12   validated your conclusions from your 1999 study?

13   A.  Yes.

14   Q.  In what sense?

15   A.  Well, I see it every day.  I mean I don't -- I don't -- I

16   don't ask every patient the 35 questions that were in the

17   original research, but the circumstances that bring them to me

18   generally involve some aspect of the stuff that we looked at in

19   that original research.  So the answer is yes.

20   Q.  Dr. Greenfield, based on your individual research, research

21   by other academics and practitioners in your field, and your 20

22   to 25 years of clinical practice with a focus on the internet,

23   have you developed certain conclusions about how individual

24   behavior and psychology are impacted by the internet?

25   A.  Yes, I have.

M6mWmel2                         Greenfield - Direct

1   Q.  What do you conclude about the concept of accelerated

2   intimacy?

3   A.  That when people communicate via internet modality, that

4   they experience intimacy in an accelerated fashion.

5             THE COURT:  I'm sorry.  Can I just be clear about

6   this.

7             When you say people, are you opining that all people

8   experience this, Dr. Greenfield?

9             THE WITNESS:  Well, the purpose of doing research is

10  to theoretically extrapolate from a sample to a population.  So

11  I would say yes, that I do think that the average person

12  experiences that.

13            Now, I've not examined or tested every person in the

14  world, so I can't say literally, but the purpose of doing

15  research -- that's the whole basis of research, is to

16  extrapolate from a sample to a population.

17            THE COURT:  Thank you.

18            So just to be clear, is it your opinion,

19  Dr. Greenfield, that 100 percent of internet users experience

20  accelerated intimacy?

21            THE WITNESS:  Well, I don't think that would probably

22  be accurate.

23            THE COURT:  Thank you.

24            What is your opinion then?

25            THE WITNESS:  My opinion is that the vast majority of

M6mWmel2                          Greenfield - Direct

1    people that use the internet experience it.

2              THE COURT:  Thank you.

3              What's the basis for that?  Where do you get the data

4    that supports the statement that the "vast majority" of

5    internet users experience that?

6              THE WITNESS:  Sorry.

7              The basis of that would be my research and my clinical

8    practice.

9              THE COURT:  Thank you.

10             So the research meaning the 1999 study --

11             THE WITNESS:  Correct.

12             THE COURT:  -- and your experience as a clinical

13   psychologist, is that right?

14             THE WITNESS:  That is correct.

15             THE COURT:  Thank you.

16             Please go on.

17   BY MS. WERNER:

18   Q.  I'd like to go back and continue on that thread for a

19   moment.  Your 1999 study did not conclude that 100 percent of

20   internet users experienced accelerated intimacy, did it?

21   A.  No, it did not.

22   Q.  It was significantly less?

23   A.  Yeah, like a large percentage.

24   Q.  And so just to clarify that point, would you testify that

25   100 percent of people --

M6mWmel2                     Greenfield - Direct

1    A.  No, I would not.

2    Q.  OK.

3        Similarly, what do you conclude about perceived anonymity?

4    A.  That a sizable percentage experience it.  I don't remember

5    the number, but 40, 50 percent, something.

6    Q.  And what do you conclude about the phenomenon of

7    disinhibition on the internet?

8    A.  That a sizeable percentage experience it.  I don't remember

9    the percentage, but --

10   Q.  Well, would you testify that those percentages are set in

11   stone, the percentages you found in 1999?

12   A.  Would I say that they're set in stone?

13   Q.  Well, I can back up and --

14   A.  Yeah, I just don't want to say anything that's inaccurate.

15   Q.  So, in 1999, you conducted this study of 17,000 people --

16   A.  Yes.

17   Q.  -- and found some percentages about how often internet

18   users and abusers experienced certain behavioral dynamics on

19   the internet.  Is that accurate?

20   A.  That is accurate, yes.

21   Q.  Now, it's been 23 years since 1999, right?

22   A.  Yes.

23   Q.  And during that time, you have conducted research and

24   writing, correct?

25   A.  Yes, I have.

M6mWmel2                          Greenfield - Direct

1   Q.  And have you also seen many patients with whom you've

2   discussed these same phenomena?

3   A.  Yes, that's true.

4   Q.  So would you imagine that those percentages from 1999, that

5   you found in your 1999 survey, if you were to conduct it again

6   today, would you find the exact same percentage?

7   A.  Well, of course, you don't know unless you do it.  I would

8   expect the percentage to be actually higher, but that's a

9   hypothesis, and it's based on my clinical work and the fact

10  that the internet is so much more accessible and readily

11  available and that we now have untethered, portablized access,

12  which has only increased the phenomenon significantly.

13       Remember, when I did this research, the smartphone didn't

14  exist and now it does.  And it's been a game changer.  So I

15  would -- again, hypothetically, I would imagine the percentages

16  are higher.

17  Q.  And does your clinical practice confirm, in part, that

18  hypothesis?

19  A.  It does, but again -- yes, yes, it does.

20  Q.  And when you talk about the smartphone as a game changer,

21  what do you mean by that?

22  A.  Well, the smartphone's only been around 13-plus years or

23  so, and in that short period of time we've reached an 85 to 90

24  percent adoption rate in the United States.  So virtually

25  everybody has a smartphone.  And the smartphone's power is in

1    its access to the internet.  If it wasn't accessible to the

2    internet, people would lose interest in it immediately.  So

3    it's become the dominant form of internet access around the

4    world, so much so that I call it a portable dopamine pump.

5        I mean I left my smartphone downstairs, because I had to

6    give it up, and I feel uncomfortable now because I don't have

7    it.  That's how attached we are to it, and the reason we're

8    attached to it is because of that repeated intermittent,

9    variable dopamine hit that we get from it.  So I, again, think

10   that the numbers would be higher.

11   Q.  In addition to the smartphone, have there been other

12   changes in the internet space that impact user access?

13   A.  Yes, tremendously.  Again, when I did my original research,

14   wi-fi wasn't a thing.  Laptops and tablets were really not a

15   thing.  Smartphones certainly weren't around, and the most

16   important change is that when I did this original research, we

17   were on dial-up.  If you -- I don't know how many people in

18   here remember that, but that was communicating at a fraction of

19   the speed that we communicate now.

20       In those days, you had to go online.  Now you're

21   always online.  So there's instant access, and one of the

22   things we know is that the faster a substance or behavior

23   induces an intoxicating response, the more addictive that

24   substance or behavior is.  And this is true of drugs as well as

25   behavior.

M6mWmel2                          Greenfield - Direct

1   Q.  What is your sense of how the majority of respondents in

2   your 1999 study were accessing the internet?

3   A.  Could you repeat that?

4   Q.  What is your sense of how the majority of respondents in

5   your '99 study were accessing the internet?

6   A.  Well, at that time, the only way they could access it was

7   dial-up.

8   Q.  Would that be from a home computer or --

9   A.  Yes, essentially from a desktop home computer.

10  Q.  Going --

11  A.  Which is not the majority now.

12  Q.  What is the majority now?

13  A.  Smartphone.

14  Q.  And what is that conclusion based on?

15  A.  Oh, there's been numbers of studies that have verified that

16  the smartphone is becoming the dominant access point for

17  internet access.

18  Q.  And do your patients discuss their smartphones and how they

19  impact their use and behavior?

20  A.  Yeah, they come in talking about their addiction to their

21  smartphone.  That is a common complaint.  Some people want to

22  do something about it and some people do not.

23  Q.  Has the availability of a smartphone impacted the way

24  people engage in chat spaces in your clinical practice?

25  A.  Yes.

M6mWmel2                        Greenfield - Direct

1   Q.  How so?

2   A.  Because, again, there's no threshold to cross.  It's always

3   on and easily accessible, and the more accessible and available

4   a substance or behavior is that has intoxicating properties,

5   the more likely you're going to use it or overuse it.

6   Q.  Thank you.

7           Going back a moment to this concept of disinhibition,

8   what is your current impression of how internet users

9   experience disinhibition online?

10          THE COURT:  I'm sorry.  Can you rephrase the question.

11  Is the question how all internet users experience disinhibition

12  online?

13          MS. WERNER:  Thank you, your Honor.  It's a good

14  clarification.

15  Q.  What is your takeaway about how nonaddicted internet

16  users -- in other words, internet users who you have not

17  diagnosed as addicted -- experience the phenomenon of

18  disinhibition online?

19  A.  Yeah.  I mean the questions that we ask, you know, that we

20  use to access that or to get at that phenomena is basically the

21  idea that you'd be more likely to say or do something online or

22  reveal some aspect of yourself than you ordinarily would do in

23  a real-time interaction.

24          THE COURT:  I'm sorry.  Can I just clarify that.  I

25  apologize.

1           What's the basis for that position, Dr. Greenfield?

2    Counsel's question was predicated on the concept that these are

3    not people that you have treated.  So what's the basis for your

4    position regarding this mass of other people's views --

5           THE WITNESS:  Oh.  Maybe I misunderstood.

6           THE COURT:  Thank you.

7           Counsel, can you rephrase the question, please.

8    BY MS. WERNER:

9    Q.  Dr. Greenfield, asking you specifically about internet

10   users who you have not diagnosed as addicts.

11   A.  So, I just -- I'm -- can I ask for clarification?  Are you

12   talking about the people who participated in my study, or are

13   you talking about people who have come to my office who then

14   turn out not to be internet addicts?

15   Q.  I am asking a general question about your belief as a

16   clinical psychologist, your belief about how nonaddicted

17   internet users experience the internet in a general sense.  So

18   internet users who are not necessarily addicts, do some or many

19   of them experience disinhibition, in your opinion?

20   A.  I would say a sizeable percentage do, not dissimilar from

21   the percentage that we found in the study.

22   Q.  And what is that based on?

23   A.  Well, it's based on the study and it's based on my

24   continued assessment of people when they come in to see me,

25   some of whom do not even have internet issues or are not

1   internet-addicted.

2   Q.  Do you diagnose 100 percent of people who come to see you

3   with internet addiction?

4   A.  Oh, not even close, no.

5   Q.  Is your conclusion about the prevalence of disinhibition

6   also based on your review of other literature in the field?

7   A.  Yes.

8   Q.  Do you draw any conclusions about the prevalence of time

9   distortion among the general internet user as opposed to a

10  diagnosed internet addict?

11  A.  Yeah.  And that's based, again, on my original research and

12  then my subsequent evaluation and observation of all the people

13  that have come to see me.

14  Q.  And what is your conclusion today about time distortion?

15  A.  I mean I think virtually everybody experiences it.  I --

16  you know, I don't have a legitimate basis to say that everybody

17  does, but my opinion is that just about all of us do.

18  Q.  And what about loss of boundaries; how does the general

19  internet user experience a loss of boundaries, in your opinion?

20  A.  A large percentage experience a loss of boundaries.  I

21  think less -- a smaller percentage than experience time

22  distortion.

23  Q.  What is that based on?

24  A.  Again, my original research and then the subsequent people

25  that have come to see me.

M6mWmel2                        Greenfield - Direct

1    Q.  And also --

2    A.  And my review of the literature.

3    Q.  What is your conclusion today about how often internet

4    users who are not diagnosed internet addicts, how often they

5    lie online?

6    A.  I mean I pretty much assume that everybody that goes online

7    lies, and --

8    Q.  And what is that based on?

9    A.  Well, it's based on my research.  It's based on other

10   people's research.  It's based on the fact that people come in

11   and tell me all the time about how much they lie and how much

12   they assume everyone else is lying.

13   Q.  Does that include your review of literature like --

14   A.  Yes.

15   Q.  -- the 2016 study and the 2011 study --

16   A.  Yes, similar to the results that we discussed earlier.

17   Q.  Do you draw any conclusions about the ability of a typical

18   internet user to tell whether others online are lying or

19   playing roles?

20   A.  Well, that's just the thing.  You can't know whether

21   somebody's lying because there's no way to validate it.  But I

22   think a large percentage of people may have some expectation

23   that there's lying going on.

24              (Continued on next page)

25

Q.  Is that supported by the 2011 study --

A.  Yes.

Q.  -- that you reviewed?

A.  Yes.

Q.  What conclusions do you draw about the phenomenon of broadcast intoxication for the average non-addicted Internet user?

A.  Well, again, since we have so much data on social media now I think it is well established that the phenomena broadcast intoxication exists.

Q.  Can you spell that out again, what you mean by broadcast intoxication?

A.  Well, another way of looking at it is what we call social validation looping, which is this idea that if you do something either real or imagined and you broadcast it, meaning put it up on the Internet in some fashion, and you get a degree of likes or acknowledgment or comments, that's an intoxication loop and it enhances the likelihood that you are going to repeat it. Now, the social media channels know this and they use this as a way to keep your eyes on the screen.  They want everybody on social media all the time because they sell your data and they sell you products and they sell advertising.  So the whole thing is a big ruse, essentially, to keep our eyes on screen but it is all based on that dopaminergic innervation from talking about their lives or some -- whether real or fake, in a

M6M5mel3                      Greenfield - Direct

1    way that other people are going to rank it, rate it, comment on

2    it, like it, and then that creates a social validation loop.

3    It is dangerous, potentially.

4    Q.  I think you testified that broadcast intoxication was your

5    term.  Have other scholars written on the same dynamic?

6    A.  Yes, they call it different things.  I mean, social

7    validation looping is another term.

8    Q.  Have you drawn any conclusions over your career about the

9    maybe factor?

10   A.  Yes, I have.

11   Q.  What is the maybe factor?

12   A.  The maybe factor is a term that is my term, but really what

13   it refers to is that one of the things we know about dopamine

14   innervation and reward is that the anticipation of a reward is

15   actually more dopaminergically enhancing than the actual reward

16   itself, so the expectation that you might win or maybe will

17   win, let's say in gambling or something online, it doesn't

18   matter what it is, actually innervates dopamine at twice the

19   level that you ordinarily would.  And this is based on animal

20   studies, primate studies that have been done by a pretty

21   well-known neurologist out of Stanford, and he shows

22   graphically how anticipated dopamine release is higher.  So

23   that's the maybe factor.  See, it's the reason why people will

24   stand in front of a slot machine or scroll through their feeds

25   over and over because maybe they'll see something they like, or

M6M5mel3                           Greenfield - Direct

1    maybe they'll see something that's relevant, or maybe they'll
2    see something that is appealing.  But if you know for a fact
3    that it will be there, or if you know for a fact that it won't
4    be there, you will lose interest.  It is the variability, the
5    maybe that really keeps us connected.
6    Q.  So in layman's terms are you saying there is a dopamine hit
7    that comes when the pictures are rotating on the slot machine
8    and not just when the pictures settle and you know whether you
9    have won or lost?
10   A.  I'm saying, yes -- the answer is yes to that, and I'm
11   saying that you are experiencing an anticipated dopamine hit
12   when you get in the car to go to the casino.  I'm saying when
13   you walk up and you see the computer opened and it is online,
14   you are already experiencing that anticipation.
15   Q.  And is your impression that Internet users, to a large
16   degree, experience the maybe factor or only Internet addicts?
17   A.  No, I think we all do, or -- yes, I think we all do, most
18   of us.
19   Q.  What is that based on?
20   A.  It is based on my research.  It is based on my review of
21   the literature, it is based on my patients, and it is based on
22   me on the fact that -- because I use myself as my own subject,
23   I watch my behavior as well.  So I think the fact that you have
24   got access to something that will maybe be pleasurable in your
25   pocket, it's almost impossible not to look at it.

1    Q.  Is that also based on your understanding of addiction

2    medicine --

3    A.  Yes.

4    Q.  -- through evolutionary biology?

5    A.  Yes.  Very much so.

6    Q.  Do you draw any conclusions at this point in your career

7    about variable reinforcement?

8    A.  Yes.

9    Q.  What is variable reinforcement?

10   A.  So variable reinforcement is speaking to the issue that I

11   was just talking about in terms of the maybe factor.  But in

12   terms of behavioral conditioning, anything that is reinforced

13   in an unpredictable and variable format is far more addictive

14   or far more resistant to extinguish than if it is regularly

15   reinforced so this is why -- well, this is why the Internet is

16   so addictive, in a sense, because it variably reinforces you.

17   Sometimes there is something good, sometimes there isn't, but

18   you don't know when and you don't know where and you don't know

19   how good it will be.

20   Q.  Is your sense that this dynamic of variable reinforcement

21   impacts non-addicted Internet users as well as Internet

22   addicts?

23   A.  It is my opinion, yes.

24   Q.  In what way?

25   A.  That we all -- you know, well, that the anticipation of the

1    possibility of seeing something and because occasionally we do
2    see something we like or find interesting or appealing, or that
3    is relevant to us which then elevates dopamine, that
4    anticipation increases the likelihood that you are going to
5    pick it up and click, or scroll, or tap, or use your mouse.
6    Q.  Do you draw any conclusions at this point in your career
7    about how potent content impacts user experience online -- and
8    I mean a non-addicted user.
9    A.  I think the more potent the content the more likely the
10   potential abuse will occur.
11   Q.  What is that based on?
12   A.  Again, based on my research, based on my clinical
13   experience, and based on the literature.  That is pretty
14   well -- and not just literature in terms of the Internet but
15   addiction medicine literature.
16   Q.  Have you developed an understanding of a concept called
17   synergistic amplification?
18   A.  Yes.
19   Q.  What is that?
20   A.  I mentioned synergistic amplification earlier, it is the
21   interaction between the content and the Internet delivery
22   mechanism.  Because the Internet delivers it in a very rapid
23   format in a focused way, it synergizes the potency and
24   available of that content.  So for instance, pornography has
25   been around a long time, long before the Internet has, but

1    there is no doubt, based on the data -- not my data only but

2    the data in the literature -- that pornography is being

3    consumed at epidemic levels now and, again, it is because of

4    that synergistic amplification of that content.

5    Q.   Is synergistic amplification a concept that applies only to

6    Internet addicts or to Internet users more broadly?

7    A.   No, I think it applies to anyone that uses the Internet.

8    Q.   Dr. Greenfield, is it correct to a say that most people in

9    the countries -- the United States -- today spend at least some

10   time on the Internet?

11   A.   Yeah, I think you could safely say that.  I am sure that

12   there are a few people out there who do not but it's pretty

13   prevalent.

14   Q.   So to ask something that may be obvious, is it fair to say

15   that most people in the United States have a basic familiarity

16   with their own online experience?

