N333MELS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                            20 Cr. 314 (GHW)

5   ETHAN PHELAN MELZER,

6                Defendant.

7   ------------------------------x    Sentencing

8                                       New York, N.Y.
                                        March 3, 2023
9                                       10:15 a.m.

10
    Before:
11
                    HON. GREGORY H. WOODS,
12
                                        District Judge
13

14                      APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    MATTHEW HELLMAN
17  SAMUEL S. ADELSBERG
    KIMBERLY J. RAVENER
18       Assistant United States Attorneys

19  FEDERAL DEFENDERS OF NEW YORK
         Attorneys for Defendant
20  JONATHAN A. MARVINNY
    ARIEL C. WERNER
21

22

23

24

25
```

N333MELS

1          THE DEPUTY CLERK:  In the matter of the United States

2     v. Ethan Phelan Melzer, docket no. 20 Cr. 314.  Counsel, please

3     state your appearance for the record.

4          MR. HELLMAN:  Good morning.  Matthew Hellman, Sam

5     Adelsberg, and Kimberly Ravener for the United States.

6          THE COURT:  Thank you very much.  Good morning.

7          MR. MARVINNY:  Good morning.  Federal Defenders of New

8     York by Jonathan Marvinny and Ariel Werner for Ethan Melzer.

9          THE COURT:  Thank you very much.  Good morning.

10          We are here to conduct a sentencing hearing for

11     Mr. Melzer.  I've received and reviewed the following materials

12     in connection with this sentencing:

13          First, the presentence report, which is dated

14     February 13, 2023.  Second, the defendant's sentencing

15     memorandum, which is dated February 3, 2023, together with its

16     exhibits.  Third, the government's sentencing memorandum, which

17     is dated February 17, 2023.  Fourth, the defendant's

18     supplemental sentencing submission, which is dated February 24,

19     2023.  Fifth, the government's supplemental sentencing

20     submission, which is dated February 27, 2023.  Sixth, the

21     defendant's supplemental sentencing submission, which is dated

22     February 27, 2023.  The two supplemental sentencing submissions

23     submitted by the defendant on February 28, 2023, and the joint

24     supplemental sentencing submission, which is dated March 1,

25     2023.

N333MELS

1            Counsel, have each of the parties received all of

2     those materials?

3            MR. HELLMAN:  Yes.

4            MR. MARVINNY:  Yes, your Honor.

5            THE COURT:  Thank you.

6            Have each of the sentencing memoranda been filed with

7     the clerk of court?

8            MR. HELLMAN:  Yes, your Honor.  I believe so.

9            MR. MARVINNY:  Yes.

10           THE COURT:  Thank you.

11           Are there any other submissions in connection with

12    this sentencing?

13           MR. HELLMAN:  Not from the government.

14           MR. MARVINNY:  Not from us, your Honor.

15           THE COURT:  Thank you.

16           Counsel for defendant, let me turn first to you.

17    Counsel, have you read the presentence report?

18           MR. MARVINNY:  Yes.

19           THE COURT:  Have you discussed it with your client?

20           MR. MARVINNY:  Yes, I have.

21           THE COURT:  Thank you.

22           Mr. Melzer, let me turn to you.  Have you read the

23    presentence report?

24           THE DEFENDANT:  Yes, Judge.

25           THE COURT:  Thank you.  Have you discussed it with

N333MELS

| | |
|---|---|
| 1 | your counsel? |
| 2 | THE DEFENDANT:  Yes, Judge. |
| 3 | THE COURT:  Have you had the opportunity to review |
| 4 | with your counsel whether there are any errors in the |
| 5 | presentence report, or if there are other issues with the |
| 6 | presentence report that should be addressed by the Court? |
| 7 | THE DEFENDANT:  No, Judge. |
| 8 | THE COURT:  Have you had the opportunity to talk about |
| 9 | such issues with your counsel? |
| 10 | THE DEFENDANT:  Yes, Judge. |
| 11 | THE COURT:  Thank you. |
| 12 | Counsel for the United States, have you read the |
| 13 | presentence report? |
| 14 | MR. HELLMAN:  Yes. |
| 15 | THE COURT:  Thank you. |
| 16 | Counsel for the United States, do you have any |
| 17 | objections related to the factual accuracy of the presentence |
| 18 | report? |
| 19 | MR. HELLMAN:  No, your Honor.  And the only amendments |
| 20 | proposed were those agreed upon by the parties in the March 1st |
| 21 | letter the Court previously referenced. |
| 22 | THE COURT:  So, as counsel alludes to, as noted in my |
| 23 | orders from last week, there were facts to which the defendant |
| 24 | objected in the PSR.  The parties convened and proposed a |
| 25 | series of modifications to the factual recitations in the PSR. |

N333MELS

1    Those proposed modifications are included in the joint letter

2    filed by the parties on March 1, 2023, at docket no. 168.

3         Counsel for the United States, am I correct in

4    understanding that the government agrees to the modification of

5    the presentence report consistent with those proposals?

6         MR. HELLMAN:  Yes.

7         THE COURT:  Thank you.

8         Counsel for defendant, do you agree to the

9    modifications of the presentence report that are set forth in

10   that letter?

11        MR. MARVINNY:  Yes, we agree.

12        THE COURT:  Thank you.

13        With the stipulation of the parties, I'll order that

14   the presentence report be modified to reflect the modifications

15   agreed to by the parties.

16        Counsel for defendant, do you have any objections

17   related to the factual accuracy of the presentence report,

18   after giving effect to the modifications outlined in docket no.

19   168?

20        MR. MARVINNY:  We have none after those modifications.

21        THE COURT:  Thank you.  Very good.

22        Counsel for the United States, do you have any

23   objections to the factual recitations in the presentence report

24   after giving effect to those modifications?

25        MR. HELLMAN:  No.

N333MELS

1          THE COURT:  Thank you.

2          Given that there are no objections to the factual

3   recitations in the presentence report, the Court adopts the

4   factual recitations in the presentence report, subject to the

5   modifications set forth in docket no. 168 to which the parties

6   have stipulated.  The presentence report will be modified to

7   reflect those modifications.

8          The presentence report will be made part of the record

9   in this matter and will be placed under seal.  If an appeal is

10  taken, counsel on appeal may have access to the sealed report

11  without further application to the Court.

12         Now, although District Courts are no longer required

13  to follow the sentencing guidelines, we are still required to

14  consider the applicable guidelines in imposing sentence.  And

15  to do so, it's necessary that we accurately calculate the

16  advisory sentencing guidelines range.

17         In this case, defendant pleaded guilty to Counts Four,

18  Five, and Seven of the superseding indictment in this case.

19         Count Four charged the defendant with attempted murder

20  of U.S. service members in violation of Title 18, United States

21  Code, Sections 114, 3238, and 2.

22         Count Five charged the defendant with provision and

23  attempted provision of material support to terrorists in

24  violation of Title 18, United States Code, Section 2339A(a),

25  3238, and 2.

N333MELS

1          And Count Seven charged him with illegal transmission

2     of national defense information in violation of Title 18,

3     United States Code, Section 793(d) and 2.

4          Counsel for the United States, does the government

5     agree that a two-level adjustment is appropriate here under

6     Section 3D1.1(a)?

7          MR. HELLMAN:  Yes.

8          THE COURT:  Thank you.

9          I calculate the sentencing guidelines in a manner

10    consistent with the plea agreement and the presentence report.

11    The applicable sentencing guidelines manual is the

12    November 1st, 2021, sentencing guidelines manual.

13         Counts Four, Five, and Seven are grouped for

14    guidelines calculation purposes because they involve the same

15    victim and two or more acts or transactions connected by a

16    common criminal objective or constituting part of a common

17    scheme or plan.

18         The guideline for that group is the guideline for

19    Count Four, as it results in the highest offense level.

20         Pursuant to Section 2A1.1(a)(1), the base offense

21    level for Count Four is 33, because the object of the offense

22    would have constituted first degree murder.  Because the

23    offense involved or was intended to promote a federal crime of

24    terrorism, 12 levels are added pursuant to Section 3A1.4(a).

25    A six-level increase is warranted pursuant to Section 3A1.2(b),

N333MELS

because the intended victims were government officers or
employees, and the defendant's commission of the offense was
motivated by their status as such.  A two-level increase is
warranted pursuant to Section 3B1.3, because the defendant
abused a position of public or private trust, or used a special
skill in a manner that significantly facilitated the commission
or concealment of the offense.

        Because the defendant has demonstrated acceptance of
responsibility for his offense through his plea allocution, I
apply a two-level reduction pursuant to Section 3E1.1(a),
resulting in an offense level of 51.

        Because this is one of the rare cases in which the
offense level exceeds 43, the offense level will be treated as
43.  As a result, the applicable guidelines offense level for
this offense is 43.

        Because the offense involved a federal crime of
terrorism, the defendant's criminal history category is VI.

        I've considered whether there is an appropriate basis
for a departure from the advisory range within the guideline
system, and while I recognize that I have the authority to
depart, I do not find any ground warranting a departure under
the guidelines.