17   A.   I think that's a safe thing to say.

18   Q.   Can a person who knows only about their own online

19   experience draw conclusions with as much force as you are able

20   to draw, based on your work?

21   A.   Could you clarify that question?

22   Q.   Your work is based on your research, your review of other

23   literature, and your clinical practice; correct?

24   A.   Yes.

25   Q.   And fair to say that the conclusions you draw, all of the

conclusions that you have discussed are based on those things?

A. Yes.

Q. And your practice, your research --

A. Yes, I would agree.

Q. -- your review of the literature?

        Does a single Internet user who knows their own experience with the Internet, is that person able to draw conclusions with as much force and weight as the conclusions you can draw in your career?

A. Well, I don't know every theoretical person that you are referring to so I would say probably not, unless they have some expertise or knowledge that goes beyond the average person.  I would say that my opinion is an informed one based on my work.

Q. What is the value of examining behavioral psychology and dynamics across a set of thousands of people?

A. Could you repeat that, please?

Q. What is the value of examining behavioral psychology or human behaviors across a set of thousands of people as opposed to examining the human behavior in a single person?

A. Well, theoretically it is so you can extrapolate to a larger population-based behavior, in other words that you can make statements that extend beyond the individual, that this is how we create diagnostic categories is that we extrapolate from a sample to a larger group and that's how we develop prevalence statistics as well.

1    Q.  So can any Internet user draw the conclusions that you have

2    been able to reach over your career?

3    A.  I mean, I guess if they did everything I did, maybe.

4              MS. WERNER:  Brief indulgence, your Honor?

5              THE COURT:  That's fine.  Take your time, counsel.

6              MS. WERNER:  No further questions.

7              THE COURT:  Thank you very much.

8              THE WITNESS:  Is it --

9              THE COURT:  I'm going to respond to your question.

10             I'm going to take a break now before we begin with the

11   cross-examination of Dr. Greenfield.  I'm going to propose that

12   we take a relatively lengthy break to let everyone stretch

13   their legs and also to eat something, if you would like.  It is

14   about 11:48 right now by my clock, I'm going to propose that we

15   reconvene at 12:30 to continue Dr. Greenfield's testimony.

16             Counsel for the United States, is there request for an

17   instruction?

18             MS. RAVENER:  Yes, your Honor.  We would ask that

19   Dr. Greenfield be instructed, as would be typical for a witness

20   on cross-examination, not to discuss his testimony.

21             THE COURT:  Good.  Thank you very much.

22             So Dr. Greenfield, as you just heard the United States

23   request, you should not talk about this case or your testimony

24   here with anyone during the course of this break.  That is

25   because you are about to be cross-examined.  And so I am

M6M5mel3                          Greenfield – Direct

1    directing that you not discuss this case or your testimony here

2    with anyone, including, in particular, counsel for defendant.

3              With that, I look forward to seeing you all back here

4    in about 40 minutes.  Thank you.

5              (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  A F T E R N O O N   S E S S I O N

2                            12:30 p.m.

3            THE COURT:  So we are back on the record after our

4    lunch break.  Let me turn to counsel for the United States.

5    Are you prepared?

6            MS. RAVENER:  We are, your Honor.

7            THE COURT:  Good.  Thank you.  So let's begin.

8            MS. RAVENER:  Thank you, your Honor.  One moment?

9            THE COURT:  Thank you.

10           MS. RAVENER:  Thank you very much, your Honor, and if

11   I could have permission as well to remove my mask during

12   questioning?

13           THE COURT:  Thank you.  Yes, you may.

14           MS. RAVENER:  Thank you.

15   CROSS-EXAMINATION

16   BY MS. RAVENER:

17   Q.  Good afternoon, Dr. Greenfield.

18   A.  Good afternoon.

19   Q.  Dr. Greenfield, your speciality within your field is the

20   study of Internet addiction, correct?

21   A.  I think my study is Internet behavior and addiction, but

22   yeah.

23   Q.  So you believe that your speciality is all Internet

24   behavior; is that right?

25   A.  I believe that I have expertise on the use of the Internet,

M6M5mel3                          Greenfield – Cross

1    and then obviously it's abuse.

2    Q.  And let me ask you this.  Your website is

3    virtualaddiction.com; correct?

4    A.  Correct.

5    Q.  And you have written two books; correct?

6    A.  Correct.

7    Q.  And the first one is called "Virtual Addiction;" right?

8    A.  Correct.

9    Q.  And the second one is called, "Overcoming Internet

10   Addiction for Dummies," correct?

11   A.  Correct.

12   Q.  And you run a center which you call the Center for Internet

13   and Technology Addiction; correct?

14   A.  Correct.

15   Q.  And that focus includes too much shopping online; right?

16   A.  Yeah.

17   Q.  And it includes distracted driving because someone is using

18   their cell phone while operating a car; right?

19   A.  Correct.

20   Q.  It includes sexual behavior online; right?

21   A.  Correct.

22   Q.  Like pornography?

23   A.  Among other things, yeah.

24   Q.  It includes online gambling; is that right?

25   A.  Yup.

1    Q.  And it includes video games; correct?

2    A.  Yes.

3    Q.  And those are the topics, the ones I just listed, that you

4    typically write and talk about, correct?

5    A.  Well, yes, I talk about all of those things but I also --

6    there are other things that I talk about that are not on your

7    list.

8    Q.  OK.  But on your website, for example, you hold yourself

9    out with areas including -- I'm sorry, you specify that your

10   areas are too much shopping online, Internet addiction,

11   distracted driving, pornography, online gambling, and video

12   games; correct?  Those are the topics that you list?

13   A.  Yes.

14   Q.  And your book, "Overcoming Internet Addiction for Dummies,"

15   lists several self-tests; correct?

16   A.  Correct.

17   Q.  And those tests are smartphone compulsion; right?

18   A.  Yes.

19   Q.  Digital distraction, right?

20   A.  Right.

21   Q.  Video game addiction, right?

22   A.  Yes.

23   Q.  Shopping, gambling and investing, right?

24   A.  Right.

25   Q.  And online pornography, right?

M6M5mel3                          Greenfield - Cross

1    A.  Right.

2    Q.  And those are the topics, the ones I just listed with

3    respect to your self-tests for which you typically treat

4    patients; correct?

5    A.  I would say that the majority of patients fall into one of

6    those categories.  There are a few categories that I deal with

7    that are not listed in that, among those tests.

8    Q.  But those are the majority of your clinical practice,

9    right?

10   A.  70 percent, 75 percent.

11   Q.  75 percent.

12   A.  Yeah.

13   Q.  And again, your website lists and specifies four areas that

14   you cover -- Internet and smartphone addiction, video game and

15   pornography, and distracted driving, right?  Those four issues?

16   A.  Yes.

17   Q.  You work, primarily, as a practicing psychologist with a

18   specialty in addictions and sex addiction treatment, right?

19   A.  Well, I work as a general psychologist and then I have a

20   subspeciality in Internet behavior and addiction so I see about

21   30 percent of my patients are just, have nothing to do with the

22   Internet, like zero.  They may use the Internet but they're not

23   dealing with problems related to the Internet.

24   Q.  OK.  And doesn't your website state that you are a

25   practicing psychologist with a speciality in addictions and sex

M6M5mel3                    Greenfield - Cross

1    addiction treatment?

2    A.  Yes, but a speciality doesn't mean -- it doesn't mean

3    exclusivity.

4    Q.  You also advertise yourself as an expert witness, right?

5    A.  I have done expert witness work, yes.

6    Q.  Well, your website offers that service, correct?

7    A.  It's on the website, yes.

8    Q.  And you state that you have provided testimony on cases

9    involving divorce, right?

10   A.  I have, yes.

11   Q.  Legal problems arising from abuse or addiction to the

12   Internet or Internet pornography and resulting issues in the

13   workplace, right?

14   A.  I have dealt with all of those, yes.

15   Q.  Those are the topics that you describe you have provided

16   testimony about before, right?

17   A.  Yup.

18   Q.  Now, when we talk about the term addiction that's not a

19   real medical term, right?

20   A.  Yeah.  Actually, the word addiction is not a medical term.

21   Q.  Thank you.

22        If you don't have -- you don't have a medical degree,

23   right, Dr. Greenfield?

24   A.  I do not.

25   Q.  And addiction is just a term you use because it's popular

M6M5mel3                    Greenfield - Cross

1    in the media; isn't that right?

2    A.  No, that is not correct.

3    Q.  OK.  Are you familiar with your testimony under oath in

4    this court house that you discussed earlier today in *United*

5    *States v. D'Amelio*?

6    A.  I don't recall everything I said in that testimony, no.

7    Q.  OK, well why don't we take a look at it at Government

8    Exhibit 6 --

9    A.  OK.

10   Q.  -- transcript page 138, and I will ask if we can bring that

11   up on the screen for you.

12   A.  On one of these screens?

13   Q.  Yes.

14           When you testified in *United States v. D'Amelio* you

15   were under oath; is that right, Dr. Greenfield?

16   A.  Yes.

17   Q.  I would like to direct you -- do you have it up?

18   A.  Nope.

19   Q.  We can provide you with a hard copy.

20   A.  OK.

21   Q.  And we can provide the Court and defense counsel with hard

22   copies as well.

23   A.  Thank you.  Am I supposed to turn to a page?

24   Q.  Yes.  I am referring to transcript page 138, Government

25   Exhibit 6.

1              MR. MARVINNY:  We have it.

2     A.  Yes, I see it.

3     Q.  Dr. Greenfield, does that refresh your memory that in

4     that -- in the *D'Amelio* case -- you testified that addiction is

5     a popular term that the press and the media use?

6     A.  Yes, I did say that.

7     Q.  And, Dr. Greenfield, I ask you to put that down now.

8     A.  OK.

9     Q.  Dr. Greenfield, we don't really have a formal definition of

10    addiction when it comes to the Internet, right?

11    A.  I don't think that's correct.  I don't agree with that.

12    Q.  OK.  Well, that was your testimony in the *D'Amelio* case,

13    correct?

14    A.  Well, the term --

15    Q.  No, I'm asking you a question about your prior testimony,

16    sir.

17    A.  I actually don't -- I didn't have a chance to read what you

18    just gave me.

19    Q.  So I can direct you to it.

20    A.  OK.

21    Q.  Please turn back to Government Exhibit 6 at transcript 138.

22    A.  OK.

23    Q.  Does that refresh your recollection that, under oath, in

24    the *D'Amelio* case, you stated we don't really have a formal

25    definition of addiction yet with the Internet?

1  A.  Yeah.

2  Q.  Was that your testimony?

3  A.  Yes, that was.  Then.

4  Q.  In 2009, correct?

5  A.  Yes.

6  Q.  And it's your testimony that in the intervening

7  approximately 10 years, that's completely changed?

8          MS. WERNER:  Objection.

9          THE COURT:  Thank you.

10         You can rephrase the question.

11 BY MS. RAVENER:

12 Q.  It is your testimony that that has changed since 2009?  Is

13 that what you are telling us?

14 A.  I think in the last 12 or 13 years things have changed,

15 yes.

16 Q.  Well, in 2009, with respect to, with specific regard to

17 technology and Internet addiction, no scientific agreement

18 exists -- I'm sorry.  Let me back up.  Withdrawn.

19         Today, with specific regard to Internet and technology

20 addiction, no scientific agreement currently exists on what the

21 final diagnostic labels will be, right?

22 A.  That's true.

23 Q.  And that is a statement that you have made in your book

24 written last year, right?

25 A.  That is correct.

1   Q.  We are not quite at a point in the science of diagnosis and

2   treatment of Internet-related disorders to make those

3   decisions, correct?

4   A.  No, that's not what I'm saying.

5   Q.  OK.  Well, let me show you your book, Government Exhibit 7.

6   A.  No, I know what I said in the book.  I agree with what you

7   said I said.  What I am talking about is the diagnostic

8   labeling.  I do think there is agreement in the literature that

9   there is such a thing as Internet addiction.

10  Q.  OK.  Well, let's talk a little bit more about that.

11  A.  OK.

12  Q.  As of now, Internet and screen addictions are still

13  relatively new areas of study even in your view, correct?

14  A.  By comparison to the substance abuse arena I would say they

15  are on the newer side, yes.

16  Q.  And as a result, in your view, addiction medicine has not

17  yet fully developed definitive diagnostic markers for these

18  purported problems, right?

19  A.  No.  They have not developed diagnostic labels.  There are

20  lots of markers that have been widely accepted.

21  Q.  OK.  Let's take a look at Government Exhibit 8 at page 147.

22          MS. WERNER:  I'm sorry.  What is Government Exhibit 8?

23  We don't have that.

24          MS. RAVENER:  You should in your binder.

25          MS. WERNER:  We didn't receive a binder.

1          MS. RAVENER:  We can provide it to you, it is his

2     book.

3          THE WITNESS:  Do you want me to look at something?

4     BY MS. RAVENER:

5     Q.  Yes, please turn to Government Exhibit 8.  Do you recognize

6     this as page 147 of your book, "Overcoming Internet Addiction

7     for Dummies," Dr. Greenfield?

8     A.  I don't see that here but I may not be looking in the right

9     section so you are going to have to help me here.

10    Q.  OK.  Do you see Government Exhibit 8?

11    A.  Is it tabbed?  Is that what you are telling me?

12    Q.  Yes, it is.

13    A.  I am in 8 and I am on page 147, and what I see --

14    Q.  There is a difference, Dr. Greenfield, between the things

15    labeled DX and the regular numbers so you might want to turn

16    further.

17    A.  OK.  I'm happy to do that.  I just don't know what I am

18    doing here.  OK.  Did you say D8?

19    Q.  Government Exhibit 8, just the number 8, Dr. Greenfield.

20    A.  I don't know what I am doing wrong here.

21         MS. RAVENER:  Your Honor, if I may ask for permission

22    to approach the witness with the document?

23         THE COURT:  You may.

24         THE WITNESS:  Yes.  If you have it.  I can't find it.

25    BY MS. RAVENER:

M6M5mel3                          Greenfield - Cross

1    Q.  Dr. Greenfield, do you recognize that document as page 147

2    of your book "Overcoming Internet Addiction for Dummies?"

3    A.  I do.

4    Q.  Do you see where it says that currently, no final consensus

5    exists -- I'm sorry -- that as a result, addiction medicine has

6    not yet fully developed definitive diagnostic markers for these

7    problems?

8    A.  Yes, I see that.

9    Q.  Thank you.  You can put that down.

10   A.  OK.

11   Q.  That's a book written by you, right?

12   A.  It is.

13   Q.  And it was published last year, right?

14   A.  That is correct.

15   Q.  Dr. Greenfield, as we sit here today, currently no final

16   consensus exists on which diagnostic markers and symptoms are

17   necessary to warrant an Internet and screen addiction

18   diagnostic label, right?

19   A.  I think that they're -- no, that's not what I am saying.  I

20   think that there are clear indicators of diagnostic symptoms,

21   the issue is we don't have a definitive agreement on how to

22   label those and in what constellation one would see those, yes.

23   Q.  OK.  Well, let's be clear about it.  Can we turn to

24   Government Exhibit 9?

25   A.  OK.

1    Q.  This should now be up on the screen -- I hope -- for you.

2    A.  There is nothing on the screen.

3    Q.  OK.  If you can turn to the ninth tab in your binder, just

4    the number 9?

5    A.  I see it.

6    Q.  Do you recognize that as page 148 of your book "Overcoming

7    Internet Addiction for Dummies?"

8    A.  Yes.

9    Q.  I would like to --

10   A.  Now -- well, that's all right, I have got it.

11   Q.  I would like to direct you to the first sentence on that

12   page --

13   A.  Yes.

14   Q.  -- where it states in your words:  Currently, no final

15   consensus exists on which diagnostic markers and symptoms are

16   necessary to warrant an Internet and screen addiction

17   diagnostic label; correct?

18   A.  That is correct, but there is a sentence right after it

19   that clarifies that.

20   Q.  And you are referring to the fact that in your view, in

21   your words, there is general agreement on many of the relevant

22   issues you present in this chapter; is that right?

23   A.  That is -- well, I am not just talking about my opinion, I

24   am talking about general agreement among the professional

25   community.

M6M5mel3                         Greenfield - Cross

1   Q.  Dr. Greenfield, that's your opinion of that general

2   agreement, correct?

3   A.  Absolutely it is my opinion.

4   Q.  And that's because the statements we are looking at right

5   now are written by you in your book, right?

6   A.  Absolutely true, yes.

7   Q.  And again, that was published last year; right?

8   A.  Correct.

9   Q.  Dr. Greenfield, you can put that down.

10          There are major organizations that evaluate new

11  psychological diagnoses and phenomena, right?

12  A.  What are you referring to?  I'm sorry.

13  Q.  So, like, the World Health Organization looks at whether

14  there are new psychological diagnoses and phenomena in the

15  world, right?

16  A.  That is correct.

17  Q.  And the American Psychiatric Association does that too,

18  right?

19  A.  Yes.

20  Q.  And your concept of compulsive Internet addiction is not

21  recognized by the World Health Organization, right?

22  A.  No, I would not agree with that.  I think that they have

23  categories now regarding compulsive online use that are in the

24  ICD-11.

25          MS. RAVENER:  If I could just approach one moment,

1  your Honor, to retrieve my document?

2            THE COURT:  Thank you.  You may.

3  Q.  Dr. Greenfield, if we can try to show you Government

4  Exhibit 8 again, which is page 147 of your book?

5  A.  Yes.  OK.

6  Q.  OK.  That is where you explain that the most agreed upon

7  term, to date, which is specific only to video game addiction,

8  is Internet gaming disorder; correct?

9  A.  That is correct.

10 Q.  And you state that that appears in the World Health

11 Organization's International Classification of Diseases -- or

12 ICD-11 listing -- as gaming disorder; correct?

13 A.  That is correct.

14 Q.  So there is no Internet addiction listed in the World

15 Health Organization's ICD-11, correct?

16 A.  That is correct.

17 Q.  Internet addiction is also not recognized by the American

18 Psychiatric Association in the Diagnostic and Statistical

19 Manual of Mental Disorders -- or the DSM-5; right?

20 A.  That is correct.  The only thing that is in it is the

21 provisional diagnosis for video game addiction.