        In sum, I find that the offense level is 43, and that
the defendant's criminal history category is VI.  Therefore,
the guidelines range in this matter would be a lifetime term of

N333MELS

imprisonment.  However, because the statutory maximum sentence

applicable to the crimes of conviction is 45 years, the

guideline sentence is 540 months' imprisonment.

        Counsel, does either party have any objections to the

sentencing guidelines calculation?

        MR. HELLMAN:  No.

        MR. MARVINNY:  No, your Honor.

        THE COURT:  Thank you.

        Let me turn first to counsel for defendant.  Counsel,

do you wish to be heard with respect to sentencing?

        MR. MARVINNY:  Yes, your Honor.  May I take podium?

        THE COURT:  Thank you.  Yes, you may.

        MR. MARVINNY:  Thank you.

        Your Honor, I want to start today in the same place we

began our sentencing letter, which is by acknowledging the

severity of Ethan Melzer's offense.  We couldn't and would not

say that it was anything other than serious.  Ethan, your

Honor, knows more than anyone in this courtroom that he did

wrong, and he is profoundly remorseful for what he did.

        He wrote a letter to this Court that's at Exhibit A of

our sentencing submission.  It was a frank and searching letter

that did not seek to shirk responsibility.  Ethan wrote that

letter entirely on his own.  As he made clear in that letter,

he will live with the shame of his offense for the rest of his

life.  He is very, very aware of that.  So, that's where we

N333MELS

1    wanted to begin.

2          Nevertheless, your Honor, we've said in our sentencing

3    letter that there are circumstances that mitigate Ethan's

4    offense, and I want to take the opportunity that I have to

5    speak to you today to highlight some of them.  They are all in

6    our sentencing submission.  I don't seek to be needlessly

7    repetitive.  I know the Court has read the letter.  But there

8    are certain aspects I would be remiss not to highlight.

9          First, your Honor, notwithstanding the severity of the

10   offense, the fact is that the Court is sentencing this young

11   man for a crime where no one was harmed, and where no one was

12   close to being harmed.  That's the reality.

13         This offense took place entirely online.  We say that

14   the planning, such as it was, that Ethan was involved in was

15   beyond inchoate.  I think that's at least partially reflected

16   in the fact that Ethan has pled guilty to inchoate offenses.

17         Your Honor, the government I know has pushed back and

18   will push back on our claim that no one was close to being

19   harmed here.  We stand by that claim.  And in support of that,

20   I respectfully point the Court no further than the words of the

21   very participants in the offense itself.  We quoted some of

22   these in our sentencing submission.  The individual now known

23   as CC-1, co-conspirator-1, who turned out to be a 15-year-old

24   living in Canada, pretending to be a paratrooper online.  Just

25   a couple of days before Ethan was taken into custody, said in

N333MELS

1    the chats that other than a really basic plan of attack we,

2    don't really have much else.  We certainly have no one to

3    commit the offense.

4          The government's informant read our last cull group a

5    confederacy of dunces.  It is not excusing or minimizing

6    anything that Ethan did to point out the reality this was a

7    crime online that was not even close to fruition.

8          There is also no dispute that is a fact this Court may

9    take into consideration.  The government quoted in its

10   sentencing letter from the Second Circuit case *Stewart*, 590

11   F.3d 93.  They quoted from the concurrence in that case, but

12   majority in that case said it is entirely reasonable for

13   district judges to consider the fact that no injury occurred in

14   an offense.  And to find that that fact mitigates the gravity

15   of the offense.

16         Of course, as this Court knows, the criminal law

17   punishes inchoate offenses less than substantive offenses.

18   That is a well-settled principle.  It is something the Court

19   can consider.

20         Your Honor, recently Judge Stein in this district in a

21   material support case imposed a 96-month sentence where there

22   was a guidelines range after trial of 420 months.  The case was

23   *United States v. Hossain*, 19 Cr. 606.  The defendant there was

24   convicted after trial of "planning to use a machine gun to

25   attack a military recruiting station in the Bronx, and then try

N333MELS

1    to travel to Afghanistan to join the Taliban."  With a

2    guideline sentence of 420 months, Judge Stein imposed 96

3    months.  He said, quoting from the sentencing transcript, which

4    is at ECF 194, "The fact that Hossain's plan was thwarted

5    before he even came anywhere close to achieving his goal is

6    part of the record here, and should be taken into account.

7    Also, what should be taken into account is that there were no

8    victims or injuries, and that Hossain's plan was unlikely and

9    muddled and unrealistic."

10        Your Honor, that was true here as well.  This plan was

11   muddled, unlikely, and unrealistic.

12        I've said it before, I'll say it again.  The bottom

13   line is that no one was close to being hurt here, despite what

14   the government says.

15        Next your Honor, an additional factor that seriously

16   mitigate's Ethan's offense that this Court should take into

17   account is his overwhelming youth.  He was 21 at the time of

18   his offense.  Just 21 years old.  He turned 22 four days before

19   he was taken into custody by military authorities.  He very

20   clearly possessed the lack of maturity and the underdeveloped

21   sense of responsibility that the Supreme Court and other courts

22   have found present in youth, and factors that should impact a

23   Court's sentencing when sentencing someone who was Ethan's age

24   at the time of the crime.

25        Judge Rakoff has put it simply that a 21-year-old's

1    criminal conduct is not as morally reprehensible as that of an
2    adult.

3         And your Honor, the fact is Ethan's youth was evident
4    all throughout this offense.  The way he was seduced by a
5    dangerous, but also in some ways ridiculous cult at the age of
6    20 in 2019.  And I say "ridiculous."  The government took issue
7    with some of what we said about that in our sentencing
8    submission.  I only mean that the Order of Nine Angles is an
9    absolutely reprehensible group, but it is a group that any
10   mature adult from the word go would recognize as absurd,
11   dangerous, and not worth following.  But Ethan fell down the
12   rabbit hole in 2019, and began following that group, and we
13   know the result of it.

14        It's not surprising that this offense took place in a
15   very juvenile online context, in that the leader of the group
16   that Ethan was chatting with was a 15-year-old from Canada, as
17   I mentioned before.

18        Again, none of this is to excuse what Ethan did, but,
19   the fact of how young he was at the time is something the Court
20   should consider.

21        And your Honor, you know, I want to say this about
22   Ethan.  Ethan is not by any means irredeemable.  He's been,
23   frankly, demonized by the government at every turn, and I feel
24   like they've sought to present a kind of monolithic view of
25   Ethan, almost to paint him as if he was a monster.

N333MELS

1     He's committed an undeniably serious crime, so I

2  understand the government's anger at him, and I'm sure it makes

3  sense as a rhetorical strategy.

4     But, your Honor, Ethan is not a dyed-in-the-wool

5  extremist.  He is not someone who can't change.  He has already

6  begun to change.  We talked about in our submission his

7  immediate willingness and efforts to assist law enforcement

8  from the moment he was questioned by authorities when he was

9  still in Europe, including through when he came to the U.S. to

10  be prosecuted in the Southern District of New York.

11     Ethan offered to assist the FBI immediately.  Was some

12  of that self-interest?  Of course, any time anyone offers to

13  cooperate, there is some level of self-interest involved.  But

14  it is also not the behavior of an extremist who is so committed

15  to his beliefs that he's willing to go down with the ship, as

16  it were.

17     And your Honor, I again direct the Court to Ethan's

18  letter at Exhibit A from our sentencing submission.  That is a,

19  again, a searching letter where Ethan talks about the

20  foolishness of the group that he followed, his regret for what

21  he did, his desire to leave that all behind him.  And those are

22  not the words of an unrepentant extremist.  Not the kind of

23  unrepentant extremist the government has tried describe Ethan

24  as.

25     I've said it several times.  Ethan is not

N333MELS

1    irredeemable.  He has a family that loves him and stands by

2    him.  Some of the members Ethan's family are in court today.

3    Frankly, even when Ethan was let down by his family, Ethan has

4    continued to love them as well.  He very much longs to see them

5    again while they are alive.

6         He has a legal team, your Honor, that is

7    extraordinarily fond of him.  Mr. Mercer, who wrote a report

8    for this Court, who spent upwards of 40 hours with Ethan, met

9    with his family in Kentucky, is extraordinarily fond of Ethan.

10   I also have spent at least that amount of time with Ethan, and

11   have also gone to Kentucky to meet with his family.

12        To sit with Ethan, you get a very different image than

13   the one the government has presented.  In person, he is kind,

14   he is considerate, and he is a pleasure to be around.

15   Government will say that's all fake.  He is just fooling

16   everyone.  But it's not true, your Honor.  Ethan has wonderful

17   qualities.

18        And we submitted, our last submission to the Court was

19   a letter from the jail, from Ethan's supervisor, a corrections

20   officer there supervises Ethan in the kitchen who talked about

21   how well liked he is in the jail, how hard he works, how he

22   volunteers his time.  He's impressed people in the jail.