22 Q.  And that is specific to video game addiction, right?

23 A.  That is correct.

24 Q.  And that is current as of today, correct?

25 A.  It is current but far outdated.

M6M5mel3                         Greenfield - Cross

1    Q.  In your view it is outdated?

2    A.  In my view it is outdated, yes.

3    Q.  That's because the DSM-5 was updated in approximately 2013;

4    is that right?

5    A.  About that.  About 15 years old.

6    Q.  And you consider 15 years outdated?

7    A.  I do.

8             THE COURT:  Sorry.  Can I break in here?  Wasn't it

9    updated in March, the DSM-5?

10            MS. RAVENER:  Your Honor, that may be right.

11            THE COURT:  Thank you.

12            THE WITNESS:  I haven't seen it, so.

13            THE COURT:  Thank you.  You may proceed.

14   BY MS. RAVENER:

15   Q.  If we could clarify that, how --

16   A.  Yeah.  I haven't used anything new that came out in March

17   so I'm not familiar with it.

18   Q.  So what current version of the DSM-5 do you use, Doctor?

19   A.  The original version, the thicker one that came out in

20   2013.

21   Q.  And you understand that it is periodically updated or

22   supplemented?

23   A.  I do.

24   Q.  And it may have been updated as recently as March?

25   A.  Apparently.  He is saying it is, so.

1  Q.  And you are not familiar with any of those updates?

2  A.  I have not read it.

3  Q.  You have not read any of the updates?

4  A.  Not the March update, no.

5  Q.  When including Internet gaming disorder, the American

6  Psychiatric Association specified that the criteria for this

7  condition is limited to Internet gaming and does not include

8  general use of the Internet, online gambling, or social media;

9  correct?

10 A.  I'm not -- I don't have that in front of me but I take your

11 word for it.

12 Q.  Well, Dr. Greenfield, is that true or not true?

13 A.  Yeah, that -- I think that the definition in -- they have

14 the most evidence on video game addiction so I think that's

15 probably accurate, yes.

16 Q.  That that is the position of the American Psychiatric

17 Association, right?

18 A.  That is the current position, yes.

19 Q.  And, by the way, part of your job is to stay current with

20 the standards of the American Psychiatric Association, right?

21 A.  Part of my job?  You mean am I supposed to stay up-to-date

22 with the literature?  Is that what you are saying?

23 Q.  Yes.

24 A.  Yes, in general I do.

25 Q.  You testified today that you have to stay current on the

1   research in your field to be valid and credible, right?

2   A.  That is correct.

3   Q.  So to be clear, Dr. Greenfield, like the World Health

4   Organization, the American Psychiatric Association does not

5   recognize Internet addiction as a disorder, right?

6   A.  That is correct.

7   Q.  And it specifies that the features of Internet gaming

8   disorder do not include general use of the Internet, correct?

9   A.  That's correct.

10  Q.  And you are aware then that today disagreements still exist

11  as to the etiology, epidemiology, diagnosis, and treatment of

12  your theories of Internet addiction and use problems, correct?

13  A.  I think there is some disagreement.  I think there is

14  general agreement that there is an issue.

15  Q.  Agreement that there is an "issue" is not something that

16  has been documented by the American Psychiatric Association in

17  the DSM-5 or the World Health Organization in the ICD-11; is

18  that right?

19  A.  That is correct.  It takes a long time for stuff to end up

20  in these nomenclatures.

21  Q.  Dr. Greenfield, you run a center focused on Internet

22  addiction, right?

23  A.  I do.

24  Q.  And you advertise yourself as providing treatment to people

25  with Internet addiction, right?

1    A.  I do.

2    Q.  And you sell books about Internet addiction, right?

3    A.  I wouldn't say I sell a lot of books, no.

4    Q.  Well, you have published books, right?

5    A.  I do publish books, correct.

6    Q.  And those are for sale?

7    A.  Yes.

8    Q.  And you make money off of the sale of those books, correct?

9    Do you earn any money off of the sale of books?

10   A.  I have earned a small amount of money, yes.

11   Q.  And you have earned money from your private practice?

12   A.  That, I do, yes.

13   Q.  And you also earn money from providing expert testimony on

14   Internet addiction like you are today, right?

15   A.  That is true, yes.  Accurate.

16   Q.  Now, Dr. Greenfield, you believe that some people use the

17   Internet compulsively, right?

18   A.  I do.

19   Q.  In fact, you testified today that most people overuse the

20   Internet, right?

21   A.  That is my belief.

22   Q.  And you have identified what you view as compulsive

23   Internet users, right?

24   A.  I'm not sure I understand your question.

25   Q.  You have identified people you view as compulsive Internet

M6M5mel3                          Greenfield - Cross

1    users, right?

2    A.   Are you asking me have I seen people in my practice that I

3    diagnose or define as compulsive Internet users?

4    Q.   Yes.

5    A.   Yes.

6    Q.   And you believe there is a concept of heavy Internet users,

7    right?

8    A.   Yes.

9    Q.   And Internet addicts, right?

10   A.   Yes.

11   Q.   But there is no way of knowing if a person is experiencing

12   symptoms related to Internet addiction without evaluating an

13   individual situation, right?

14   A.   Ultimately, yes, you have to evaluate the person directly

15   to make a definitive diagnosis, yes.

16   Q.   And so you agree that any attempts at medical or

17   psychiatric diagnoses, they must be performed in the context of

18   a professional evaluation or consultation by a psychologist,

19   psychiatrist, or other licensed mental health or addictions

20   professional, right?

21   A.   I would agree with that.

22   Q.   You can't just assume someone is addicted to the Internet,

23   right?

24   A.   You can't diagnose them with an Internet addiction without

25   evaluating them; that's correct.

1   Q.  And you can't assume someone is an Internet addict without

2   an evaluation being conducted, correct?

3   A.  I would not diagnose somebody as definitively as having an

4   Internet addiction unless I evaluated them and I do specify

5   that in the book, that ultimately no matter how much the

6   evidence appears that way, they still need a final evaluation

7   by a person.

8   Q.  And that's because you have to conduct tests to diagnose

9   them, right?

10  A.  Sometimes.  It is more that you have to eyeball them.  You

11  have to ask them a lot of questions to really evaluate them.

12  Q.  And part of what you do is you use tests that you have

13  created yourself, right?

14  A.  Yeah.  I don't use the tests a lot.  I rely more on my

15  clinical interviews at this point but the tests are there, yes.

16  They're in the book and I have used them.

17  Q.  So you publish tests about these diagnoses but you don't

18  use them in your clinical practice?

19  A.  I don't routinely use them because I ask the same questions

20  in the course of my clinical interviews anyway.  So I don't

21  hand them a piece of paper; they're in my office and I am doing

22  an initial workup which covers everything that is in those

23  tests.

24  Q.  But you don't apply the standards set forth in those tests

25  to your clinical practice?

M6M5mel3                       Greenfield - Cross

1   A.  That's not what I am saying.  I do apply those standards, I

2   just don't hand them a piece of paper and say fill this out.

3   Q.  And those questions include things like: *Do you find*

4   *yourself seeking more stimulating video games?*

5   A.  That's -- yeah, that's one of the questions.

6   Q.  And: *Do you find yourself repeatedly seeking more*

7   *stimulating content on the Internet?*

8   A.  Yup.

9   Q.  And one of those questions is whether someone has used

10  their smartphone to commit a crime; right?

11  A.  I don't recall that question but I am sure it is accurate

12  that it is in there.  I believe you.

13  Q.  But really, Dr. Greenfield, you agree that you need to

14  examine a person in a clinical setting in a professional way in

15  order to form an opinion about them, right?

16  A.  It would be unethical to diagnose a patient with anything

17  without evaluating them directly.  You can't do it by proxy or

18  even a paper and pencil test and I specify that in the book.

19  Q.  And it would be unethical, then, to also draw assumptions

20  about a person's conduct if they hadn't been evaluated, right?

21  A.  I don't -- well, you can have opinions about people's

22  behavior, you just can't definitively diagnose them.

23  Q.  Well, you haven't examined the defendant in this case Ethan

24  Phelan Melzer; right?

25  A.  I didn't hear what you said.

M6M5mel3                         Greenfield - Cross

1   Q.  You have not examined the defendant in this case, Ethan

2   Phelan Melzer?

3   A.  Correct, I have not evaluated him.

4   Q.  You never treated Ethan Melzer?

5   A.  No.

6   Q.  You don't know how much he uses the Internet, right?

7   A.  I think I assume that he used -- at least did -- use it

8   quite a bit.

9   Q.  So you have made assumptions about his Internet use?

10  A.  I did make that assumption.

11  Q.  You made that assumption without reviewing the evidence in

12  this case, correct?

13  A.  I -- I mean, I know something about the case so, I mean, I

14  do know that he did spend a lot of time on the Internet but I

15  did not do a formal evaluation of him.

16  Q.  Dr. Greenfield, have you reviewed Mr. Melzer's Telegram

17  chat messages in this case?

18  A.  I did review some of the messages in the case, yes.

19  Q.  You believe you reviewed some but not all of the electronic

20  messages sent in this case?

21  A.  I read a lot of -- I can't tell you whether I read

22  everything because I don't know that for a fact and I don't

23  want to misrepresent.

24  Q.  You don't know, sitting here today, how much Mr. Melzer

25  used the Internet in May of 2020 compared to the average user,

M6M5mel3                    Greenfield – Cross

1    correct?

2    A.  No, I can't make that comparison.

3    Q.  And you don't know if he has ever committed an act of

4    violence, do you?

5    A.  No, I do not know that.

6    Q.  Would that be a factor in drawing assumptions about the

7    defendant?

8            MS. WERNER:  Objection.

9            THE COURT:  You can answer the question.

10           THE WITNESS:  I'm sorry?

11           THE COURT:  You can answer the question.

12           THE WITNESS:  I'm not sure I understand the question.

13   BY MS. RAVENER:

14   Q.  Would it be a factor in your assumptions about the

15   defendant to know whether or not he had committed an act of

16   violence in the past?

17   A.  If I were evaluating a patient and they committed an act of

18   violence, if you are asking me would that go into the process

19   of my evaluating them and my coming up with a diagnosis, the

20   answer is yes.

21   Q.  Now, to be clear, because you didn't meet Mr. Melzer and

22   you have reviewed only selected portions of evidence in this

23   case, you can't diagnose Mr. Melzer as an Internet addict,

24   right?

25   A.  No, I cannot formally diagnose him.

M6M5mel3                        Greenfield - Cross

1  Q.  And you can't diagnose him as a compulsive Internet user,

2  right?

3  A.  Nope.

4  Q.  And you can't diagnose him as a heavy Internet user, right?

5  A.  Nope.

6  Q.  But you, nonetheless, told defense counsel, based on your

7  assumptions, that Mr. Melzer was a stupid kid who got in over

8  his head, correct?

9  A.  I do believe that.  That's my opinion.

10 Q.  So you formed an opinion about the evidence in this case

11 based on your own assumptions, correct?

12 A.  My own opinions.

13 Q.  Dr. Greenfield, you are aware that there is going to be a

14 trial in this case; right?

15 A.  I -- yes, I am aware of that.

16 Q.  And you understand evidence will be presented at that

17 trial, right?

18 A.  I assume so, yes.

19 Q.  You have not seen all of that evidence, correct?

20 A.  I don't think so.  I am assuming I haven't.

21 Q.  And so, even though you are assuming you have not reviewed

22 all of the relevant evidence, you have never examined

23 Mr. Melzer, you have drawn conclusions and formed opinions

24 about this case, correct?

25 A.  I have an opinion, yes.

M6M5mel3                    Greenfield - Cross

1   Q.  You formed that opinion as well without examining

2   Mr. Melzer's personal history, correct?

3   A.  I know some of his history.  I don't -- you are right, I do

4   not know everything.  That's true.

5   Q.  You know history about Mr. Melzer that was provided to you

6   by defense counsel; is that correct?

7   A.  That is correct.

8   Q.  And not from any information from Mr. Melzer himself,

9   correct?

10  A.  No, I talked to Mr. Melzer.

11  Q.  Oh, you did?

12  A.  Yeah.

13  Q.  How many times did you talk to Mr. Melzer?

14  A.  It was one time but it was about an hour and a half, I

15  believe.

16  Q.  I'm sorry, Dr. Greenfield, I thought your testimony earlier

17  was that you had not evaluated the defendant.

18  A.  I didn't evaluate him.  I talked to him.

19  Q.  And the purpose of talking to the defendant was not to

20  evaluate him?

21  A.  No, I was not doing an evaluation.

22  Q.  So your opinion is also based on Mr. Melzer's own

23  representations to you about his conduct; is that right?

24  A.  He made representations as to his Internet use patterns and

25  behavior, yes, and I suppose that would include his conduct;

1    yeah.

2    Q.  I see.  So that has been one of the factors that you

3    considered in forming your opinions, is the defendant's own

4    statements that were only disclosed to you and his lawyers; is

5    that right?

6    A.  That's part of what informed my opinion in addition to what

7    I read.

8    Q.  Dr. Greenfield, you often review case files and documents

9    and offer your expert opinion related to Internet and

10   technology use to assist in constructing a legal defense,

11   correct?

12   A.  No.  That's not correct.

13   Q.  OK.

14   A.  I don't -- I don't believe I said that I do that often and

15   I do it occasionally.  I mean, I do not testify very often and

16   I have probably done 10 cases in my career, maybe 12 total.  I

17   didn't know if that qualifies as often.

18   Q.  One moment?

19        Dr. Greenfield, if I could ask you to look at

20   Government Exhibit 3 in your binder?  And we will try to pull

21   that up on the screen for everyone for efficiency.

22   A.  OK.  Are you talking about the page from my website?

23   Q.  So first of all, Government Exhibit 3, you recognize this

24   as a series of excerpts from your website?

25   A.  Yes.

M6M5mel3                      Greenfield - Cross

1  Q.  Let's turn to page 2 of the exhibit and I will direct you

2  to paragraph 3 on that page --

3  A.  OK.

4  Q.  -- where you represent to the public that you -- quote --

5  often review case files and documents and offer your expert

6  opinion relating to Internet or technology use to assist in

7  constructing a legal defense.

8          Do you see that?

9  A.  I do see that.

10  Q.  Is it your testimony here today that your statements and

11  representations on your website are incorrect?

12  A.  I don't know how I would use the word "often."  I mean, I

13  have done it so -- I mean, I feel like you are splitting hairs

14  so I don't really know how to answer you.

15  Q.  Well, Dr. Greenfield, I'm asking about your own statement

16  and whether it's truthful.

17  A.  Yes.  This website was constructed 12 years ago and,

18  frankly, I have not read it probably since it was put up.  So

19  do I often do it?  I don't know.  I mean, I have done it enough

20  to say that I have done it many times.  Would I declare that a

21  statement that would be equivalent to often?  I don't know.

22  Probably not but -- so maybe that's a misword in that

23  particular case.  I don't know.  I really can't answer that.

24  Q.  Would you say that 12 years ago you had less experience

25  than you do now?

M6M5mel3                          Greenfield - Cross

A.   Possibly.

Q.   And you advertise that you help in achieving a reduction or elimination of sentences for criminal defendants; is that right?

A.   Yeah.  I have not done it -- I have done -- a lot of the work that I do legally or have done has been with people who have gotten in trouble with looking at child porn online so I often consult with the attorneys and the patients to help in those cases, so that's probably what I am referring to in that case.

Q.   And so you help reduce and eliminate sentences for criminal defendants accused of participating in child pornography offenses?

A.   I typically am hired or have been hired by the defense to write a report that they will use to help in either the plea component or the sentencing.

Q.   And you describe yourself as a defense witness to legal counsel, correct?

A.   In general I work more for the defense.

Q.   And as we just discussed, the majority of those cases, in your experience, relates to child pornography and sexual behavior, correct?

A.   I would say I have done more child porn cases than any one category.  The next category has been cases, like, these chat cases.  That's probably the second largest.

M6M5mel3                        Greenfield - Cross

1   Q.  We will talk about what you mean by these chat cases.

2   A.  OK.

3   Q.  Let's put that to the side.

4   A.  OK.

5   Q.  You conducted a survey in 1999, right?

6   A.  I did.

7   Q.  That was before the creation of Facebook, correct?

8   A.  Yeah.  I actually don't recall when Facebook was created

9   but that may be true.

10  Q.  That was before the creation of Instagram, right?

11  A.  That I know, yes.

12  Q.  Before the creation of Discord, right?

13  A.  I believe so.

14  Q.  That was before the creation of Gab, right?

15  A.  I believe so.

16  Q.  That was before the creation of Telegram, right?

17  A.  I'm fairly sure of that.

18  Q.  And, today, billions of people around the world use the

19  Internet all the time, right?

20  A.  All the time.

21  Q.  You conducted this study more than 20 years ago, right?

22  A.  Correct.

23  Q.  And I believe you previously testified here today that you

24  viewed approximately nine to 15 years as extremely dated

25  information, correct?

M6M5mel3                    Greenfield – Cross

1   A.  I think that the -- I was referring to the DSM, yes, I do

2   think the DSM is outdated.

3   Q.  And your study that you have been relying on here today, in

4   substantial part, is even older; right?

5   A.  It is older.

6   Q.  The study was conducted on ABCnews.com, right?

7   A.  It was.

8   Q.  It was added to the ABC news website alongside their cover

9   story on Internet use and addiction, right?

10  A.  Well, that I actually don't recall that but that's very

11  possible.

12  Q.  Well, we want to get it right, Dr. Greenfield.  Is that

13  correct or not?

14  A.  I can't answer that question.

15          MS. WERNER:  Objection.

16          THE COURT:  Thank you.  I overrule the objection.  I

17  accept the answer.

18          You can proceed, counsel.

19  BY MS. RAVENER:

20  Q.  Well, we can take a look at what's been marked --

21  A.  No, I believe you.  I am just telling you I don't remember

22  that so I don't want to misrepresent what I remember.

23  Q.  Dr. Greenfield, people chose to respond to the survey,

24  right?

25  A.  They did.

M6M5mel3                       Greenfield - Cross

1    Q.  Right?

2    A.  Yes.

3    Q.  And people self-selected to answer your survey, right?

4    A.  That is correct.

5    Q.  And so you know that the fact that the survey was posted

6    along with an article on Internet addiction may have yielded

7    some bias in the responses, right?