23   That's much to his credit.  This is a young man under

24   incredible pressure and stress, and he's made the most of what

25   he has at the MDC.  We submitted the certificates that he's

N333MELS

1    achieved.

2           He's someone with a future.  He's young.  And his

3    youth kind of exemplifies everything the Supreme Court and

4    other courts have said about how youth should impact

5    sentencing.

6           His youth also means he can have a future.  The

7    government seeks a sentence that would mean that Ethan is not

8    released until he is over 60 years old.  They seek a sentence

9    that would take away all of the best years of his life.

10          Many years ago, Judge Hellerstein said that the goal

11   of rehabilitation "cannot be served if a defendant can look

12   forward to nothing beyond imprisonment.  That hope is the

13   necessary condition of mankind, and that a judge should be

14   hesitant before sentencing so severely that he destroys all

15   hope and takes away all possibility of useful life."

16          Ethan longs to see his mother again.  He longs to see

17   his father, his grandmother.

18          We're asking the Court to impose a sentence that

19   acknowledges the severity of what he did, but allows him the

20   chance to redeem himself and begin a new life.

21          The 45-year sentence, your Honor, that the government

22   seeks is not necessary.  it is far greater than necessary.  It

23   is excessive.

24          We ask that the court impose a sentence of 15 years'

25   imprisonment, 10 years of supervised release.  That is a

N333MELS

1    sentence that accomplishes all of the sentencing goals.  It has

2    teeth.  It's long.  It would place Ethan on a long period of

3    supervision when he is released.  It is a sentence that is

4    sufficient, but not greater than necessary, to accomplish what

5    this Court should at sentencing.

6            I'm happy to answer any questions the Court has, but

7    that's our request on behalf of Ethan.

8            THE COURT:  Thank you.

9            Let me turn to the defendant.  Mr. Melzer, do you wish

10   to make a statement to the Court?

11           THE DEFENDANT:  Yes.  I'm a little bit nervous.

12   But --

13           THE COURT:  That's fine.  Please take your time.

14           THE DEFENDANT:  I don't think I could have said it

15   better than when I wrote that letter.  I kind of poured my

16   heart out into it.  Everything I said.  I still regret

17   everything that I did.  I'm trying to -- I wish I could fix

18   what I did, but I can't.  But, I want to be able to show my

19   family and, like, I wish I could say I'm sorry to my platoon.

20   They're not here.  But, I'm sorry to them as well.  And I'm

21   sorry to my family.  I want to be able to show my family I can

22   actually be a productive member of society, and not just what

23   they're trying to make me as.

24           THE COURT:  Good.  Thank you very much, Mr. Melzer.

25           THE DEFENDANT:  Thank you.

N333MELS

1       THE COURT:  Counsel for the United States, does the

2  government wish to be heard with respect to sentencing?

3  Counsel, I've been informed that there are also victims present

4  who wish to be heard.  I propose to hear from the government

5  first, and then to hear from them, unless you have an

6  alternative proposal.

7       MR. HELLMAN:  That's fine.

8       THE COURT:  Thank you.  Please proceed.

9       MR. HELLMAN:  Ethan Melzer is a traitor.

10      He attempted to murder dozens of American soldiers by

11  enabling terrorists to commit attacks through the exploitation

12  of sensitive and classified information he disclosed to others.

13      He was motivated to commit these crimes by a devotion

14  to a neo-Nazi, satanist, white supremacist group that embraces

15  a seemingly limitless racist and sexist violence toward all

16  people, except a narrow band of white men.

17      In support of that group's sole unifying principles,

18  which are chaos, death and white power, the defendant took

19  advantage of his position of trust.  He violated the awesome

20  privilege and honor unique to our nation's servicemen and

21  women, weaponized his access to sensitive information, and

22  plotted the direct murders of his fellow unit members.

23      The defendant believed not only that he could arm

24  terrorists with information that would lead to the savage

25  ambush killings, which he described as his nearly defenseless

N333MELS

1  and surprised Army unit as it traveled to a military base, or

2  an assault on what military base itself.  But also that by

3  causing those murders, he would draw the United States into

4  prolonged conflict that would cost even more American lives and

5  weaken America's leadership and status as the world's leading

6  plural democratic society.

7          The defendant sought to end American lives and America

8  itself.

9          He did so as the enemy within, by betraying every oath

10  he took, the service members who were ready to fight and die

11  alongside him, if necessary, his countrymen, and every single

12  promise and ideal of the nation he was sworn to serve.

13          That is why the government says Ethan Melzer is a

14  traitor.

15          That is why the position of the United States

16  government is clear:  That the defendant should receive a

17  sentence of 45 years' imprisonment.  It is the sentence called

18  for by the guidelines, it is the sentence that sufficiently and

19  correctly punishes the defendant for the devastating ways he

20  committed each of the three crimes of conviction, incapacitates

21  the defendant from using his training and experience from

22  threatening additional lives, and deters similar conduct,

23  particularly by those with missions of hate, terror, and

24  division who would seek to use the military or other government

25  resources to harm America or her allies from within.

N333MELS

1          The government has detailed the reasons for its

2     position in its sentencing memorandum, so I will endeavor to

3     highlight today a selection of the facts that the government

4     believes are most supportive of imposing that serious 45-year

5     sentence in this case.

6          And I must begin by addressing the nature and

7     circumstances of the offense, which are in many ways without

8     compare.  And I have to start by outlining the Order of Nine

9     Angles quickly.

10          We know that the defendant was discussing the Order of

11     Nine Angles by February of 2019.  O9A is a vicious white

12     supremacist and satanist organization that promotes violence,

13     including rape and murder, against women and children, and

14     indiscriminate hate-fueled attacks against individuals and

15     organizations across nearly the full spectrum of American life.

16     The organization lionizes Hitler and the Holocaust, advocates

17     rape as a tool of political violence and terror, as well as a

18     means by which to further the so-called white race, embraces

19     terrorist, is aligned with a variety of hate groups, which seek

20     the violent destruction of western civilization.

21     Specifically, O9A are accelerationists, that is, they believe

22     in the inevitability of a global race war, and seeks to move

23     civilization closer to it through disruptive violence and

24     chaos.

25          There is nothing benign about the organization.  It

N333MELS

espouses devastating world views, it ensnares people like the
defendant, certainly.  But it's, frankly, on its face no more
ridiculous than any of many other severely maligned terrorist
or white supremacist organizations which exist in the world
today and have existed in the past.  As the government
submitted in its sentencing memorandum, Nazism is on its face
ridiculous.  It was responsible, of course, for a world war and
millions upon millions of deaths.

By March 2019, weeks after the defendant's February
discussions about researching O9A, the defendant told others he
want to be recruited to join O9A.  By April, he had downloaded
and saved nearly a dozen O9A-related texts to his phone, and
began sharing them with others.  By May, he explained to O9A
followers online that he had enlisted with the U.S. Army, and
would train to become a member of the Airborne.  He had a
direct conversation in which he acknowledges that the uniform
code of military justice clearly banned O9A, and explained that
he would hide his affiliations from the military.

Later, in May 2019, Melzer discussed starting an O9A
group with others and suggested its motto:  Total Aryan
Victory.  Three weeks later, he reported for basic training at
Fort Benning, Georgia.

By the time the defendant began basic training, he had
embraced O9A's world view, decided to hide it from others in
the military, and he did.

N333MELS

1          By September 2019, he deployed to Italy.  His

2     enthusiasm for O9A was at that point undimmed.  In October and

3     November of 2019, well before the specific offense conduct, he

4     continued discussing O9A with others, frustrations he had in

5     the military.

6          In December of 2019, when discussing the purportedly

7     coming race war, the defendant told another person "I'm in the

8     Army specifically for this.  I literally did join for this

9     exact reason.  Can't really do anything when I'm in fucking

10    Italy.  My unit is stationed in Italy."  Described his military

11    service as "serving the enemy."  And "that he hated what they

12    have us preparing to fight for and their ideals behind it."

13    That's in December of 2019.

14         There are more examples of this in the government's

15    sentencing submission.

16         To be clear, the government is only talking about

17    Melzer's adoption of O9A's principles between not earlier than

18    February and not later than June of 2019.  The point is that

19    the defendant was an outright supporter and recruiter in

20    certain ways for O9A prior to beginning basic training.

21         He was serving O9A's mission and himself, and

22    apparently waiting for an opportunity.  That opportunity came

23    when Melzer was reassigned to a platoon heading out of Italy to

24    what we have collectively defined as the military base.

25         Before addressing that, it's important to note that

N333MELS

1    throughout this period, the materials Melzer accessed, as his

2    commitment to O9A deepened, depicted countless forms of

3    extremist, jihadist, and racist violence.  The Court has had an

4    opportunity to review a subset of those materials.  They are

5    absolutely horrific.  Nazi and neo-Nazi propaganda.  A video

6    which appears to depict a black woman being lynched in front of

7    a confederate flag by two laughing white men.  Then there is

8    the ISIS and other jihadist propaganda, footage of assaults on

9    U.S. forces and counterterrorist forces of other nations,

10    bombings, ISIS executions, including the beheadings of

11    prisoners, videos of hostages shot in the head and pushed into

12    mass graves or dumped in to rivers like garbage.