8    A.  Yes, but we did factor that into the statistical analysis.

9    Q.  Well, that's because anyone who may be having difficulty

10   with their online use is likely to read a story about Internet

11   addiction, correct?

12   A.  More likely, yes.  But I don't think that that's entirely

13   accurate because we only got a 6 percent number who met the

14   criteria for addiction.

15   Q.  Dr. Greenfield, the description that I just gave you about

16   the potential bias in your study, do you recall that that

17   description is the description you published in your article

18   about the study?

19   A.  I don't know what you are saying right now so could you

20   clarify that, please?

21   Q.  So Dr. Greenfield, let's take a look at what's been marked

22   as DG 4 at page 404.  You testified earlier today that this was

23   the publication of your study; is that correct?

24   A.  You mean the article that appeared in 1999?

25   Q.  Take a look at DG 4 and tell us if you recognize that.

1   A.  DG 4.

2   Q.  In your binder it will be labeled D4, I will ask you to

3   turn to page 404, which is page 2 of the document.

4   A.  Yes, I have it.

5   Q.  OK.  And I would like to turn you to the right-hand side of

6   the page.  Do you see that this is where you wrote -- and I

7   quote -- the fact that the story was about Internet addiction

8   may have yielded some bias in the responses --

9   A.  Yes.

10  Q.  -- as we assumed that anyone who may be having difficulty

11  with their online use is likely to read a story about Internet

12  addiction.

13  A.  Uh-huh.  Yes.  I agree.

14  Q.  Well, you agree that that's true; correct?

15  A.  Yes, of course there may be bias, but self-selection

16  appears in all behavior science research.

17  Q.  Dr. Greenfield, I'm asking you is that what you published

18  in your study.

19  A.  Yes.  Obviously.  Because I'm reading it.

20  Q.  And is it accurate?

21  A.  Well, if it is written it is.

22  Q.  It was written by you, right?

23  A.  It is.  It was written by me.

24  Q.  Dr. Greenfield, the study examined, in part, unique factors

25  involved with sexuality on the Internet; right?

1   A.  Could you repeat that, please?

2   Q.  The survey –– the 1999 survey ––

3   A.  Yes.

4   Q.   –– examined, in part, unique factors involved with

5   sexuality on the Internet; right?

6   A.  Yes.  That was some of the questions.

7   Q.  And it took only about 10 to 15 minutes to complete, right?

8   A.  Yeah.  In general, I think 15.

9   Q.  And the survey asked, in essence, if people had ever lied

10  on the Internet, right?

11  A.  Among other things, yes.

12  Q.  And even one lie counted, right?

13  A.  Yes.

14  Q.  And any kind of lie counted, right?

15  A.  Yeah.  We didn't specify what the lie was; that's correct.

16  Q.  And so, if you lied once about anything and you admitted it

17  on the survey then you count it as an Internet lie or for the

18  purposes of the study, right?

19  A.  Yes.

20  Q.  And you did not differentiate between people who lied once

21  and people who had lied frequently, right?

22  A.  Actually, I don't know the answer to that so I don't want

23  to misrepresent.  I would have to look at the data to really

24  answer that question.

25  Q.  OK.  Well, let's take a look at Government Exhibit 6 in

1    your binder and see if we can pull it up on the screen.  I will

2    ask you to look at page 176, lines 10 through 15.  Do you

3    recognize this as a transcript of your testimony under oath in

4    *United States v. D'Amelio* in this court house?

5    A.  Could you tell me the page again, please?

6    Q.  176.

7    A.  OK.  Got it.

8    Q.  I ask you to look at lines 10 through 15 on that page.

9    A.  Yes.  That's pretty much what we just said.

10   Q.  Well, Dr. Greenfield, I believe you didn't answer the

11   question so let me ask it again.

12   A.  OK.

13   Q.  You did not ask questions that would differentiate between

14   people that lie sometimes and always, right?

15   A.  That is correct.

16   Q.  And in your survey, if somebody lied once or lied a lot

17   there was no way of differentiating that in your survey, right?

18   A.  Well, can I just, before I answer that, I know that's what

19   it says here.

20   Q.  Well, hold on a second, Dr. Greenfield.

21        Was it your testimony in *United States v. D'Amelio* --

22   A.  Yes.  That's what it says.

23   Q.  -- that you did not differentiate?

24   A.  That's what it says, correct.

25   Q.  OK.  And in that trial you were under oath the same exact

M6M5mel3                        Greenfield - Cross

1   way that you are under oath here today?

2   A.  Absolutely.

3   Q.  As part of your survey and analysis you tried to tell what

4   people lied about most often, right?

5   A.  Yes.

6   Q.  And you found that people lied about their age?

7   A.  They do, yes.

8   Q.  They lied about their weight?

9   A.  They do.

10  Q.  They lied about their height.

11  A.  They do.

12  Q.  They told a lot of lies about physical appearance, right?

13  A.  Yeah, their life circumstance; job.  That sort of thing.

14  Q.  They lied about how much money they earned, for example?

15  A.  Education they lie about.

16  Q.  And no matter what they lied about, a white lie or a

17  dangerous lie, you counted it the same way, right?

18  A.  That is correct.

19  Q.  And you published the results of that survey, right?

20  A.  Yes.  Uh-huh.

21          THE COURT:  Sorry.  Is that a yes?

22  A.  Yes.  Sorry.

23  Q.  And you tried to include all the findings of that survey in

24  your publications, right?

25  A.  Yes, I attempted to.  You can't put everything in because

1   we had tens of thousands of data points so you put in the

2   pertinent points.

3   Q.  Well, Dr. Greenfield, you have been testifying and talking

4   publicly about the survey results for 25 years, right?

5   A.  Yes.

6   Q.  And you published the article that we just looked at,

7   right?

8   A.  Yes.

9   Q.  You also published a book called "Virtual Addiction" and

10  another book called "Overcoming Internet Addiction for

11  Dummies," right?

12  A.  That's correct.

13  Q.  And your books also discuss the survey, right?

14  A.  Yeah, they do, although my latest book doesn't really talk

15  about the survey a whole lot.

16  Q.  It draws on the survey, correct?

17  A.  Not in my opinion.  It draws mostly on my clinical work

18  over the last 20 years.  That was my attempt to do that.

19  Q.  You have tried to include the salient interesting points

20  from the survey in your publications and explanations of the

21  survey, right?

22  A.  Certainly in some of my articles, yes.

23  Q.  And nowhere did you find that people lied about being a

24  criminal when they were really innocent, right?

25  A.  OK.  That, I lost you.  So you are saying people --

M6M5mel3                        Greenfield - Cross

1    Q.  Your survey did not reveal when people lied and said they

2    were a criminal when, in fact, they were innocent; right?

3    A.  I don't know that we asked that, so no.  I would have no

4    way of knowing that.

5    Q.  And your survey didn't find that people lied about being a

6    white supremacist when they really weren't, right?

7              MS. WERNER:  Objection.

8    A.  No.

9              THE COURT:  Sorry.  You can answer the question.  I

10   accept the answer.

11             You can proceed.

12   A.  We did not ask anything about white supremacy.

13   Q.  And your survey didn't expose that, right?

14   A.  No.

15   Q.  And nowhere did you find that people lied about being a

16   terrorist when they really weren't, right?

17   A.  We did not ask that question.

18   Q.  You didn't make that finding, right?

19   A.  We did not.

20   Q.  But you found that about 50 percent of people admitted to

21   you that they had told a lie on the Internet at some point in

22   time, right?

23   A.  That's correct.

24   Q.  And that's because telling some kind of a lie on the

25   Internet is a very common experience, right?

1   A.  I believe it is, yes.

2   Q.  And common lies continue to be about someone's physical

3   appearance, right?

4   A.  I say that that's among the more common lies, yes.

5   Q.  By the way, Dr. Greenfield, those people who said they were

6   liars, admitted they were liars in your survey; for your

7   purposes you credited them as telling you the truth, right?

8   A.  Yes.

9   Q.  And you assumed that although they all lied online they

10  were all telling you the truth when you gave them an online

11  survey?

12  A.  Yes, I did assume that.

13  Q.  And it's been your testimony here today that you assume

14  everyone who goes online lies but you did not apply that

15  assumption in evaluating the data in your 1999 survey, did you?

16  A.  Well, that's not entirely true.  We did put things in the

17  survey that would attempt to minimize lying.  We can't

18  eliminate it but we did try because we were aware, of course,

19  of what you are talking about that people lie a lot online so

20  maybe they would lie on the survey too.  We just didn't think

21  that there would be any payoff in them lying on the survey as

22  opposed to when they're trying to garner a favorable impression

23  since we had no direct contact with the individuals, so our

24  assumption was there would be less motivation to lie.

25  Q.  And that's because you assume that people tend to lie when

M6M5mel3                              Greenfield - Cross

1    they think they could gain something positive from it, right?

2    A.  I think it is more likely that if they feel like it will

3    put them in better stead to who they're lying to that it is

4    more likely they'll lie.

5    Q.  Because they want to be casting themselves in a better

6    light, right?

7    A.  I would agree with that.

8    Q.  Based on this survey of yours you decided that people lie

9    online more often than in real life, correct?

10   A.  That's my belief, yes.

11   Q.  You decided that approximately 50 percent of users on the

12   Internet admit to lying or misrepresenting facts online with

13   regularity, correct?

14   A.  Yes.

15   Q.  And you decided that it is often difficult to separate

16   reality from fantasy on the Internet, right?

17   A.  That is correct.

18   Q.  You decided that the Internet is a forum where it can be

19   difficult or impossible to discern what is true or real from

20   what is false, fictitious or fanciful, right?

21   A.  I believe that to be true.

22   Q.  You decided that Internet users often assume their online

23   speech has no real world consequences, right?

24   A.  Well, I don't know that I would go that far but I think

25   that that's -- I think people act as if there is no real world

1   consequences at times online, yes.

2   Q.  Well, Dr. Greenfield, let's be specific about that.

3   A.  OK.

4   Q.  Are you familiar with the defense's notice of you in this

5   case?

6   A.  The defense's notice of me?

7   Q.  Are you aware that the defense has represented to the Court

8   that your testimony will include that Internet users often

9   assume that their online speech has no real world consequences?

10  A.  Yes, I did see that.

11  Q.  And that is not accurate; is that what you are saying?

12  A.  No, I'm not saying it is not accurate.  I think that there

13  is an assumption that there is less likelihood that it will

14  have real world consequences.  I can't say that it is none but

15  I would say it's much less.

16  Q.  And that's based on your opinion, right?

17  A.  Absolutely.

18  Q.  You have decided that people using the Internet must be

19  even more likely to engage in fantastical or role playing

20  behaviors and discussions, right?

21  A.  That is true.  It is a modality that really lends itself to

22  that.

23  Q.  Well, that's your opinion; correct?

24  A.  Well, I don't think it is just my opinion but that is my

25  opinion.

1   Q.  You draw those conclusions based on your 1999 study,

2   correct?

3   A.  Among other things, yes.

4   Q.  As well as your clinical practice, right?

5   A.  Yes.

6   Q.  Where you hold yourself out as an expert in Internet

7   addiction, correct?

8   A.  Yes.  It's also in addition to my review of the literature

9   and my interaction at conferences with some of the preeminent

10  experts -- actually many of the preeminent experts in the world

11  on this subject.  So we do share data and information.

12  Q.  So let's talk about the literature.  Right around the same

13  time as your studies, other studies concluded that people lie

14  just as frequently in person as you found they did online,

15  right?

16  A.  I'm not familiar with that study but I believe you found

17  something that says that.

18  Q.  Well, Dr. Greenfield, you were just telling us that your

19  opinion is informed, in part, by your review of the relevant

20  literature; right?

21  A.  I did not read that particular study.

22  Q.  Well, in order to assess whether people lie more online

23  than in real life you also need to know how often people lie in

24  real life; right?

25  A.  Well, yeah.  I think I know what you are saying but that

M6M5mel3                          Greenfield - Cross

1   doesn't mean that one study that says that people lie -- I

2   don't agree with that finding but I did not read that

3   particular study so I can't tell you.

4   Q.  So let's be clear, Dr. Greenfield.  You have not conducted

5   your own study on how often people lie in face-to-face

6   interactions, correct?

7   A.  That is correct.

8   Q.  And you have told us that you need to review the literature

9   in order to make sure what you say is valid and credible,

10  right?

11  A.  Yes, I do review the literature, yes.

12  Q.  But you don't review all the literature that disagrees with

13  you, right?

14  A.  You cannot possibly read everything that's ever been

15  written on a subject.  It is not -- not only is it not

16  practical, it is not possible.

17  Q.  Dr. Greenfield, you drew, you made a decision, you formed

18  an opinion that people lie more often online than in real life

19  without having data about how often people lie in real life in

20  face-to-face interactions, correct?

21  A.  That is true.

22               (Continued on next page)

23

24

25

M6mWmel4                    Greenfield - Cross

1    BY MS. RAVENER:

2    Q.  And in fact, studies show that right around the same time

3    that you conducted your study, people lied just as frequently

4    in person as you found they did online, right?

5    A.  Well, that's what you're telling me.

6    Q.  Well --

7    A.  I haven't read that study, so -- but I believe you.

8    Q.  OK.  Have you been informed about a united -- sorry, a

9    University of Massachusetts psychologist who conducted an

10   experiment in 2002, approximately, and found that 60 percent of

11   people lie at least once during a ten-minute face-to-face

12   interaction?

13   A.  Oh, I agree with you.  People lie all the time.  I just

14   think they lie more online.

15          MS. RAVENER:  Your Honor, we would mark Government

16   Exhibit 23, and we would ask that the Court take judicial

17   notice of that survey, that description of that study.

18          THE COURT:  Thank you.

19          Counsel for defendant.

20          MS. WERNER:  I object.  I haven't seen the study

21   they're talking about.

22          MS. RAVENER:  This is a study that was provided

23   previously to defense counsel in our submissions.

24          THE COURT:  Thank you.

25          Counsel for defendant, it's also, I understand, tab 23

M6mWme14                    Greenfield - Cross

1    in the government's binder.

2                MS. RAVENER:  That's correct, Judge.

3                MS. WERNER:  I would object to that being admitted,

4    your Honor.  Dr. Greenfield's testified --

5                I apologize.  May I remove my mask, your Honor?

6                THE COURT:  Thank you.

7                Just a few brief responses.

8                First, please do use the microphone.

9                Unfortunately, I can't allow you to take off your mask

10   there.  The rules allow me to do it so long as there's no

11   witness in the box.  And the witness and the questioner can do

12   so.  But unfortunately, I can't allow you to do that consistent

13   with our rules.

14               MS. WERNER:  Understood, your Honor.

15               THE COURT:  The request is that I take judicial notice

16   of it.  Counsel for the United States is not taking the

17   position that this witness is in a position to authenticate it.

18               MS. WERNER:  Understood, your Honor.

19               THE COURT:  Thank you.

20               So what's your response?

21               MS. WERNER:  Your Honor, I still object to it coming

22   in as to relevance.

23               THE COURT:  Thank you.

24               Is the basis for the objection relevance?

25               MS. WERNER:  Yes, your Honor.

1          THE COURT:  Thank you.

2          I accept it.  You can proceed.

3          MS. RAVENER:  Thank you, your Honor.

4   Q.  And Dr. Greenfield, are you familiar with the Journal of

5   Basic and Applied Social Psychology?

6   A.  I'm familiar with the name.  I don't subscribe to that

7   particular journal.

8   Q.  It's a peer-reviewed journal, correct?

9   A.  Yeah.  I'm assuming it is, yes.

10  Q.  Dr. Greenfield --

11  A.  It's not a main -- it's not one of the main journals, but

12  I'm -- I've heard its name.

13  Q.  Dr. Greenfield, Human Communication and Research, that's

14  also a peer-reviewed journal in your field, right?

15  A.  Yup, I've heard of that too.

16  Q.  And so you're aware that there's also been studies that

17  show that on average Americans tell one to two lies per day

18  regardless of whether they're on the internet or in person?

19  A.  I haven't read that study, but that does not surprise me at

20  all.

21  Q.  And in fact, the same study showed that approximately 40

22  percent of people self-reported telling a lie in just a 24-hour

23  period, including in person and over the internet, right?

24  A.  That does not surprise me.

25          MS. RAVENER:  Your Honor, on the same basis, we ask

M6mWmel4                      Greenfield - Cross

1     that the Court take judicial notice of Government Exhibit 24.

2                 THE COURT:  Thank you.

3                 Counsel for defendant.

4                 MS. WERNER:  Your Honor, I object.  I don't believe

5     the government has established the reliability of this journal

6     article.  They simply asked about it and ask the Court to take

7     judicial notice.

8                 THE COURT:  Thank you.

9                 Counsel for the United States.

10                 MS. RAVENER:  Your Honor, Dr. Greenfield's confirmed

11     that this is a document from a peer-reviewed journal.  We

12     provided it to defense counsel as well as included it in our

13     briefing, and Dr. Greenfield's testimony is that it is

14     necessary to review the available literature in order to

15     validate his conclusions.  We believe it's relevant for those

16     purposes.

17                 THE COURT:  Thank you.  Understood.

18                 Counsel for defendant, any further argument?

19                 MS. WERNER:  Briefly, your Honor.

20                 I don't take Dr. Greenfield to be saying that he is

21     familiar with these specific articles; simply that he's heard

22     the names of these journals.  I don't think he is establishing

23     the reliability of these particular articles by any means.

24                 THE COURT:  Good.  Thank you.

25                 On the basis of that argument, I'm going to sustain

1    the objection both as to this and as to the prior exhibit,

2    which I previously said I accept.  But the defense has raised

3    an objection beyond relevance.

4              Counsel, you can move on.  I understand the point.

5              MS. RAVENER:  Thank you, your Honor.

6    Q.  Dr. Greenfield, you're aware that studies show that most

7    people think deception is prevalent on the internet, correct?

8    A.  I'm not familiar with a particular study, but I think -- in

9    general, I would say you're correct that people assume that

10   there is a fair amount of deception online.

11   Q.  Well, Dr. Greenfield, let's be specific.  In connection

12   with your preparation for this case, you provided defense

13   counsel with a study that showed that people indeed held

14   opinions that deception was prevalent on the internet and that

15   it is easy to lie without being caught, correct?