13        But of particular concern was the ISIS propaganda

14    video showing the murder of several U.S. service members in

15    Africa in 2018.  That footage was released by ISIS, after their

16    members gathered the footage from the corpse of an American

17    service member.

18        The ambush in question involved Army forces in a

19    convoy.  Weeks after that video was on the defendant's phone,

20    the defendant would begin telling others that an ambush of his

21    own upcoming convoy could result in a mass casualty event.

22        So, by May of 2020, the principal period of the

23    offense conduct here, Melzer had been an active O9A supporter

24    for well over a year.  That included the entire time he was in

25    the Army since basic training.  He learned that he would be

N333MELS

1    joining another unit, and training rapidly to deploy to the

2    military base.

3              As he was training on the parameters of that mission,

4    he learned important things:  The purpose and location of the

5    military base, the platoon's duties at the base, its weapons

6    requirements, threats scenarios at the base, and other critical

7    information.  Almost immediately after beginning to receive it,

8    Melzer began sharing it with other O9A members.  Within weeks,

9    he was discussing passing the information about the deployment

10   to others, including an individual described as a member of al

11   Qaeda, who could take advantage of the sensitive knowledge

12   Melzer possessed.

13             Importantly, he did not just pass that information to

14   one individual, CC-1, or a very small subset of others in a

15   closed-off chat.  He passed it to a broader group online and

16   then entered that closer group.

17             He actively sought an audience for the information he

18   obtained, pursuing others who could bring the knowledge to

19   those who could execute an assault on the unit at the base.

20             The inspiration for the attack was entirely Melzer's

21   own.  The defendant proposed the assault, the horrific

22   casualties that would ensue if the attack was executed

23   properly.  And importantly, particularly in the context of the

24   defendant's conviction under Section 793(d), the defendant

25   disclosed the purpose of the military base.  This was on the

N333MELS

1    context of outlining the importance of the base, and the

2    devastating impact that an assault on the base, however

3    successful, would have on American interests going forward.

4           To the extent that counsel has mentioned messages by

5    CC-1 or the government's source that suggested that the attack

6    plan that was not fully baked.  That is not the opinion of the

7    Army.  And I think the impact statements the Court is going to

8    hear today will help explain that, perhaps better than I can.

9           Whatever the idea in the minds of the co-conspirators,

10   the idea in the mind of the defendant was clear.  And the

11   reason that these attack scenarios were proposed by the

12   defendant, and the reason that he credited these attack

13   scenarios as not merely fantasy and not unrealistic or

14   unlikely, is because they are the scenarios he was told by the

15   Army to watch out for.  These are the scenarios the Army

16   suggested posed the greatest risk to Melzer and his unit, and

17   to the military base.  And he regurgitated them to other

18   members of the group.  They are not high fantasy.  They may

19   sound unrealistic and strange from a courtroom in New York

20   City.  But, in a deployment, in a remote location, and a

21   military base which must be secured by 40 paratroopers, these

22   are real dangers that were really briefed to the unit, and they

23   are real dangers that do not evaporate because the defendant

24   has been brought to justice.  It is sensitive information which

25   has entered the internet, and over which the government has

N333MELS

1    lost positive control.

2              The day he was arrested, the defendant believed he was

3    on the verge of deploying to the military base, literally.  He

4    was in uniform, bags packed, waiting for the bus to go to the

5    airport.  He had O9A books in his bags.  Just hours earlier, he

6    was still discussing the attack plot with the confidential

7    source, complaining the U.S. would "be in a frenzy to send

8    people out there and start another war."  Hours before his

9    apprehension.

10             I outlined the foregoing again, your Honor, because

11   the nature and circumstances of the offenses are frankly

12   independently worthy of a guideline sentence.  The conduct I

13   described is one of the most stunning betrayals from within the

14   ranks of the U.S. military ever to be prosecuted in federal

15   court.  It is undisputed that the defendant committed himself

16   to O9A prior to starting basic training, that he reaffirmed his

17   allegiance to O9A to the military over and over again in

18   conversations with others, consumed immensely violent

19   propaganda, and viewed his military service as training that

20   was helping to make him a view violent tool of O9A's mission.

21             When unexpectedly assigned to a mission that would

22   bring him and his unit mates to a place of real danger, at the

23   very first opportunity, the defendant proposed the murder of

24   his fellow service members, and provided the exact details that

25   would help terrorists he knew could access the military base to

N333MELS

1   do it.

2         There is tangible harm.  It is absolutely true the

3   military base was not attacked.  The convoy was not attacked.

4   As the Court is going to hear soon from Captain Jacob Ferris,

5   who went on the deployment after the defendant's disclosures,

6   the deployment happened, and its members completed that

7   deployment's mission.

8         But as both Captain Ferris and Captain Joshua Kraus

9   will note, the potential danger is ongoing.  There is also the

10  harm that was caused to the unit members, which Captain Ferris

11  will describe.  Immense psychological harm.  A weakening of the

12  bonds within the military.

13        I cannot do justice to the frame of mind that the unit

14  mates had when they deployed.  I'll let the victims speak to

15  that.  But there is a real harm to the fellow service members

16  who were the targets of the defendant's murderous plot.

17        There is also a harm to the United States.  And that

18  is in terms of the national defense information, including

19  classified information, that was distributed by the defendant

20  with the intention that it advance the interests of enemies of

21  the United States.  That is information the United States

22  cannot reclaim.  It is information that the defendant

23  distributed.  There is real harm done.

24        Which leads me then to discuss briefly specific and

25  general deterrence.

N333MELS

1          For well over a year, including as a member of the

2     Army, the defendant shrewdly advised others on pursuing O9A's

3     goals, while enriching his own knowledge of the organization.

4          It bears repeating that the genesis of this attack

5     plot was entirely the defendant's own.  It was his idea.  He

6     willingly gave classified and dangerous information about his

7     unit to other members of the chats, and indeed, much of those

8     disclosures happened as he was peppered with questions about

9     his plot by others, but that's entirely of his own devise.  He

10    openly and repeatedly sought others to help complete the attack

11    and further the information for him.

12         It is true that the actual quite literal dissemination

13    of the information happened in encrypted chatrooms that the

14    defendant used, but it also happened in briefing rooms where

15    the defendant learned the information, began harvesting it, and

16    intending to deliver it later.

17         The harm happened to the deployment, the men who

18    actually went to the military base, and the harm continues to

19    the risks that adhere to the military base and service members

20    who deploy in the future.

21         I think importantly, nothing about the defendant's

22    Army service, including what are described in his submission as

23    salutary effects, positive effects of military service, to the

24    extent that's true, none of them dissuaded from O9A, or the

25    oaths and support of the U.S. against extremism that were

1    ignored.  His experiences in training, getting to know other

2    service members, literally sleeping next to them, did not

3    prevent him from determining in the end to attempt to effect

4    their murders.

5            He instead sought military training and experience and

6    exhorted others to take his path.  The defendant's willingness

7    to die, recruitment of others to O9A, military training, proven

8    ability to hide within even the Army while pursuing his true

9    aims, weigh heavily and unambiguously in incapacitating the

10    defendant through a strong sentence.

11            Turning to general deterrence, it is a critical

12    priority in fashioning a just sentence, respectfully.  An

13    adequate deterrent message to mitigate the threat posed by

14    individuals affiliated with neo-Nazi or white supremacist or

15    violent terrorist groups, is an important feature of this

16    sentencing, amplified by the significant and specific danger

17    posed by insider threat actors like the defendant, in

18    particular.

19            That general deterrence prerogative is perhaps defined

20    no better or highlighted no better by defendant's own

21    statements in trying to recruit others to O9A from within the

22    military.  Exhorting others to join the U.S. Armed Forces in

23    pursuant of O9A.  Take advantage of training and experience so

24    that those individuals can become better servants of O9A.

25            Sadly, it is a reality that there are others who have

N333MELS

1    used, are using, and will use government resources, like the

2    military, to advance their extremist agendas. A significant

3    sentence in this case is necessary to deter those considering

4    entering the military, despite their hidden extremist beliefs.

5           To be absolutely clear, the defendant is not be

6    sentenced for his beliefs, his worldview, or even his advocacy

7    for it. But using the Army as a tool by which to advance those

8    goals, and threatening lives of his fellow service members,

9    while abusing classified and other national defense

10   information in support of terrorism is, and a message of

11   general deterrence reinforced by a significant sentence in this

12   case will dissuade others from using the Armed Forces

13   similarly.

14          I want to briefly address a point that counsel made

15   that the defendant is not irredeemable. The government

16   extended a plea agreement that the defendant accepted which

17   took the possibility of a life sentence off the table. The

18   government still urges a significant sentence, which is also

19   the guideline sentence in this case.