16   A.  Yeah, that's accurate.

17   Q.  But studies show that there is actually a relatively low

18   level of reported personal experience with online deception,

19   correct?

20   A.  I'm -- which study are you referring to?  The --

21   Q.  Dr. Greenfield, you provided defense counsel --

22   A.  No, no.

23   Q.  -- article?

24             THE COURT:  I'm sorry.  I'm sorry.  Let counsel for

25   the United States finish their question.

M6mWmel4                     Greenfield - Cross

1              Please go on.

2    BY MS. RAVENER:

3    Q.  Dr. Greenfield, you provided defense counsel with an

4    article in connection with your preparation for testimony in

5    this case?

6    A.  Yes.

7    Q.  That stated that there is actually a relatively low level

8    of reported personal experience of online deception, correct?

9    A.  I mean that's correct, but that doesn't surprise me.

10   Q.  So the misconception that people hold is actually that

11   lying is prevalent on the internet when, in fact, it is less

12   common than people think it is, right?

13   A.  No, that's not what that's saying.  I think that there may

14   be plenty of lying but that people may not believe that people

15   are lying.  I believe there's tons of lying that go on online,

16   that goes on online.

17   Q.  Dr. Greenfield, you provided defense counsel with a link to

18   an article published in a peer-reviewed journal called Cyber

19   Psychology and Behavior, correct?

20   A.  Yeah, that's one of the journals that I published in as

21   well.

22   Q.  And --

23   A.  I don't know which article you're referring to, though.

24   Q.  You provided defense counsel with an article entitled

25   "Online Deception:  Prevalence, Motivation, and Emotion,"

1    correct?

2    A.  OK.  Yes.

3    Q.  And if I can ask you to turn to page -- I'm sorry.

4         Turn to Government Exhibit 21, and look at page 58 of that

5    document.  First of all, do you recognize this as the

6    article --

7    A.  Yes.

8    Q.  -- that you supplied to defense counsel?

9    A.  Yes.

10   Q.  OK.  If I can ask you to turn to the first full sentence of

11   page 58, that article stated that:  "People indeed held the

12   opinion that deception was prevalent on the internet and that

13   it is easy to lie without being caught.  Most, however,

14   reported that they themselves did not deceive and that few, if

15   any, attempts were made by others to deceive them.

16   Interestingly, despite the relatively low level of reported

17   personal experience of online deception, people still hold the

18   notion that online deception is widespread."

19        Do you see that?

20   A.  I do.

21        MS. RAVENER:  Your Honor, we would offer Government

22   Exhibit 21, which was supplied by Dr. Greenfield in this case

23   to the defense.

24        THE COURT:  Thank you.

25        Counsel.

1           MS. WERNER:  No objection.

2           THE COURT:  Thank you.

3           I'm accepting it.

4           Please proceed.

5    BY MS. RAVENER:

6    Q.  And so, in reality, Dr. Greenfield, studies show that

7    people lie online approximately as often as they do in person,

8    correct?

9    A.  Well, this study certainly says that.

10   Q.  Dr. Greenfield, it's been your testimony that you also draw

11   on your clinical practice in forming your opinions, right?

12   A.  Yes.

13   Q.  And again, you hold yourself out as a specialist in

14   internet addiction, right?

15   A.  I do.

16   Q.  And you ask your patients, almost all of them, I believe

17   you said, about their internet use?

18   A.  As part of a routine workup when I have a new patient, I

19   ask about everything in their life, including their internet

20   use.

21   Q.  And so when you review your files, you're looking primarily

22   at people who have sought your help because they use the

23   internet too much, right?

24   A.  No, that's not correct, because about 30 to 35 percent of

25   the patients I see don't have an issue with the internet, so

M6mWmel4                          Greenfield - Cross

1    they're seeking treatment for other psychiatric reasons.

2    Q.  But you still question them about their internet use?

3    A.  I do, along with gambling, alcohol, drugs.  Everything.

4    Q.  And that would still leave about 60 to 70 of your patients

5    who do come to you because they're seeking treatment for

6    internet addiction or related --

7    A.  That is correct.

8    Q.  So that would be the majority, right?

9    A.  Definitely the majority.

10   Q.  To be clear, Ethan Melzer was not one of those people,

11   right?

12   A.  No, he was not a patient.

13   Q.  You met with him, right?

14   A.  Yes.

15   Q.  You questioned him about the case, right?

16   A.  Yes.

17   Q.  You questioned him about his internet use, right?

18   A.  Correct.

19   Q.  But it's your testimony that you never evaluated him?

20   A.  I did not.

21   Q.  You also use your own personal experience with the internet

22   as a factor in forming your opinions, correct?

23   A.  In part, yes.  It's not what I base my theories on, but

24   every person that publishes and every scientist that does

25   research is always looking at their own behavior in addition to

M6mWmel4                          Greenfield – Cross

1    the people that they study.

2    Q.  Well, that's your opinion, right, Dr. Greenfield?

3    A.  It is.

4    Q.  There are some people who study individuals or behavior

5    that they don't engage in themselves, right?

6    A.  Oh, yes, of course.

7    Q.  Whereas the behavior of internet use is something that's

8    common to everyone in this courtroom?

9    A.  Absolutely.

10   Q.  Right?

11   A.  Very much so.

12   Q.  And so you also apply your personal experience and opinions

13   to your analysis, right?

14   A.  Yes.  But I would not say that that's what I base all of my

15   conclusions on.

16   Q.  Dr. Greenfield, you have not specifically conducted any

17   studies on the use of Telegram, correct?

18   A.  No, I have not.

19   Q.  You have not specifically conducted any studies on the use

20   of what's called encrypted applications, right?

21   A.  No, I have not.

22   Q.  You understand that those are platforms where users can

23   communicate with additional privacy, right?

24   A.  Yes, but ultimately trackable and traceable.

25   Q.  Well, Dr. Greenfield, you understand that not even the

1    hosting company can see the messages that they exchange, right?

2    A.  That's correct.  But they'll --

3    Q.  End-to-end encryption, correct?

4    A.  Yeah, I'm aware of it, and I've also seen ways that people

5    crack through it.  So yes, but you're correct.

6    Q.  You have not studied those people's behavior as applied to

7    those particular encrypted platforms, right?

8    A.  No.

9    Q.  And you have not studied how such behavior might compare,

10    if at all, to other online behavior, right?

11    A.  No, I have not.

12    Q.  And you haven't studied how that behavior might compare to

13    off-line or in-person behavior, right?

14    A.  That is correct.

15    Q.  And by the way, Dr. Greenfield, today people use the

16    internet for work, right?

17    A.  Yes.

18    Q.  Some people use it for remote work, right?

19    A.  Yes.

20    Q.  And so there are people who have jobs where the work they

21    do is solely with people they've met online, right?

22    A.  Yes.

23    Q.  And people use the internet for dating, right?

24    A.  Yes.

25    Q.  Making friends, right?

M6mWmel4                    Greenfield - Cross

1   A.  Yes.

2   Q.  Keeping in touch and making plans with people they know,

3   right?

4   A.  All true.

5   Q.  And virtually everyone has a cell phone, right?

6   A.  Yes.

7   Q.  And I believe that was your testimony earlier, that

8   virtually everyone misses it when it's gone?

9   A.  Yes.

10  Q.  And that doesn't mean that we all aren't responsible for

11  our behavior when using the internet, correct?

12  A.  I think we're always responsible for our behavior.

13  Q.  Dr. Greenfield, you testified earlier today that you,

14  quote, can't know whether someone is lying on the internet

15  because there is no way to validate it, right?

16  A.  Ultimately, you can never really prove a lie unless you

17  have other sources of data to confirm it.

18  Q.  Well, Dr. Greenfield, you're aware that this is a criminal

19  case, right?

20  A.  Oh, yes.

21  Q.  And you're aware that there is going to be a criminal

22  trial, right?

23  A.  I am.

24  Q.  And you expect that evidence will be introduced at that

25  trial, right?

M6mWmel4                    Greenfield - Cross

1    A.  Yes, I do assume that.

2    Q.  And you would expect that that evidence would address what

3    happened in this case, right?

4    A.  Yes.

5    Q.  And you would expect that that evidence would address

6    whether information is a truth or a lie, correct?

7    A.  I would assume so, yes.

8    Q.  So you are not in a position to say whether or not the

9    jury, for example, can't know whether someone is lying because

10   there's no way to validate it, right?

11   A.  You ultimately cannot know whether somebody is lying or not

12   unless you have other sources of data to support that.

13   Q.  And a criminal trial is designed to provide those other

14   sources of data, isn't it?

15           MS. WERNER:  Objection.

16           THE COURT:  You can answer the question.

17   A.  I -- I -- I mean I'm not an attorney, but I assume a

18   criminal trial is to present all the facts such that the jury

19   can draw their own conclusion.

20   Q.  And Dr. Greenfield, you examined, you said, some of the

21   chats in this case, right?

22   A.  Yes.

23   Q.  But you didn't examine all of the --

24   A.  I mean I can't tell you whether I examined all of them.  I

25   did read through probably four or five hours' worth.

M6mWmel4                          Greenfield - Cross

1  Q.  And you have not examined all the evidence in this case,

2  right?

3  A.  No.  I'm assuming that there's stacks of evidence that I

4  haven't seen.

5  Q.  You haven't examined evidence supplied by the United States

6  military, have you?

7  A.  No, I have not.  Well, I mean I don't -- I actually don't

8  remember.  I can't answer that question.

9  Q.  You don't know what evidence you looked at and what you

10  didn't?

11  A.  I don't -- I mean it's been a while since I looked at it,

12  so I don't remember everything I've read.

13  Q.  But you expect that you weren't provided with all of the

14  evidence, right?

15  A.  I would assume that.

16  Q.  And yet, again, you felt comfortable forming an opinion,

17  right?

18  A.  I'm not forming an opinion as to the defendant's guilt or

19  innocence.  I'm forming an opinion based on what I think is

20  going on with his internet use.  I'm not saying --

21  Q.  Dr. Greenfield, let's pause there.  You are forming an

22  opinion based on this defendant's internet use.  Is that your

23  testimony today?

24  A.  I'm talking about internet use in general.  And then I have

25  an opinion about -- yeah, I have an opinion about some of his

M6mWmel4                          Greenfield - Cross

1   internet use.  I can't tell you whether he's innocent or

2   guilty, though.

3   Q.  But your testimony is not that he's an internet addict,

4   right?

5   A.  I can't define that because I didn't evaluate him.

6   Q.  And your testimony is that he does not display any other

7   cognizable, recognized medical diagnosis related to the use of

8   the internet, correct?

9   A.  I have a hunch that he was a pretty good internet -- heavy

10  internet user, but I can't define that definitively.  I can't

11  say that definitively because I did not do a formal evaluation.

12  Q.  And so, Dr. Greenfield, you're testifying in court here

13  today based on your hunch, is that right?

14          MS. WERNER:  Objection.

15          THE COURT:  You can answer the question.

16  A.  No, I'm not -- I said that about a specific question you

17  said.  I'm certainly not here just talking about hunches.  I

18  think what I'm talking about is based on a lot of experience

19  and a lot of science.  I'm talking about the specific issue

20  with regard to the defendant that you asked me about.

21  Q.  The defendant you didn't evaluate?

22  A.  I did not evaluate him for what -- I did not diagnose him

23  and do a full evaluation, that's correct.

24  Q.  You testified about the idea of disinhibition, right?

25  A.  Yes.

1    Q.  You think disinhibition applies to everyone using the

2    internet, right?

3    A.  I think that it's a pretty universal construct, but not

4    everybody.  Not -- I would -- you know, based on my original

5    research, a percentage of people experience it, but not

6    everybody.

7    Q.  Disinhibition is the ability to express yourself in ways

8    that you are not normally able to do, right?

9    A.  Yeah, roughly.

10   Q.  And it can be an exciting freedom to express yourself,

11   right?

12   A.  Yes.

13   Q.  And in part, because of disinhibition, people express their

14   innermost thoughts and feelings, right?

15   A.  I don't know that for a fact, but I think that that's a

16   reasonable statement.

17   Q.  Well, Dr. Greenfield, in your book, you published that

18   statement -- that people express their innermost thoughts and

19   feelings on the internet because of disinhibition?

20   A.  Yeah.

21   Q.  Is that right?

22   A.  I think that that's a reasonable thing to say, yes, but I

23   can't tell you that that's -- I can't tell you definitively

24   that everything that people talk about on the internet

25   represents their innermost thoughts and feelings.  But it is a

M6mWmel4                    Greenfield – Cross

1  lot easier to express your innermost thoughts and feelings on
2  the internet.
3  Q.  Dr. Greenfield, everyone reveals things about themselves or
4  feeling judged or accountable on the internet, right?
5  A.  I'm not sure what you're asking.
6  Q.  Well, Dr. Greenfield, you've written that -- in a published
7  book, that everyone reveals things about themselves without
8  feeling judged or accountable on the internet, right?
9  A.  I think that that's a common experience, yes, especially on
10  chats and social media platforms.
11  Q.  And that's because on the internet, in your view, the
12  normal self-control and filtering that occurs in the real-time
13  world is absent, right?
14  A.  Yes.
15  Q.  You can go ahead and reveal aspects of your life which you
16  might not ordinarily share with anyone, not even a spouse,
17  right?
18  A.  Yes.
19  Q.  And by the way, Dr. Greenfield, that would be especially
20  true for people who wanted to do deeply unpopular things,
21  right?
22  A.  I -- I can't say that I know -- I mean I suppose.  I don't
23  know that for a fact, but I would -- if you're asking me can
24  people -- well, tell me what you're asking me, because I want
25  to make sure that I answer it accurately.

1   Q.  Well, Dr. Greenfield, we were talking about disinhibition.

2   A.  Correct.

3   Q.  Right?

4   A.  Yes.

5   Q.  And how, on the internet, people feel free to reveal

6   aspects of their life which they might not ordinarily share,

7   even with people very close to them, right?

8   A.  Yes.

9   Q.  And that would be especially true for people who wanted to

10  do things that other people might disapprove of, right?

11  A.  I don't know that for a fact.  I think that's -- that's a

12  theory based on what you're saying.  But you're -- what you're

13  saying is that they would use the internet platform because of

14  its anonymity and the disinhibition if they had a desire to

15  talk about or do something that would be unacceptable or

16  illegal or -- is that what you're saying?

17  Q.  Sure.

18  A.  I don't know that to be true.

19  Q.  Well, Dr. Greenfield, if a person had a space like the

20  internet where they could be -- have an exciting freedom to

21  express themselves --

22  A.  Yes.

23  Q.  Right?

24  A.  Yes.

25  Q.  -- in an anonymous way, or what they thought was

1    anonymous --

2    A.  Yes.

3    Q.  Right?

4    A.  Right.

5    Q.  -- that would be especially true for someone, for example,

6    who wanted to join a hate group?

7    A.  I think that the internet allows a sense of anonymity and

8    freedom that is not experienced in other modalities.

9    Q.  And so that would be especially appealing to someone who

10   wanted to commit acts of violence with a hate group, right?

11   A.  It might be.

12   Q.  You know that research has shown that internet anonymity

13   enhances self-disclosure and honesty, right?

14   A.  It -- yes, it does.  It also facilitates people lying.  So

15   I don't know how to square those two things, but I hear you.

16   Q.  Well, Dr. Greenfield, is it true that research has shown

17   that internet anonymity enhances self-disclosure and honesty?

18   A.  It does.

19   Q.  And Dr. Greenfield, you also talked about accelerated

20   intimacy, correct?

21   A.  I did.

22   Q.  And you think that accelerated intimacy is something that

23   happens to a lot of people using the internet, right?

24   A.  Yes.

25   Q.  Almost everyone, right?

1    A.  It's a frequent experience.

2    Q.  And you know many individuals who establish successful

3    relationships with people they met over the internet?

4    A.  Oh, yes, I do know that.

5    Q.  And you know, because it's your theory, that people --

6    because people communicate on the internet through typewritten

7    messages, they will reveal aspects of themselves to others in a

8    more open and forthright manner, right?

9    A.  Yes, that's true, but those -- the data also shows that

10   relationships that start online or marriages that start online

11   are no better off as a result of that.  In other words, they

12   have the same result of dissolution and divorce.

13   Q.  That's not my question, Doctor.

14   A.  OK.  Well, then ask it again.

15   Q.  Let me ask it again.

16   A.  I'll try better.

17   Q.  It is your theory that because people communicate on the

18   internet through typewritten messages, they will reveal aspects

19   of themselves to others in a more open and forthright manner,

20   correct?

21   A.  That is accurate.

22   Q.  And in fact, there appears to be a greater trust and

23   perceived honesty in what is communicated when it is written as

24   opposed to other forms of communication, correct?

25   A.  Yes, I believe I said that.

M6mWmel4                        Greenfield - Cross

1  Q.  Dr. Greenfield, people also use the internet to commit

2  illegal acts while hiding their identity, correct?

3  A.  Yes.

4  Q.  Acts like bomb making?

5          MS. WERNER:  Objection.

6          THE COURT:  Thank you.

7          You can proceed, counsel.

8  A.  I mean I have not been involved in that, but I'm assuming

9  that that's true.

10 Q.  Well, I don't want you to draw any assumptions,

11 Dr. Greenfield.  Let's look at DG 0, defense exhibit 9, page

12 40.  Do you recognize that as your manuscript?

13 A.  Say it one more time.  Where am I going?

14 Q.  D9 at page 40.

15 A.  OK.  I got it.

16 Q.  OK.  And do you see before the break in the heading -- this

17 is your book, right, or a manuscript of yours?

18 A.  Oh, yes.  You're referring to the sentence where I say --

19 but I'm using that as an example.  I'm not specifically saying

20 that that occurred or that I was aware of that occurring.

21 Q.  Well, Doctor, this is your book, right?

22 A.  Yes, it is.

23 Q.  And you tried to publish accurate things in the book,

24 right?

25 A.  Yeah.

1  Q.  So you wrote in your book:  "I'm sure that the net privacy

2  has also contributed to the popularity of many websites,

3  including gambling, adult shopping sites.  There are darker

4  sides to anonymity, such as in the case of protecting illegal

5  or antisocial acts, like bomb making."