20          Because a life sentence in this case is no longer a

21   possibility, the defendant will have many of the advantages

22   that counsel described. The ability to serve a sentence and

23   look towards a life after it.

24          But the sentence that the government requests is

25   necessary to reflect all the prerogatives that I have already

N333MELS

1    described, however serious it may be, especially in the case of

2    a young person.

3            I'll conclude, your Honor, by repeating that the

4    defendant's arguments simply do not support the extraordinarily

5    variance he seeks.  By requesting a 30-year variance from the

6    guidelines, the defendant essentially requested that he be

7    sentenced for only one of the three crimes he committed.  Such

8    a variance would position the defendant significantly more

9    halfway beneath the sentence called for by the guidelines.

10           I think one way of looking at that sentence is to note

11   that that kind of sentence would suggest the defendant's

12   conduct placed him in the bottom quotient of those committing

13   offenses like these.

14           It simply cannot be that the defendant's active

15   membership in an extremist group for over a year of military

16   service, recruitment of others to the military in service of a

17   racist terror organization, distribution of sensitive national

18   security information and secrets, efforts to pass troop data to

19   terrorists, all in service of a plot to murder U.S. soldiers

20   and drive the nation to war in another country, qualifies him

21   for a sentence so severely divorced from the guidelines

22   recommendation.

23           That sentence would not reflect congressional intent,

24   it would not sufficiently deter the defendant or others, and it

25   would place the defendant's conduct dangerously out of scope

N333MELS

1   with the statutes he wantonly violated.

2          The defendant crossed every conceivable line.  Lying

3   to drill instructors, superior officers, fellow soldiers,

4   classified briefers, and more, so he could receive classified

5   information and pass it to an organization as to which he knew

6   even association was grounds for removal from the Army.

7          The defendant's longterm and deep commitment to the

8   Order of Nine Angles, and his ultimate decision to serve its

9   goals, in violation of every American value he was sworn to

10  protect, meant he broke bonds with his fellow soldiers, his

11  Constitution, and his country.

12         The defendant is a traitor.  He tried to murder

13  Americans.  He did so by disclosing secrets and embracing

14  terrorism.  A 45-year sentence is the appropriate sanction for

15  these immense crimes.

16         THE COURT:  Thank you, counsel.

17         I understand that there are victims present who wish

18  to address the Court.  I'd ask that the first come forward.

19  You can use the podium.  My deputy can assist you.

20         MR. HELLMAN:  Thank you.  For the record, I'll note

21  that the Army is represented by three individuals today.

22  First, Major Estefania Mishkin.  She will not be speaking on

23  behalf of the Army, but is present.

24         The first victim impact statement will be delivered by

25  Captain Joshua Kraus.

N333MELS

1          THE COURT:  Thank you, please come forward.

2          CAPTAIN KRAUS:  Good morning, your Honor.  I have

3     prepared a statement today I would like to read to the Court.

4          My name is Captain Joshua Kraus.  I am a military

5     intelligence officer who has worked with both the 173rd

6     Infantry Brigade Combat Team, and the 207th Military

7     Intelligence Brigade.  As a military intelligence officer, my

8     duties include providing leaders with relevant, timely, and

9     accurate information regarding enemy actions, capabilities, and

10    how to deter them.

11         I was directly in charge of the preparation of

12    classified and unclassified intelligence to prepare Ethan's

13    platoon to deploy to the military base.  I provided an overview

14    of the terrain, weather, enemy, and travel considerations that

15    they were to consider.  I outlined presumed modes of

16    transportation that the platoon might take once they arrived in

17    country.  I went over scenarios in which enemy units, terrorist

18    organizations, or civilians might directly attack the military

19    base.  I went into classified space in which I outlined

20    specific actors and organizations that might have been

21    operating within 8 to 16 hours of the platoon's position.  I

22    provided the squad leaders and above with unclassified products

23    to review during their flight.

24         Now, due to Ethan's actions, I will always have to

25    think twice in regards to how I brief and whom I share very

N333MELS

1    sensitive information with.

2          I was asked to review some of the material Ethan had

3    shared with his group, and was completely shocked to see the

4    information I relayed to Ethan's platoon being shrouded in

5    those messages.  The information that I delivered to protect

6    Ethan and his platoon was shared with our sworn enemies.

7          My professional observation, your Honor, is that the

8    sentence that you will hand down will set a precedent in many

9    ways.  Our allies and enemies are very aware of this case.  Our

10   allies will take notice of the sentence and will weigh if they

11   should continue to share the most critical and sensitive

12   secrets with the United States of America.  The United States

13   must and will continue to lead from the front.

14         Ethan Melzer knowingly violated his oath of enlistment

15   to the United States Army, Department of Defense, and most

16   importantly, to the men and women to his left and right who

17   were serving alongside with him in Italy.  That violation of

18   trust amongst the ranks is egregious, and will unfortunately

19   have lasting impacts.

20         Instead of standing ready to engage and destroy the

21   enemies of the United States in close combat, Ethan Melzer

22   invited enemies of the United States into our sensitive spaces.

23   He wanted to orchestrate a violent jihadist attack against his

24   team, his squad, and his platoon.

25         Building cohesive teams is central to the Army

N333MELS

culture.  That is why the Army instills that we have team
leaders to lead small teams, squad leaders, platoon leaders,
and company commanders.  Ethan had the trust of his team, and
now has caused his entire platoon to question the trust they
give to their comrades to the left and right for the rest of
their lives.

        An effective grasp of any mission requires training
personnel.  Commanders must not underestimate the importance of
providing training.  Now due to Ethan's actions, every
commander and leader that this case has affected will think
twice about the people they are sending out on a deployment.
Ethan created a psychological cancer that attacks the very
fiber of who we are as U.S. service members.

        We do not care who you sleep with, who you worship,
where you call home, or who you voted for.  It is our duty to
uphold the Constitution of the United States and accomplish the
mission at hand.  When Ethan was entrusted with critical and
sensitive information intended to keep U.S. service members
free from harm, he took that information and relayed it to our
very worst enemies in order have them killed.

        I want to provide context and my point of view, your
Honor, to the damage Ethan has done.  I provided sensitive
information on how I would attack this base if I were the
enemy.  That is part of my job as an intelligence professional,
to describe in detail possible vulnerabilities of the military

N333MELS

1    base.  I relayed the threats and described in detail my

2    assessment.  This assessment was on a need-to-know basis.  This

3    information now can never be retrieved.  This information now

4    can be passed to any amount of people and/or organizations and

5    can still be used to harm U.S. service members and partner

6    nation forces.

7         The Department of Defense cannot just pick up and move

8    a base again, due to Status of Forces agreements and diplomatic

9    agreements.  I say that to underscore that once this case is

10   over, the threat caused by this conduct will continue to

11   threaten U.S. service members, wherever they may be.

12        Your Honor, Ethan should receive 45 years in prison

13   because the information that he shared will never be able to be

14   recovered, and can still harm servicemen and women now and long

15   into the future.  Thank you.

16        THE COURT:  Thank you.

17        MR. HELLMAN:  Your Honor, the second and last victim

18   impact statement will be delivered by Captain Jacob Ferris.

19        THE COURT:  Thank you.  Please come forward.

20        CAPTAIN FERRIS:  Your Honor, I'd like to thank you for

21   allowing me to speak in your courtroom today.

22        My name is Captain Jacob Ferris.  And while I am now

23   transitions to the civilian sector to pursue my MBA, I've also

24   served in the U.S. Army for the last 11 years.  I've held a

25   wide range of jobs, all the way from an enlisted private to

N333MELS

captain.  More importantly, I served as the platoon leader of

2nd Platoon, Attack Company, 1-503D Infantry Battalion, 173rd

Infantry Brigade.  I deployed with 2nd Platoon, "The Kowboiz,"

and was the officer in charge of security on the military base.

While I may be one man standing in a courtroom, I'd

like to be clear that I am speaking for 35 other U.S. Army

paratroopers that I've eaten, slept in the mud, and bled with.

The men of the 2nd Platoon made serving as a leader of

paratroopers one of the greatest honors I've ever experienced.

They came from all walks of life and built a cohesive team,

despite their polarizing differences.  This team was comprised

of teenagers, fathers, young men who had escaped harsh

upbringings, and farmers who couldn't wait to get home to their

families.  The majority of 2nd Platoon had never deployed, and

therefore felt a sense of pride and anxiety simultaneously.  It

is an incredible responsibility that these young men felt, and

it's not something that many in our great nation will ever

experience.  However, the team we had built was ready for the

task, because we'd created relationships based on trust and

commitment to the task at hand.

Prior to the deployment, Ethan Melzer's actions made

impacts that no military schooling can prepare you for as a

leader.  The first few days after his arrest were confusing for

the platoon for several reasons.  Our departure date for the

deployment was changed multiple times, but 2nd Platoon was kept

1    in the dark.