6  A.  Yes.

7  Q.  Right?

8  A.  I agree with that.

9  Q.  And you wrote that in your book about Virtual Addiction,

10 right?

11 A.  I did do that.

12 Q.  And Doctor, you're aware of cases where people have used

13 the internet to carry out violent acts, including murder and

14 rape, right?

15 A.  Yes, I am aware of that.

16 Q.  And by the way, Doctor, people sometimes tell lies online

17 in order to commit crimes, correct?

18 A.  I -- I would have to assume that that's correct, yes.

19 Q.  Dr. Greenfield, you also testified today that internet use

20 delivers a dopamine hit to a person's brain, correct?

21 A.  Yes.

22 Q.  And you testified that that happens to everyone, right?

23 A.  Yes.  I mean I didn't examine everybody, but I think it's a

24 fairly safe assumption.

25 Q.  And dopamine is a neurotransmitter that makes people feel

M6mWmel4                    Greenfield - Cross

1  pleasure, right?

2  A.  Yeah.

3  Q.  Makes them feel happy?

4  A.  It's an excitatory neurotransmitter, yes.

5  Q.  And it makes people feel happy, right?

6  A.  Happy or just lifted slightly.  I mean it doesn't make

7  people walk around giddy and, you know, laughing and smiling.

8  Q.  It's a good feeling, correct?

9  A.  Definitely a better feeling than other things.

10 Q.  And you testified that when someone even gets in their car

11 to head to a casino, if they're the kind of person who enjoys

12 going to a casino, they're going to feel a dopamine hit right

13 then and there, right?

14 A.  You bet.

15 Q.  Just for the anticipation, right?

16 A.  That is correct.

17 Q.  And so it's also true that if someone is planning to go

18 conduct a bank robbery and they get in the car to do it,

19 they're going to feel a dopamine hit too, correct?

20 A.  I suppose so.

21 Q.  And so, in your view, if a person is using the internet to

22 consistently view material relating to violence, that will give

23 them pleasure, right?

24 A.  No, I can't assume that, because I don't know -- that's

25 assuming that they develop pleasure from violence.

1    Q.  Well, Dr. Greenfield, isn't it your testimony that internet

2    use for all of us delivers a dopamine hit to the brain?

3    A.  It does.

4    Q.  And so a person's selected content will deliver that

5    pleasurable feeling for them, right?

6    A.  I suppose if the person was excited or elated from acts of

7    violence or criminal behavior, that that would be the case.

8    Q.  And so, for someone, for example, who wanted to carry out

9    acts of violence or engage in criminal behavior, seeing

10   violence on the internet would give them pleasure, right?

11   A.  Yes, I believe that's true.

12   Q.  And seeing even more extreme violence would give them

13   additional pleasure, right?

14   A.  I think that's a reasonable assumption.

15   Q.  Dr. Greenfield, in your opinion, posting content on the

16   internet and receiving social validation also increases

17   dopamine levels, right?

18   A.  Yes, very much.

19   Q.  And to be clear, you have not personally conducted any

20   study that shows the transmission of dopamine in response to

21   internet use, correct?

22   A.  Well, the only way you can do a study like that is through

23   a scan, and I've not done a scan study.  I've read the scan

24   studies, but I've not done them.

25   Q.  You have not conducted --

1   A.  I have not conducted a scan study.

2   Q.  And you wouldn't be authorized to conduct such a study,

3   because you're not a medical doctor, right?

4   A.  No, that's actually not true.  I mean I'm not a medical

5   doctor, but psychologists do scan studies all the time.

6   Q.  But without conducting a study of your own, you've decided

7   that compulsive internet use causes quasi involuntary behavior,

8   right?

9   A.  Yes.  I -- I mean I'm not sure -- in what context are you

10  asking that question?  Can you rephrase the question?  Sorry.

11  Q.  Doctor, is it your opinion that -- have you decided that

12  compulsive internet use, in your view, causes quasi involuntary

13  behavior?

14  A.  I think that it -- yeah.  I mean I think it -- it feeds

15  unconscious or more automated behavior, yeah.  So I guess that

16  would be quasi -- the word you used, yeah.

17  Q.  Well, you're aware that the defense has represented that

18  you're going to speak about that in this case, right?

19  A.  Yes, I am aware of that.

20  Q.  OK.  What study is that based on?

21  A.  I don't know what study that's based on particularly.  I

22  think that --

23  Q.  Dr. Greenfield, I don't have a question pending.  Please

24  wait for the question.

25  A.  OK.  Sorry.

M6mWmel4                          Greenfield - Cross

1    Q.  Dr. Greenfield, without conducting a study to examine the

2    brain, you've also decided that the internet causes the

3    clouding of a user's judgment, right?

4    A.  Yes, I do assume that.  Not in every case, but I think that

5    it does cloud people's judgment based on my experience with the

6    people that I've worked with.

7    Q.  And you think that's true for everyone?

8    A.  No, I can't say it's true for everyone, because I've not

9    evaluated everyone.

10   Q.  And you haven't evaluated the defendant, correct?

11   A.  I have not evaluated the defendant.

12   Q.  So you can't say it's true for him --

13   A.  I cannot.

14   Q.  -- correct?

15   A.  No, I cannot.

16   Q.  By the way, Dr. Greenfield, you've offered these opinions

17   about the clouding of judgment or involuntariness of someone's

18   response, for example, in a lawsuit brought against Apple, is

19   that right?

20   A.  Yeah, I was asked, I think, to comment on -- I mean that

21   was a long time ago.  I don't even remember what I said in that

22   case.

23   Q.  That case has an opinion from 2017, which was five years

24   ago, is that right?

25   A.  Yeah.

M6mWmel4                          Greenfield - Cross

1   Q.  Long time for you?

2   A.  It is when you're 66.

3   Q.  A lot more recent than your 1999 study, though, correct?

4   A.  Apparently.  I don't even remember doing it, but I -- I

5   know that there was a lawsuit against Apple.  I don't think it

6   went anywhere.

7   Q.  Well, you provided an opinion that a distracted driver was

8   not responsible for their conduct because when she received a

9   notification on her iPhone, she responded to an automatic

10  neurobiological compulsion to read the message.  Do you recall

11  providing --

12  A.  Yes.

13  Q.  -- that opinion?

14  A.  And I think that does occur.

15  Q.  Yeah.  And you said that lawsuit didn't go anywhere, is

16  that right?

17  A.  I don't know where it went.  I was never told after that.

18  Q.  Yeah.  Well, that's because the court determined that those

19  allegations were clearly frivolous and advanced a claim or a

20  defense that was not legally sufficient on their case, correct?

21          MS. WERNER:  Objection.

22          THE COURT:  Thank you.

23  A.  I actually --

24          THE COURT:  Sorry.

25          You can answer the question.

M6mWmel4                          Greenfield - Cross

1          THE WITNESS:  OK.

2    A.  I was not aware of that outcome.

3    Q.  Are you aware of it now?

4    A.  Because you told me.

5    Q.  Would you like to take a look at the opinion?

6    A.  No.  I believe you.

7          MS. RAVENER:  Your Honor, I'd like to provide the cite

8    to the Court.

9          THE COURT:  Thank you.

10          MS. RAVENER:  This is *Meador v. Apple, Inc*.  The cite

11    is 2017 WL 3529577.  And Dr. Greenfield's opinions are

12    discussed at approximately page 5.

13    Q.  Dr. Greenfield, you've also decided, without any

14    examination of the brain yourself, that the internet causes the

15    loss of one's ability to discern fantasy from reality, is that

16    right?

17    A.  Well, I do -- not in everybody, but it has the capacity to

18    do that, yes.  And I don't know what you mean by not examining

19    the brain.  You mean, like, doing dissections of people's

20    brains, or you're --

21    Q.  Well, we talked, for example, about scan studies, and you

22    haven't conducted one, right?

23    A.  But a scan study is not going to necessarily show that.

24    Those are behavioral constructs that won't show up in a scan

25    study.

1    Q.  And those are behavioral constructs that are pretty hard to

2    apply to all people, right?

3    A.  I would say that there's no behavioral construct that

4    applies to all people.

5    Q.  And so you can't say, for example, that using the internet

6    causes the loss of one's ability to discern fantasy from

7    reality for all people, right?

8    A.  No, you cannot say that for all people.

9    Q.  And in order to draw a conclusion like that, you would have

10   to actually evaluate someone, right?

11   A.  Yes.  To make a comment about that particular person, you

12   would have to evaluate them.

13   Q.  Which, by the way, there is no diagnosis, as we established

14   earlier, that's been recognized by the World Health

15   Organization or by any other known body, like the American

16   Psychiatric Association, that would allow you to make that

17   conclusion, right?

18   A.  That -- that is correct in terms of the nomenclature, but

19   that does not mean that people don't diagnose internet

20   addiction problems.

21   Q.  And Dr. Greenfield, you have not been able to conduct any

22   evaluation that would allow you to opine that the loss of one's

23   ability to discern fantasy from reality was present in this

24   case for this defendant, right?

25   A.  That is correct.

1   Q.  And as we discussed, it would be impossible for you to

2   apply that conclusion to people generally, right?

3   A.  I don't think you can ever make a comment in science about

4   every single person.

5   Q.  So, Dr. Greenfield, you called the maybe factor the idea

6   that social media users post online without knowing what

7   content would be rewarded or validated, right?

8   A.  Yes.

9   Q.  And as we just established, that's not something you can

10  apply to all people because that wouldn't be responsible

11  science, right?

12  A.  Yeah, I suppose.

13  Q.  But if that did happen, your view is that happens even when

14  people post entirely true and accurate statements, right?

15  A.  I'm not following you.  I'm sorry.

16  Q.  Even when people post a wholly true and accurate statement

17  about themselves online --

18  A.  OK.

19  Q.  -- the maybe factor of not knowing what content will be

20  rewarded and validated still happens --

21  A.  Oh, yeah.

22  Q.  -- in your view?

23  A.  I would agree.  It doesn't matter whether the content is

24  true or not.

25  Q.  And that's true even when they post online to groups of

M6mWmel4                        Greenfield - Cross

1    people who are identified to them as their friends on social

2    media, right?

3    A.  I suppose so.  I don't think it matters whether they're

4    friends or not.  I think it has -- I mean although that might

5    increase the saliency; I think it's just the recognition and

6    acknowledgment that increases it.

7    Q.  You also testified about role playing --

8    A.  Yes.

9    Q.  -- is that right?

10           And you testified that role playing is taking on an

11   identity that is different from the reality of your life,

12   right?

13   A.  Yeah.

14   Q.  That's the definition, right?

15   A.  Essentially, yeah.

16   Q.  OK.  And you have never done any specific research on role

17   playing on the internet?

18   A.  Not specific to just role playing, no.

19   Q.  And you have not personally gathered any statistics about

20   how often people role play on the internet, right?

21   A.  No.

22   Q.  You have no idea what percentage of people online are

23   engaged in role play, right?

24   A.  Yeah.  I mean I wouldn't be prepared right now to give that

25   number, no.

M6mWme14                        Greenfield - Cross

1   Q.  And you know that pretending to be someone else is

2   relatively uncommon on the internet, right?

3   A.  I mean I don't know that.  You're -- you're telling me

4   that.  You must be basing it on something.  I don't know that

5   for a fact, but I'm not shocked by that.

6   Q.  You are not surprised to learn, for example, that studies,

7   including one of the studies you provided to the defense,

8   stated that pretending to be someone else is relatively

9   uncommon on the internet, right?

10  A.  Yeah, I think that's -- I mean it wouldn't surprise me.

11  Q.  And for the record, I'll note that that statement is

12  contained in Government Exhibit 21, which has been received by

13  the Court at page --

14  A.  Most of the time what I see is people -- they -- they don't

15  change their name and identity.  They just change a lot of

16  features about themselves.

17  Q.  And by the way, Dr. Greenfield, you view any lie about

18  their identity as role play, is that right?

19  A.  Yeah, I think that that falls into the category.  I mean

20  I --

21  Q.  And we saw, Dr. Greenfield --

22          MS. WERNER:  May he finish his answer, your Honor?

23          THE COURT:  Thank you.

24          Did you have more to say, Dr. Greenfield?

25          THE WITNESS:  Yeah.  I don't think that necessarily

1    telling someone you weigh 160 pounds when you really weigh 180

2    falls, means that you're necessarily role playing, although you

3    could argue that.  I think that playing a role is sort of

4    taking on a character that is substantively different than who

5    you actually are.  I suppose it's a -- it's a factor that moves

6    in that direction.

7    BY MS. RAVENER:

8    Q.  Well, Dr. Greenfield, I believe you testified earlier today

9    that any lie about your identity would be, in your view --

10   A.  In a sense it is --

11          THE COURT:  I'm sorry.  Let me just make sure that the

12   reporter got the full question.

13          THE WITNESS:  Sorry.

14          THE COURT:  Please, counsel.

15          THE WITNESS:  I agree that there's --

16          THE COURT:  I'm sorry.

17          THE WITNESS:  Sorry.

18          THE COURT:  Let's just wait for counsel.

19   BY MS. RAVENER:

20   Q.  Dr. Greenfield, I believe you testified earlier today that

21   any lie about your identity would be, in your view, role play?

22   A.  It is a form of role play, but I don't know that it

23   involves -- it rises to the level where someone has taken on a

24   whole new identity.

25          THE COURT:  Counsel, let me just apologize.  I'd like

1    to take a short break just to let everyone stretch their legs

2    at some point.  We don't need to do that at this very moment,

3    but if you could be looking for a reasonable place for a

4    natural break, I'd appreciate it.

5              MS. RAVENER:  Yes, your Honor.  I believe that I may

6    have about 15 minutes left.

7              THE COURT:  Thank you.

8              So is this a reasonable break point, counsel?

9              MS. RAVENER:  That's fine.

10             THE COURT:  Good.

11             So, counsel, I'm going to propose that we take just a

12    five-minute break to let everyone stretch their legs.

13             Dr. Greenfield, during this recess, as before, I'm

14    directing that you not discuss this case or your testimony in

15    it with anyone.

16             I'll see you all back here in about five minutes.

17    Thank you.

18             (Recess)

19             THE COURT:  Thank you.  Please be seated.

20             So we're back on the record after a short recess.

21             Counsel for the United States, you can proceed.

22             MS. RAVENER:  Thank you, your Honor.

23    Q.  Dr. Greenfield, when we left off, we were talking about

24    role playing.  Do you recall that?

25    A.  I do recall.

M6mWmel4                    Greenfield - Cross

1   Q.  And you haven't done any research on role playing in

2   person, right?

3   A.  I'm not --

4   Q.  You're aware that people gather --

5   A.  Oh.

6   Q.  -- to do role playing in person, right?

7   A.  No.  I have not done research on that, but I am aware of

8   that.

9   Q.  And you have no idea how often people gather in person to

10  role play in real life, right?

11  A.  No, I don't know that -- those statistics.

12  Q.  You haven't written any peer-reviewed articles regarding

13  role play on the internet, right?

14  A.  Not solely on the role play, no, but I did include it in

15  some of my work.

16  Q.  And nonetheless, without knowing how often people role play

17  in real life, you formed the opinion that people must role play

18  more often on the internet, correct?

19  A.  You're saying that -- I would say that it's much -- yeah.

20  Yes.  That is a conclusion that I would come to.  I don't know

21  that for a fact in the sense that I've not evaluated in the

22  world how many times people do role playing in person, but I do

23  think it's a reasonable assumption that people do it more

24  frequently, more easily online.

25  Q.  And that's an assumption, right?

M6mWmel4                        Greenfield - Cross

1   A.  It is.  Absolutely.  It's an educated assumption.

2   Q.  And Dr. Greenfield, you have treated patients, and that's

3   part of your basis for understanding role play, right?

4   A.  Yes, part of it.

5   Q.  But you have not treated any patients who have role played

6   as a terrorist seeking to kill Americans, have you?

7   A.  No, I have not.

8   Q.  Never came up, right?

9   A.  Nope.  I don't think so.

10  Q.  You're not aware of any particular web forums where people

11  go in order to pretend to be a terrorist seeking to kill

12  Americans when they're really not one, right?

13  A.  I'm not aware of any.

14  Q.  And instead, your work focuses on role playing primarily

15  involving cyber sex, correct?

16  A.  No.  No.  I would say the role playing often involves video

17  game characters, some with -- a lot of it with sex, but not all

18  of it.  A lot of it is anime acting, animal acting, historical

19  characters, very --

20  Q.  You hold yourself out --

21          MS. WERNER:  Objection.

22          MS. RAVENER:  Excuse me.

23          THE COURT:  You can proceed, counsel.

24  BY MS. RAVENER:

25  Q.  You hold yourself out as specializing, as we discussed, in

1  internet addiction and sexual addiction in particular, right;

2  sexual behaviors?

3  A.  Well, people tend to get themselves into a lot of

4  difficulty sexually online.

5  Q.  OK.  And you found that if you engage in online cyber sex,

6  you are probably much more likely to have a real-time affair

7  off-line, right?

8  A.  Yeah, that was one of the statistics that we found.

9  Q.  You found a clear correlation between, for example, cyber

10 sex online and then carrying out that very activity, right?

11 A.  Yes.  It was -- I mean not -- it's not a 100 percent

12 correlation.  I think it was 30 percent more likely, and I may

13 be misquoting the number.

14 Q.  You called it a clear correlation in your book --

15 A.  Yes.

16 Q.  -- right?

17 A.  Yes, that's true.

18 Q.  And a progression from virtual sex to actual sex, right?

19 A.  Yes.

20 Q.  And in other words, people often carry out their online

21 plans in real life, right?

22 A.  No, that's not what I'm saying.  What I'm saying is that

23 when it comes to sex, there is a higher likelihood that people

24 will engage in real-time sexual behavior or approaching

25 real-time sexual behavior if they start out online.