2            There were several rumors concerning the sudden

3    timeline changes spreading across the battalion.  And it led

4    members of the platoon to speculate that something serious had

5    happened.  The uncertainty prior to departure increased the

6    younger paratroopers' anxiousness due to this being their first

7    deployment.

8            Sergeant First Class Campbell, the platoon sergeant,

9    and I had to determine the best way to communicate to the

10   platoon what had transpired.  Imagine trying to explain to 34

11   men that rely on you to keep them alive that one of their own

12   had planned to kill them.  This was a stressful time because we

13   wanted to ensure that the platoon remained cohesive and

14   functional.  The idea that the paratroopers couldn't trust

15   their own teammates had already been planted, and it stayed at

16   the forefront of their minds.

17           With so much thought being given to Melzer's actions,

18   it steered focus away from the task at hand.

19           Once the platoon understood why Ethan had been

20   arrested, we had to work diligently to mitigate the anger and

21   frustration that these paratroopers developed.  This is because

22   the anger could easily cloud judgment and raise tensions within

23   platoon.

24           It's one thing to ask young men to put their lives on

25   the line for their country.  It's something entirely different

N333MELS

1    when you ask them to put their lives on the line immediately

2    after the foundations of their belief in the team have

3    crumbled.

4           Prior to departing Italy, Sergeant First Class

5    Campbell and I were forced to confiscate all phones.  These

6    young men were now heading to an incredibly remote military

7    base with zero connections to friends, family, or the outside

8    world.  All they had to rely on was each other.

9           How would you feel if you were ordered to deploy to a

10   war zone after finding out that the only 35 people you could

11   rely on for the next five to six months may be trying to cause

12   you harm.

13          During the deployment, we had to quarantine for two

14   weeks prior to moving to the military base, and were confined

15   to an area no larger than 200 square meters.  This confined

16   area meant that paratroopers had ample time to consider the

17   impact that Ethan's actions could have had.

18          During quarantine, every member of the platoon had to

19   speak with investigating agents at Incirlik Air Base.  The

20   questions were frustrating for most of the platoon, because we

21   were asked questions such as Did you notice anything strange

22   about Melzer's behavior prior to the deployment?  Some of the

23   paratroopers were frustrated and blamed themselves because they

24   believed they should have seen the threat coming.

25          The reality of the situation is that these

N333MELS

paratroopers were deceived and betrayed.  None of us saw this

coming.  And there are a few things worse than betrayal in a

profession such as ours.

I implore you to consider how much loyalty Ethan

The Army has seven basic values:  Loyalty, duty,

respect, selfless service, honor, integrity, and personal

courage.

I implore you to consider how much loyalty Ethan

demonstrated when he planned to attack his own.  How much honor

or integrity exists within Ethan's heart after what he's done.

The men of 2nd Platoon tried to make Melzer feel like a member

of the team, and came to find that he had taken advantage of

the situation in order to murder them.

Tensions among the platoon were high when we started

the deployment, and multiple soldiers came to me saying they

were frustrated because they couldn't find a healthy outlet for

their anger.  No amount of work or time in the gym can give you

reprieve from your own mind.  35 young men with heightened

emotions, in a remote and hazardous area, can spiral into chaos

if not properly mitigated.

In addition to these mental frustrations, we had to

mitigate additional threats to the military base by completely

overhauling security measures and protocols.  This is because

Private Melzer had passed on sensitive information specific to

how we would maintain security of the base.

However, I want to be clear that 2nd Platoon

1  maintained a high standard of professionalism throughout the

2  deployment, and successfully accomplished a mission that we

3  were selected for out of 20 platoons.

4       Due to the remoteness of our deployment, the platoon

5  had begun to move on from the incident with Melzer as we

6  prepared to return to Italy.

7       Upon return, many of us came to find we'd been labeled

8  as the platoon that had a terrorist.  This ostracized the

9  platoon and created the sense that we were somehow tainted.

10  These paratroopers had done a job, and done it well, but their

11  performance was overshadowed by the actions of Private Melzer.

12       One paratrooper came to me and said, I know there's

13  way any of us could have known, but I feel like out of 35

14  people, one of us should have seen the signs.  Then we wouldn't

15  have to hear about how our platoon bred a terrorist.

16       The men of 2nd Platoon, Attack Company, will have to

17  permanently live with the memory that one of their own assisted

18  in trying to end their lives.

19       As the platoon leader, everything the platoon does or

20  fails to do is my responsibility.  This principle applies to

21  Ethan's actions as well.  I could have been killed.  Even

22  worse, I could have survived but lived with the knowledge that

23  I couldn't return the other 35 men to their families.

24       Terrible things happen in war, but no family should

25  ever lose their son or daughter to a situation like this.

N333MELS

1          I feel incredibly fortunate that law enforcement was

2     able to stop Ethan before any further action could be taken.

3     However, I will forever carry the knowledge that I was

4     responsible for a paratrooper that planned to harm the rest of

5     our team.

6          I hope that this sentencing will be bring closure to

7     those who were affected by Private Melzer's actions so

8     everyone, including Ethan, can move on.  Thank you, your Honor.

9          THE COURT:  Thank you, Captain.

10         Counsel, I am going to take a brief recess.  It's

11    11:13 by my clock.  I am going to propose that we convene at

12    11:20 a.m.

13         Thank you very much.

14         (Recess)

15         THE COURT:  So, counsel, is there any reason why

16    sentence should not be imposed at this time?

17         MR. HELLMAN:  No, your Honor.

18         MR. MARVINNY:  No, your Honor.

19         THE COURT:  Thank you.  I'll now describe the sentence

20    that I intend to impose, but counsel will have a final

21    opportunity to make legal objections before the sentence is

22    finally imposed.

23         As I've stated, the guidelines sentence applicable to

24    this case is 540 months of imprisonment.

25         I've considered the guideline sentence.  Under the

N333MELS

1    Supreme Court's decision in *Booker* and its progeny, the

2    guidelines range is only one factor that I must consider in

3    deciding the appropriate sentence.

4        I'm also required to consider the other factors set

5    forth in 18, United States Code, Section 3553(a).  These

6    include:

7        First, the nature and circumstances of the offense and

8    the history and characteristics of the defendant;

9        Second, the need for the sentence imposed to:

10        (A) reflect the seriousness of the offense, to promote

11    respect for the law, and to provide just punishment for the

12    offense;

13        (B)  to afford adequate deterrence to criminal

14    conduct;

15        (C) to protect the public from further crimes of the

16    defendant; and

17        (D) to provide the defendant with needed education or

18    vocational training, medical care or other correctional

19    treatment in the most effective manner;

20        Third, the kinds of sentences available;

21        Fourth, the guidelines range;

22        Fifth, any pertinent policy statement;

23        Sixth, the need to avoid unwarranted sentence

24    disparities among defendants with similar records who have been

25    found guilty of similar conduct; and

N333MELS

1          Seventh, the need to provide restitution to any

2     victims of the offense.

3          Ultimately, I'm required to impose a sentence that is

4     sufficient, but no greater than necessary, to comply with the

5     purposes of sentencing that I mentioned a moment ago.

6          Now, I've given substantial thought and attention to

7     the appropriate sentence in this case considering all of the

8     3553(a) factors and the purposes of sentencing as reflected in

9     the statute.

10          Based on a review of all of the factors, which I am

11     going to discuss in much more detail in a moment, I intend to

12     impose a guideline sentence of 240 months' imprisonment with

13     respect to Count One, 180 months with respect to Count Five,

14     and 120 months with respect to Count Seven, to be served

15     consecutively, followed by three years of supervised release,

16     subject to the mandatory and special conditions described in

17     the presentence report, which I am going to detail with more

18     specificity later.

19          I do not expect to impose a fine.  I will impose the

20     mandatory fee of $100.

21          Let me begin with the nature of the offense, because

22     that's where the statute asks me to begin.

23          Mr. Melzer's crimes were repugnant.  He betrayed the

24     United States of America.  He betrayed the United States

25     military.  He targeted for murder his fellow soldiers.  He

N333MELS

worked to aid jihadist terrorists.  All so he could achieve his

nihilist goal of undermining Judeo-Christian values and

rupturing civilized society.

Much has been said here about the organization that

Mr. Melzer joined.  I do not think that I need to give that

organization more of a soapbox than it's already had here.  But

it is a white nationalist, neo-Nazi, satanist, pro-jihadist

group that promotes the use of extreme violence to accelerate

and cause the demise of western civilization.

In its view, as embraced by Mr. Melzer, those values

hold us back from the state of nature and are holding us back

from what it and Mr. Melzer views as the natural order --

chaos.  The organization and Mr. Melzer opposed those Judeo and

Christian values because they are good for civilization.  His

crimes were committed in order to destroy civilization, to

bring us back to a state of nature.

Mr. Melzer was interested in neo-Nazi ideology years

before he joined the military.  By February 2019, after he

enlisted in the military, but before he appeared for basic

training, Mr. Melzer was researching the organization and its

American affiliate.