M6mWmel4                    Greenfield - Cross

1   Q.  And that's because there is a clear correlation between
2   cyber sex and what they do off-line, right?
3   A.  That is correct.
4   Q.  And cyber sex is one of the things you study a lot, right?
5   A.  Yeah.  I would say that's true.
6   Q.  And as we established, terrorism is not something that you
7   study a lot, right?
8   A.  I would not hold myself as an expert in terrorism.
9   Q.  You have never written, published, or presented on any
10  nexus between heavy internet use and white supremacists, right?
11  A.  No.
12  Q.  You've never written, published, or presented on any nexus
13  between heavy internet use and terrorism-related activity,
14  right?
15  A.  No, I have not.
16  Q.  You've never treated someone who was a member of ISIS,
17  right?
18  A.  No.
19  Q.  You've never treated someone who is a member of Al Qaeda?
20  A.  No.
21  Q.  You've never treated someone who is a member of a white
22  supremacist terrorist group, like the Ku Klux Klan, correct?
23  A.  Correct.
24  Q.  And as an expert on the internet, surely you're aware that
25  terrorists and terrorist organizations make significant use of

M6mWmel4                    Greenfield - Cross

1    the internet for real-world purposes, right?

2    A.  I am aware of that.

3    Q.  You're aware that they use the internet for recruiting,

4    right?

5    A.  Yes.

6    Q.  You're aware that they use the internet for financing,

7    right?

8    A.  Yes.

9    Q.  For training, right?

10   A.  I was less aware of that, but that doesn't surprise me.

11   Q.  Or incitement to commit acts of terrorism, right?

12   A.  I -- I would -- that, again, doesn't surprise me.

13   Q.  And terrorists and foreign terrorist organizations and

14   domestic terrorists, they all use the internet also for

15   gathering and disseminating information and -- excuse me,

16   gathering and disseminating information for terrorist purposes,

17   right?

18   A.  I -- yes, I would agree with that.

19   Q.  And domestic and foreign terrorists use the internet for

20   disseminating information for purposes that include material

21   support for planned acts of terrorism --

22           MS. WERNER:  Objection.

23   Q.  -- right?

24           MS. WERNER:  Your Honor, he's testified that he's not

25   an expert in the --

M6mWmel4                         Greenfield – Cross

1          THE COURT:  Thank you.

2          You can proceed, counsel.

3          You can answer the question, Dr. Greenfield.

4    A.   Yeah.  I mean I don't know that factually, but I mean none

5    of that surprises me.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6M5mel5                    Greenfield - Cross

BY MS. RAVENER:

1

Q.  You are not aware of that?

2

A.  Not in the sense that I have studied it extensively myself,

3

but.

4

Q.  Dr. Greenfield, you are here as an expert on Internet use

5

and behavior, right?

6

A.  Right.

7

Q.  And so it is your testimony that you are not familiar with

8

the use of the Internet for providing information that includes

9

material support for planned acts of terrorism?

10

A.  Well, I'm not an expert in terrorism but if you are asking

11

me am I aware that people use the Internet for nefarious acts,

12

of course, yes, they do.

13

Q.  Are you familiar with the United Nations Office on Drugs

14

and Crimes' report on use of the Internet for terrorist

15

purposes?

16

A.  I have not read the report.

17

Q.  Are you familiar with the report?

18

A.  I have heard of it but I have not read it.

19

Q.  You have heard of the report.

20

            And you are then familiar about the fact --

21

            MS. WERNER:  Objection.

22

            THE COURT:  You may proceed, counsel.  Ask the

23

question.

24

Q.  -- that the Internet is used for terrorist purposes?

25

M6M5mel5                        Greenfield – Redirect

1    A.  Again, that does not surprise me; yes.  I am aware that it

2    is used for terrorism.

3    Q.  Including committing acts of terrorism, right?

4    A.  Yes, including that.

5            MS. RAVENER:  One moment?

6            (Counsel conferring)

7            MS. RAVENER:  No further questions.

8            THE COURT:  Thank you.

9            Counsel for defendant?

10   REDIRECT EXAMINATION

11   BY MS. WERNER:

12   Q.  Good afternoon now, Dr. Greenfield.

13   A.  Good afternoon.

14   Q.  You were asked on cross-examination about your expertise

15   and speciality in addiction.  What is it about your expertise

16   in Internet addiction that qualifies you to share thoughts on

17   Internet use and behavior more generally?

18   A.  Because you can't understand the abuse or addictive use of

19   substance or behavior without understanding the behavior or the

20   substance.  That would be like saying you could treat cocaine

21   addiction without understanding the pharmacology or

22   neurobiology of how cocaine addiction operates.  So it is

23   essentially to understand the subject matter of what it is that

24   people are becoming addicted to or even overusing or abusing,

25   which is really where things are moving.

Q.  And has your research examined the difference between

Internet use and Internet addiction and the commonalities of

behavior between a general user and an addicted user?

A.  Yes.

Q.  You were asked on cross-examination about the focus of your

writing on Internet addiction.  Have you written, generally, on

the ideological and neurobiological aspects of Internet use in

your peer-reviewed articles?

A.  Yes, I have.  And I have given a lot of lectures on that

subject.

Q.  You were asked on cross-examination about the fact that you

don't have a medical degree.  Does your training as a

psychologist prepare you to testify about addiction?

A.  Absolutely.

Q.  What part of your training prepares you to testify about

addiction?

A.  Well, my coursework, my clinical experience, my board

certification, my advanced training, my fellowship, my

internship.  I mean, I have both a significant amount of

experience in addiction medicine so, yes.  You don't have to be

a medical doctor to be an expert in addiction medicine or

addiction.

Q.  Is it common for psychologists to have an expertise in

addiction?

A.  As common as it is, it is probably more common among

1    psychologists as well as other mental health professionals.

2    The addictionology field and addiction medicine field is an

3    interdisciplinary field so the American Society of Addiction

4    Medicine has got members that are psychologists, psychiatrists,

5    some are general docs, some are social workers.  It is really a

6    wide range of professionals that practice addiction medicine.

7    Q.  During your 20 years on the faculty of the University of

8    Connecticut, what school and department did you serve in?

9    A.  In the School of Medicine in the Department of Psychiatry.

10   Q.  And what did you teach there?

11   A.  I taught addiction medicine, I taught Internet addiction --

12   courses in Internet addiction.  I taught courses in sexual

13   medicine and sexual addiction.  And, I supervised third-year

14   residents.

15   Q.  You were asked on cross-examination about disagreement in

16   the field about the appropriate labeling for Internet addiction

17   or Internet compulsion, Internet use disorder.

18   A.  Yes.

19   Q.  Does this disagreement in the field mean there is

20   disagreement about whether addiction -- I'm sorry, whether the

21   Internet is being abused and whether there is a phenomenon of

22   Internet abuse?

23   A.  I don't think there is a huge amount of disagreement in the

24   professional addiction community that the Internet can be an

25   addictive experience and that people are experiencing addiction

1  to it.  I do think there are disagreements with regard to the

2  nosology, the labeling, and a little bit to what criteria go

3  into the equation to decide whether someone is addicted or not,

4  but I don't think the root concept of whether Internet

5  addiction or some variation of that exists is really up for

6  debate at this point.  It has been accepted.

7  Q.  Can you define the term "nosology"?

8  A.  Labeling, like the way you would label a diagnosis or a

9  syndrome or condition.

10 Q.  Is it unusual for there to be some disagreement about

11 labeling or nosology in a behavioral -- give me one second --

12 in a behavioral science field?

13 A.  Actually, medicine is one of the most inexact fields you

14 could find.  There is disagreement with everything including

15 surgical procedures.

16 Q.  What is the basis for your belief that in 2022 many or most

17 people are abusing the Internet?

18 A.  Well, I don't know if -- I mean, abuse is a value-laden

19 term so I would say overusing, in the sense that everyone is

20 complaining about it and the statistics, the surveys that have

21 been done long since mine are showing that large numbers of

22 people feel like they're overusing their devices and they wish

23 that they could use it less.  Whether that meets the criteria

24 where they need help or not -- I mean, most people don't get

25 help, they just live with whatever they're doing and either

1    complain about it or suffer whatever consequences come about as

2    a result of it.  The average user in America right now is

3    probably pushing three or four hours and in some cases the

4    numbers are going up to seven or eight hours and those numbers

5    have increased by 15 percent since the pandemic.  If you add up

6    the number of hours that the average person spends online -- if

7    you spend three hours a day online and you sleep eight and you

8    start as a kid and you live into your 80s, you are going to

9    spend 10 years of your life on the Internet.

10   Q.  You spoke about smartphones.  Are you aware of any

11   mechanism on smartphones that have been developed to help

12   people control their Internet use?

13   A.  Yes.  There are apps built into the operating system and

14   there are aftermarket apps, I have worked with some of them.

15   We employ an IT person in our clinic who helps people install

16   those.  They're helpful.  And they can limit it.  The big part

17   with the smartphone is you have it in your pocket or your

18   pocketbook.

19   Q.  You are not suggesting that you can make a diagnosis of

20   everyone in the world as an Internet addict, are you?

21   A.  I think it would be grandiose of me to say everybody in the

22   world is an Internet addict.  I think -- I think it is a

23   reasonable statement to say that we are overscreened and

24   overwired and that there are some consequences to that and

25   there have been some severe, significant consequences as a

1    result of excess social media use that are not helping not just

2    the individuals, but society.

3    Q.  You were asked on cross-examination about the

4    self-assessment that is included in your more recent book.

5    A.  Yes.

6    Q.  To be clear, do you use a self-assessment or a quiz in your

7    clinical practice?

8    A.  No, because the self-assessment is just what it is, these

9    are tools that people use themselves and the disclaimer on the

10   tool is that they should not rely on that as a sole indicator

11   as to whether they have a problem or not, that it needs to be

12   confirmed by a mental health or addictions professional.

13   Q.  And what is the audience for your more recent book?

14   A.  Well, that's a good question.  I have no idea.  I mean, I

15   wrote it -- the reality is that the people who buy books on

16   mental health or addiction are not the people who have the

17   problems, they're usually family members or loved ones or

18   interested parties who then try to impart that information to

19   the addict.  Very few people who have a problem seek out the

20   book.

21   Q.  But is that an academic text?

22   A.  What is?

23   Q.  Your more recent book, Internet use -- I'm sorry.

24   A.  I mean they're all based on some of my original studies but

25   they've been updated.  They've not been re-normed.  There are

M6M5mel5                          Greenfield - Redirect

tests that have been re-normed more recently that are for sale,
in other words tests that have been published.  I haven't done
that.

Q.  What is the audience for your peer-review journals on the
subject of Internet use and behavior?

A.  Other professionals.  And the book also, my expectation was
that professionals would buy it and use it.

Q.  You were asked about your 1999 survey and the fact that
participants self-selected into that survey.  Is that common in
behavioral science research?

A.  All behavioral science research people are self-selected.

        So there is an inherent bias in all behavioral science
research that somebody who agrees to participate has some
potential for bias.  You have to sort of include that in your
analysis and just take that for granted as part of the nature
of doing that kind of research.  There is no way to objectively
examine or experiment on people without their knowledge or
their agreement.

Q.  Can you give any other examples of behavioral science
research studies where participants self-report or self-select,
other types of fields?

A.  You mean in behavior?  I mean, certainly most of psychology
research and psychiatry research are self-selected.  Even
evaluations of responses to medications people self-selected,
they agree to participate in the study and, in fact, in some

1  cases they get paid for participating in the study or they get

2  free treatment.  So that's the nature of all human subject

3  research, is self-selection.

4  Q.  Did you pay the participants in your '99 study?

5  A.  No.

6  Q.  And is it generally accepted in the field of psychology to

7  use this self-reporting mechanism research in a study of this

8  sort?

9  A.  There are studies that people are paid.  I can't tell you

10  what percentage.

11  Q.  Sorry, just to clarify, I'm not asking about paying

12  participants, I am asking about self-reporting.  Is it standard

13  to rely on self-reporting and self-selection in a behavioral

14  science survey?

15  A.  Yes.  It's very, very common.

16  Q.  And is that generally accepted in the field?

17  A.  Yes, but with acknowledgment of the potential for bias.

18  Q.  You were also asked about the possibility that your survey

19  participants were lying.

20  A.  Sure.

21  Q.  Were there any safeguards in your study to protect against

22  data being skewed by that possibility?

23  A.  Yes, there were some statistical tests that were put into

24  the analysis that would look for in -- what's the word --

25  response patterns that would reflect lying -- and this is way

M6M5mel5                          Greenfield - Redirect

1   beyond my pay grade because this involved some very
2   sophisticated statistical analysis -- and then also people that
3   would repeat things and people that would respond too
4   affirmatively or too negatively, all that data was thrown out.
5   So I don't know, about 1,500 subjects or so were thrown out
6   because we thought there was a high likelihood that they were
7   lying or misrepresenting themselves.  We can't guarantee that
8   nobody snuck in, but we did try.
9   Q.  And did you partner on that study with a statistician whose
10  pay grade that was not beyond?
11  A.  Yes.  In fact, I think she did get paid for doing the
12  statistical analysis.
13  Q.  You also discussed the large sample size of that study.
14  Did the large sample size help to address the possibility that
15  lying might have skewed the results?
16  A.  Yes.  The larger the sample, the more valid your
17  conclusions are because you average out the error, you decrease
18  the error, and increase the power of the study.  So, you know,
19  if you have a study of 20 subjects, that error can be very
20  skewing but when you have 1,700, that error gets spread out
21  throughout that data set.
22  Q.  I believe you testified that around 6 percent of the
23  respondents to that study seems to be overusing the Internet?
24  A.  Well, they met the criteria of what I defined then as
25  addicted or -- we use the word compulsive at the time -- it was

1   about 5.9 percent, which that statistic is pretty consistent to

2   what people find today.

3   Q.  Would you expect that number to be higher if your data set

4   was skewed by the phenomenon of self-reporting by lies?

5   A.  I don't know what incentive there would be for someone to

6   lie about a negative circumstance but I suppose it's possible.

7   Q.  You were asked on cross-examination about the phenomenon of

8   lying on the Internet and the reasons why people lie.  You were

9   asked whether people lie in order to be in better stead with

10  the people they're lying to.  Do you remember that?

11  A.  Yes.

12  Q.  Are you familiar with cases involving dynamics such as age

13  play?

14  A.  Yes.

15  Q.  And are you familiar with online fetish?

16  A.  Oh yes.

17  Q.  And are you familiar with online fetish spaces where people

18  disclose criminal behavior and criminal fetishes?

19  A.  Oh yes.

20          MS. RAVENER:  Objection.

21          THE COURT:  Thank you.

22          You can go ahead and answer the question,

23  Dr. Greenfield.

24          THE WITNESS:  Yes.  I was asked to comment on such a

25  case, actually that was in New York.

1    BY MS. WERNER:

2    Q.  In cases of that nature, do people disclose lies that

3    others might find reprehensible or even criminal?

4    A.  Yes.

5    Q.  Why might they do that?

6    A.  Because they feel that it might be valued within the

7    community that they're revealing that information.  In other

8    words, it increases their cred within that world.

9    Q.  So in a world where the fetish is about something that

10   would in the common space be deemed reprehensible, someone

11   might be held in higher stead by admitting --

12   A.  Yes.  That's correct.

13              MS. WERNER:  Brief indulgence?

14              THE COURT:  That's fine.  Please take your time.

15   Q.  You were asked on cross-examination about lies that people

16   tell in their everyday life.  Do you have a sense that there is

17   a different sort of lying that can occur online?

18              I can rephrase.

19   A.  Yes, please.

20   Q.  Are people able to lie about things online that they cannot

21   get away with lying about in real life?

22   A.  Yeah, I would believe so, because there is no validation

23   checks.  I mean, ultimately, if you lie about, you know,

24   whether you wear glasses or not and then you meet the person,

25   you will know whether they wear glasses or not.  Online you may

1  never meet the person, you may never see them, you may never

2  talk to them, you may never have any way to validate or

3  invalidate what they're saying.

4  Q.  So does that mean that online it is possible to role play

5  identities that are more different from your own?

6  A.  Yes.  I believe so.

7  Q.  You were asked on cross-examination about your reliance on

8  your personal experience as a factor.  Is that all you rely on

9  when you are drawing your academic conclusions?

10  A.  No.  I just use myself as one of the many.  I certainly

11  don't base my research conclusions on myself, that would be not

12  a smart idea.  Although, I do miss my smartphone right now

13  which I had to give up downstairs.

14  Q.  You were provided with a definition of disinhibition on

15  cross-examination.  Do you remember that?

16  A.  I do.

17  Q.  Have you also written that disinhibition seems to allow

18  users to express and experience themselves in a manner that is

19  less affected by ego constraints allowing them to take on

20  alternate persona, roles, or behaviors?

21  A.  Yes.  I believe I wrote that.

22  Q.  Do you recall writing that in a peer-reviewed journal?

23  A.  I don't know where I wrote it but it sounds like something

24  I would write.

25  Q.  Would it refresh your recollection to see a copy of the

1   article where you state that?

2   A.  Sure.

3   Q.  You have a binder in front of you.

4   A.  I do.

5   Q.  Directing you to the tab DG-4.

6   A.  OK.  What page?

7   Q.  I apologize, DG-3.

8   A.  OK.  Got it.

9   Q.  Do you recognize this article?

10  A.  Yeah.  This just came out last year.

11  Q.  And I am directing you to page 101 which is the third page.

12  A.  OK.

13  Q.  I am directing you to the bottom of the page where there is

14  the direction of disinhibition.

15  A.  Yes.

16  Q.  Do you recall now publishing this recently in a

17  peer-reviewed journal?

18  A.  I do.

19  Q.  And so thank you, you can put your binder down.

20          So disinhibition, you were asked on cross-examination,

21  whether that allows people to reveal their truest selves but it

22  seems that disinhibition is also a phenomenon that allows

23  people to role play more easily; is that right?

24  A.  Yes.  Whether you could -- yes, the answer is yes, and I

25  can't tell you whether that's their true self or their less

M6M5mel5                    Greenfield – Redirect

1  truer self, but yes, I think they're freer to experiment with

2  aspects of themselves that they wouldn't ordinarily be able to

3  do.

4  Q.  At its broadest level, would you say that disinhibition is

5  the freedom to say things you would not necessarily say in real

6  life?

7  A.  Yes.  That's the definition of it.

8  Q.  Would that include role-playing roles that are edgy or

9  transgressive?

10  A.  It could and often does.

11          MS. WERNER:  Brief indulgence?

12          THE COURT:  That's fine.  Please take your time.

13  Q.  Dr. Greenfield, you were asked on cross-examination about

14  meeting with Ethan Melzer.

15  A.  Yes.

16  Q.  Did you meet with Ethan Melzer because you were asked to

17  evaluate him?