While in the military, Mr. Melzer worked to recruit

and indoctrinate others to the organization's violent mission.

He had himself tattooed with a symbol for chaos, reflecting his

mission to destroy western civilization to give way to satanic

forces and unrestrained violence.  He self-indoctrinated
himself through rituals.

I am not going to review all of his activities while
in the military in support of the mission of this organization.
What's important is that he acted to advance extremist views,
his extremist philosophy and ideology in secret, he did so for
an extended period of time, he did so notwithstanding the fact
that it was prohibited by the military's rules, and
notwithstanding his knowledge of the risk that he would be
disciplined for his participation in it.

He told others that his service in the military was a
"insight role" for his organization, and that he was not
"patriotic for sh**," and that "all these places deserve to be
burned."

As counsel for the United States described, he is not
charged here with his ideology.  His crime began after his unit
was transferred to Italy.  While there, he learned that his
platoon was going to be sent on a classified deployment abroad.
The assignment required a security clearance, and the defendant
received national defense information about the deployment.  He
received briefings that informed him about the importance of
maintaining confidential that information.

Mr. Melzer then worked to plan an attack on his
platoon, while on its deployment abroad.  Mr. Melzer sought to
provoke jihadi terrorists to commit the attack.  By doing so,

N333MELS

Mr. Melzer intended to cause a mass casualty event that would
provoke a war.

Mr. Melzer was willing to die in the attack, and in
his words, "Who gives a F***. The aftereffects of the convoy
getting attacked would cover it... it would be another war... I
would have died successfully... because another 10-year war in
the Middle East would definitely leave a mark."

Mr. Melzer provided national defense information to
others intending that it be used to murder the members of his
platoon by the jihadi fighters. Mr. Melzer strategized about
the best ways to attack his unit, and to kill the 40 or so
service people in it.

Thankfully, one of the people on the group with whom
Mr. Melzer was communicating informed the government about
Mr. Melzer's plotting, and he was arrested before it could come
to fruition.

But I want to emphasize that this was not a lark.
This was not merely time spent in a dark internet rabbit hole.
Mr. Melzer did indeed attempt to murder his fellow soldiers.
He did provide and attempt to provide assistance to terrorists.
He did share national defense information in the pursuit of his
goals.

That the attack did not take place was not for lack of
trying by Mr. Melzer. He believed that his plans and the
participants in it were real, and that they were as committed

N333MELS

1    to the project as he.

2           That he was committing his crime on the internet does

3    not mean that his acts were not serious or that his intentions

4    were not real.  He pleaded guilty to those crimes because he

5    actually commit those crimes.  Instead, it means the crime was

6    taking place in 2020, when so much of our lives can happen

7    online.  That includes terroristic efforts to murder U.S.

8    service people.

9           So I think that these crimes are exceptionally serious

10   in nature, as reflected by the guidelines recommendation that

11   the Court impose a lifetime term of imprisonment.

12          Mr. Melzer is a young man.  He was born in May 1998 in

13   Louisville, Kentucky.  He is now 24 years old.  He committed

14   his offense when he was 21.  He is both parents' only child.

15   Mr. Melzer's parents separated when he was only four years old.

16   He was raised primarily by his mother.

17          Mr. Melzer had what he described as a chaotic

18   childhood, for a number of reasons.  His mother suffered from

19   alcoholism.  Sadly, she suffered abuse at the hands of

20   partners.

21          Mr. Melzer's home life was, in his counsel's words,

22   "Suffused with racist, homophobic, and anti-Semitic views."  In

23   the midst of that fraught environment, Mr. Melzer also

24   struggled with the realization that he was gay.  That fact

25   increased his sense of alienation and difference from the

N333MELS

1    culture that surrounded him.

2           He began to use drugs, and he began to sell drugs.

3    Once, when meeting somebody to buy drugs, Mr. Melzer ran away

4    from the car where the transaction was taking place.  He was

5    chased by a person who I understand to have been his dealer.

6    Mr. Melzer pulled out a handgun and fired several shots at that

7    victim.  The gunshot shattered the victim's humerus, and caused

8    him to lose full use of his arm.

9           Mr. Melzer also talked about participating in other

10   acts of violence during that time.  He told one person that he

11   robbed stores with members of a gang and sold drugs.

12   Mr. Melzer told another witness that he was happy about the

13   mass murder at the Las Vegas Route 91 Harvest Festival, and

14   shared with that witness his racist, anti-Semitic views.

15          I've read the mitigation support submitted on behalf

16   of Mr. Melzer, and I've read the many letters of support

17   submitted on Mr. Melzer's behalf.

18          I can see from them the effect of Mr. Melzer's

19   difficult childhood, and his feeling that he did not belong,

20   and his serious challenges as a teen.  Members of his family

21   have described him as a kind, intelligent person.  And the

22   letters make clear that there are members of Mr. Melzer's

23   family who miss and support him.

24          Mr. Melzer is blessed with good health.  He has not

25   been diagnosed with a mental illness, but he believes he may

1    suffer from depression, a condition that has affected other

2    members of his family.

3          Mr. Melzer has a long history of substance abuse.  He

4    smoked marijuana from the time he was 14 until he was 17, used

5    ecstasy daily from the time he was 17 until he was 18, he used

6    Xanax several times a month between ages 14 and 17, and he used

7    meth daily from age 17 to 18.

8          Mr. Melzer dropped out of high school when he was in

9    the tenth grade.  He obtained his high school diploma later

10   while working in the Job Corps.  From 2015 through 2016, he

11   worked at a series of fast food restaurants, and from 2017 to

12   2018 he worked as a cook and cleaner at another restaurant.  He

13   joined the Job Corps in 2018.  It was from there that he left

14   to join the military.

15         Mr. Melzer does not have other criminal convictions,

16   but this is not his only set of crimes.  He was involved with

17   narcotics and, significantly, as I described earlier, he shot a

18   person, seriously wounding him.

19         I believe that a meaningful sentence is important in

20   this case in order to promote respect for the law, and to

21   impose a just punishment.  A very serious sentence of the

22   magnitude that I am imposing is needed to impose a just

23   punishment.

24         Mr. Melzer betrayed his comrades in arms; he tried to

25   have them murdered; provided assistance to people he believed

are terrorists; and he shared national defense information to

do so.  This is a very serious crime, and the sentence must be

substantial to be just.

I'm required to consider the deterrent effect, both on

Mr. Melzer personally, and also the need to deter others from

committing this crime.

With respect to personal deterrence, I believe that

the need for it is very high.  I'm very concerned about the

likelihood that Mr. Melzer will again commit another crime, and

I'm concerned that the risk to his fellow citizens is

substantial, were he to choose to do so.

Mr. Melzer now expresses remorse, as he is facing

justice for his crimes.  But I, frankly, do not believe him.

Mr. Melzer has demonstrated his interest in and commitment to

his repugnant ideology, which ultimately blossomed into his

crime, over an extended period of time.  Mr. Melzer had himself

tattooed with a symbol of his commitment to it.

Part of the methodology of his organization, as I

understand it, is that one should hide one true's intentions

and commitment to better achieve its goals.  And over an

extended period of time, Mr. Melzer effectively did just that.

I have, for example, a letter from the Job Corps describing how

shocked the writer was about Mr. Melzer's actions, because they

were not consistent with the young man she worked with.

That does not tell me that Mr. Melzer was a good young

N333MELS

1  man, because he went off and tried to kill service members,

2  but, rather, that he hid his views effectively.  As we just

3  heard today, he hid his views effectively from his platoon

4  mates.

5        Mr. Melzer found community in this organization

6  because it sang his song.  He sought out fellowship with people

7  that shared his belief system.  He could have logged off at any

8  time.  Instead, he demonstrated his commitment to terrorism and

9  murder.

10       So I do not trust his expression of remorse or that he

11  has truly renounced his commitment to violence.  I hope it's

12  true, but I don't trust it.

13       I think it is more likely that Mr. Melzer is playing

14  another role to obtain leniency from the Court, as he played

15  soldier while working in secret to murder servicemen.

16       Mr. Melzer was well aware of the potential

17  consequences of his conduct here, yet he chose to commit it

18  nonetheless.  I'm left with the definite impression that

19  Mr. Melzer has little respect for, or ability to comply with,

20  the law.

21       Given his desire to commit murder and terrorist acts,

22  and his violent nature, as expressed, among other things,

23  through his earlier shooting, I'm very concerned for the safety

24  of the community should he choose to recidivate.

25       I think it is important for me to impose a sentence

N333MELS

1  that will protect the public and achieve the goal of personal

2  deterrence.

3          I must also consider the goal of general deterrence.

4  This is a factor that weighs very heavily in my evaluation of

5  the appropriate sentence in this case.

6          Mr. Melzer was a soldier placed in a position of trust

7  by his country and his comrades.  He betrayed that trust.  We

8  heard from the victims who spoke today the effect, the

9  corrosive effect, of that betrayal on his fellow service

10 members, and potentially on America's allies and enemies

11 abroad.