18  A.  No.

19  Q.  Were you asked to diagnose him?

20  A.  No.

21  Q.  Have you been asked in this case to opine, in any way, on

22  Ethan Melzer's culpability?

23  A.  No.

24  Q.  Have you been asked in this case to give any opinion about

25  whether he is addicted to the Internet?

M6M5mel5                    Greenfield - Redirect

1   A.  No.

2   Q.  Have you been asked to give any opinion on whether Ethan

3   Melzer, in particular, experiences the behavioral dynamics that

4   we have spent so much of today discussing?

5   A.  No.

6   Q.  But you did meet with Mr. Melzer?

7   A.  I did.

8   Q.  And you were asked about a specific conclusion; the

9   conclusion, I believe, was that he was a stupid kid who was in

10  over his head?

11  A.  Yes.

12  Q.  What else did you conclude about Mr. Melzer from meeting

13  with him?

14  A.  I thought that he was an intelligent guy who lacked a lot

15  of self-esteem -- these are my impressions -- and that he was

16  using the chats as a means to kind of show off, almost, to kind

17  of belong to something.  I have no idea whether he believed

18  them or not or what he knew or didn't know, but I know that he

19  seemed way over his head in terms of what he was doing.

20  Q.  Have you been asked to share that testimony at a trial in

21  this case?

22  A.  Not at this point.  No.

23          MS. WERNER:  No further questions.

24          THE COURT:  Thank you.

25          Counsel for the United States?

M6M5mel5                                    .

 1                MS. RAVENER:  One moment, your Honor?

 2                THE COURT:  Thank you.  Please, take your time.

 3                (Counsel conferring)

 4                MS. RAVENER:  Your Honor, we have no further questions

 5      for this witness.

 6                THE COURT:  Thank you.

 7                Dr. Greenfield, thank you very much for your

 8      testimony.  You can step down.

 9                THE WITNESS:  Thank you.

10                (witness steps down)

11                THE COURT:  Counsel, first, thank you very much for

12      doing all of that good work in the amount of time that we had

13      to do it.  I appreciate very much the clear attention to the

14      issues here that both parties put into the presentation of

15      Dr. Greenfield's testimony here.  The issue is fully submitted.

16      I am happy to take this under advisement and I will try to rule

17      on it well in advance of trial.

18                There are also a number of pending applications to the

19      Court that were submitted to me recently.  I will try to take

20      those up promptly, too.  I expect to see you all here on the

21      27th.  I don't know if I am going to be in a position to rule

22      on this motion by then but I can tell you that I will do my

23      best to put ourselves in a position to resolve the issue

24      regarding the admissibility of Dr. Greenfield's testimony

25      sometime next week, that is, in advance of trial.  If not on

M6M5mel5                    .

1    the 27th, then perhaps later.  I actually expect to enter an

2    order later today just to set a placeholder conference for

3    Friday the 1st in the event that there is any work that we have

4    not completed by that date so we can take it up.  You will see

5    that order issued later today.

6            Counsel, I don't want to invite plenary argument

7    regarding Dr. Greenfield's testimony.  Again, the issues have

8    been well-presented to me by the parties.  I expect to resolve

9    them based on the evidence that was presented here.  I have one

10   just slightly interesting to me question that I would just like

11   to hear your views on.

12           There are suggested, in some of the questions by the

13   United States, namely related to Dr. Greenfield's

14   qualifications to testify in the areas of -- I will call it --

15   psychiatry, neurology, and evolutionary biology.  There are a

16   number of points of his proposed testimony where he speaks

17   about the effect of dopamine on the brain, he talks about scan

18   studies which, as counsel for the United States pointed out, he

19   did not himself conduct.  So I would just like to hear from

20   each of you briefly, counsel, about your views as to

21   Dr. Greenfield's qualifications to testify as to such topics.

22   I should say, except for purposes of this conversation, that I

23   will conclude that he is qualified as a clinical psychologist

24   as a general matter, although I haven't yet made that

25   determination, but I would just like to hear from you about

M6M5mel5                          .

1    whether and to what extent his experience and expertise and

2    educational training qualify him to testify about neurology

3    and, in particular, I will call it biological underpinnings of

4    the human brain that were the subject of a portion of his

5    testimony.  Let me hear first from counsel for defendant.

6              MS. WERNER:  Thank you, your Honor.

7              I believe his testimony supports the fact that both

8    his training and his practice have prepared him for such

9    testimony.  So during his own educational studies and his Ph.D

10   program he undertook a study of addiction.  He testified that

11   these concepts are fundamental to the study of addiction

12   psychology and that they're generally accepted in the field of

13   addiction psychology.  He also testified about a fellowship

14   that he completed subsequent to his Ph.D in the field,

15   specifically, of psycho-pharmacology.  Your Honor, he also

16   testified about his own academic experience including 20 years

17   on the faculty of the University of Connecticut School of

18   Medicine in the Department of Psychiatry which he was qualified

19   to do because of the close relationship between the fields of

20   psychology and psychiatry, as well as his own extensive

21   experience practicing as a psychologist in a hospital setting.

22   And so, your Honor, I think there is no doubt on this record

23   that Dr. Greenfield is qualified to render testimony on that

24   subject based on his own training and experience.

25             In terms of the scan studies specifically, he

M6M5mel5                            .

1    testified about having reviewed those and how those are

2    commonly relied upon in the field of addiction medicine which,

3    although he is not a medical doctor, he is an expert in this

4    field of addiction, certainly.

5            THE COURT:  Thank you.

6            Counsel for the government?

7            MS. RAVENER:  Thanks, your Honor.

8            Your Honor, may I remove my mask to address the Court?

9            THE COURT:  You may if you take the podium.

10           MS. RAVENER:  That's fine.  I will leave it as is.

11           Your Honor, defense counsel's argument betrays one of

12    the foundational problems with Dr. Greenfield's proposed

13    testimony in this case which is the focus on addiction.  There

14    is no direct link as required under the rules and under *Daubert*

15    analysis to show that any testimony about any kind of

16    addiction, Internet or otherwise, has any place in this trial.

17    To the extent that Dr. Greenfield is basing his testimony

18    regarding the biological underpinnings or activities of the

19    human brain on that school of science, it's inapposite as

20    applied to this case and so we believe that he is not qualified

21    to talk about those things in the context of this case and as

22    applied to these facts.  The logical conclusions that he has

23    presented and drawn here are untethered to the science and to

24    his experience and qualifications.  In addition, while it may

25    be permissible for him to speak about his review of the

M6M5mel5                       .

1    literature and studies conducted by others, if he truly had

2    expertise in that area we don't believe that it has been

3    established and that the defense has met their burden to show

4    that he has those qualifications.  He did not name a single

5    study that he was relying on so we cannot discern whether he is

6    relying on one study, multiple studies, what those studies are

7    so that they can be independently reviewed, and so that the

8    Court can be assured that he is not simply repeating hearsay

9    from a single study.  Moreover, whether those studies were

10   conducted in the context of addiction science would also be an

11   issue that would undermine his qualifications to address them

12   in the context of this case where, by his own account, he

13   cannot say any Internet addiction is present or relevant.

14            THE COURT:  Thank you.

15            Any response to that line of argument, counsel for

16   defendant?

17            MS. WERNER:  Very briefly, your Honor.

18            THE COURT:  Please.

19            MS. WERNER:  I think that the testimony could not be

20   clearer that Dr. Greenfield's expertise in addiction gives him

21   a unique qualification to share his conclusions about Internet

22   use more generally, in addition to the fact that he has spent a

23   great deal of time researching and comparing the behaviors of

24   people who simply use the Internet to the behaviors of people

25   who abuse them.  In addition, your Honor, I believe his

M6M5mel5                         .

1    testimony about the scan studies was that the scan studies show

2    the affect of dopamine in the brain not only for those who

3    suffer from addiction but also those who are just receiving a

4    dopamine hit in the part of the brain that is receptive to the

5    neurotransmitter dopamine.

6            THE COURT:  Thank you.

7            I did not invite plenary argument on this but since

8    counsel for the United States raised it, counsel for defendant,

9    how do you respond to the argument presented by counsel for the

10   United States that testimony regarding addiction here doesn't

11   fit with this case, in other words, that there is no support

12   for the conclusion that Mr. Melzer or anyone else involved in

13   the offense was an Internet addict, whatever that means.

14           MS. WERNER:  Yes, your Honor.  Thank you.

15           The testimony about Internet addiction is relevant in

16   as much as it provides context for Dr. Greenfield's testimony

17   about individual and group behavior on the Internet generally,

18   and it so happens as a result of his focus on addiction that

19   some of the research he has conducted on individual behavior,

20   the individual behavior of Internet users is framed in the

21   context of a comparison with Internet addicts.  There is no

22   question that his testimony about Internet use, generally, is

23   extremely relevant to this case which turns entirely on an

24   evaluation of the behavior of a set of individuals in an online

25   chat room.  And so, if Dr. Greenfield can provide context for

M6M5mel5                         .

1    how people generally behave in large numbers online and to set

2    that in the context of his expertise as an Internet addiction

3    psychologist, that is extraordinarily relevant and useful to

4    the jury.

5              THE COURT:  Thank you.

6              Let me just make sure I understand the defense's

7    position here.  As I understand it, you are not planning to

8    introduce the testimony of Dr. Greenfield regarding Internet

9    addiction in order to suggest that Mr. Melzer or any of the

10   co-conspirators -- alleged co-conspirators were Internet

11   addicts.  Instead, as I understand it, the testimony about

12   addiction is expected to frame Dr. Greenfield's testimony about

13   broader Internet use generally.

14             Is that fair?

15             MS. WERNER:  That's correct, your Honor.  And there is

16   one other way in which it is relevant and that is his expertise

17   on Internet addiction and his expertise on the neurobiology of

18   addiction more generally, including its basis in evolutionary

19   biology enables Dr. Greenfield to explain how the Internet

20   affects the human brain including the brain of an Internet

21   user, a general user who has not been diagnosed with Internet

22   addiction.  He testified about the way that dopamine affects

23   the brain, for instance, when someone uses cocaine for the

24   first time or when somebody encounters gambling or sex or any

25   other behavior that causes a dopamine hit in the nucleus

M6M5mel5

accumbens.  So his testimony about dopamine and the brain is

relevant to our discussion of Internet use in a general way,

separate and apart from the testimony about addiction and

addicts specifically.

THE COURT:  Thank you.

I apologize, I don't want to engage in a plenary

discussion regarding the briefing but let me just ask, since I

have you, counsel for defendant, to the extent that the defense

is not arguing that Mr. Melzer or any of the co-conspirators

are Internet addicts, and given that Dr. Greenfield is not

purporting to opine that they are, what's your view regarding

the 403 argument here?  Why isn't that confusing -- so

confusing to the jury that I should exclude it?  The

government, in essence, will make the argument -- has made the

argument -- I will reframe it -- that your presenting that

evidence to the jury suggests to them that they should make

some kind of unqualified diagnosis of Mr. Melzer based on the

description of what an Internet addict is.  And we heard from

Dr. Greenfield today that diagnosing someone on that basis

would be, in his words, unethical.  How do you respond to an

argument that presenting evidence regarding Internet addiction

and its markers here would be so confusing as to be unduly, I

will call it, to outweigh the probative value of the evidence

given the possibility of confusing the jurors?

MS. WERNER:  Brief indulgence, your Honor?

M6M5mel5                       .

1          THE COURT:  Thank you.  That's fine.  Take your time.

2          (Counsel conferring)

3          MS. WERNER:  Your Honor, I think that the government's

4    403 arguments rely on a misframing or a misunderstanding of the

5    subjects that Dr. Greenfield will testify about at trial.  I

6    believe it will be clear as day at trial that Dr. Greenfield is

7    testifying about Internet addiction only to provide context for

8    his opinions about Internet use and the fundamental science

9    that we have discussed.  At trial, his testimony would be far

10   more cabined on the issue of Internet addiction which we needed

11   to flesh out today for the purposes of this hearing.  The

12   government would also have the ability to vigorously

13   cross-examine him about what he can and cannot say on the

14   subject matter, but certainly it would be more cabined even at

15   the stage of direct examination.  We are not proposing that he

16   will testify about an Internet addiction on the part of

17   Mr. Melzer or any other actor in this case.

18          THE COURT:  Thank you.  Good.

19          Do you anticipate that on direct examination he would

20   talk about diagnosing Internet addiction or any of the markers

21   for Internet addiction that were the subject of some of the

22   questioning here today?

23          MS. WERNER:  No, your Honor.  I think that testimony

24   is largely relevant in response to the government's arguments

25   about his ability to testify in general.

M6M5mel5                               .

1              THE COURT:  Good.  Thank you.  That's helpful.

2              Counsel for the United States, any response?

3              MS. RAVENER:  Yes, your Honor.  First of all, any

4    testimony about Internet addiction, we believe, would run afoul

5    of Rule 403.  The hearing here today confirms that this is a

6    notion of an unapproved alleged disease that has no bearing on

7    the facts of this case.  To put that before the jury at all is,

8    in and of itself, a problem under Rule 403 and, we believe,

9    would violate the rule.

10             In addition, the major issue with doing that and with

11   Dr. Greenfield's testimony at large is that he has drawn

12   opinions and conclusions about the clouding of a person's

13   judgment, about the voluntariness of their behavior, about the

14   likelihood of them lying or engaging in fantasy that are wholly

15   unrooted in any scientific comparison, that could reasonably be

16   relied upon any expert in the field let alone by him, and to

17   the extent his alleged views of the science, that is, the

18   movement of dopamine in one's body or a person's biological

19   reactions to Internet use is drawn or derived from the setting

20   of addiction.  That is drawing even further logical leaps and

21   assumptions that he just simply has not set forth and the

22   defense has failed to meet their burden to set forth a reliable

23   basis for.

24             So even if it were to have some marginal relevance

25   which we submit it actually does not, his testimony here today

M6M5mel5

1    demonstrates that those opinions and those conclusions are not

2    adequately supported by reliable methods and lack a reliable

3    basis in violation of Rule 702 and for those reasons the

4    testimony drawing those conclusions should be precluded.

5        The defense had ample opportunity to elicit a basis

6    for those opinions from Dr. Greenfield.  We submit we did not

7    hear one today and for those reasons the jury should not be

8    left to wonder about how they might apply these various bits

9    and pieces of Dr. Greenfield's purported experience on their

10   own.  That's especially true, your Honor, where the defense has

11   expanded Dr. Greenfield's alleged scope of expertise to all

12   Internet use and all Internet behavior which is just simply not

13   an appropriate subject for expert testimony, certainly not in

14   this case.

15       The testimony here today has established what I think

16   we can all use our common sense to know, that the jury pool is

17   going to be highly likely to be very familiar with the use of

18   the Internet and their own lives, it has been common practice

19   for all of us to use the Internet for more than 25 years and

20   people use it regularly -- I believe Dr. Greenfield's own

21   testimony was something more than 90 percent or almost

22   everyone.  This is not an area that the jury needs instruction

23   on.  It does not matter to any fact in issue and it will not

24   help the jury assess any evidence presented in this case to

25   know whether or not dopamine affects the brain or to know the

M6M5mel5                              .

1    evolutionary biology that Dr. Greenfield believes might be

2    applicable to every time each and every one of us uses the

3    Internet.  There is just no application for that on these facts

4    and on this evidence.

5              THE COURT:  Thank you.

6              Counsel for defense, any response?

7              MS. WERNER:  Yes.  Thank you, your Honor.

8              First, I do disagree with the government's

9    characterization of whether or not we met our burden today and

10   with their characterization of our notice which I believe

11   firmly included the testimony that he is going to give at

12   trial.  But more importantly, your Honor, I think it is

13   important not to lose sight of the fact that, repeatedly,

14   Courts in this district have admitted testimony by

15   psychologists like Dr. Greenfield that is informed largely by

16   clinical practice, by qualitative interviews, synthesis and

17   interpretation, and there are numerous examples where Courts in

18   this district have admitted testimony of that nature.  And so,

19   I think when Dr. Greenfield testifies that he sees patients in

20   his clinical practice experience the clouding of their

21   judgment, that is valuable and that is admissible.

22             Turning, your Honor, to the subject matter of the

23   dopamine and the neuroscience, it is relevant in as much as it

24   helps frame his understanding of these individual behaviors;

25   Dr. Greenfield's understanding of the behaviors that he has

M6M5mel5                              .

1  seen in survey respondents, in surveys conducted by colleagues,

2  as well as patients in his own practice.  It is impossible to

3  fully appreciate how he developed those theories and confirmed

4  them without understanding their rooting in this evolutionary

5  biology and neuroscience.  Certainly it is not the main focus

6  of his testimony, nor is addiction, but it's a useful framing

7  for the jury to hear about, at least briefly.

8           THE COURT:  Good.  Thank you very much.

9           So again, thank you very much, counsel, for the time

10 and the careful presentation of evidence here.  It was very

11 helpful for me so thank you for doing that work.  I look

12 forward to seeing you all back here on the 27th and we will

13 take up issues related to the voir dire process.

14          Counsel, anything else that either side would like to

15 raise with me before I step down, first counsel for the

16 government?

17          MS. RAVENER:  Your Honor, we don't have anything to

18 raise but we would ask for the Court's permission to stay

19 present in the courtroom for a view brief moments with the

20 Court's staff and defense counsel so we can confer about some

21 additional matters.

22          THE COURT:  Thank you.

23          MS. RAVENER:  I'm sorry, your Honor.  One moment?  And

24 we would ask the defendant to remain for that as well.

25          THE COURT:  Thank you.

M6M5mel5                              .

1           Counsel for defendant, anything else that you would

2    like to raise with me before I step down?

3           MS. WERNER:  No.  Thank you, your Honor.

4           THE COURT:  Good.  Thank you.

5           Yes, I'm happy for the parties to remain in the

6    courtroom after I step down, and subject to the availability of

7    the marshal's service.

8           Thank you all again for your work.  I will see you

9    Monday.

10                              o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       INDEX OF EXAMINATION

2      Examination of:                           Page

3      DAVID GREENFIELD

4      Direct By Ms. Werner . . . . . . . . . . . . . .3

5      Cross By Ms. Ravener . . . . . . . . . . . .78

6      Redirect By Ms. Werner . . . . . . . . . . . 161

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25