12         This sentence must send a strong message that an

13 attempt to murder U.S. military servicemen in order to promote

14 extremist views, that to betray the United States by arming

15 terrorists with national defense information will result in

16 very serious consequences.  Here, the insider threat risk is

17 substantial, and the risk should be addressed through a

18 sentence that adequately satisfies the goal of general

19 deterrence.  I believe that the sentence that I'm imposing is

20 necessary in order to achieve this important goal in this

21 context.

22         Mr. Melzer will be able to use the period of

23 incarceration for educational or vocational training, medical

24 care, or other correctional treatment.  There are a number of

25 things I hope he will be able to do while in prison.  Among

N333MELS

them are to continue to advance his education, and to develop

job skills so he can obtain legitimate employment when he is

released.  He will be released because this is not a life

sentence.

I've considered the kinds of sentences available.  In

this case, I believe that a sentence involving a meaningful

term of incarceration is necessary.

I've given serious consideration to the guidelines and

the policy statements.  In this case, I believe that a

guideline sentence is appropriate.  I reached that conclusion

after having considered all of the 3553(a) factors and purposes

of sentencing.

I'd just like to note a few things here.  First off,

as the government articulated in its remarks, the defendant's

sentence is capped by the offenses to which he pleaded guilty.

But for the plea deal offered by the government, and accepted

by the defendant, his guidelines range would have been life

here.

The plea deal offered by the government has had the

effect of substantially reducing the guideline sentence

associated with Mr. Melzer's crime, and I considered that fact.

I've also considered all of the mitigating arguments

presented by the defendant in support of a substantially lower

sentence.  But I start off with the proposition that the

government's plea deal with the defendant has already afforded

N333MELS

him a lesser sentence than the guidelines would otherwise
recommend, given the nature of his crimes.

I've considered all of the arguments presented by the
defendant in support of a downward variance here.  I am going
to comment on just three of those arguments now.  That I am
limiting my comments to those three should not be read to
suggest that I've not considered them all, but I want to just
comment on three.

First, I accept the argument that Mr. Melzer's youth
at the time of his offense could be considered to be a
mitigating factor.  I've weighed that in my sentence.  I view
it as mitigating, but only to a degree.  I observe that
Mr. Melzer was not a minor at the time of his offense.  Rather,
he was a 21-year-old soldier, and Mr. Melzer's crime was
exceptionally serious.

Second, while I appreciate that Mr. Melzer had a
challenging childhood, and struggles with his identity as a gay
man, at best, those facts explain -- they do not begin to
justify -- his decision to commit this set of crimes.

Third, I appreciate that it is fortunate that this
attack did not come to fruition.  But as I said earlier, that
was not for a lack of trying.  Mr. Melzer was engaged in trying
to kill his fellow servicemen.  And we've heard from the
victims and the United States about the fact that there is
still harm from his crime.  Thankfully he was not successful in

N333MELS

1    his goal of murdering his platoon mates.  But his crime caused

2    lasting harm by corroding the trust between his fellow service

3    members; by making available to people who may wish the United

4    States harm, as Mr. Melzer did, this national defense

5    information that increases, as I understand it, the risk to

6    those who are sent to potentially serve at the military base in

7    the future.

8            So, while the ultimate goal of Mr. Melzer's attack did

9    not come to fruition, that does not mean that it failed to have

10   and create a continuing harm on the country and his unit, as

11   we've heard from our victims.

12           So while I've considered all of the arguments

13   presented by the defendant in favor of a downward variance, my

14   view is they do not justify a downward variance from the

15   guideline sentence, which, as I've already noted, would have

16   been life, but for the effect of the defendant's plea deal.

17           I've considered the need to avoid unwarranted

18   sentencing disparities.  On balance, however, given the

19   particular personal characteristics of the defendant, and the

20   nature of his offenses, I believe that this sentence is

21   appropriate for him.  And again, as I noted, it is in line with

22   the recommendations of the guidelines here.

23           So with that, Mr. Melzer, please rise for the

24   imposition of sentence.

25           Mr. Melzer, it is the judgment of this Court that you

N333MELS

be sentenced to serve 240 months of imprisonment with respect

to Count Four, 180 months with respect to Count Five, and 120

months with respect to Count Seven, with each of those terms to

be served consecutively.

Following your term of imprisonment, I am sentencing

you to a term of three years of supervised release with respect

to each of Counts Four, Five, and Seven, with those terms to be

served concurrently.

The mandatory conditions of supervised release shall

apply.  They are:  The defendant shall not commit another

federal, state, or local crime.  The defendant shall not

unlawfully possess a controlled substance.  The defendant shall

refrain from any unlawful use of a controlled substance.  The

defendant shall submit to one drug test within 15 days of

release from imprisonment, and at least two periodic drug tests

thereafter as determined by the Court.  The defendant shall

cooperate in the collection of DNA as directed by the probation

officer.

The standard conditions of supervised release, 1

through 12, shall apply.  In addition, the following special

conditions shall apply:  The defendant shall submit his person,

and any property, residence, vehicle, paper, computer, other

electronic communication, data storage devices, cloud storage,

or media, and effects to a search by any United States

probation officer, and, if needed, with the assistance of any

N333MELS

law enforcement.  A search is to be conducted when there is

reasonable suspicion concerning violation of a condition of

supervision or unlawful conduct by the person being supervised.

Failure to submit to a search may be grounds for revocation of

release.  The defendant shall warn any occupants that the

premises may be subject to searches pursuant to this condition.

Any search shall be conducted at a reasonable time and in a

reasonable manner.

            The defendant shall be supervised in his district of

residence.

            There will be no fine because the probation department

reports that the defendant is unable to pay one.

            The defendant must pay to the United States a total

special assessment of $100 for each of the crimes of

conviction, for a total of $300.

            Counsel for the United States, I understand that the

government is not seeking forfeiture or restitution in this

matter.  Is that correct?

            MR. HELLMAN:  Yes.

            THE COURT:  Thank you.

            Counsel, do any of you know of any legal reason why

this sentence shall not be imposed as stated?

            MR. HELLMAN:  No.

            MR. MARVINNY:  No, your Honor.

            THE COURT:  The sentence as stated is imposed.

N333MELS

```
1          I find that sentence to be sufficient, but not greater
2     than necessary, to comply with the purposes of sentencing set
3     forth in 18, United States Code, Section 3553(a).
4          Thank you very much.  Mr. Melzer, you can be seated.
5          Mr. Melzer, you have the right to appeal your
6     conviction and sentence, except to whatever extent you may have
7     validly waived that right as a part of your plea agreement.
8     The notice of appeal must be filed within 14 days of the
9     judgment of conviction.
10         If you are not able to pay the costs of an appeal, you
11    may apply for leave to appeal in forma pauperis.  If you
12    request, the clerk of court will prepare and file a notice of
13    appeal on your behalf.
14         Counsel, are there any other applications?
15         MR. HELLMAN:  I move to dismiss open counts and
16    previous indictments.
17         THE COURT:  Thank you.  Counsel for the defendant,
18    what's your position on that request?
19         MR. MARVINNY:  We agree, your Honor.
20         THE COURT:  I am dismissing any open counts and
21    underlying indictments.
22         Anything else from the United States?
23         MR. HELLMAN:  No, thank you.
24         THE COURT:  Thank you.
25         Counsel for defendant?
```

1          MR. MARVINNY:  Your Honor, I have a couple of requests

2     with respect to a recommendation as to designation.

3          THE COURT:  Please.

4          MR. MARVINNY:  We request that the Court recommend

5     that the Bureau of Prisons designate Ethan Melzer to one of the

6     following two facilities:  FCI Terre Haute or FCI Tucson.

7          And your Honor, we also ask if the Court would

8     recommend --

9          THE COURT:  Can I ask why?  Why those facilities?

10         MR. MARVINNY:  One second, your Honor.

11         (Defendant conferring with his counsel)

12         MR. MARVINNY:  Well, your Honor, I was -- I'll answer

13    that question, of course.

14         My next request is that the Court recommend Mr. Melzer

15    be placed into the Challenge Program that the Bureau of Prisons

16    offers, which is a cognitive behavioral treatment program.

17    That program is available at both of the two facilities that

18    we've requested.

19         We also believe that the facilities we've requested

20    are consistent with what we expect to be Mr. Melzer's security

21    designation.

22         THE COURT:  Thank you.  Good.

23         Yes, I am happy to include a recommendation that the

24    defendant be designated to one of those two facilities, to the

25    extent it's consistent with his security designation, and also

N333MELS

1     that he be permitted to participate in the Challenge Program,

2     to the extent that he is eligible.

3              MR. MARVINNY:  Thank you.

4              THE COURT:  Good.  Anything else, counsel for

5     defendant?

6              MR. MARVINNY:  No.

7              THE COURT:  Thank you very much.  Good.  Thank you all

8     very much.  This proceeding is adjourned.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25